UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
STEPHEN GRAY, individually and on        :
behalf of all others similarly situated,     :
                                             :
                    Plaintiff,               :        Civil Action No: 07 Civ. 9790 (SHS)
v.                                           :
                                             :
CITIGROUP INC., CHARLES PRINCE,              :
THE PLANS ADMINISTRATIVE                     :
COMMITTEE OF CITIGROUP INC.,                 :
THE 401(k) INVESTMENT                        :
COMMITTEE, and JOHN DOES 1 - 20,             :
                                             :
                    Defendants.              :
-------------------------------------------------------x
SHAUN ROSE, Individually and On              :
Behalf of All Others Similarly Situated,     :
                                             :
                    Plaintiff,               :        Civil Action No: 07 Civ. 10294 (DC)
v.                                           :
                                             :
CITIGROUP INC., CHARLES PRINCE,              :
THE PLANS ADMINISTRATIVE                     :
COMMITTEE OF CITIGROUP INC.,                 :
THE 401(k) INVESTMENT                        :
COMMITTEE, and JOHN DOES 1 - 10,             :
                                             :
                    Defendants.              :
-------------------------------------------------------x
MEREDITH TRANBERG, individually            :
and on behalf of all others similarly situated :
                                             :
                    Plaintiff,               :        Civil Action No: 07 Civ. 10341 (UA)
v.                                           :
                                             :
CITIGROUP INC., CHARLES PRINCE,              :
THE PLANS ADMINISTRATIVE                     :
COMMITTEE OF CITIGROUP INC.,                 :
THE 401(k) INVESTMENT                        :
COMMITTEE, and JOHN DOES 1 - 20,             :
                                             :
                    Defendants.              :
-------------------------------------------------------x

```
-------------------------------------------------------x
ANTON RAPPOLD, individually and on          :
behalf of all others similarly situated,    :
                                            :
            Plaintiff,                      :       Civil Action No: 07 Civ. 10396 (UA)
v.                                          :
                                            :
CITIGROUP INC., CITIBANK, N.A.,             :
CHARLES PRINCE, THE PLANS                   :
ADMINISTRATIVE COMMITTEE OF                 :
CITIGROUP INC., THE 401(k)                  :
INVESTMENT COMMITTEE, and JOHN              :
and JANE DOES 1 - 10,                       :
                                            :
            Defendants.                     :
-------------------------------------------------------x
SAMIER TADROS, on Behalf of All             :
Others Similarly Situated,                  :
                                            :
            Plaintiff,                      :       Civil Action No: 07 Civ. 10442 (UA)
v.                                          :
                                            :
CITIGROUP INC., CHARLES O.                  :
PRINCE, C. MICHAEL ARMSTRONG,               :
ALAIN J.P. BELDA, GEORGE DAVID,             :
KENNETH T. DERR, JOHN M. DEUTCH, :
 ROBERTO HERNANDEZ RAMIREZ,                 :
ANN DIBBLE JORDAN, KLAUS                    :
KLEINFELD, ANDREW N. LIVERIS,               :
ANNE MULCAHY, RICHARD D.                    :
PARSONS, JUDITH RODIN, ROBERT E.  :
RUBIN, ROBERT E. RUBIN, FRANKLIN :
A. THOMAS, JOHN DOES 1-20 (BEING  :
CURRENT AND FORMER MEMBERS                  :
OF THE PLANS ADMINISTRATIVE                 :
COMMITTEE OF CITIGROUP INC.)                :
and JOHN DOES 21-40 (BEING                  :
CURRENT AND FORMER MEMBERS                  :
OF THE INVESTMENT COMMITTEE                 :
OF THE CITIGROUP INC. 401(K) PLAN), :
                                            :
            Defendants.                     :
-------------------------------------------------------x
```

```
-------------------------------------------------------x
STEPHAN FIORINO, individually and on    :
behalf of all others similarly situated,    :
                                        :
                Plaintiff,              :    Civil Action No: 07 Civ. 10458 (UA)
                                        :
v.                                      :
                                        :
CITIGROUP INC., CITIBANK N.A.,          :
CHARLES PRINCE, THE PLANS               :
ADMINISTRATIVE COMMITTEE OF             :
CITIGROUP INC., THE 401(k)              :
INVESTMENT COMMITTEE, and               :
JOHN DOES 1 - 20,                       :
                                        :
                Defendants.             :
-------------------------------------------------------x
JAMES BOLLA, individually and on behalf :
 of all others similarly situated,      :
                                        :
                Plaintiff,              :    Civil Action No: 07 Civ. 10461 (UA)
                                        :
v.                                      :
                                        :
CITIGROUP INC., CITIBANK N.A.,          :
CHARLES PRINCE, THE PLANS               :
ADMINISTRATIVE COMMITTEE OF             :
CITIGROUP INC., THE 401(k)              :
INVESTMENT COMMITTEE, and               :
JOHN DOES 1 - 20,                       :
                                        :
                Defendants.             :
-------------------------------------------------------x
MARK GEROULO, individually, on behalf   :
of the CITIGROUP 401(k) Plan, the       :
CITIBUILDER 401 (K) PLAN FOR            :
PUERTO RICO, and all others similarly,  :
                                        :
                Plaintiff,              :    Civil Action No: 07 Civ. 10472 (UA)
                                        :
v.                                      :
                                        :
CITIGROUP, INC., CITIBANK, N.A.,        :
THE PLAN ADMINISTRATIVE                 :
COMMITTEE OF CITIGROUP, INC.,           :
MICHAEL E. SCHLEIN, JOHN DOES           :
1-10, THE CITIGROUP 401(k) PLAN         :
INVESTMENT COMMITTEE and JOHN           :
DOES 10-20, C. MICHAEL                  :
ARMSTRONG, ALAN J.P. BELDA,             :
GEORGE DAVID, KENNETH T. DERR,          :
JOHN M. DEUTCH, ROBERTO                 :
HERNANDEZ, ANN DIBBLE JORDAN,           :
ANDREW N. LIVERIS, DUDLEY C.            :
MECUM, ANNE M. MULCAHY,                 :
RICHARD D. PARSONS, ANDRALL E.          :
PEARSON, CHARLES PRINCE, JUDITH         :
```

RODIN, ROBERT E. RUBIN, FRANKLIN  :
A. THOMAS, SANFORD I. WEILL,     :
                              :
         Defendants.         :
----------------------------------------------------------x
ALAN STEVENS, on Behalf of Himself  :
and All Others Similarly Situated,     :
                              :
         Plaintiff,          :       Civil Action No: 07 Civ. 11156 (UA)
v.                             :
                              :
CITIGROUP INC., CITIBANK, N.A,    :
CHARLES PRINCE, C. MICHAEL     :
ARMSTRONG, ALAIN J.P. BELDA,    :
GEORGE DAVID, KENNETH T. DERR, :
JOHN M. DEUTCH, PETER JOHNSON,  :
ROBERTO HERNANDEZ RAMIREZ,   :
ANDREW N. LIVERIS, ANNE       :
MULCAHEY, RICHARD D. PARSONS,  :
JUDITH RODIN, ROBERT E. RUBIN,   :
ROBERT L. RYAN, FRANKLIN A.    :
THOMAS, THE PLANS          :
ADMINISTRATION COMMITTEE OF  :
CITIGROUP, INC., THE INVESTMENT  :
COMMITTEE and JOHN DOES 1-30,   :
                              :
         Defendants.         :
----------------------------------------------------------x
STEPHEN GOLDSTEIN, on Behalf of   :
Himself and a Class of Persons Similarly :
Situated,                   :
                              :
         Plaintiff,          :       Civil Action No: 07 Civ. 11158 (UA)
v.                             :
                              :
CITIGROUP INC., THE PLANS      :
ADMINISTRATION COMMITTEE OF  :
CITIGROUP, INC., MICHAEL E.     :
SCHLEIN, CHARLES PRINCE, C.    :
MICHAEL ARMSTRONG, ALAIN J.P.  :
BELDA, GEORGE DAVID, KENNETH T. :
DERR, JOHN M. DEUTCH, ROBERTO  :
HERNANDEZ RAMIREZ, ANDREW N.  :
LIVERIS, ANNE MULCAHEY,     :
RICHARD D. PARSONS, JUDITH    :
RODIN, ROBERT E. RUBIN, ROBERT L. :
RYAN, AND FRANKLIN A. THOMAS,  :
And JOHN DOES 1-30,        :
                              :
         Defendants.         :
----------------------------------------------------------x

CHRIS SOUTHARD, on Behalf of All   :
Others Similarly Situated,           :
                                    :
        Plaintiff,           :     Civil Action No: 07 Civ. 11164 (UA)
v.                           :
                                    :
CITIGROUP INC., CHARLES O.     :
PRINCE, C. MICHAEL ARMSTRONG, :
ALAIN J.P. BELDA, GEORGE DAVID, :
KENNETH T. DERR, JOHN M. DEUTCH, :
ROBERTO HERNANDEZ RAMIREZ, :
ANN DIBBLE JORDAN, KLAUS     :
KLEINFELD, ANDREW N. LIVERIS,  :
ANNE MULCAHY, RICHARD D.    :
PARSONS, JUDITH RODIN, ROBERT E. :
RUBIN, ROBERT E. RUBIN, FRANKLIN :
A. THOMAS, JOHN DOES 1-20 (BEING :
CURRENT AND FORMER MEMBERS  :
OF THE PLANS ADMINISTRATIVE   :
COMMITTEE OF CITIGROUP INC.)   :
and JOHN DOES 21-40 (BEING     :
CURRENT AND FORMER MEMBERS  :
OF THE INVESTMENT COMMITTEE   :
OF THE CITIGROUP INC. 401(K) PLAN), :
                                    :
        Defendants.        :
-------------------------------------------------------
FRANCIA BRICK, individually and on   :
Behalf of all others similarly situated,      :
                                    :
        Plaintiff,           :     Civil Action No: 07 Civ. 11369 (UA)
v.                           :
                                    :
CITIGROUP INC., CHARLES PRINCE, :
THE PLAN'S ADMINISTRATIVE    :
COMMITTEE OF CITIGROUP, INC.,   :
THE 401(k) INVESTMENT COMMITTEE,:
And JOHN DOES 1-10,           :
                                    :
        Defendants.        :
-------------------------------------------------------

# DECLARATION OF JOSEPH H. MELTZER

I, Joseph H. Meltzer, declare under penalty of perjury this 13th day of December, 2007 as follows:

I am an attorney in good standing and a partner of the law firm of Schiffrin Barroway Topaz & Kessler, LLP ("SBTK"). I submit this declaration in support of Plaintiffs Shaun Rose and Mark Geroulo's Motion For Consolidation of Related Actions and Appointment of Interim Lead Plaintiffs, Co-Lead Counsel and Liaison Counsel and in Opposition to the Gray and Tadros Plaintiffs' Motion for Appointment of Lead Plaintiffs and Leadership Structure, and Entry of [Proposed] Pretrial Order No. 1.

1.    Attached as Exhibit A is a true and correct copy of the Report of the Independent Fiduciary for the Proposed Settlement in *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. 02-CV-1500 (S.D.N.Y).

2.    Attached hereto as Exhibit B is the firm resume of SBTK.

3.    Attached as Exhibit C is a true and correct copy of a transcript of proceedings in *In re Westar Energy, Inc. ERISA Litigation*, No. 03-cv-4032-JAR (D. Kan. July 27, 2006).

4.    Attached hereto as Exhibit D is a true and correct copy of a transcript of proceedings in *In re Mirant Corp. ERISA, et al.,* No. 03-cv-1027-RWS (N.D. Ga. Nov. 16, 2006).

5.    Attached hereto as Exhibit E is a true and correct copy of a transcript of proceedings in *In re Citigroup Litigation,* No. 03-cv-2932 (S.D.N.Y. Nov. 15, 2006).

6.    Attached hereto as Exhibit F is a true and correct copy of a transcript of proceedings in *In re Honeywell Intern'l ERISA Litig.,* No. 03–cv-1214-DRD (D.N.J. July 19, 2005).

7.     Attached hereto as Exhibit G are true and correct copies of excerpts from the transcript of proceedings in *In re: Tyco International, Ltd*., No. C.02-MD-1335-B (D.N.H. Nov. 2, 2007).

8.     Attached hereto as Exhibit H is a true and correct copy a letter Rose Plaintiffs sent to the Plan's fiduciaries in accordance with ERISA § 104.

9.     Attached hereto as Exhibit I is the firm resume of Dealy & Silberstein, LLP.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this 26th day of December, 2007 at Radnor, Pennsylvania.

/s/
_____
Joseph H. Meltzer

# EXHIBIT A





# Report of the Independent Fiduciary for the Proposed Settlement in the AOL Time Warner ERISA Litigation

Fiduciary Counselors Inc.
June 29, 2006

FIDUCIARY COUNSELORS INC.
700 12th Street NW, Suite 700
Washington, DC 20005
202.558.5130 phone
202.558.5140 fax
www.fiduciarycounselors.com

# TABLE OF CONTENTS

I.    Introduction ................................................................................................1

II.   Executive Summary of Conclusions ....................................................1

III.  Background .........................................................................................2

    A.    AOL Time Warner ..................................................................2

    B.    Procedural Background ..........................................................2

    C.    Regulatory Proceedings ........................................................4

        1.    The Department of Labor ...........................................4

IV.  Procedure ...........................................................................................4

    A.    General Description of Due Diligence ..................................4

    B.    Documents Reviewed ............................................................4

V.    Summary of the Settlement Terms .....................................................5

    A.    The Sources and Sum of Settlement Funds ..........................5

    B.    The Classes and Settling Defendants ...................................5

    C.    The Release Order .................................................................6

        1.    The Released Parties ...................................................6

        2.    The Released Claims ...................................................6

        3.    The Released Claims Carve-Out ................................7

        4.    The Manner in Which Claims are Released ...............7

        5.    Analysis of Released Claims and of Other Potential Claims ................7

VI.  Issues Affecting the Settlement .........................................................7

    A.    Defendants' Defenses on the Merits .....................................7

    B.    Insurance ............................................................................10

        1.    Analysis of Available Sources of Insurance Funds ..............10

        2.    Exhaustion of Insurance Proceeds .........................10

    C.    Payout and Plans of Allocation ..........................................10

        1.    Plan of Allocation ....................................................10

        2.    Reasonableness of Recovery ...................................11

    D.    Attorneys' Fees and Expenses ............................................11

    E.    Reasonableness of Attorneys' Fees .....................................12

    F.    Standard to Challenge Settlement Under the Federal Rules ............12

        1.    Procedural Fairness ..................................................13

        2.    Substantive Scrutiny ...............................................13

G.    Fulfilling the DOL Class Exemption for Settlements ........................................17

VII.    CONCLUSION .........................................................................................................18

EXHIBIT A:  Independent Settlement Fiduciary Experience

EXHIBIT B:  ERISA and Securities Litigation Settlements

EXHIBIT C:  Paul J. Ondrasik, Jr.

**Report of the Independent Fiduciary for the
Proposed Settlement in the AOL Time Warner ERISA Litigation**

## I.    Introduction

Fiduciary Counselors Inc. ("Fiduciary Counselors") was retained as the
independent fiduciary to evaluate the proposed settlement of the litigation *In re AOL Time
Warner ERISA Litigation* No. 02 CV 8853 (SWK), on behalf of the Time Warner Savings Plan,
the Time Warner Thrift Plan and the TWC Savings Plan (collectively the "Plans"). Fiduciary
Counselors has been retained pursuant to Section 2.5 of the Settlement Agreement either to
approve and authorize the proposed settlement ("Settlement") in accordance with the Department
of Labor's Class Exemption for the Release of Claims and Extensions of Credit in Connection
with Litigation, Prohibited Transaction Exemption 2003-39[1] or to state that the Settlement does
not constitute a prohibited transaction under ERISA § 406(a).[2] The issuance of such a
determination is a condition of the Settlement.

## II.    Executive Summary of Conclusions

After a review of key pleadings, mediation submissions, selected discovery materials and
interviews with relevant parties, Fiduciary Counselors has determined that:

- There is a genuine controversy involving the Plans.

- The Settlement is reasonable in light of the Plans' likelihood of full recovery, the risks
  and costs of litigation, and the value of claims foregone.

- The terms and conditions of the transaction are no less favorable to the Plans than
  comparable arm's-length terms and conditions that would have been agreed to by
  unrelated parties under similar circumstances.

- The transaction is not part of an agreement, arrangement or understanding designed to
  benefit a party in interest.

---

[1] 68 Fed. Reg. 75632-01 (Dec. 31, 2003). A description of Fiduciary Counselors'
experience in evaluating settlements is attached as Exhibit A. An article describing the
requirements of Prohibited Transaction Exemption 2003-39 is attached as Exhibit B.

[2] The members of the Administrative Committee that serves as the plan administrator for
the Plans are among the parties to be released in these settlements. Because they and other
parties in interest to the Plans would benefit from a release, the settlement, if consummated,
arguably could result in a prohibited transaction under ERISA. Prohibited Transaction Class
Exemption 2003-39 was issued by the Department of Labor to address situations such as this.
Accordingly, Fiduciary Counselors has been engaged to meet the requirements of the class
exemption. In compliance with the terms of the exemption, Fiduciary Counselors has
acknowledged, in its retention agreement, that it is a fiduciary with respect to its assignment
within the meaning of ERISA § (3)(21).

- The transaction is not described in Prohibited Transaction Exemption 76-1.

- All terms of the Settlement are specifically described in the written settlement agreement.

- The Plan is receiving no assets other than cash in the Settlement.

Based on these determinations about the Settlement, Fiduciary Counselors hereby approves and authorizes the Settlement in accordance with Prohibited Transaction Exemption 2003-39.

We conclude that the Settlement is reasonable in light of the substantial recovery that the Plans will obtain, the risks and costs of continued litigation and the value of claims foregone. This conclusion is based on the following:

- The Defendants have many potential good faith defenses to the Plaintiffs' claims.

- The Settlement Agreement is the result of considerable arm's-length negotiations between the parties, and was achieved in a connection with a mediation conducted by an experienced court-appointed mediator.

- We understand that the settlement exhausts the available insurance proceeds available to Defendants, and that that AOLTW is contributing a substantial sum -- as much as half of the settlement amount -- from its own funds.

- The scale of recovery in this action compares favorably with the recoveries in similar large-scale ERISA litigations. Other than the Enron settlement, the pool of funds available for distribution, $100 million less fees and expenses, is the largest ever awarded in an ERISA employer stock case.

- The recovery in this action is augmented, rather than offset, by the Plans' share of the $2.6 billion recovery in the previously settled, companion securities litigation.

No fee application has been filed and therefore we have not yet made any determination as to whether such fee request is reasonable.

### III.    Background

#### A.    AOL Time Warner

AOL Time Warner ("AOLTW") was formed in connection with the January 11, 2001 merger between America Online and Time Warner. As a result of the merger, America Online and Time Warner each became wholly owned subsidiaries of AOLTW. AOLTW is a fully integrated, media and communications company.

#### B.    Procedural Background

A Consolidated ERISA Complaint was filed in the United States District Court for the Southern District of New York on July 3, 2003. Plaintiffs in this action are individual participants in the Plans. As set forth in the Consolidated Complaint, they purport to sue both on behalf of the Plans and on behalf of a class of all participants in the Plans for whose individual

accounts the Plans held shares of the AOLTW Stock Fund "from September 30, 2000 to the present."

Participants in the Plans contributed a percentage of their income to the Plans, which they could direct among a number of investment options, including ten core funds and dozens of mutual funds. Among the investment options available for participant contributions was a fund invested primarily in AOLTW stock. Participants in the Plans also received a matching contribution from AOLTW. In the Savings and Thrift Plans, matching contributions were required to be invested in Company Stock, until April 1, 2002, at which point the employees were permitted to transfer all or a portion of the match to any of the other investment options. In the TWC Plan, employees had complete control over the matched portion throughout the class period.

Under the Savings Plan, an Administrative Committee and an Investment Committee are created, the former having the responsibility for administering the plan, the latter for determining investment funds, among other duties. The Thrift Plan is identical in all material respects to the Savings Plan. The TWC Plan also creates Administrative and Investment Committees, the former with duties limited to plan administration, the latter with duties limited to determining investment guidelines and alternatives under the Plan. Both Committees are designated as named fiduciaries under each of the Plans. The Savings and Thrift Plan Committees are appointed by the Board of Directors; the TWC Committees are appointed by Time Warner Entertainment Company, L.P.

Plaintiffs assert that Defendants were fiduciaries with respect to the Plans, and in that capacity, violated their fiduciary duties under ERISA. In the Consolidated ERISA Complaint filed on July 3, 2003, Plaintiffs assert three causes of action under ERISA § 404 and seek damages and equitable relief pursuant to ERISA § 502.[3] First, Plaintiffs allege that Defendants improperly permitted the Plans to hold and continue to acquire AOLTW stock, even though the AOLTW Stock Fund had become an imprudent investment. Second, Plaintiffs allege that Defendants breached their fiduciary duties by making misrepresentations and failing to disclose material information necessary for participants to make informed investment decisions. And third, Plaintiffs allege that Defendants violated their obligations under ERISA by failing to properly appoint, monitor and inform the Plans' fiduciaries.

Plaintiffs premise their legal claims on the following core factual allegations: (1) that by the end of 1999, AOL's primary assets were the apparent growth of its subscriber base and its ability to parlay this growth into high margin online advertising revenue; (2) that the burst of the internet-bubble severely eroded AOL's advertising revenues, as the parties it contracted with could no longer afford to advertise or went out of business; (3) and consequentially, at the time of the merger, despite its claims of financially strength, AOL's subscriber base was shrinking, rather than growing.

---

[3] A fourth cause of action alleged that the officers and directors breached their duties of loyalty by selling AOLTW stock while allowing the Plans to maintain their AOLTW investments. It was dismissed in Judge Kram's March 9, 2005 Opinion.

According to Plaintiffs, Defendants knew or should have known these and other facts as a result of the yearlong due diligence process triggered by AOL's announcement of its intent to purchase Time Warner. Had Defendants fulfilled their duties in this regard they would have determined that it was improvident for the Plans to invest in the AOLTW stock fund and would have made disclosures to the Plans' participants regarding AOL's pre-merger "roundtrip" transactions, inflated, faulty and/or inaccurate reporting of advertising revenue, the financial prospects of the AOL side of the business and the attendant risks of investment in AOLTW stock.

### C.    Regulatory Proceedings

#### 1.    The Department of Labor

To our knowledge, the Department of Labor has not instituted an investigation into the alleged ERISA violations. Certainly, the lack of an investigation does not correspond to a finding that Plaintiffs' claims were not meritorious. However, it does permit an inference that Plaintiffs' claims may not have been as strong as those in other cases in which the Department has instituted investigations.

## IV.    Procedure

### A.    General Description of Due Diligence

As part of the due diligence necessary for Fiduciary Counselors to fulfill its fiduciary obligations to the Plans and its participants, we retained Steptoe & Johnson LLP ("S&J") as counsel to advise us on the merits of the legal issues and defenses raised by both sides. The S&J team was headed by Paul Ondrasik, an experienced ERISA litigator with experience in similar employer stock cases under ERISA. (Mr. Ondrasik's resume is attached as Exhibit C).

Principals of Fiduciary Counselors, along with its counsel, interviewed key participants in the settlement process. On June 19, 2006, Fiduciary Counselors and S&J participated in a teleconference with Gary A. Bornstein, Peter T. Barbur and Owen L. Cyrulnik, all attorneys at Cravath, Swaine & Moore, LLP, counsel for Defendants. They also participated in a teleconference that same day with Edwin J. Mills, Joseph H. Meltzer, Michael J. Klein and Andrew M. Schatz, Plaintiffs' co-lead counsel. On June 20, 2006, Fiduciary Counselors and S&J participated in a teleconference with Paul Wachter, who has acted as mediator for the settlement, and his counsel Bob Meyer.

### B.    Documents Reviewed

Fiduciary Counselors and S&J reviewed a substantial quantity of materials, including numerous pleadings filed in the litigation, mediation submissions, selected deposition transcripts. In addition, S&J performed a targeted review of key documents contained in eighteen boxes of hard-copy documents produced by Defendants in the ERISA litigation after indexing the eighteen boxes. In addition, S&J was given access to an electronic database prepared by Plaintiffs and performed computer searches and a targeted review of a sample of documents provided in electronic format.

## V.    Summary of the Settlement Terms

### A.    The Sources and Sum of Settlement Funds

The Settlement Agreement provides for a settlement fund of $100 million. The Plans will receive a distribution from the fund, including interest, after payment of any taxes and Court-approved attorneys' fees, administrative costs and others expenses. The distribution of the net settlement amount to the class members will be governed by the Plan of Allocation set forth as Exhibit C to the Settlement Agreement, as amended by the Court. It is anticipated that the Plans will also recover an additional $30-35 million from the settlement in the *Securities Action*.

While we have not been provided with insurance documents, it is our understanding that the insurance policies have been exhausted by this settlement and that AOLTW is contributing a significant portion of the fund. Given that there was no DOL investigation and no other ERISA litigation raising the issues involved in this case, all of the settlement proceeds can be attributed solely to the efforts of Plaintiffs' counsel.

### B.    The Classes and Settling Defendants

For purposes of settlement only, the Court on May 1, 2006, preliminarily approved one class in this action. The "Settlement Class" includes all current and former participants and beneficiaries of the Plans for whose individual accounts the Plans purchased and/or held interests in the AOLTW Stock Fund at any time during the period January 27, 1999 through and including July 3, 2003. On the front end, this settlement class period goes back approximately twenty months longer in duration than that alleged in the Consolidated Complaint.

The "Defendants" in this action are: Time Warner (as defined as Time Warner, Inc., each of Time Warner's predecessors and successors-in-interest and each person that controls, is controlled by, or is under common control with Time Warner, including but not limited to America Online, Inc., Time Warner Companies, Inc., Time Warner Cable, Inc., Time Warner Entertainment Company, L.P., Turner Broadcasting System Inc., Time Inc., and Warner Communications, Inc., and any of their direct and indirect parents and subsidiaries and any company whose employees participated in an ERISA plan set up or sponsored by Time Warner), Time Warner Entertainment Company, L.P., Stephen M. Case, Gerald M. Levin, Kenneth J. Novack, Daniel F. Akerson, James L. Barksdale, Frank J. Caufield, Miles R. Gilburne, Robert W. Pittman, Robert E. (Ted) Turner, Richard D. Parsons, Stephen F. Bollenbach, Carla A. Hills, Reuben Mark, Michael A. Miles, Franklin D. Raines, Francis T. Vincent, Jr., J. Michael Kelly, Wayne H. Pace, Christopher P. Bogart, Richard J. Bressler, the AOL Time Warner Savings Administrative Committee, the AOL Time Warner Thrift Plan Administrative Committee, Pascal Desroches, Peter R. Haje, John A. LaBarca, Shelly D. Fischel, Derek Q. Johnson, Carolyn K. McCandless, R. Mackereth Ruckman, Andra D. Sanders, Paul D. Williams, the Time Warner Cable Savings Plan Administrative Committee, Glenn A. Britt, Charles W. Ellis, Landel C. Hobbs, Beth A. Wann, Ann L. Burr, Tommy J. Harris, Thomas M. Rutledge, the AOLTW Investment Committee, Raymond G. Murphy, Joseph A. Ripp, Mark A. Wainger, and Frederick C. Yeager.

The Settlement Agreement provides that Defendants shall not be liable in the event of any failure of Fidelity Management Trust Company or any successor Plan Trustee, or

any Authorized Administrator to distribute the net settlement proceeds according to the Plan of Allocation.

### C.    The Release Order

#### 1.    The Released Parties

The Settlement Agreement defines the term "Released Parties" as "the Defendants and any Person (defined as an individual, partnership, corporation, governmental entity, or other form of entity or organization) who served as a trustee or named fiduciary of the Plans, including Fidelity Management Trust Company,[4] together with, for each of the foregoing, any predecessors, Successors-In-Interest (defined as a Person's estate, legal representatives, heirs, successors or assigns, including successors or assigns that result from corporate mergers or other structural changes), present and former Representatives (defined as representatives, attorneys, agents, directors, officers, or employees), direct or indirect parents and subsidiaries, and any Person that controls, is controlled by or is under common control with any of the foregoing."

#### 2.    The Released Claims

By joining the settlement, the Plans would release the Released Parties from certain "Released Claims," defined in the Settlement Agreement as to include any known or unknown claim arising out of acts or occurrences during the class period that are, were or could have been alleged in the Complaint or that would have been barred by *res judicata* should such claims have been fully litigated. Specifically included in the definition are claims for any and all losses, damages, unjust enrichment, attorneys' fees, disgorgement of profits, litigation costs, injunction, declaration, contribution, indemnification, or any other type or nature of legal or equitable relief. We understand that this release, while broad in scope, is intended to be limited to matters that were the subject matter of the complaint, *i.e.*, that it does not encompass claims that are unrelated to the Plans' investment in company stock.

The parties to the Settlement Agreement specifically acknowledge that it is their intention to expressly waive the provisions of Section 1542 of the California Civil Code and any other applicable statute or common law of another jurisdiction, which serve to limit the reach of this general release.

---

[4] Fidelity had been voluntarily dismissed by Plaintiffs without prejudice on February 16, 2006. Trustees are not always named as Defendants in ERISA employer stock cases (*see e.g., In re Williams Cos. ERISA Litig.*) and, where they are, have frequently prevailed on motions to dismiss on the grounds that they had limited authority as "directed trustees" under ERISA §403(a). *See, e.g., Summers v. State Street Bank and Trust Co.,* Nos. 05-4005 and 05-4317 (7th Cir. June 28, 2006) (slip opinion); *DiFelice v. US Airways, Inc.*, 397 F. Supp. 2d 735 (E.D. Va. 2005). The Department of Labor, in Field Assistance Bulletin No. 2004-03, concluded that directed trustees may follow directions absent extraordinary circumstances that call into serious question a company's viability as a going concern. Thus, Fidelity's release is consistent with the direction of the law in this area, given the facts on which this action is based.

### 3.    The Released Claims Carve-Out

The Settlement Agreement expressly carves out from the definition of Released Claims a few claims that are not released, including: (1) claims relating to the covenants or obligations set forth in the Settlement Agreement and (2) any claim that has been or could be asserted by the class in the *Securities Action, In re AOL Time Warner, Inc. Securities Litigation,* Civil Action No. 02 cv 5575 (SWK), MDL Docket No. 1500, United States District Court for the Southern District of New York (Hon. Shirley Wohl Kram), and any and all cases now or hereafter consolidated therewith (the "Securities Action"). Thus, the settlement should not impact the Plans' ability to participate in the Settlement of the Securities Action, or the amount of monies they should receive under that Settlement.

### 4.    The Manner in Which Claims are Released

By the terms of the Settlement Agreement, effective upon the entry of the final judgment by the Court, the named Plaintiffs, on behalf of the settlement class and the Plans, will absolutely and unconditionally release and forever discharge the Released Parties from the Released Claims. These releases, however, will be null and void should the Settlement Agreement be terminated.

### 5.    Analysis of Released Claims and of Other Potential Claims

As noted above, we understand the Settlement Agreement to release only claims arising out of acts during the class period that are, were or could have been alleged in the Complaint. We are aware of no other actual or potential claims relating to the Plans' investments in AOLTW stock that were or could have been alleged in the Complaint (apart from those actually alleged) which have arisen during this time period, other than those alleged in the Securities Action which have specifically been carved out of the release. Therefore, the release of such unknown claims, when compared to the sure and substantial recovery in this settlement, is not a significant concern.

## VI.    Issues Affecting the Settlement

### A.    Defendants' Defenses on the Merits

On June 19, 2006, Cravath, Swaine & Moore, during our teleconference, made a detailed presentation of Defendants' strongest defenses to the ERISA claims brought by the class. We have also read and analyzed their mediation statements, their briefs in support of their Motion to Dismiss, their Motion for Partial Summary Judgment on loss causation and their Motion for Partial Judgment on the Pleadings on an asserted lack of standing. In our view, the Defendants have raised arguably valid defenses to the ERISA claims, which are, at a minimum, a fair ground for settlement.

First, Defendants argue that Plaintiffs are seeking to recover damages for losses in the value of AOLTW stock not caused by the misconduct – the purported failure to disclose – alleged in their Complaint. Defendants contend that the absence of a causal link between an alleged fiduciary breach and the losses purportedly suffered by a plan is fatal to Plaintiffs' claim under the Second Circuit's holding in *Silverman v. Mutual Benefit Life Ins. Co.,* 138 F.3d 98, 105-06 (2d Cir. 1998). Defendants further maintain that their position has been buttressed by the

Supreme Court's decision in *Dura Pharmaceutical v. Broudo,* 125 S. Ct. 1627 (2005), which while not an ERISA case, establishes principles of general applicability in assessing whether "loss causation" has been demonstrated. Under the heightened showing required under *Dura,* damages would be, at maximum, in the neighborhood of $20 million.

According to Defendants, the first public disclosure tied to any allegations in the Complaint occurred on July 18 and 19, 2002 with the publication by the *Washington Post* of articles detailing AOL's questionable accounting for certain advertising revenue. According to Defendants' expert, there was no statistically significant drop in AOLTW's stock price on either day, once industry and market-wide movements are taken into account. While a subsequent press release by AOLTW on July 25, 2002 was followed by a statistically significant decline in the price of AOLTW stock, Defendants allege that it was not evidence of loss causation for two reasons. First, the news release did not deal with allegedly improper accounting for advertising, but merely revealed the initiation of an SEC investigation; second, the stock drop was followed by an almost complete price recovery the following day. Should Plaintiffs have to prove damages under a *Dura* standard, the resulting losses would be quite low.[5]

Second, the Defendants argue that AOLTW stock could only be removed by amendment to the Plans, a settlor function rather than a fiduciary function. AOLTW stock, both as the match and an investment option, was specified in the Plans. ERISA §404(a)(1)(D) requires a fiduciary to administer a plan "in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with [ERISA]." Other than by plan amendment, Plaintiffs would have to prove that the investment in AOLTW stock was imprudent or otherwise violated ERISA. Defendants point to *Moench v. Robertson,* 62 F.2d 553 (3d Cir. 1995), to argue that their actions in retaining the AOLTW stock should be accorded a "presumption of prudence," which undercuts Plaintiffs' claims that Defendants should have eliminated AOLTW stock from the Plans. Defendants place significant reliance on the decision in *In re Polaroid*, 362 F. Supp. 2d 461, 475 (S.D.N.Y. 2005). *Polaroid* held that a fiduciary's decision to keep an "eligible individual account plan," such as AOLTW's, invested in company stock is presumed to be reasonable unless the plaintiff proves (1) a "precipitous"

---

[5] To the extent alleged accounting breaches occurred at AOL *prior* to the merger, at this point, the Plans only held Time Warner stock and the Defendants were effectively "outsiders" rather than "insiders" with respect to any financial reporting problems at AOL. To the extent the accounting breaches were discovered after the merger, any disclosure claims would have to be evaluated primarily as claims by "holders," rather than "purchasers," since after the merger there were net sales rather than acquisitions of AOLTW stock. While under "efficient capital markets hypotheses" a post-merger disclosure of accounting improprieties would cause the price of AOLTW stock to fall, mere "holders" arguably would not be entitled to recover the paper loss caused by the collapse. *See In re McKesson HBOC, Inc.*, 2002 WL 31431588 at *6-*7 (N.D. Cal. Sept. 30, 2002) *but cf. In re Enron Corporation Securities, Derivative & "ERISA" Litig.,* 284 F. Supp. 2d 511 (S.D. Tex. 2003) (generally asserting disagreement with *McKesson*); *In re Sears, Roebuck & Co. ERISA Litig.*, 2004 WL 407007 (N.D. Ill. Mar. 3, 2004) (denying "efficient capital markets hypothesis" argument as it was not proper at motion to dismiss stage). Thus, in the absence of net purchases during the post-merger period, Plaintiffs faced the risk that any damages resulting from the alleged breach of a disclosure obligation would be *de minimis*, even if they were able to prevail on the merits.

decline in the company's stock price; and (2) that the Company was on the "brink of collapse." This presumption is based on Congress' enactment of ERISA §404(a)(2) (29 U.S.C. § 1104(a)(2)), which exempts such plans from ERISA's general diversification requirement.

While an argument can be made that this "presumption" only applies when company stock is offered through an Employee Stock Ownership Plan ("ESOP"), and is not generally applicable to all eligible individual account plans, the Defendants point to the legislative history of ERISA which indicates that Congress was aware that "individual account plans which are profit sharing plans, stock bonus plans, employee stock ownership plans, or thrift savings plans . . . commonly provide for substantial investments in employer securities or real property." H.R. REP. No. 93-1280 (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5097. Case law on the application of this presumption to plans other than ESOPs is divided. Compare *Polaroid*, 362 F. Supp. 2d at 474 ("while this rule has generally been applied to ESOPs, it applies with equal force to 401(k) plans requiring that the employer's stock be an investment option") and *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1098 n.3 (9th Cir. 2004) ("stock bonus plans . . . and ESOPs are both EIAPs and are treated the same for the purpose of fiduciary duty analysis") with *In re Westar Energy, Inc. ERISA Litig.*, 2005 U.S. Dist. LEXIS 28585, at *70-71 (D. Kan. Sept., 29, 2005). Thus, both sides faced litigation risk on this issue.

Measured against the *Polaroid* standard, Plaintiffs cannot credibly argue that AOLTW was on the "brink of collapse" during the class period. During the class period, the price of AOLTW stock declined from a high of approximately $55 per share to a low $13 per share. While this 76% decrease is significant, a $13 low indicates that AOLTW was not on the verge of bankruptcy. The company was and is extremely viable, remaining one of the largest media companies in the world. Even in the summer of 2002, after the *Washington Post* disclosure and eventual financial restatements, AOLTW reported quarterly revenues of around $10 billion and free cash flow of $1.5 billion, performance inconsistent with a conclusion that AOLTW was in any danger of going out of business. Throughout the period, AOLTW had an investment grade rating from both Standard & Poors and Moody's.

Plaintiffs would argue that the presumption could be overcome simply by showing that a reasonably prudent fiduciary, under similar circumstances, would have divested company stock, in light of the fact that its price was overvalued. However, the only basis for determining that the publicly traded price was overvalued would have been non-public information. A fiduciary cannot trade on inside information and disclosure of the information would have depressed the stock price. Plaintiffs also argue that it was imprudent to purchase stock whose value was artificially inflated due to corporate accounting and other improprieties. However, there were net *dispositions* of AOLTW stock post merger and therefore damages based on this claim would be difficult to prove.

Third, though it may be the weakest of Defendants' arguments, they argue that the Plaintiffs lack standing under ERISA. Though Plaintiffs generally claim they are seeking recovery under ERISA § 502, it is clear that monetary damages could only be awarded pursuant to ERISA § 502(a)(2), which creates a cause of action where plaintiffs can demonstrate "losses to the plan." Despite Plaintiffs' contention that they are seeking the requisite Plan-wide recovery, Defendants maintain that Plaintiffs in fact are attempting to recover losses to participants' individual accounts. As support, they cite to a relatively recent district court decision within the Second Circuit, *Fisher v. J.P. Morgan Chase & Co.*, 230 F.R.D. 370

(S.D.N.Y. 2005), which held that in similar circumstances, plaintiffs lacked standing under §502(a)(2). *Id.* at 375 (plaintiffs "asserting claims for damages to individual [accounts] on behalf of a subset of Plan participants" lack standing under ERISA). Here, Defendants make similar arguments to those made in *Fisher*.

There are obvious weaknesses to Defendants' standing defense. There are a host of cases from other jurisdictions that, unlike *Fisher*, have rejected the 502(a)(2) argument, at least at the motion to dismiss stage. *See, e.g., Kuper*, 66 F.3d at 1453; *Schering-Plough*, 420 F.3d 235. In addition, the decision in *Fisher* relied upon cases that have subsequently been reversed or vacated and remanded. *See Schering-Plough Corp.*, 420 F.3d 231 (reversing District Court decision); *Milofsky v. American Airlines, Inc.*, 2006 WL 488622 (5th Cir. March 3, 2005) (en banc) (vacating and remanding earlier Fifth Circuit opinion). However, this case is brought in the same district as *Fisher* and there is no contrary authority in the Second Circuit, creating a more significant litigation risk for Plaintiffs than they might face in another court.

**B.    Insurance**

**1.    Analysis of Available Sources of Insurance Funds**

The Settlement Agreement is silent as to the source of the funds, and it is our understanding that it was reached without assurance of participation from the insurance companies.

**2.    Exhaustion of Insurance Proceeds**

While the Settlement Agreement is silent as to this issue, it is our understanding that the settlement exhausts the insurance policies.

**C.    Payout and Plans of Allocation**

**1.    Plan of Allocation**

The Plan of Allocation provides that for each participant's account "Net Loss" will consist of, the (1) the dollar value of the balance in the AOLTW Stock Fund on the first day of the Class Period (January 27, 1999) plus (2) the dollar value of all of the purchases of interest in the AOLTW Stock Fund during the Class Period as of the time of purchase(s) minus (3) the dollar value of all dispositions of interests in the AOLTW Stock Fund during the Class Period as of the time of sale(s) minus (4) the dollar value of the balance in the AOLTW Stock Fund on the last day of the Class Period (July 3, 2003).

The Net Losses of all plan participants shall be totaled to yield the "Plans' Loss," and each participant will be assigned an "Alleged Net Loss Percentage" of the Plans' Loss, by dividing each participant's Net Loss by the Plans' Loss. Each participant's personal share of the Net Proceeds will be equal to the participant's Alleged Net Loss Percentage multiplied by the Net Proceeds. If a participant's personal share of the Net Proceeds is less than or equal to $10, that participant shall receive an allocation from the Net Proceeds of zero. Thereafter, the Alleged Net Loss Percentage of participants whose personal share is greater than $10 will be recalculated so as to arrive at each such participant's "Final Individual Dollar Recovery."

This allocation formula is consistent with claims advanced in the complaint and is similar to formulas used in settlements of similar cases. We therefore concluded that the allocation formula is reasonable.

### 2.     Reasonableness of Recovery

We have evaluated the reasonableness of the value of the proposed settlement in this action. Pursuant to the Settlement Agreement, $100 million, plus interest, less taxes, fees and expenses, will be available for distribution to the Plaintiffs. As noted above, the Plans are also expected to recover an additional $30-$35 million as participants in the settlement of the Securities Action. This would bring the total recovery by the Plans to approximately $130-$135 million.

On its face, the settlement amount here would be one of the largest ERISA employer stock action settlements in history. Plaintiffs would be presented with serious obstacles in proving losses that exceeded the levels alleged. Based on Plaintiffs' maximum damages calculation, a $100 million, sum certain settlement (plus the additional $35 million) is a significant and reasonable recovery.

Locating historical data on ERISA class action settlements is difficult and subject to a number of uncertainties. Nonetheless, based on our own experience and research of publicly available information, this recovery clearly seems to be reasonable as an absolute matter. Among similar cases, only the *Enron* settlement is larger. We evaluated approximately forty settlements in ERISA cases involving employer stock. The average reported recovery is under $30 million and the median recovery is between $14 and $15.5 million. Against these measures, the Settlement appears very satisfactory. Moreover, comparing the settlement amount in the ERISA case ($100 million), to the total settlement amount received in the Securities Action ($2.6 billion), the recovery seems equally reasonable since ERISA class members will apparently receive three times more per share than the member of the securities class and will participate in Securities Action settlement as well. In conclusion, we believe the settlement amount to be a more than reasonable recovery for the Plans, and we are aware of no basis for lodging an objection.

### D.     Attorneys' Fees and Expenses

Plaintiffs' co-counsel has not yet filed an application for attorneys' fees. In the Findings and Order Preliminarily Certifying a Class for Settlement Purposes, Preliminarily Approving Proposed Settlement, Approving Form and Dissemination of Class Notice, and Setting Date for Hearing on Final Approval, the Court notes that counsel will seek attorneys' fees not to exceed twenty-five percent (25%) of the total settlement amount of $100 million and for reimbursement of expenses. While we have recently received a draft copy of the Plaintiffs' fee application, we are not yet in a position to evaluate the request.

Although ERISA class action settlement data is often difficult to obtain, we have compiled information for approximately 40 class action awards in other ERISA employer stock cases as well as other large scale ERISA litigation. The Plaintiffs' fee application will be assessed against this data as well as the applicable legal standards for fee awards in the Second Circuit. Our assessment of that request will be the subject of a separate memorandum.

-11-

### E.   Reasonableness of Attorneys' Fees

In the Second Circuit, courts can use either the "lodestar" method or the "percentage of the fund" method to calculate attorneys' fees in common fund cases; however, "[t]he trend in [the Second] Circuit is toward the percentage method." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 296 F.3d 96, 121 (2d Cir. 2005). Despite this trend, the Second Circuit recognizes the utility of the lodestar method, by encouraging "the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (citation omitted).

The key to any fee determination is that attorneys are only entitled to an award that is reasonable under the circumstances. *Id.* at 47. "What constitutes a reasonable fee is properly committed to the sound discretion of the district court." *Id.* (citation omitted). Recognizing, however, that windfalls may occur in common fund cases, "courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable." *Wal-Mart Stores,* 396 F.3d at 122. Irrespective of whether the lodestar or percentage method is used, the Second Circuit Courts look to the following factors to ultimately determine the reasonableness of a common fund fee: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of the representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Id.* at 50. (citation omitted).

As noted above, we are not yet in a position to assess Plaintiffs' fee application under these standards and will address them in a separate memorandum.

### F.   Standard to Challenge Settlement Under the Federal Rules

The Settlement Agreement appears to be reasonable when analyzed under the framework established by the federal rules. *See* Fed. R. Civ. P. 23(e). Because the settlement will have a *res judicata* effect, courts review a settlement to ensure that it is "fair, reasonable and adequate." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982); *TBK Partners v. Western Union Corp.,* 675 F.2d 456, 461 (2d Cir.1982). The courts make this determination by examining (1) the negotiations that led up to the Settlement, and (2) the substantive terms of the Settlement. *See, e.g., Weinberger*, 698 F.2d at 73-74. In this light, the proposed settlement appears to be fair, reasonable and adequate.

Here, the parties have sought and received a preliminary certification of the class for purposes of settlement only. The use of a settlement class for purposes of settlement allows the parties to concede, for purposes of settlement negotiations, the propriety of bringing suit as a class action and allows the court to postpone formal certification of the class until after settlement negotiations have ended. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619 (1997). The use of a class for settlement purposes only, however, raises certain cautionary flags. The parties do not have as much information on the probabilities of success of their claims when they reach a settlement early in the course of the litigation. Thus, a court that certifies the settlement class after the parties reach the terms of settlement will require a "clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of the negotiations leading to it." *Weinberger*, 698 F.2d at 73. Even under this more stringent standard, however, this settlement is likely to be upheld.

### 1.    Procedural Fairness

In approving a class action settlement, courts examine the negotiating process to ensure that the settlement is the result "of arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *Weinberger*, 698 F.2d at 73, *see also Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983). If the settlement meets both of these requirements, the settlement is accorded a presumption of fairness. *See, e.g., In re Milken and Assoc. Sec. Lit.*, 150 F.R.D. 57, 66 (S.D.N.Y.1993). Once the settlement is presumed fair, "[i]t is not for th[e] Court to substitute its judgment as to a proper settlement for that of such competent counsel . . . ." *In re Warner Comm. Sec. Lit.*, 618 F. Supp. 735, 746 (S.D.N.Y. 1985).

We are aware that Stull, Stull & Brody, Schatz & Nobel, P.C. and Schiffrin & Barroway, LLP, co-lead counsel for the Plaintiffs, are well-known plaintiffs' lawyers, and are experienced in class action litigation, including class action litigation under ERISA. All negotiations leading up to the settlement agreement were hard-fought, and were conducted at arm's-length. The Honorable Shirley Wohl Kram confirmed that the negotiation process was arm's-length and led by capable counsel. Furthermore, as both parties conducted discovery in this action, they had ample relevant information necessary to formulate an agreement and resolve this matter short of trial. Accordingly, there is a basis for the court to find that the settlement is the product of arm's-length negotiations conducted by experienced counsel, knowledgeable in complex class actions, and to find that the settlement may enjoy a presumption of fairness.

### 2.    Substantive Scrutiny

When making a determination of whether the settlement is substantially fair, courts review "the substantive terms of the settlement compared to the likely result of a trial." *Malchman*, 706 F.2d at 433. The court must "apprise [itself] of facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should [the] claim[s] be litigated." *Weinberger*, 698 F.2d at 74. Although the court need not effectively conduct a trial on the merits, the court will likely make "findings and conclusions of law whenever the propriety of the settlement is seriously in dispute." *Malchman*, 706 F.2d at 433.

In determining whether a settlement is "fair, reasonable and adequate," courts in the Second Circuit analyze the following: (1) the complexity, expense and likely duration of litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974). Here, taking all these factors into account, we have determined that the settlement is reasonable in light of the Plans' likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone.

### a.    Complexity, Expense and Duration of Litigation

The costs of litigating the complicated, varied legal and factual issues in this action will be large, which tilts the scales in favor of settlement. Most class actions are inherently complex, thus settlement avoids the expense, delays and multitude of other problems associated with this mode of litigation. *See In re NASDAQ Market-Makers Antitrust Lit.*, 187 F.R.D. 465, 477 (S.D.N.Y.1998) ('[C]lass actions have a well deserved reputation as being most complex.'). Settlements of such complex matters are favored by courts. *See, e.g., In re Medical X-Ray*, No. 93 Civ. 5904, 1998 WL 661515, at *3 (E.D.N.Y. Aug. 7, 1998). This action is clearly complex and if the pre-trial history thus far has been any indication, it would likely continue for many years at a significant cost to all parties. Further litigation of this case would present the Court with difficult legal issues regarding this novel area of ERISA law, including the calculation of damages, the weight to be given to the presumption of prudence in the case of a viable company with a volatile stock and the appropriate assessment of standing under ERISA § 502(a)(2). Appeals would certainly follow, thus lengthening and increasing the cost of the litigation.

### b.    Reaction of the Class

A certain number of objections are to be expected in a class action with a potentially large number of class members. *See In re NASDAQ Market-Makers Antitrust Lit.*, 187 F.R.D. at 478 ("In litigation involving a large class, it would be extremely unusual not to encounter objections."). We are unaware of any objections from class members that have been lodged to date, a fact that can be viewed as indicative of the adequacy of the settlement. *See id.* at 478-79; *Marisol A. v. Giuliani*, 185 F.R.D. 152, 162 (S.D.N.Y. 1999) ("The Court views the small number of comments from a plaintiff class of over 100,000 children as evidence of the Settlement Agreements' fairness, reasonableness and adequacy."). However, given that objections may still be filed at the time this report is submitted, it would be premature to provide a final evaluation on this point.

### c.    The Stage of the Proceedings and Amount of Discovery Completed

There has also been sufficient discovery to enable the parties to gather evidence regarding the potential merits of the case before deciding to settle. To approve a proposed settlement, the Court need not find that the parties have engaged in extensive discovery. *See generally Plummer v. Chemical Bank*, 668 F.2d 654, 660 (2d Cir.1982). Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to "intelligently make ... an appraisal" of the Settlement. *Id.*

A substantial amount of discovery and motions practice, however, has taken place. Millions of pages of documents have been obtained and reviewed during the course of discovery. The parties have conducted depositions, as well consulted experts to assist in preparing their claims, defenses and calculation of damages. The Court has already ruled on the Defendants' Motion to Dismiss, granting it in part and denying it in part. Defendants have also filed a Motion for Summary Judgment on loss causation grounds and a Motion for Judgment on the Pleadings on standing grounds, though the parties reached this settlement during the briefing of these motions.

The parties also partook in two mediation sessions, one in December 2005 and one in February 2006, conducted by an experienced special master, who had extensive familiarity with this litigation and the *Securities Action* involving Time Warner. The parties submitted initial briefs outlining their arguments to the mediator for the December session and later submitted follow-up briefs, highlighting and expanding upon certain issues pursuant to the mediator's instructions. The parties eventually exchanged these briefs with each other.

### d.    Risk of Establishing Liability

As discussed above, Defendants have powerful defenses to the Plaintiffs' claims, which would have presented challenges in ultimately litigating this case.

The court need not foresee with absolute certainty the outcome of the case. *See Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981) (courts need not "decide the merits of the case or resolve unsettled legal questions."). Instead, the Court must only "weigh the likelihood of success by the plaintiff class against the relief offered by the Settlement Agreement." *Marisol*, 185 F.R.D. at 164. Because each of the defenses outlined by the Defendants appears to have at least some merit, there is a basis for the court to find that the risks of establishing liability are significant, especially since to date no plaintiff has prevailed on the merits in an ERISA employer stock case, and those cases that have been disposed of on the merits, albeit relatively few in number, have been in favor of defendants.

### e.    Damages

Assuming Plaintiffs succeed in establishing liability, they would still be required to prove damages, which as discussed above, was a challenge that may have ultimately resulted in a severe diminution of recovery.

### f.    The Risks of Maintaining the Class Action through Trial

The court has not yet granted final certification to the class, and it is far from certain whether the class would remain certified for trial. Plaintiffs filed a Motion for Class Certification on January 17, 2006. However, no further briefing on this issue has occurred, given the ongoing negotiations between the parties. This is expected to be a highly contested matter, and would further deplete any remaining insurance funds.

### g.    Ability of Defendants to Withstand a Greater Judgment

There is evidence that the Defendants could have sustained a judgment in excess of $100 million were Plaintiffs to succeed at trial. However, simply because AOLTW could have contributed more money to the settlement amount, does not demonstrate that the settlement amount was insufficient. *In re PaineWebber Ltd. Partnership Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) ("[T]he fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate.").

h.    **The Range of Reasonableness of the Settlement in Light of the Best Recovery and Risks of Litigation**

The court must assess the settlement value as compared to the range of possible recovery and the dangers in continuing the litigation. Determining whether a settlement is reasonable "is not susceptible of a mathematical equation yielding a particularized sum." *In re Michael Milken and Associates Sec. Lit.*, 150 F.R.D. at 66. The propriety of the settlement amount offered should be judged "in light of the strengths and weaknesses of the plaintiff[s'] case." *In re Med. X-Ray*, 1998 WL 661515 at *5.

Given the nature of the disputes at issue in these actions, and the proof available to Plaintiffs, establishing their damages would be a difficult and costly task. Plaintiffs' success on the merits cannot be assured and litigation through trial and a likely appeal would be lengthy and expensive. While there have been a large number of ERISA employer stock cases filed in the wake of Enron's demise and many have been settled (often for significant sums), this remains a novel and largely unsettled area of ERISA law, with little guidance, particularly from appellate courts, as to the applicable fiduciary standards involved. To be sure, many have cases have proceeded past the pleadings stage, including cases that have involved companies that remained viable entities. *See, e.g., In re Cardinal Health, Inc., ERISA Litig.*, 424 F. Supp. 2d 1002 (S.D. Ohio 2006); *In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 826 (S.D. Ohio 2004); *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898 (E.D. Mich. 2004).[6] There are also decisions such as *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004), *In re McKesson HBOC Inc.*, 2005 WL 1878118 (N.D. Cal. Sept 9, 2005) and *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786 (W.D. N.C. 2003), which absolved defendants of liability at the motion to dismiss stage, where like AOLTW, the companies remained viable entities. And most recently, in *Smith v. Delta Air Lines, Inc.*, 2006 WL 855777 (N.D. Ga. Mar. 3, 2006), plaintiffs' claims were dismissed even though Delta's financial straits were dire.

Moreover, those actions that have preceded beyond the motion to dismiss stage to a decision on the merits, while relatively few in number, have resulted in rulings for the defendants. In this regard, during the current year, summary judgment was entered for the defendants in *In re Reliant Energy ERISA Litig.*, 2006 WL 148898 (S.D. Tex. Jan 18, 2006) and *In re Syncor ERISA Litig.*, 410 F. Supp. 2d 904 (C.D. Cal. 2006). And, more recently, in the *US Airways* case, the United States District Court for the Eastern District for Virginia, following a bench trial, entered judgment for the defendants, finding no breach of fiduciary duty in connection with the plan's continued offering of the employer stock fund as a plan investment option, even though the significant financial difficulties faced by US Airways ultimately led to

---

[6]    There are also a large number of cases that proceed past this stage that involved companies that were bankrupt or on the brink of bankruptcy. But these cases are, of course, distinguishable. *See, e.g., Rankin v. Rots*, 278 F. Supp. 2d 853 (E.D. Mich. 2003) (K-Mart filed for bankruptcy); *WorldCom, Inc.*, 263 F. Supp. 2d 745, 751, 764-65 (S.D.N.Y. 2003) ("[C]atastrophic" fall in stock price and company went bankrupt); *In re Enron Corporation Securities, Derivative & "ERISA" Litig.*, 284 F. Supp. 2d 511 (S.D. Tex. 2003) (Enron filed for bankruptcy).

its bankruptcy. *Memorandum Opinion, DiFelice v. US Airways, Inc.*, No. 04-889 (E.D. Va. June 26, 2006).[7]

In sum, as noted earlier, despite the large number of ERISA employer stock cases and the many settlements of those actions that have been reached, the fact remains that *no* plaintiff has successfully litigated an ERISA employer stock case to conclusion on the merits, and those that have been resolved on the merits have resulted in defense judgments. Thus, should Plaintiffs' claims survive until trial, litigating this action would present a host of other risks and challenges. Given the uncertainties in the law, the fact that AOLTW was always a viable entity, the difficulties faced by Plaintiffs in establishing significant damages, and the significant recovery offered by the settlement, there can be little doubt that Plaintiffs would be taking a significant risk by rejecting this settlement.

If this settlement is approved Plaintiffs and the Settlement Class are assured a pool of funds of $100 million, less expenses and other costs. Moreover, as discussed above, the Plans are receiving an additional $30-$35 million from the *Securities Action* settlement. Given these facts, the court should readily find that that the settlement falls within the range of reasonableness.

## G.    Fulfilling the DOL Class Exemption for Settlements

Prohibited Transaction Exemption 2003-39 requires the independent fiduciary make certain determinations and Fiduciary Counselors has determined that:

- There is a genuine controversy involving the Plans. That the court has certified a class for settlement purposes fulfills this requirement. Even without such certification, however, we would have determined that a genuine controversy existed.

- The Settlement is reasonable in light of the Plans' likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone. As discussed above, the Plaintiffs faced significant litigation risks and have achieved a significant settlement.

- The terms and conditions of the transaction are no less favorable to the Plans than comparable arm's-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances. For the reasons discussed above under Procedural Fairness, we have determined that Plaintiffs' counsel have ably represented

---

[7] Even before *DiFelice* reached trial, however, the United States District Court for the Eastern District of Virginia substantially narrowed the scope of the action. First, the Court dismissed all claims against the Plan's "directed trustee" for failure to state a claim. *DiFelice,* 397 F. Supp. 2d at 758. As a result, the only defendant that remained in the case was US Airways. Next, the Court dismissed all but one of plaintiffs' claims, including disclosure claims, much like those at issue here. The only claim remaining related to the alleged lack of "prudence in retaining the company stock fund claim." *DiFelice v. US Airways, Inc.* 2005 U.S. Dist. LEXIS 24914, at *59 (E.D. Va. Oct. 19, 2005). Plaintiffs' decision to proceed to trial in *US Airways* was in the context of a company in "imminent danger" of collapse, which eventually went bankrupt.

the class and achieved a significant settlement at arm's-length.

- The transaction is not part of an agreement, arrangement or understanding designed to benefit a party in interest. We found no evidence of any such agreement, arrangement or understanding.

- The transaction is not described in Prohibited Transaction Exemption 76-1.

- All terms of the Settlement are specifically described in the written settlement agreement. The parties have satisfied the requirement that the settlement terms must be in writing by submitting to the court the lengthy stipulation of settlement and attachments.

- The Plan is receiving no assets other than cash in the Settlement.

The independent fiduciary may not have a relationship with any of the parties that would affect its judgment. No such relationship exists regarding this settlement. Fiduciary Counselors has not previously performed work for the Defendants or the Plans. Our fee for acting as independent fiduciary is within limits set by the Department of Labor in prohibited transaction exemptions under which we have served as independent fiduciaries.

## VII.   CONCLUSION

We believe that the settlement is reasonable for the reasons described above and should be approved. Based on the analysis provided above, we also believe that all of the requirements of Prohibited Transaction Exemption 2003-39 have been met.

EXHIBIT A

**FIDUCIARY COUNSELORS**

### Independent Settlement Fiduciary Experience

Fiduciary Counselors Inc. is an investment adviser registered with the Securities and Exchange Commission under the Investment Advisers Act of 1940. Since 1998, Fiduciary Counselors has assets under management of more than $1 billion, of which over $750 million is publicly-traded employer stock in defined contribution plans.

Fiduciary Counselors has acted or is currently acting as independent fiduciary with respect to class action settlements for plans sponsored by:

- Allegheny Energy (securities litigation)
- Amarada Hess (ERISA litigation)
- AOL Time Warner (ERISA Litigation)
- Enron (securities litigation)
- Global Crossing (ERISA and securities litigation)
- Federal-Mogul Corporation (securities litigation)
- Fifth Third (securities litigation)
- Fluor (securities litigation)
- Polaroid (ERISA litigation)
- Sprint (securities litigation)
- United Air Lines ESOP (ERISA litigation)

### Settlement Fiduciary Responsibilities

Depending on the nature of the settlement, Fiduciary Counselors will assume responsibility for:

- Acting as the independent fiduciary to determine whether the settlement satisfies the conditions of Prohibited Transaction Exemption 2003-39 ("PTE 2003-39"), including negotiating any changes necessary to protect the interests of the Plans and their participants;
- Determining whether plans should opt out of the settlement;
- Determining whether any objections should be brought on behalf of the Plans;
- Determining how to make claims on behalf of the Plans in the settlement; and
- Determining how the proceeds of the settlement are allocated to participants' accounts.

We generally provide a report describing our conclusions, which may be submitted to the court. We will direct the trustee as to whether to opt out and prepare the claims to be filed. If an objection is necessary, we will file the objection with the court on behalf of the plans.

We review the strength of the claims brought in the litigation, the potential recovery if the suit had been won, the recovery obtained, the scope of the release being granted (particularly as it impacts potential ERISA claims that the Plans might have) and the reasonableness of fees paid to plaintiffs' counsel.

To the extent possible (given limitations of data), we have allocated any recovery to participants in securities cases to the participants in proportion to the claims they would have had if they acquired the stock directly. However, in cases where sufficient historical data about participant transactions has not been available, we have used other methods to approximate each participant's share of the recovery, such as the amount of stock held by each participant in the class period. In ERISA settlements, the allocation method has usually been negotiated as part of the settlement and we have reviewed it for reasonableness as part of our overall review of the settlement.

## Qualifications and Experience of Litigation Committee

Three experienced ERISA attorneys form Fiduciary Counselors's Litigation Committee, which evaluates class action settlements:

- **Nell Hennessy,** President & CEO of Fiduciary Counselors, has headed the company since its incorporation and prior to that served on the Board of its parent company beginning in 1998. From 1993 to 1998, as Deputy Executive Director and Chief Negotiator of the Pension Benefit Guaranty Corporation (PBGC), Ms. Hennessy negotiated with major corporate pension plan sponsors in a wide range of industry sectors. Before joining PBGC, as a partner at Willkie Farr and Gallagher, she advised employers and plan fiduciaries about employer stock issues. She is a founding Board member of the American College of Employee Benefits Counsel and recently served as chair of the Employee Benefits and Executive Compensation Committee of the American Bar Association. She also served on the ABA Task Force on Corporate Responsibility, which recommended a variety of corporate governance changes (the "Cheek Report"). She has been involved in all of Fiduciary Counselors' assignments involving litigation settlements and has also acted as an expert witness in employer securities cases.

- **Christopher Capuano** is Fiduciary Counselors' General Counsel. He has been responsible for the litigation aspects of our assignments as independent fiduciary with respect to litigation settlements. He previously served as General Counsel of Proxicom, an Internet application development company, from its initial venture funding in 1996 through its successful initial public offering of stock in 1999 and its acquisition by Dimension Data (LSE: DDT) in 2001. He was also responsible for developing, implementing and operating all of Proxicom's employee plans, including serving as a trustee of the 401(k) plan. Prior to joining Proxicom, he was a litigator and benefits attorney at Willkie Farr & Gallagher.

- **Stephen Caflisch** is Fiduciary Counselors' Deputy General Counsel. He has more than 16 years of experience in employee benefits and bankruptcy law. Before joining Fiduciary Counselors, Mr. Caflisch was an employee benefits consultant at Price Waterhouse, specializing in qualified and non-qualified plans with an emphasis on qualified retirement plans. Prior to his work at Price Waterhouse, Mr. Caflisch worked on issues involving both single-employer and multiemployer plans as a Special Counsel at the Pension Benefit Guaranty Corporation. Mr. Caflisch also specialized in employee benefits as an associate with the law firm of Reed Smith Shaw & McClay in Washington, DC.

FIDUCIARY COUNSELORS

EXHIBIT B

# ERISA and Securities Litigation Settlements

**Nell Hennessy, President, Fiduciary Counselors Inc.**
**Marc I. Machiz, Partner, Cohen, Milstein, Hausfeld & Toll, P.L.L.C**

The collapse of Enron, WorldCom and other major companies has fueled a significant number of class action suits that are now reaching settlement. In virtually every case, separate suits have been brought alleging violations of securities laws and the Employee Retirement Income Security Act of 1974 (ERISA). Securities litigators are often not focused on the fact that the company's 401(k) plan and its participants are members of the securities settlement class in addition to any claims they may have in the ERISA case. As a result, they often overlook the requirements of a prohibited transaction class exemption that the Department of Labor ("DOL") issued at the end of 2003.[1] In broad terms the exemption provides relief for releases of litigable claims and associated extensions of credit by plans and plan fiduciaries, subject to a fairly straight forward array of conditions.   While the problem addressed by the exemption is nothing new, the wave of securities and ERISA litigation brought against both corporations sponsoring plans holding large blocks of employer stock and corporate insiders associated with those companies made manifest the need for the exemption.

At the heart of the exemption's conditions, is the requirement that the claims addressed be settled by an independent fiduciary.   The role of an independent fiduciary in settling claims against parties in interest can be delicate, especially when the actual or potential defendants are the plan sponsor, and its officers and directors who are directly or indirectly responsible for the independent fiduciary's appointment.

This article will analyze both the literal and practical consequences of the exemption. Consistent with DOL's usual practice in issuing an exemption, it declined to opine whether or when a settlement would give rise to a prohibited transaction.[2] Nevertheless, a practical understanding of the exemption requires some discussion of the sorts of transactions where its application might be needed to avoid liability.

This article will discuss the settlements for which the exemption may well be necessary and the conditions of the exemption.  We will highlight some of the policy choices made by the Department in revising the exemption to respond to comments. Finally, relying on our experience with the role of independent fiduciaries settling litigation, we will go beyond merely describing the exemption to offer our views of some of the practical considerations that plan fiduciaries who appoint independent fiduciaries and independent fiduciaries themselves can expect to encounter, particularly in the context of securities fraud and related ERISA allegations.

---

[1] Class Exemption for the Release of Claims and Extensions of Credit in Connection with Litigation, Prohibited Transaction Exemption 2003-39, 68 Fed. Reg. 75632-01 (Dec. 31, 2003) ("PTE 2003-39").

[2] *Id.* at 75633.

**When is the exemption needed and what transactions are exempt?**

By its terms the exemption provides relief retroactive to January 1, 1975 for violations of the prohibited transactions described in sections 406(a)(1)(A), (B) and (D) of ERISA and the excise taxes imposed under the corresponding provisions of the Internal Revenue Code.[3]   Relief is provided for two types of transaction:

- releases of claims by a plan or plan fiduciary "against a party in interest in exchange for consideration, given by, or on behalf of, a party in interest to the plan in partial or complete settlement of the plan's or the fiduciary's claim"[4]  and
- extensions of credit in connection with such settlements where the party in interest agrees to make payments over time in settlement of such a claim.

As a threshold matter it is fair to ask whether the transactions addressed by the exemption really give rise to prohibited transactions that require the relief offered by the Department.

The Department of Labor has held that a prohibited transaction will occur when a plan fiduciary causes a plan to release a claim against a person who is a party in interest at the time of the settlement. In the Department's view, such a settlement involves "an exchange of property (a chose in action) between such [plan] and parties in interest as described in section 406(a)(1)(A)."[5]  Similarly, a fiduciary who causes a plan to release claims against himself or his affiliates, or a person with respect to whom the fiduciary has an interest that could affect such person's judgment, will likely be found to have violated section 406(b) of ERISA (the "fiduciary self-dealing violations").[6]  Appointment of an independent fiduciary to act for the plan will avoid the fiduciary self-dealing violations without the need for an exemption, so the exemption does not provide relief for fiduciary self-dealing violations.  An exemption, however, is necessary to avoid a violation of party in interest violations under section 406(a).  In Advisory Opinion 95-26A, the DOL opined that the statutory exemption for necessary services[7] could, in appropriate circumstances, provide the requisite exemption where the release was granted "solely to resolve claims arising out of the performance of an underlying service arrangement."[8]  Implicit in the Advisory Opinion, however, was that the release of some other kind of claims against parties in interest would require an administrative exemption.[9]

---

[3] IRC § 4975(c)(1)(A), (B), and (D) .

[4] 68 Fed. Reg. at 75639.

[5] DOL Opinion 95-26A, 1995 ERISA LEXIS 38 at *7 (Oct. 17, 1995).

[6] *Id.* at *10.

[7] ERISA § 408(b)(2).

[8] *Id.* at *7-*8.

[9] Other situations may already be covered by existing exemptions.  The preamble to the exemption lists the correction of a prohibited transaction that complies with § 4975(f)(5) of the Internal Revenue Code,

Less clear is whether releasing claims that a fiduciary might bring to recover assets for a plan as a result of breaches of ERISA's fiduciary duties would give rise to a prohibited transaction. If such claims are viewed as the claims of the plan against the party in interest, then the analysis is identical to the release of non-ERISA claims belonging to the plan, as set out above. But, as the DOL acknowledges in the preamble to the Exemption, "ERISA civil actions for breach of fiduciary duty may only be brought by participants, beneficiaries, fiduciaries, and the Secretary of Labor," not by the plan.[10] It is arguable that the release of a fiduciary's right to bring such a claim is not tantamount to the release of a plan's claim.[11] The Secretary of Labor at least would likely argue that she is not bound by such a settlement, and could still bring a claim on behalf of a plan after the fiduciary settled his claim.[12] Nevertheless, where the fiduciary settling the claim was specifically empowered by the governing plan documents to take action on behalf of the plan, a release by a fiduciary might very well bind other fiduciaries and the participants and beneficiaries. This is because these parties can be viewed as suing derivatively for the plan, so a settlement by the plan's fiduciary might well amount to a de facto release of a claim that should be thought of as the plan's claim, even though the plan cannot bring it in its own name. Thus, arguments can be made pro and con as to whether settlement of an ERISA fiduciary breach claims gives rise to a prohibited transaction.

In issuing the exemption, however, DOL has cut this Gordian knot by modifying the final class exemption so that it applies by its terms to the release of claims by both the plan and a plan fiduciary. It has left for another day the question of whether these settlements are prohibited transactions at all. As a practical matter, plan fiduciaries forced by circumstances to take a position on the impending settlement of ERISA claims to recover assets for a plan brought against parties in interest will want to leave this debate to academia and assure that the conditions of the exemption have been met. The goal of settlements is the end of litigation, not the production of new and interesting issues to litigate.

Similarly "interesting" is the question of whether the plan or the participants have securities claims where a 401(k) plan acquires employer stock in a company alleged to have committed securities fraud. It is the premise of the DOL exemption, and indeed its inspiration, that these claims belong in some measure to the plan, and not merely to the

---

reimbursement of a plan without a release of the plan's claim; settlements authorized by the Department pursuant to PTE 94-71 (settlements resulting from an investigation of an employee benefit plan conducted by DOL); and judicially approved settlements where the Labor Department or the Internal Revenue Service is a party pursuant to PTE 79-15.

[10] 68 Fed. Reg. at 75633.

[11] See Beck v. Levering, 947 F.2d 639, 642 (2d Cir. 1991).

[12] See, e.g. Herman v. S. Carolina Nat'l Bank, 140 F.3d 1413, 1424-26 (11th Cir. 1998). (Secretary of Labor held not in privity with a class of plan participants, and not bound by their settlement of a fiduciary claim to recover losses for the plan pursuant to § 502(a)(2) of ERISA.)

3

individual participants. In the preamble to the proposed exemption the Department explained that "a number of informal inquiries regarding the settlement of class-action securities fraud cases where the plan and/or its participants are shareholders" caused the Department to determine that a class exemption would be appropriate.[13] At least where the participants exercise some control over the acquisition or sale of an interest in employer stock or an employer stock fund in such a plan, it is possible to argue that the participants have standing to assert securities claims, either in lieu of or concurrently with the plan itself. One court decided that a 401(k) plan trustee (rather than each individual participant) could file a claim with the settlement administrator in connection with a settled securities fraud class action that treated each decision by a plan participant to buy into a unitized employer stock fund maintained the plan as a separate purchase within the meaning of the securities laws.[14] The implication of this decision is that the securities claims have a dual character as both the plan's claim and the individual participant's claim.[15] Moreover, where a plan accepts employer stock in satisfaction of a dollar denominated matching obligation, the plan would seem to be purchaser within the meaning of the securities laws. Nothing the Department did or could say in issuing the exemption could answer the fundamental question—who owns, and who has standing to assert, the securities fraud claims with respect to employer stock in 401(k) plans where the participants direct purchases and sales of employer stock or interests in employer stock funds. Plan fiduciaries have an obligation, however, to see that the plan has an opportunity to participate in the settlement, either through a claim for the plan as purchaser of the securities or through a claim on behalf of individual participants. Until the question is resolved, fiduciaries are well advised to file on both bases, so that the plan participants will benefit from the settlement irrespective of which theory prevails.

To the extent that securities claims can be asserted by plans or by plan fiduciaries, the release of these claims is covered by the class exemption. As with the ERISA fiduciary breach claims discussed above, defendants and potential defendants in securities class actions should prefer that the exemption be complied with rather than

---

[13] Class Exemption for Release of Claims and Extensions of Credit in Connection with Litigation, 68 Fed. Reg. 6953, 6954 (proposed Feb. 11, 2003).

[14] *Kurzweil v. Philip Morris,* 2001 U.S. Dist. Lexis 83 (S.D.N.Y. Jan. 9, 2001).

[15] The court explained:

> There is no artifice in treating the claims of these individual investors 'as a collection of separable, purportedly individual brokerage account actions' (Reply p.4); that, effectively, is what they were

> Nor, as this Court held in In re New York City Housing Development Corp. Bond Redemption Litigation, 1987 WL 494921 (S.D.N.Y. 1987), is there any valid objection to having these claims filed by Fund trustees who have the documentation to prove them. *See* id. at 7-8. Of course, any individual investors who wish to pursue their claims on their own may do so, provided that no claim filed by the Fund may duplicate a claim filed by an individual investor.

*Kurzweil,* 2001 U.S. Dist. Lexis 83, at *9-*10.

4

pinning their hopes for litigation peace on an argument that the settled claim does not belong to the plan such that there is no prohibited transaction when a fiduciary permits a securities class action settlement to go forward.

In class action settlements, where neither the plan nor the plan fiduciary is the named plaintiff, there is also a question of whether a plan fiduciary can be said to have caused the settlement, giving rise to a prohibited transaction violation. In securities fraud class actions, if we assume that the plan is at least a class member, the question is not that difficult. Because these cases are certified pursuant to Fed. R. Civ. P. 23(b)(3), settlements of the cases often, though not invariably, provide an opportunity to opt out after notice is given of the terms of the settlement. By declining to opt out, the responsible plan fiduciary causes the plan to release its claims pursuant to the terms of the class settlement. But the issue is more substantial in a non-opt out class action, which is often the form taken by class actions brought by participants for breach of fiduciary duty under ERISA to recover for a plan, or an opt out class action where the only opportunity to opt out might occur prior to the negotiation of a settlement. Even if we assume that the class settlement binds the plan, there is no obvious point at which it can be said that a plan fiduciary causes a release of the plan's claims or the fiduciary's claims.

In response to comments, the Department declined to opine as to whether the settlement of a non-opt out class would give rise to a prohibited transaction. Instead the Department suggested in the preamble that even in such cases "the fiduciary is unlikely to remain uninvolved," if only because the fiduciary will be a defendant.[16] This discussion by the Department is a bit muddy. The defendant fiduciary is involved in the case as a defendant in his individual capacity, not on behalf of the plan, and in settling the claims against him such a defendant will not, if well advised, purport to act for the plan, but will only act for himself. Likewise, if the plan is named in an ERISA class action, it is named as a rule 19 defendant for the purpose of assuring that complete relief is granted. The plan is not before the court with standing to assert or release its own claims; as noted above, the plan probably has no standing as an ERISA plaintiff in a fiduciary breach case. In the preamble to the exemption, the Department also noted that even if a fiduciary does not cause the transaction with the plan, a prohibited transaction under the Code may still occur if the settlement of the class action produces a transaction between the plan and the disqualified person, so that the disqualified person may need to assure compliance with the exemption to avoid an excise tax.

While the need for the exemption in non-opt out ERISA breach of fiduciary duty cases is less than clear, there is reason to comply with the exemption. Since a plan fiduciary could seek the court's leave to intervene and object to the terms of such a settlement, deciding not to do so could be viewed as causing a release of the plan's claims. This is particularly true if the settlement by the class is ultimately found to have bound plan fiduciaries in their pursuit of the same claims after settlement of the class action. Likewise, the Department is correct that a prohibited transaction may be deemed

---

[16] 68 Fed. Reg. at 75635.

to have occurred under the Code if an ERISA class action settlement precludes plan fiduciaries from pursuing the same claim. If the decision not to intervene and object is made in compliance with the exemption by an independent fiduciary, uncertainty about whether the settlement can be challenged as a separate and distinct violation of ERISA is eliminated.

In the preamble to the exemption the Department identified two other specific types of transactions for which the exemption would be available. These are settlement agreements relating to an employer's failure to timely remit participant contributions to a plan, and settlements involving failure to remit employer contributions to a single employer plan or to a non-collectively bargained multiple employer plan.[17] No relief was provided for settlements involving delinquent employer contributions to a collectively bargained plan; these settlements are covered by a separate exemption.[18]

**What are the conditions of the Exemption and what was the Department's intent in imposing them?**

The Department imposed two sets of conditions on the availability of the exemption, those that apply to all transactions (Section II of the exemption), and those that apply only to settlements entered into after January 30, 2004 (Section III of the exemption). This article will focus only on those conditions applicable to settlements entered into after January 30, 2004.

a.    **There is a genuine controversy involving the plan.[19]**

The purpose of this condition is to protect against sham or collusive settlements. Without it parties in interest might simply buy blanket releases in the context of claims with no real value, to protect against the possibility of a real claim being asserted in the future.

A genuine controversy will be deemed to exist where the court has certified the case as a class action.[20] If the litigation has not been certified as a class action, an attorney or attorneys retained to advise the plan on the claim must determine that there is a genuine controversy involving the plan.[21] The attorneys can have no relationship to any of the parties, other than the plan.

b.    **The fiduciary that authorizes the settlement has no relationship to, or interest in, any of the parties involved in the litigation, other than**

---

[17] 68 Fed. Reg. at 75634-35.
[18] PTE 76-1, A.I. (41 Fed. Reg. 12740, March 26, 1976, as corrected, 41 FR 16620, April 20, 1976).
[19] 68 Fed. Reg. at 75639.
[20] *Id.*
[21] *Id.*

6

**the plan, that might affect the exercise of such person's best judgment as a fiduciary.**[22]

In the most important change from the proposed exemption, this provision dropped the requirement from the proposal that an independent fiduciary actually negotiate rather than merely authorize the settlement. The Department recognized that where the plan is merely part of a class action, the independent fiduciary will not, at least initially, have any role in negotiating the terms of the settlement. The Department cautioned, however, that "even where negotiation does not take place between the plan and the defendant, a fiduciary will be compelled, consistent with ERISA's fiduciary responsibility provisions, to make a decision regarding the settlement on behalf of the plan, even if that decision is merely to accept or reject a proposed settlement negotiated by other class members."[23]

The Department enlarged on its definition of independence in the preamble. First, the Department rejected concerns expressed by several commenters that institutional fiduciaries chosen by the fiduciaries that had a stake in the settlement to be reviewed could not be relied upon to fairly evaluate settlements. These commenters had suggested that at least prospectively, the exemption should provide participants with input into any settlement that might bind the plan. The Department simply reminded the public that these independent fiduciaries remained subject to 406(b) of ERISA and the general fiduciary responsibility provisions of the Act. That said, the Department was at pains to point out that in many cases the plan's existing independent fiduciary could undertake the task of evaluating the settlement where the "current fiduciary who is not a party to the action and who is not so closely allied with a party (other than the plan) as to create a conflict of interest."[24] Moreover, in the preamble, the Department opined that "the mere fact that a party in interest pays for the independent fiduciary or advisor to the independent fiduciary would not destroy independence, but that compensation paid to the professional fiduciary or advisor by a party in interest should constitute "no more than a small percentage of such professional's annual gross income."[25]

In practice, many independent plan trustees and investment managers who have carefully limited the extent of their discretion in

---

[22]*Id.*

[23]68 Fed. Reg. at 75635-36.

[24]68 Fed. Reg. at 75635.

[25]*Id.*

order to control the risk of liability will be reluctant, at best, to take on the task of evaluating litigation settlements on behalf of plans. Many, if not most plans, will be forced to look outside of their existing roster of service providers for independent fiduciaries to serve the role contemplated by the class exemption. Where existing providers are willing to undertake this role, they will likely insist on separate compensation for the increased responsibility and exposure to litigation. It is not obvious that plans or plan sponsors can save money by using existing fiduciaries to perform this task.

In the preamble to the proposal the Department stated that "in some instances where there are complex issues and significant amounts of money involved, it may be appropriate to hire an independent fiduciary having no prior relationship to the plan, its trustee, any parties in interest, or any other parties to the litigation."[26] Although this statement was not repeated in the preamble to the final exemption, it was not contradicted or withdrawn. Thus, we understand that it is still the Department's position.

c.    **The settlement is reasonable in light of the plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone.[27]**

This is the key determination that the independent fiduciary must make. Some of the issues that the fiduciary will examine are discussed below.

d.    **The terms and conditions of the transaction are no less favorable to the plan than comparable arms-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances.[28]**

Here the Department has decided to apply a condition to all transactions that was not included in the original proposal. It is not clear what the Department understood this requirement to add to the "reasonableness" test described above. If it were read to require class action settlement terms comparable to what the plan could have obtained had it filed its own suit and negotiated individually, this provision might be an impediment to participation in reasonable class action settlements. Opting out of a securities class action is an option that must always be considered, but it should not be considered without

---

[26] *Id.* at 75638.

[27] *Id* at 75639.

[28] *Id.*

regard to its costs and risks. Prudence would suggest that a plan should not undertake substantial litigation expense in the hopes of only slight improvements in settlement terms.

This condition takes on more significance in an ERISA settlement, when only the plan and its participants are involved. The preamble, however, contains language to support the view that the Department meant to require no more than a straightforward cost-benefit analysis. After describing the reasonableness and the arms-length requirements of the exemption, the Department added, "an independent fiduciary could satisfy the authorization requirements under the final exemption by deciding not to opt out of class action litigation if, after a review of the settlement, such fiduciary concludes that the chances of obtaining any further relief for the plan are not justified by the expense involved in pursuing such relief."[29]  Read with the Department's own gloss, the requirements of the exemption remain workable.

e.    **The transaction is not part of an agreement, arrangement or understanding designed to benefit a party in interest.[30]**

This requirement is unchanged from the proposal. In the preamble to the proposal the Department explained that "[t]he intent of this condition is not to deny direct benefits to other parties to a transaction but, rather, to exclude transactions that are part of a broader overall agreement, arrangement or understanding designed to benefit parties in interest."[31]  As with the requirement of a "genuine controversy," the Department's concern in promulgating this condition was to preclude collusive settlements.

f.    **Any extension of credit by the plan to a party in interest in connection with the settlement of a legal or equitable claim against the party interest is on terms that are reasonable, taking into consideration the creditworthiness of the party in interest and the time value of money.[32]**

This provision is a change from the proposal which recognizes that settlements often provide for a defined stream of payments over time and are not couched in the form of principle and interest. While exhibiting flexibility as to the form of such settlements, the Department

---

[29] *Id.* at 75635.

[30] *Id.* at 75639.

[31] *Id.* at 75638.
[32] *Id.* at 75639.

9

insists that in assessing the reasonableness of a settlement and associated extension of credit, the fiduciary recognize that the value of a promised stream of payments must be discounted for the time value of money and the credit risk presented by party making the promise. This provision should have explicitly recognized the value of security for such a promise. Presumably, were the Department asked, it would subsume the availability of security under the rubric of creditworthiness, since the Department in the preamble "encourages fiduciaries to seek security for an extension of credit, wherever feasible, to protect the plan against the risk of default."[33]

g.    **The transaction is not described in Prohibited Transaction Exemption (PTE) 76-1, A.I. (41 FR 12740, March 26, 1976, as corrected, 411 FR 16620, April 20, 1976) (relating to delinquent employer contributions to multiple employer plans and multiple employer collectively bargained plans).** [34]

This carve out from the applicability of the exemption is new in the final exemption. PTE 76-1, which, like the present exemption, provides no exemption from § 406(b) violations, will continue to apply to settlements of delinquent employer-contributions claims. PTE 76-1 has no condition relating specifically to the use of an independent fiduciary, but does require diligent and systematic attempts to collect the whole amount owing prior to any settlement, and reasonableness requirement similar to the present exemption.

h.    **All terms of the settlement are specifically described in a written settlement agreement or consent decree.**[35]

This requirement is unchanged from the proposal and was uncontroversial.

i.    **Assets other than cash may be received by the plan from a party in interest in connection with a settlement only if (1) necessary to rescind a transaction that is the subject of the litigation; or (2) such assets are securities for which there is a generally recognized market, as defined in ERISA section 3(18)(A), and which can be objectively valued.** [36]

---

[33] *Id.* at 75636.

[34] *Id.* at 75639.

[35] *Id.*

[36] *Id.*

In response to comments, this requirement contains far more flexibility than the proposal, which limited the use of non-cash assets to those assets necessary to rescind a transaction. Note that even the proposal, and now the final, by separately exempting extensions of credit in connection with settlements, effectively allowed the plan to receive even non-marketable *debt* as part of a settlement. The final exemption, however, recognizes that in securities class actions stock is often contributed as part of a settlement, and that in ERISA suits involving disputes over qualifying employer securities, the most sensible resolution often involves the contribution of additional qualifying employer securities. This condition will still create an impediment for more creative settlements that may involve a potentially higher recovery. For example, in the settlement of securities litigation against Lucent which involved that the provisions of warrants to class members,[37] the independent fiduciary was unable to take the warrants and negotiated for substitute compensation. In a situation involving bankruptcy, where the only compensation for equity under the plan of reorganization was warrants, the DOL has granted an individual exemption to permit the plan to hold accept and hold the warrants.

j.    **To the extent that assets, other than cash, are received by the plan in exchange for the release of the plan's or the plan fiduciary's claims, such assets must be specifically described in the written settlement agreement and valued at their fair market value.[38]**

Fair market value of non-cash assets must be determined in accordance with section 5 of the DOL's Voluntary Fiduciary Correction (VFC) Program.[39] The methodology for determining fair market value, including the appropriate date for such determination, must be set forth in the written settlement agreement. This VFC valuation methodology allows assets traded on a generally recognized market to be valued at the average value of the asset on such market on the applicable date, but requires an appraisal of any other asset by a qualified, independent appraiser. The requirement is new to the final exemption and may present practical problems for some settlements. Such a promise would have to be valued like any other debt, taking into account the time value of money, creditworthiness of the person making the promise and security for the promise, if any.

Obtaining compliance with the requirement that the value be made an explicit part of the settlement will be particularly difficult in class settlements, where the independent fiduciary for the plan does not

---

[37] Notice of Pendency of Class Action, *In Re Lucent Techs. Inc Sec. Litig.* No. 00-CV-621 (JAP), (D. N.J. Sep. 23, 2003), at http://www.lucentsecuritieslitigation.com/notice.pdf
[38] *Id.* at 75639-40.
[39] 67 FR 15062 (March 28, 2002)

11

negotiate the terms of the settlement. It may be appropriate to ask the Department for a modification of this provision as to class settlements where the plan or plan fiduciary is not the named plaintiff or to negotiate a separate settlement document that values the non-cash assets.

In addition, this condition is unclear as to whether it applies to a promise by a party in interest to make periodic payments as part of a settlement. If so, then permitted extensions of credit to parties in interest would have to be valued like any other debt that might be given as part of a settlement, taking into account the time value of money, creditworthiness of the party in interest, and security, if any, for the promise. Clarification should be sought from the Department regarding the application of this condition to extensions of credit to parties in interest that are permitted by the exemption.

k.      **The settlement may include a written agreement to: (1) Make future contributions; (2) adopt amendments to the plan; or (3) provide additional employee benefits.**[40]

Often the settlement of ERISA claims, including claims for relief to the plan includes injunctive relief that benefits plan participants but might not be said to be relief for the plan. A promise to make future contributions falls into a grey area as to whether it amounts to an asset other than cash received by a plan. The Department has not made clear whether such a promise must be valued by an independent appraiser, and the value included in the settlement agreement. We suspect this was not the Department's intent, but the Department should be asked to provide guidance on this point to confirm this reading.

More troubling is the question of whether a fiduciary is entitled to weigh relief that benefits the participants, but not the plan as an entity, in deciding to release a claim on behalf of a plan. The language of the exemption make clear that such relief is, at least, permitted, but in practice it is weighed heavily by parties negotiating settlements of claims brought on behalf of plans just as if it were value delivered to the plan. If value to the participants cannot be taken into account by a fiduciary in assessing the adequacy of a settlement, the terms of the exemption will needlessly constrain the flexibility of parties in arriving at appropriate settlements. Here again, clarification as to the Department's intent should be sought.

l.      **The plan fiduciary acting on behalf of the plan has acknowledged in writing that it is a fiduciary with respect to the settlement of the litigation on behalf of the plan.**[41]

---

[40]*Id.* at 75640.

There is no change from the proposal. As a practical matter, the plan will already have a trustee. However, directed trustees may be unwilling to take on the added responsibility of evaluating the settlement (or their fees for that service may be higher than independent fiduciaries who are not also trustees).

In light of the Enron decision, which places a higher burden on a directed trustee who follows the direction of a named fiduciary as contrasted with following the direction of an investment manager, trustees have in some cases insisted that the independent fiduciary be appointed as an investment manager with well-defined authority over the claim being settled. Other designs, however, are possible, including appointing a new trustee for the chose in action and appointing a named fiduciary.

Care should be taken to amend the governing plan documents and trust agreements to reflect the intended scope of the independent fiduciary's authority, and his means of appointment. The plan's existing institutional trustee will need to be a party to any amendments to the trust agreement, so the trustee must, as a practical matter, be consulted on the substance and form of these changes. If the authority of the independent fiduciary is limited—e.g. if the fiduciary only has the right to evaluate a class settlement negotiated by others, but may not actually pursue the claim in on behalf of the plan, residual authority will be left with other fiduciaries who may have serious conflicts of interest. The scope of the independent fiduciary's authority needs to be carefully thought through.

m.  **The plan fiduciary must maintain records for six years from which interested parties may determine compliance with the other conditions of the exemption. [42]**

These records must be available to:

- the Department or the Internal Revenue Service;
- any fiduciary of the plan;
- any contributing employer and any union whose members are covered by the plan,; or
- any participant or beneficiary of the plan.

Confidential financial information or trade secrets is protected from disclosure, except to government agencies. These provisions are the same as those contained in the proposal except that the burden of recordkeeping

---

[41] *Id.*
[42] *Id.*

and disclosure is placed on the plan fiduciary that authorized the release of claims.

It is unclear whether the protection for confidential trade secrets or financial information is broad enough. During the course of investigating a settlement, certain persons may be willing to provide information to the independent fiduciary on the condition that it be kept confidential. For example, in our experience we have found it useful to talk to mediators who were involved in settlement negotiations. These individuals would not have been candid with us if they had understood that we might be required to share the substance of what they told us with plan participants. Clarification should be sought from the Department on the scope of this protection—the information available to independent fiduciaries should not be limited by the generally salutary disclosure requirements.

**Practical Considerations**

Based on our experience with the independent fiduciary role contemplated by the exemption, there are a number of practical considerations that independent fiduciaries appointed to evaluate securities class action settlements and settlements of ERISA claims must take into account in performing their duties. We review some of them here.

**Release of ERISA Claims In Securities Class Actions**

In our experience the most common problem presented by class action settlement of securities claims (and in some ERISA settlements) is the almost automatic inclusion in these settlements of extraordinarily broad release language. These releases cover claims other than securities claims, and release claims against non-parties with some connection to the defendants.

In the preamble to the exemption the Department made it clear that such releases are unacceptable unless the plan receives additional consideration for the release of other valuable claims.[43]

[T]he Department recognizes that, in a number of securities fraud class action settlements, the participants and or plan fiduciaries have successfully objected to the original release and were able to modify the terms of the release to permit the plan to receive its share of the securities fraud settlement without releasing its ERISA claims against the parties in interest. In other instances, fiduciaries have successfully negotiated additional relief for the plan beyond that provided to shareholders who did not have ERISA claims against the defendants. The Department notes that plan fiduciaries should

---

[43]If pressed the courts will likely take a similar position. *In re Harnischfeger Indus. Sec. Litig.*, R.R.D. 400, 406 (E.D. Wisc. 2002).

consider whether additional relief may be available for the ERISA claims before agreeing to a broad release.[44]

By the same token if the release preserves ERISA claims that might be made on behalf of the plan, the plan can participate in the securities fraud settlement on the same basis as other class members, provided that the settlement otherwise meets the conditions of the exemption.

We have been successful in obtaining, on behalf of plans, revisions to preliminarily approved securities settlements that contained overbroad release language and failed to provide any additional compensation for the release of plan claims. These negotiations, however, have been resolved at the deadline for filing objections or opting out of a class action settlement. Our experience convinces us that it would be in the interest of plans to have an independent fiduciary appointed within a short time after the appointment of lead counsel in the securities fraud class action case. This would give the independent fiduciary a better opportunity to shape the terms of any release negotiated in the securities case, and meaningfully explore the possibility of a global settlement of securities and ERISA claims while the securities case is still unresolved. Such a settlement of course, must provide adequate consideration for the release of ERISA claims.

**Settlements limited to "open market purchasers."**

The securities laws protect purchasers of securities, broadly defined. The protections of these laws are not limited to purchasers on the open market. Plans in particular acquire stock other than on the open market, most commonly through contributions by plan sponsors of employer stock in satisfaction of a matching obligation or an obligation to contribute stock or cash equal to a percentage of compensation. A settlement of securities claims that does not compensate for these non-open market purchases is not adequate from the plan's perspective where it has acquired stock outside of the open market.

Further, many plans allow participants to acquire stock within the plan. This can occur whether the plan maintains a unitized stock fund where the plan nets buys and sell of the fund, or where the plan allocates actual shares to participants' accounts. In either event there is "trading" at the plan level (and injury to defrauded participant purchasers) that is not reflected in open market purchases by the plan. *Kurzweil v. Philip Morris*[45] supports the proposition that a plan trustee may file a claim based on the losses of participants, not just the losses of the plan as a whole based on open market purchases. The independent fiduciary must be mindful of this issue in evaluating the settlement itself to avoid any language that would prejudice the plan's position that claim should be filed on this basis, maximizing recovery for the plan and its participants.

---

[44] 68 Fed. Reg. at 75637.
[45] *Supra*

15

**Evaluating The Plan Of Allocation**

Securities class settlements contain a plan of allocation that that are quite individual to the particular case. Which purchases count and how much, as well as what sales are netted out, and to what extent, will be specified in the settlement, and the parties' resolution may be fair or unfair to class members generally, and may have a particular impact on the plan depending on the plan's and the participants' purchase and sale patterns. The allocation plan needs to be looked at for its fairness to the plan.

**Opting Out of Securities Class Actions**

Where the plan's claim is very large, and the case is very strong, participating in a class action may not be in the plan's interest. Facts peculiar to the individual case, *e.g.,* whether distinct misrepresentations were directed to plan fiduciaries, and whether class counsel is the best available counsel will have an impact on whether opting out is in the plan's interest. The plan will have an explicit opportunity to opt out of the class action at the time the class is certified, and often, but not invariably, at the time the case is settled. In some cases, where the class has already been certified and the court does not require a second opportunity to opt out, the plan's only recourse once a settlement has been reached is to file an objection with the court.

From the time a class action is filed, however, plan fiduciaries (whether they appreciate it or not) are making a fiduciary decision about whether to pursue a separate action. If a case justifies a separate action by a plan, often the ideal time to file is relatively early in the life of the litigation, so that the plan can participate in discovery and settlement discussions. Although the class exemption only deals with settlements, the decision not to opt out of a securities class action and bring a case separately on behalf of a plan is typically being made by plan fiduciaries laboring under a serious conflict of interest. The prompt appointment of an independent fiduciary broadly empowered to pursue the plan's claims, when made not long after lead counsel is appointed in the securities litigation, may protect against allegations that the fiduciaries of the plan did not pursue both securities and ERISA claims appropriately.

Usually, however, by inaction or deliberate decision, a plan will not have filed its own action, or opted out in advance of the class settlement. The independent fiduciary has significant leverage in obtaining changes to class settlements where the settlement gives class members the ability to opt out. Often the plan will be the largest claimant, and the settlement itself, or a side letter will stipulate that the defendants can withdraw from the settlement if opt outs represent a specified portion of the class. The defendants want peace, and the prospect that the plan, with substantial resources, might continue the pursuit of the claims provides a powerful incentive to negotiate changes that do not alter the fundamental complexion of the deal. To take advantage of this leverage, however, the independent fiduciary must be empowered to opt out. A decision to opt out effectively commits the plan to file its own action. Even if the terms of the independent fiduciary's engagement do not empower it to take such a step, it must be understood that

16

some fiduciary will have to make that decision in the wake of opting out. A decision not to file suit on behalf of a plan that opts out will be difficult to defend.

### Appointing An Independent Fiduciary To Pursue ERISA Claims

Once a securities class action is filed against a company whose plan purchased stock during the class period, the possibility of an ERISA claim based on the same facts should, by now, be apparent to everyone. Existing plan fiduciaries have a responsibility to evaluate what action to take on such a claim on behalf of the plan, but these fiduciaries are generally the same individuals who would be defendants in any ERISA action. The conflict of interest is manifest. Nevertheless, common practice is to wait for a participant to file an action and leave the decision about who and whether these claims are prosecuted to the vagaries of competition in the plaintiffs' class action bar. Instead of a fiduciary directing the ERISA litigation on behalf of the plan, it is prosecuted by a class representative who may or may not be adequate, and will generally be, at best, unsophisticated.

The uncertain nature of pursuit of ERISA claims that parallel securities fraud allegations brings into sharp focus a key issue in hiring an independent fiduciary to evaluate settlements of securities claims, ERISA claims, or both. What is the appropriate scope of the fiduciary's authority? Is it merely to take action that must be taken in the securities case (opt out or not, object or not), or does it include the authority to pursue the plan's claims (securities and ERISA) if that is appropriate. Unlike the securities case where the plan is a class member, there is no point in an ERISA class action where the plan as an entity must take a position as a matter of class action procedure. The parties may seek the protection of an independent fiduciary signing off on the settlement, but an ERISA case can be settled by a participant class without fiduciary participation.

Appointing an independent fiduciary with authority to sue the appointing authority or persons closely associated with the appointing authority is an awkward task at best. Failure to do so, however, means, as practical matter, that the decision to file or, more often, not to file suit is being made by individuals too conflicted to fairly make that decision for the plan.

### Filing the Plan's Claim(s)

Once an independent fiduciary has approved the settlement for the plan, submission of the actual claim with the claims administrator for a securities class action settlement need not be made by the independent fiduciary. This is so, at least where, by the terms of the settlement, a fixed amount of money will go to the class, and the division of the proceeds within the class is a matter of indifference to the defendants. Nevertheless, as practical matter, once an independent fiduciary is appointed to deal with the class action, most appointing fiduciaries will want to include complete responsibility for filing the post settlement claim to the fiduciary.

An interesting question exists as to whether the claim can be filed to cover not just acquisitions of stock by the plan as a whole, but acquisitions by each participant. Generally, by filing a claim at the participant level the plan can maximize its recovery because acquisitions and dispositions on behalf of individual participants will be netted out by the plan before the plan acquires stock on the open market. This analysis is complicated somewhat where the participant acquires shares in a unitized company stock fund that contains a small amount of cash, rather than shares of stock.

The issue of whether a plan fiduciary can file a post settlement claim for acquisitions made by each participant is discussed and resolved in the plan's favor in *Kurzweil v. Philip Morris*. Any fiduciary filing a post-settlement claim on behalf of a 401(k) plan should be mindful of this issue and try and submit the claim in the form most advantageous to the plan and its participants.

**CONCLUSION**

PTE 2003-39 clears the way for settlements in cases involving immediate cash payments, payments over time (with or without security) and additional benefits to participants (within the plan or outside of the plan), without concerns that the settlement itself will create a prohibited transaction. However, it still prevents settlement of cases involving parties in interest (including the employer) where non-cash assets, such as warrants, are received in the settlement. This may prevent the plan from accepting valuable consideration, available to other class members, without an individual exemption. Given the length of time it takes to obtain an individual exemption, it is unlikely that the exemption will be granted before the decision must be made to opt out of the settlement. In those cases, in-house fiduciaries will probably still want to retain an independent fiduciary to make the decision as to whether to opt out of the settlement and pursue separate litigation or to negotiate a change in the settlement that brings it within the class exemption.

Our recent experience indicates that the lawyers handling securities settlements for the employer are often oblivious to the ERISA issues, even where parallel ERISA litigation has been brought. Therefore, in-house fiduciaries and ERISA counsel defending the ERISA litigation should monitor the securities litigation so that an independent fiduciary can be retained before the terms of the settlement are locked in place. While the exemption no longer requires that an independent fiduciary negotiate the settlement, plan fiduciaries may find themselves in an akward position if the class is limited to market purchases, thus disadvantaging participants whose purchases within the plan are netted against sales by other participants, or if a settlement has been negotiated that could release ERISA claims related to the securities purchases. Until appointment of an independent fiduciary, some existing plan fiduciary must monitor to make sure that the interests of the participants and beneficiaries are being protected in the securities litigation, particularly when those interests are not the same as the class representative and  must also assess whether the ERISA claims are being appropriately pursued in the parallel ERISA class action.

18

# EXHIBIT C

# Paul J. Ondrasik, Jr.



1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: 202.429.8088
Fax: 202.429.3902
pondrasik@steptoe.com

**AREAS OF PRACTICE**
Employee Benefits
Labor
Litigation

**EDUCATION**
University of Virginia
J.D., 1975
Notes Editor, *Virginia Law Review*
Order of the Coif

Princeton University
A.B., 1972 (Distinction in American Civilization)

**HONORS AND DISTINCTIONS:**
#1 Ranked Attorney *Chambers USA 2006, America's Leading Business Lawyers*; National ERISA Litigation

Law Clerk to the Honorable Warren E. Burger, Chief Justice, the Supreme Court of the United States, 1976-1977

Law Clerk to the Honorable Collins J. Seitz, Chief Judge, US Court of Appeals, Third Circuit 1975-1976

Charter Fellow, American College of Employee Benefits Counsel

Paul Ondrasik is a partner in the Washington office of Steptoe & Johnson LLP. He practices primarily in the employee benefits field, with a particular emphasis in ERISA litigation and the fiduciary responsibility area. He is the head of the firm's ERISA, Labor, and Employment Group, which recently received Number 1 rankings in National ERISA Litigation, DC Employee Benefits, and Executive Compensation, and Phoenix Employment in *Chambers USA 2006, America's Leading Business Lawyers*.

Mr. Ondrasik has more than twenty-five years of experience in the employee benefit plan field, and has served as lead counsel in numerous ERISA action, including class actions and cases arising from complex corporate transactions. Representative cases include: *Albrecht v. Comm. on Employee Benefits of the Federal Reserve Employee Benefits System,* 357 F.3d 62 (D.C. Cir. 2004) (successfully defended claims of fiduciary breach based on failure to eliminate plan's mandatory employee contribution feature), *Flanigan v. General Elec. Co.,* 242 F.3d 78 (2d Cir. 2001) (successfully defended ERISA fiduciary and statutory claims arising from complex corporate transaction involving, among other things, trust-to-trust transfer of assets exceeding $1 billion), and *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.,* 259 F.3d 1036 (9th Cir. 2001) (successfully defended fiduciary breach claims based on investment of plan assets in complex mortgage derivatives). In addition, Mr. Ondrasik has had lead defense roles in a number of major class actions challenging the investment of 401k plan assets in company stock, including the *Enron, Dynegy,* and *Williams* cases.

He also was the principal ERISA attorney involved in Steptoe & Johnson LLP's successful representations of petitioners before the Supreme Court of the United States in two important decisions dealing with the scope of remedies available in ERISA actions -- *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134 (1985) (holding that punitive damages are not available under ERISA in benefit claim cases) and *Pilot Life Ins. Co. v. Dedeaux,* 107 S. Ct. 1549 (1987) (holding that ERISA preempts state common-law remedies in cases involving claims under an employee benefit plan).

# Paul J. Ondrasik, Jr.

Mr. Ondrasik was law clerk to the Honorable Collins J. Seitz, Chief Judge, US Court of Appeals, Third Circuit, 1975-76 and to the Honorable Warren E. Burger, Chief Justice, the Supreme Court of the United States, 1976-77.  He also is a Charter Fellow of the American College of Employee Benefits Counsel.

He has served as an Advisory Director of the International Foundation of Employee Benefit Plans and is currently a member of its Government Liaison Committee.  He also is a frequent lecturer and author on fiduciary responsibility, preemption, and other ERISA matters for a variety of educational organizations.

# EXHIBIT B



**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Attorneys at Law








PROTECTING INVESTORS WORLDWIDE





**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Attorneys at Law

Schiffrin Barroway Topaz & Kessler, LLP ("SBTK"), comprised of over sixty attorneys, has specialized in prosecuting complex class action litigation and protecting and recovering assets for twenty years. During this time, SBTK has recovered billions of dollars on behalf of our clients and the classes they represent, and has been a leader in implementing corporate governance reforms designed to protect shareholder rights, improve share-holder value and prevent corporate mismanagement. SBTK has developed a worldwide reputation for excellence, focusing primarily on the prosecution of securities fraud, deriv-ative, transactional and ERISA/401K litigation brought against public companies, their officers and directors, and advisors. In addition, SBTK has represented institutional and individual consumers in antitrust and consumer fraud actions as well as in mass tort and product liability actions.

Since the passage of the Private Securities Litigation Reform Act of 1995, which specifically encouraged large investors, especially institutional investors, to participate as lead plaintiffs in securities class actions, SBTK has actively and successfully represented public and multi-employer pension funds, mutual fund managers, invest-ment advisors, insurance companies, hedge funds and individual investors from around the world in this important role. SBTK currently works with institutional investors from the United States, Canada, United Kingdom, Netherlands, Ireland, Sweden, Denmark, Norway, Finland, Germany, Austria, Italy, and France.

**Please take some time to learn more about our firm
and contact us at any time for more information.**

**280 King of Prussia Road, Radnor, Pennsylvania 19087
610-667-7706 • Fax: 610-667-7056**

**2125 Oak Grove Road, Suite 120, Walnut Creek, California 94598
925-945-0770 • Fax: 925-945-8792**

**Please visit our website which is available in 17 languages at:**

**www.sbtklaw.com**



# OUR BACKGROUND

Schiffrin Barroway Topaz & Kessler, headquartered just outside of Philadelphia, Pennsylvania, with an office in Walnut Creek, California, specializes in representing shareholders and consumers in complex class action litigation in state and federal courts throughout the United States. Since our inception, SBTK has recovered billions of dollars on behalf of defrauded shareholders and aggrieved consumers. The firm is led by its senior partners, Richard S. Schiffrin, Andrew L. Barroway, Marc A. Topaz, and David Kessler, with assistance from partners Stuart L. Berman, Katharine M. Ryan, Gregory M. Castaldo, Michael K. Yarnoff, Joseph H. Meltzer, Darren J. Check, Tobias L. Millrood, Andrew L. Zivitz, Sean M. Handler, John A. Kehoe, Lee D. Rudy, Kay E. Sickles and Eric L. Zagar, and numerous experienced associates and staff.

SBTK focuses on the prosecution of securities fraud actions and derivative and transactional litigation brought against public companies, their officers and directors, and their auditors and investment banking firms. In addition, SBTK represents employees in ERISA/401 K actions. Institutional and individual consumers are represented in antitrust and consumer fraud actions as well as mass tort and product liability actions.

Throughout our history, SBTK has represented all types of institutional investors, including public and multi-employer pension funds, mutual fund managers, hedge funds, insurance companies, investment advisors, as well as thousands of individual investors in securities fraud, derivative and transactional class actions. Currently, SBTK is serving as Lead or Co-Lead Counsel in several high profile securities class actions against companies such as Tyco, Tenet Healthcare, Sprint and Delphi. In addition, SBTK has played a prominent role in the following precedent-setting actions:

### In re Initial Public Offering Securities Litigation, Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002):

SBTK is one of only six law firms comprising Plaintiffs' Counsel's Executive Committee, and was selected from over sixty law firms which had brought such actions. This litigation challenges the legality of the IPO allocations practices of virtually all of the major investment banking firms from 1998 through 2000, and encompasses over 300 coordinated actions.

### In re AremisSoft Corp. Securities Litigation, C.A. No. 01-CV-2486 (D.N.J. 2002):

SBTK is Lead Counsel in this extraordinarily complex securities fraud class action involving the embezzlement of hundreds of millions of dollars by former officers of the Company who are now fugitives. SBTK is particularly proud of a settlement it helped to craft with the Company. The Settlement allowed for the Company to be reorganized as a new Company so it could continue operations, while establishing a litigation trust to pursue claims against the Company's auditors and its counsel, as well as those individuals who looted the Company. The Settlement further provides the harmed shareholders with a majority of the equity in the new company, as well as their pro rata share of all monies recovered by the litigation trust. The Court-appointed co-trustees of the litigation trust have retained SBTK to continue prosecuting the actions on behalf of the litigation trust. SBTK currently is litigating this action in the Isle of Man, where it has successfully frozen more than $200 million of stolen funds from one of the fugitives, and is working hard to recover this money on behalf of all beneficiaries of the litigation trust. The litigation also is continuing with respect to the remaining fugitive.

**Please feel free to contact us by phone or e-mail for answers to any further questions you may have about the firm or the cases we are currently litigating.**

**SBTK**

# MONITORING YOUR PORTFOLIO

## Securities Tracker Portfolio Monitoring Program

Institutional fiduciaries are charged with the important responsibility of protecting their investments. This responsibility takes on even greater importance considering today's well-publicized growing trend of corporate fraud and malfeasance.

SBTK offers institutional investors its valuable portfolio monitoring services at no charge. This comprehensive service is intended to allow our clients to more effectively fulfill their fiduciary obligations and efficiently track all class actions in which they have a financial interest.

SBTK requests a five-year history of securities transactions from the client or its custodial bank, preferably in electronic format, and immediately integrates that information into its proprietary database. SBTK then seeks to obtain quarterly updates to transaction information. Of course, SBTK will work with the client and its custodial bank to obtain this information in the easiest and most expeditious manner.

### Our Proprietary Tracking System

Working with database experts, SBTK has developed a proprietary monitoring system which has been dubbed "Securities Tracker." This system allows for quick and easy integration of a client's transactions. In addition, Securities Tracker allows for quick access and accurate sorting of a client's transactional history to easily identify a client's potential losses in new cases and to assist in determining if the client has a financial interest in a case in which there is a recovery on behalf of the plaintiff class.

**Securities Tracker provides a complete solution to tracking class actions which affect your investments and ensuring the recovery of all settlement monies to which you are entitled.**

### Benefits to the Client

**New Cases:** Whenever a new class action is filed and it is determined that a client may have suffered losses in that action, a brief, yet concise report which details the relevant facts, class period, jurisdiction, deadlines, and strengths and weaknesses of the case is provided to the client. In addition, this report contains the estimated losses suffered by the client and damages suffered by the class (when available at this early stage), and a recommendation for how the client should proceed.

**Quarterly Reports:** SBTK will also issue to its clients for whom it monitors a quarterly report which details the status of each class action in which a client has a financial interest regardless of whether the client is a lead plaintiff. The report further provides updates on all settled cases as well as cases which have been dismissed.

**Claims Administration:** Institutional investors do not always prepare and file Proof of Claim forms which are required to participate in recoveries. In fact, a recent study determined that only 28% of institutional investors are filing class action claim forms and are thus potentially leaving billions of dollars unclaimed. As a result, many institutions are not maximizing recoveries on behalf of their investors. The most common reason institutions fail to file claims is that the fiduciaries are not aware that a lawsuit was filed or that there was a recovery. Through SBTK's monitoring service, we assist our institutional clients with fulfilling their fiduciary responsibilities by identifying when lawsuits have been filed and resolved. In addition, upon request, SBTK will assist with completing and filing the necessary claim forms.

4

# WHY SHOULD INSTITUTIONS GET INVOLVED?

1. Institutional fiduciaries oversee the financial security of their funds. As such, they must take reasonable steps to monitor all real and potential claims arising from fraud and malfeasance by corporate wrongdoers.

2. Since the passage of the Private Securities Litigation Reform Act of 1995 — which specifically encouraged institutional investors to participate as lead plaintiffs in securities class actions — settlement recoveries have increased dramatically. In fact, a recent study by NERA Economic Consulting revealed that securities class actions with institutional investors as lead plaintiff settled for one-third more than those with individual investors serving as lead plaintiff.

3. Institutions typically are able to negotiate larger settlements while simultaneously lowering legal fee rates, both of which increase recoveries for investors.

4. Institutions frequently bring a certain level of sophistication and experience to each case which often proves to be an asset in developing litigation and trial strategy or negotiating a settlement.

5. Litigation has emerged as an important vehicle available to institutional investors to obtain extensive and significant corporate governance changes, such as:

- Mandate annually elected Boards controlled by independent directors;
- Separate Chairman of the Board and CEO offices;
- Require that at least two-thirds of the Board shall be independent directors;
- Require immediate public disclosure of all sales or purchases of a company's stock by any corporate officer or director;
- Establish director term limits;
- Limit the number of boards a director may sit on;
- Eliminate "super-voting" classes of stock;
- Restrict/limit stock options;
- Rotate outside auditors; and
- Limit executive compensation.

## How Can Institutions Get Involved?

The best way for institutional fiduciaries to protect their investments and to maximize the recovery of lost assets is to actively monitor market developments. Recognizing that this is a time-consuming and expensive process, SBTK offers a monitoring service designed to enable institutions to identify important events in the marketplace and discuss what effect, if any, those events have on their investments. SBTK will discuss the merits of claims filed as well as potential claims, and evaluate all legal rights and options recovery. This service allows institutional investors to efficiently assess all claims and to take any steps necessary to protect assets, without disrupting their business.

There is no cost or obligation for this service and SBTK handles all class actions on a fully contingent basis. SBTK is only paid if the litigation is successful and, win or lose, Pennsylvania law allows for the responsibility for all costs and expenses to rest with us.



# CORPORATE GOVERNANCE



## What Is Corporate Governance?

The term "corporate governance" refers to the policies, procedures, systems and structures by which the board of directors of a corporation oversees and manages the activities of the company for the benefit of its shareholders. Corporate governance is the instrument that defines and makes effective the relationship between the directors and managers of a company and the shareholders whom they serve. Thus, corporate governance encompasses such matters as:

- The size, structure, and membership of the board of directors and its committees
- The manner in which directors and committee members are nominated and elected
- The rights and responsibilities of directors and management
- The rights and responsibilities of shareholders
- Policies and procedures relating to accounting, auditing, and financial reporting
- Policies and procedures relating to executive compensation

## Why Is Corporate Governance Important to Shareholders?

Strong and effective corporate governance serves as a system of checks and balances that takes account of the interests of shareholders without unduly constraining the functioning of management. Ultimately, the goal of corporate governance is to maximize the long-term value of the corporation for the benefit of its shareholders. Numerous academic studies have demonstrated a strong correlation between corporate governance and company performance, and, in particular, have shown that companies with strong corporate governance produce better long-term returns for shareholders, are more profitable and less volatile, and are less likely to commit fraud or other corporate wrongdoing. Improving a company's corporate governance is one of the most effective means for institutional investors and other long-term shareholders to make their voices heard in the board room, and thereby protect and advance their long-term interests.

## What Corporate Governance Principles Are Most Important to Shareholders?

### Independence and Autonomy

The foundation for all good corporate governance is a board of directors that is not merely independent on its face, but is also willing and able to act independently of management. This means, among other things, that the vast majority of board members, including the chairperson of the board, should be "outside" directors who have no substantial personal, financial, business, or employment connections with management. Indeed, the surest way to ensure that the board of directors functions in a truly independent fashion is for directors to be nominated by shareholders rather than by management. Simply put, directors nominated and/or selected by shareholders are the only directors who have a real economic incentive to act in the best interests of shareholders rather than the interests of management. Thus, measures that expand shareholders' access to and influence on the director nomination process should be highly sought.

### Diligence and Proactivity

The interests of shareholders are best served by directors who not only diligently monitor the conduct of management with appropriate objectivity and skepticism, but who also proactively guide and oversee the activities of the corporation with an eye towards creating and preserving long-term value. Corporate governance measures designed to achieve these goals, such as limiting the number of corporate boards and committees on which directors serve, adopting reforms to strengthen internal and external auditing functions, and planning for succession of key executives and board members, all inure to the benefit of shareholders.

### Openness and Accountability

Directors are more likely to fulfill their duty to represent the interests of shareholders when the board functions in an open and accessible manner and shareholders have the means to hold directors accountable if they fail to perform. For example, corporate governance measures that require the Board to disclose the background and

6

rationale for decisions on director nominations, executive compensation, and other matters that affect the interests of shareholders, should be pursued. To hold directors accountable, director and committee-person term limits, annual election of all directors, and other measures are each designed to ensure that directors remain responsive to shareholders.

## How Does Schiffrin Barroway Topaz & Kessler Assist Shareholders in Improving Corporate Governance?

SBTK advances the corporate governance agenda on behalf of shareholders through both litigation and direct action. As one of the leading firms in the nation representing shareholders in

securities class action and shareholder derivative litigation, SBTK believes that litigation can be used not only as a means to recover monetary losses, but also as a vehicle to implement corporate governance reform in appropriate cases.

In addition to its successful litigation practice, SBTK assists shareholders in improving corporate governance through direct action, including bylaw amendments, director nominations, and other means by which shareholders can assert direct and substantial influence on the composition and functioning of boards of directors. SBTK also works closely with leading corporate governance experts, organized labor, and other shareholder advocates to promote public policies that compel or encourage corporations to adopt corporate governance measures that serve the interests of shareholders.

# ANNUAL RIGHTS AND RESPONSIBILITIES OF INSTITUTIONAL INVESTORS SEMINAR

Schiffrin Barroway Topaz & Kessler serves as the exclusive sponsor of the annual Rights and Responsibilities of Institutional Investors seminar. The seminar is presented by Institutional Investor Conferences in Amsterdam, Netherlands, and is dedicated to educating investors about their legal rights and responsibilities with respect to their investments, particularly those investments on U.S. exchanges. This annual meeting provides a forum for leaders in the investment and legal community to explore the role that active ownership and shareholder rights can play in better serving their funds and their beneficiaries.

Each year over 100 senior executives and legal and compliance professionals from public pension plans, mutual fund companies, hedge funds, insurance companies, and other institutional investors and their advisors from around the globe come together to share experiences and learn more about approaches to active ownership and what they can do to protect and enhance their assets. Speakers have included Vice President Al Gore, United States Securities and Exchange Commission Chairman Harvey L. Pitt, as well as representatives from many of the world's largest institutional investors and the academic community.



The seminar is a reflection of SBTK's commitment to not only serving as legal counsel to its clients, but also as an educator on all issues related to shareholder activism and asset protection and recovery. The firm's philosophy is that an educated client not only serves itself better, but under the right circumstances serves the interests of others as well.

To learn more about the Rights and Responsibilities of Institutional Investors, or to inquire about participating and attending, please visit www.rriiconference.com or contact Darren J. Check, Esquire.



# PRACTICE AREAS

## Securities Class Actions

The federal securities laws were designed to promote honesty and integrity within the securities markets, which depend on full and fair disclosure of all material facts regarding public companies. Only when public companies adhere to this standard will there be a "level playing field" for investors. However, when full and fair disclosure of all material facts is not made, one or more of the public company, its officers and directors, as well as certain of the company's advisors may be in violation of the federal securities laws. In such instances, a securities class action may be initiated by one or more investors on behalf of all investors who are similarly situated, who suffered damages as a result of purchasing the company's securities at artificially inflated prices.

SBTK is currently prosecuting numerous securities class action lawsuits as the court-appointed lead or co-lead counsel in federal courts throughout the country. Several of these cases are against high-profile companies such as Tyco, Tenet Healthcare, Sprint, Delphi, and PNC Bank, to name a few. For a more comprehensive review of the various cases in which SBTK has prosecuted in its twenty-year history, please refer to the "Noteworthy Recoveries" section of this booklet.

## Shareholder Derivative Actions

A shareholder derivative action is a lawsuit brought by a shareholder of a public company, on behalf of, and for the benefit of, the company. In essence, the shareholder is bringing an action that the company has a right to and should bring, but it does not, due to the improper influence an officer and/or director is exercising over the company's affairs. Derivative actions are usually litigated under state corporation laws.

For example, a derivative class action may be appropriate where the company's officers and/or directors are engaged in self-dealing, where the company is selling a corporate asset to an officer and/or director of the company at a price below fair market value. Because the company is being harmed, this is a legal right that the company should enforce, but sometimes does not. Based on this example, a plaintiff shareholder of the company could allege that the company breached

fiduciary duties (a legal concept which usually includes ideas of "fair dealing," "good faith" and "loyalty") owed to company shareholders and the company itself. If a derivative action is favorably resolved for the plaintiffs, the officer and/or director who was harming the company may be required to make monetary payments to the company. In addition, a successful derivative action may also include important corporate governance changes, so that the type of conduct complained of in the derivative action will not occur again. If either one (or both) of these forms of relief is accomplished, all current shareholders will benefit and it may have a positive effect on the company's stock price.

## Mergers and Acquisitions

These class actions are brought to protect and defend the rights and privileges of public shareholders whose companies have entered into management-led buyouts, mergers, or other similar business combinations. Directors of a publicly traded company owe the company's public shareholders the tripartite fiduciary duties of due care, loyalty, and full and fair disclosure. Unfortunately, in the merger context, directors often fail to fulfill these duties as a result of material conflicts of interest. Shareholder interests are commonly overlooked and/or disregarded entirely in favor of the interests of directors, management, or a company's majority shareholder. SBTK has prosecuted numerous class actions on behalf of shareholders who have been unfairly or inadequately treated in a merger or business combination. SBTK has achieved substantial recoveries in many of these cases, including: (1) millions of dollars in increased consideration for shareholders' shares; (2) the disclosure of material information which enables a shareholder to better judge the fairness of a proposed transaction; and (3) other types of therapeutic relief designed to protect and maximize shareholder value.

## ERISA Litigation

SBTK is also at the forefront of protecting the rights of employees. The firm's ERISA Litigation Department specializes in breach of fiduciary duty actions brought pursuant to the Employee Retirement Income Security Act of 1974. Many of these suits involve fiduciary breaches by a company in the administration of an employee benefit

8

plan. For example, a company sponsoring and administering a defined contribution 401(k) plan for the benefit of its employees, has a fiduciary duty to ensure that plan assets (including employer securities) are directed to appropriate and prudent investment vehicles.

This duty is sometimes breached, particularly where a company deems investment in its own equities appropriate despite having access to information that clearly indicates otherwise. This conflict of interest and the resultant losses can be devastating to employees who often depend on their 401(k) accounts as a principal source of retirement income.

SBTK commits considerable resources to litigating claims on behalf of pension plan participants and is currently prosecuting more than two dozen ERISA actions nationwide as lead or co-lead counsel against companies including El Paso, Northwest, Polaroid, JDS Uniphase, and Schering-Plough. In addition, the firm has served as lead or co-lead counsel in cases against AOL Tine Warner, Honeywell, and Bristol-Myers, which have resulted in recovery of well over $250 million for pension plan participants.

## Antitrust/Consumer Litigation

**Antitrust Litigation:** Antitrust class actions brought pursuant to federal and state antitrust laws, are initiated by claimants injured by anti-competitive conduct of suppliers, purchasers, competitors and others. This includes anti-competitive conduct occurring abroad which affects United States markets. Violations of the antitrust laws include price-fixing, bid-rigging, monopolization, resale price maintenance and price discrimination. The antitrust laws also prohibit corporate mergers and acquisitions so large and encompassing that, if consummated, would likely inhibit competition and other corporate conduct designed with the intention to be predatory or to monopolize. Recently, drug manufacturers have been the focus of many high profile antitrust actions as a result of their efforts to maintain their monopoly of certain drugs following the expiration of their patent. In an effort to extend the patents on their products manufacturers have gone so far as to initiate patent infringement suits against generic brand drug manufacturers and entered into collusive licensing arrangements with generic manufacturers.

SBTK combats this anti-competitive conduct through class action litigation and has been appointed by courts to leadership positions in several important antitrust actions filed in courts throughout the country. SBTK represents many third-party payors in these cases, including public entities and Taft-Hartley Health & Welfare funds.

**Consumer Litigation:** SBTK also specializes in litigation on behalf of consumers. More broadly, consumer fraud describes a wide range of improper practices that may involve advertising, marketing and/or the sale of goods or services. Consumer fraud class actions are initiated, for example, when a company overcharges or improperly charges consumers for goods or services, or runs deceptive or misleading ads for its products. Companies also commit consumer fraud when they interpret a contract or agreement in a manner that unfairly disadvantages consumers.

SBTK has taken a prominent role in prosecuting claims against pharmaceutical companies, medical device manufacturers, life insurance companies, private mortgage insurers, and credit card companies which have resulted in significant monetary recoveries and changes in corporate policies on a class-wide basis.

## Mass Tort Litigation

SBTK's Mass Tort Department is a powerful force for consumers and victims harmed by pharmaceutical drugs and medical device products. Over the years, pharmaceutical companies have made increasingly significant efforts to receive quicker approval for new drug applications. A natural result of the shortened time period is that the rush to approval sacrifices the careful scrutiny over safety that a drug must have before being approved. As a result, many drugs that received approval in the late 1990's, have either been withdrawn or are being petitioned for removal from the market. Additionally, the number of consumers injured by pharmaceutical products has risen since the change to fast tracking drugs. The attorneys in our Mass Tort Department work diligently to represent individuals harmed by the pharmaceutical and medical device industry, and in being amoung a small group of trial lawyers who are willing to fight big pharmaceutical companies. To successfully pursue such cases, the firm has brought together a team of experienced and dedicated trial attorneys. Currently, we are litigating cases involving Vioxx® (and Cox-2 Inhibitor Drugs), Hormone Replacement Therapy (Prempro/Premarin), Fen Phen, Ephedra and Baycol. Additionally, our Mass Tort attorneys continue to keep a vigilant eye on the actions of the pharmaceutical industry and its interaction with the Food and Drug Administration. All too often, pharmaceutical companies continue to fail to comply with FDA requirements to investigate or warn about drug problems. Until satisfactory regulation of this industry is once again imposed, the only corrective deterrent for this industry's behavior will come at the hands of the individuals and attorneys who are willing to stand up to big pharmaceutical companies and hold them accountable.



# NOTEWORTHY RECOVERIES

During the firm's successful history, SBTK has recovered billions of dollars for defrauded stockholders and consumers. The following are among the firm's notable achievements:

### In re Tenet Healthcare Corp. Securities Litigation, No. CV-02-8462-RSWL (Rx) (C.D. Cal. 2002):

SBTK serves as co-lead counsel on behalf of the State of New Jersey and its Division of Investment against Tenet Healthcare Corp. and certain of its former officers and directors. Among other things, the Lead Plaintiff alleges that defendants made a series of materially false or misleading statements and omissions concerning Tenet's business model and financial health from January 11, 2000 through November 7, 2002. After defeating defendants' motions to dismiss and performing substantial document and deposition discovery, a partial settlement has been reached in the amount of $216.5 million in cash which will be submitted for preliminary approval by the Court in the coming weeks. The Partial Settlement is being funded primarily by Tenet and its insurance carriers ($215 million), with personal contributions in the aggregate amount of $1.5 million being made by two of Tenet's former officers, Jeffrey Barbakow and Thomas Mackey. In addition to the substantial cash recovery, the prosecution of this action has played a prominent role in Tenet's initiation of sweeping corporate governance reforms which have led to Tenet being ranked by various institutional rating entities as among the best corporations in America for its corporate governance. The case will continue against KPMG as the Court denied KPMG's motion to dismiss the action in its entirety in December, 2005.

### In re AremisSoft Corp. Securities Litigation, C.A. No. 01-CV-2486 (D.N.J. 2002):

SBTK is particularly proud of the results recently achieved in this case before the Honorable Joel A. Pisano. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, who are now fugitives. In settling the action, SBTK, as sole Lead Counsel, assisted in reorganizing the Company as a new Company to allow for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The Settlement, which was recently approved, calls for the class to receive the majority of the equity in the new Company, as well as their pro rata share of any amounts recovered by the litigation trust. The Court-appointed co-trustees, Joseph P. LaSala, Esq. and Fred S. Zeidman, have retained SBTK to continue prosecuting the actions on behalf of the litigation trust. In this capacity, we have filed an action in the Isle of Man, and have successfully frozen more than $200 million of stolen funds from one of the fugitives, and are in the process of attempting to recover the money on behalf of the trust. In addition, we are continuing to litigate the trust's claims against the remaining fugitive.

### In re The Interpublic Group of Companies Securities Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002):

SBTK served as sole Lead Counsel in this action on behalf of an institutional investor and recently received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock with expected distribution by early summer 2005. As of February 2005, the stock had an approximate value of $87 million, resulting in a total settlement value of approximately $107 million. In granting its approval, the Court praised SBTK for acting responsibly and noted the firm's professionalism, competence and contribution to achieving such a favorable result.

### In re Digital Lightwave, Inc. Securities Litigation, Consolidated Case No. 98-152-CIV-T-24E (M.D. Fla. 1999):

The firm served as Co-Lead Counsel in one of the nation's most successful securities class actions. After extensive litigation and negotiations, a settlement consisting primarily of stock ultimately grew to a value of over $170 million between the time in which the settlement was negotiated and the time at which it was distributed. SBTK took on the primary role in negotiating the terms of the equity component, insisting that the class have the right to share in any upward appreciation in the value of the stock after the settlement was reached. This recovery represented an astounding approximately two hundred percent (200%) of class members' losses. We believe that this represents the largest percentage recovery for shareholders in securities class action history.

### In re Initial Public Offering Securities Litigation, Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002):

SBTK holds a prominent position as an Executive Committee member in this action. Of the sixty plaintiffs firms which originally filed actions in these coordinated proceedings, SBTK was one of only six selected to serve on the Executive Committee. The coordinated actions, which have been filed against 309 separate issuers of publicly traded securities, challenge the legality of the practices which accompany the allocations of shares in initial public offerings. In addition to suing the issuers of such securities, the 309 coordinated actions also name as defendants the primary investment banking firms which underwrote the offerings. This case, which has received a great deal of national and international media attention, is widely considered the largest securities class action litigation in history. At the present time, the Court has preliminarily approved a $1 billion settlement with the insurers and their officers and directors. The case is proceeding against the underwriting defendants.

### In re Global Crossing, Ltd. ERISA Litigation, No. 02 Civ. 7453 (S.D.N.Y. 2004):

SBTK served as Co-Lead Counsel in this complex and high-profile action which alleged that certain directors and officers of Global Crossing, a former high-flier of the late 1990's tech stock boom, breached their fiduciary duties under the Employee retirement Income Security Act of 1974 to certain company-provided 401(k) plans and their participants. These breaches surrounded the plans' alleged imprudent investment in Global Crossing stock during a time when defendants knew, or should have known, that the company was facing imminent bankruptcy. A settlement of plaintiffs' claims restoring $79 million to the Plans and their participants was approved in November 2004. At the time, this represented the largest recovery received in a company stock ERISA class action.

### In re Honeywell International ERISA Litigation, No. 03-1214 (DRD) (D.N.J. 2004):

SBTK is serving as Lead Counsel in a breach of fiduciary duty case under ERISA against Honeywell International, Inc. and certain fiduciaries of Honeywell pension plans. The suit alleges that Honeywell and the individual fiduciary defendants, allowed Honeywell's 401(k) plans and their participants to imprudently invest significant assets in company stock, despite that defendants knew, or should have known, that Honeywell's stock was an imprudent investment due to undisclosed, wide-ranging problems stemming from a consummated merger with Allied Signal and a failed merger with General Electric. A settlement f plaintiffs' claims, which includes a $14 milion payment to the plans and their affected participants, and significant structural relief affording participants much greater leeway in diversifying their retirement savings portfolios, is currently pending court approval.

### In re Remeron Antitrust Litigation, No. 02-CV-2007 (D.N.J. 2004):

SBTK is Co-Lead Counsel in an action challenging Organon, Inc.'s filing of certain patents and patent infringement lawsuits as an abuse of the Hatch-Waxman Act, and an effort to unlawfully extend their monopoly in the market for Remeron. Specifically, the lawsuit alleges that defendants violated state and federal antitrust laws in their efforts to keep competing products from entering the market, and seeks damages sustained by consumers and third-party payors. After lengthy litigation, including numerous motions and over 50 depositions, the matter settled for $36 million. The settlement is pending final approval by the court.

### Henry v. Sears, et al., Case No. 98 C 4110 (N.D. Ill. 1999):

The firm served as Co-Lead Counsel for one of the largest consumer class actions in history, consisting of approximately 11 million Sears credit card holders whose interest rates were improperly increased in connection with the transfer of the credit card accounts to a national bank. SBTK successfully negotiated a settlement representing approximately 66% of all class members' damages, thereby providing a total benefit exceeding $156 million. All $156 million was distributed automatically to the class members, without the filing of a single proof of claim form. In approving the settlement, the District Court stated: ". . . I am pleased to approve the settlement. I think it does the best that could be done under the circumstances on behalf of the class. . . . The litigation was complex in both liability and damages and required both professional skill and standing which class counsel demonstrated in abundance."

### Jordan v. State Farm Insurance Company, Case No. 97 CH 11 (Cir. Ct., McLean County, Ill. 1998):

Plaintiffs alleged that State Farm had engaged in fraudulent sales practices known as "churning," and marketing and selling "vanishing premium" policies that do not actually "vanish." After several years of discovery, motion practice and settlement negotiations, SBTK, as Liaison Counsel, successfully resolved the action for $225 million in cash, dividend enhancements and other monetary benefits for current and former State Farm policyholders.

### In re Liberate Technologies Securities Litigation, No. C-02-5017 (MJJ) (N.D. Cal. 2005):

Plaintiffs alleged that Liberate engaged in fraudulent revenue recognition practices to artificially inflate the price of its stock, ultimately forcing it to restate its earnings. As sole Lead Counsel, SBTK successfully negotiated a $13.8 million settlement, which represents almost 40% of the damages suffered by the class. In approving the settlement, the district court complimented Lead Counsel for its "extremely credible and competent job."



### In re InfoSpace, Inc. Securities Litigation, Master File No. C-01-0913-Z (D. Wash. 2001):

SBTK served as Co-Lead Counsel on behalf of plaintiffs alleging that InfoSpace and certain of its officers and directors overstated revenues by using improper accounting methods, overstated the demand for InfoSpace's wireless services, misstated InfoSpace's financial relationships with major customers, and falsely represented that InfoSpace would receive subscription fees from users of web-enabled cell phones. After two years of hard-fought litigation and complex mediation, a settlement of $34.3 million was obtained for members of the class.

### In re Riverstone Networks, Inc. Securities Litigation, Case No. CV-02-3581 (N.D. Cal. 2002):

SBTK served as sole lead counsel on behalf of plaintiffs alleging that Riverstone and certain of its officers and directors sought to create the impression that the Company, despite the industry-wide downturn in the telecom sector, had the ability to prosper and succeed and was actually prospering. In that regard, plaintiffs alleged that defendants issued a series of false and misleading statements concerning the Company's financial condition, sales and prospects, and used inside information to personally profit. After extensive litigation, the parties entered into formal mediation with the Honorable Charles Legge (Ret.). Following five months of mediation, the parties reached a settlement of $18.5 million which has been preliminarily approved by the Court.

### In re Assisted Living Concepts, Inc. Securities Litigation, Lead Case No. 99-167-AA (D. Or. 1999):

SBTK served as Co-Lead Counsel and was instrumental in obtaining a $30 million recovery for class members from the Company, its executive officers and directors, and several underwriters for their role in an alleged complex accounting fraud involving the use of a purportedly independent joint venture to absorb the Company's start-up losses. Even after this $30 million recovery, through counsel's efforts, an additional $12.5 million was obtained from the auditors providing for a total recovery of $42.5 million.

### Wanstrath v. Doctor R. Crants, et al., No. 99-1719-111 (Tenn. Chan. Ct., 20th Judicial District, 1999):

SBTK served as Lead Counsel in a derivative action filed against the officers and directors of Prison Realty Trust, Inc., challenging the transfer of assets from the Company to a private entity owned by several of the Company's top insiders. Numerous federal securities class actions were pending against the Company at this time. Through the derivative litigation, the Company's top management was ousted, the composition of the Board of Directors was significantly improved, and important corporate governance provisions were put in place to prevent future abuse. Mr. Schiffrin, in addition to achieving these desirable results, was able to personally effectuate a global settlement of all pending litigation against the backdrop of an almost certain bankruptcy. The case was resolved in conjunction with the federal securities cases for the payment of approximately $50 million by the Company's insurers and the issuance of over 46 million shares to the class members.

### In re Cumulus Media Inc. Securities Litigation, Lead Case No. 00-C-391 E.D. Wis. 2000):

SBTK served as Lead Counsel and successfully litigated the action and negotiated a settlement of $13 million in cash and 240,000 shares of freely tradable stock in Cumulus Media, which traded for approximately $19 per share, for a total settlement value of $17.5 million at the time the settlement was approved by the Court.

---

*"I know you know that I take this responsibility seriously and try to think hard about these issues. And I do want to compliment class counsel. I think that you behaved responsibly here and gave very good service to the class. They were well served by you."*

— **The Honorable Denise Cote of the United States District Court for the Southern District of New York addressing SBTK in the context of approving the settlement of *In re The Interpublic Group of Companies Securities Litigation*.**

---

# FREQUENTLY ASKED QUESTIONS
# ABOUT CLASS ACTIONS

### 1. What is a class action?

A class action is a representative lawsuit which allows an individual or entity to initiate a lawsuit on behalf of other individuals or entities that are in the same or similar circumstances with respect to a given defendant. A class action is appropriate when many people have been affected by a company's course of conduct in a similar fashion.

### 2. What is a class period?

A class period is a range of dates within which a company is alleged to have been engaged in improper conduct. The attorneys investigating and prosecuting a case will review the facts of the case, and along with the court-appointed Lead Plaintiff, determine the appropriate beginning and end of a class period. Sometimes, after an initial complaint is filed, a class period will be lengthened or shortened as an investigation continues. If you purchased the securities of a company during a class period, you are automatically a class member, regardless of whether you specifically retain a law firm to prosecute claims on your behalf. This "class membership" concept is also true with respect to consumer fraud class actions and antitrust class actions. For example, if you purchased goods from a company that was accused of improper marketing practices during the relevant period of time (the class period), you would be a member of the class for a consumer fraud class action, even if you did not personally retain an attorney.

### 3. What is a lead plaintiff?

A lead plaintiff in a class action brought pursuant to the federal securities laws, sometimes referred to as a named plaintiff or representative party, is typically appointed by the court within 90 days of the publication of a notice of the pendency of the class action. In these types of actions, the court selects the class member or members most capable of representing the interests of the "absent" class members. There is a statutory presumption that the class period investor or investors with the largest financial losses, who are otherwise typical of the "absent" class members and are adequate to represent those class members, are considered the "most adequate" plaintiff. Courts have appointed individuals, groups of individuals, institutional investors, groups of institutions, or even combinations of both as lead plaintiff as the circumstances of each case may dictate. The lead plaintiff selects counsel to represent the lead plaintiff and the class, and these attorneys if approved by the court are lead counsel or class counsel.



### 4. How long does it take to prosecute a class action?

The time to prosecute each class action varies based on the facts, parties, and jurisdiction of a particular case. It is not unusual for a class action to take up to 3 years to complete.



### 5. What is contingency fee litigation?

Contingency fee litigation refers to situations where attorneys get paid only if they win the case at trial or if the action settles. Attorneys who practice on a contingent fee arrangement typically do not receive any form of monetary payment from a client at the outset of a litigation. Rather, the attorneys' fees are paid only once there is a successful resolution from any settlement or judgment that is achieved. There are no out-of-pocket expenses for the plaintiffs as Pennsylvania law allows SBTK to advance all such costs on behalf of its clients. SBTK handles virtually all of its cases on a contingency fee basis.

### 6. What will it cost to be involved in a class action?

Because SBTK prosecutes class actions on a contingency fee basis, there are no out-of-pocket fees or expenses paid by the client, regardless of the outcome of the case. If we are successful in obtaining a recovery for the class, we will apply to the court for a fee that fairly represents the work performed and risk assumed by SBTK. In securities class actions, attorneys' fees typically are awarded as a percentage of the relief achieved by the attorneys for the class. These percentages vary considerably based on the size of the recovery for the class, the length and complexity of the litigation, and several other factors.

### 7. Will my out-of-pocket loss equal my damages?

Damages are a complex legal calculation that may or may not equal your out-of-pocket loss, which is a purely economic calculation. To establish damages in securities class actions, lead counsel typically hires experts to determine the extent by which a company's stock is artificially inflated during the relevant class period. Because there are often other factors which contribute to stock movement, factors which experts readily assess, one's damages are not necessarily the equivalent of out-of-pocket loss.

### 8. Do I have to keep my stock to participate in a securities class action?

No. As long as you purchased during the class period, you are eligible to participate in any recovery that the class enjoys regardless of your current holdings.

### 9. Why should I sign up with Schiffrin Barroway Topaz & Kessler?

SBTK has specialized in class action litigation for nearly twenty years, and has represented all types of investors in recovering financial losses caused by fraud or other misconduct. SBTK has developed a nationwide reputation for excellence and has recovered over one billion dollars for victims of fraud and other corporate misconduct.

---

*"Now this goes back to the original approval of the securities fraud settlement because I found in my opinion approving the settlement that counsel for the class were to be commended because they cast their lot along with their clients. That is to say that counsel's fees were to be determined and paid in accordance with the way the class members were going to be paid; that this was, in my view, a creative and unique approach to the problem of paying fees to class counsel in a securities fraud case."*

— The Honorable Joel A. Pisano of the United States District Court for the District of New Jersey approving the settlement in *In re AremisSoft Corporation Securities Litigation.*

---



14

# EUROPEAN, ASIAN AND OTHER NON-U.S. INVESTORS



Historically, institutional investors based outside the United States have refrained from seeking leadership roles in securities fraud class actions brought in United States courts. The simple reason is that many of these institutional investors are not aware that they may assert claims in the United States. Recently, however, courts in the United States have appointed a growing number of foreign institutional investors as lead plaintiffs in class actions on behalf of both United States and foreign investors. As such, there is an increased incentive for foreign investors, especially foreign institutional investors which have suffered substantial losses, to step forward to lead securities fraud and derivative class actions in the United States.

Despite the fact that many foreign institutional investors lose many millions of dollars as a result of corporate fraud, frequently these investors are not aware that they may pursue claims based on these losses. In fact, some foreign institutions are not even aware that certain actions were filed until after the deadline for filing a lead plaintiff application has passed. Similarly, foreign institutions often miss out on recovering some or all of their financial losses when a lawsuit settles or a judgment is reached, if the proper claim form is not submitted in a timely fashion.



SBTK has extensive experience working with investors worldwide, including institutions located outside the United States, such as in Europe, Asia, Canada, Australia and South America. The firm offers the same professional services to all of its institutional clients, including those located outside the United States. One valuable service the firm provides is regularly monitoring our institutional clients' investment portfolios so that we can properly advise our clients as to potential securities claims and whether our clients had financial losses as a result. At no cost to our clients, we investigate all potential claims and cross-reference those claims against our clients' trading histories. We personally discuss all pertinent facts and legal options with our clients so that they can properly evaluate if and how they will seek to recover losses. Additionally, regardless of whether our clients decide to pursue formal legal action, we provide our clients with detailed updates on the progress of all litigation which impact our clients' interests. As a result, our clients are best positioned to protect their rights and interests at all stages of litigation.



SBTK's website is available in seventeen different languages so that our clients around the world can easily access information about the firm and the cases we are litigating. For more information about the firm or references from our institutional clients, please contact Darren J. Check, Esq. at (610) 822-2235 or via e-mail at dcheck@sbtklaw.com.







## STUDY FINDS THAT INSTITUTIONS ADD VALUE TO SECURITIES CLASS ACTIONS

**By: Darren J. Check, Esquire**

St. Johns University School of Law Professor and noted scholar on securities class action litigation Michael A. Perino recently published a study which found that the participation of institutional investors and public pension funds in particular as lead plaintiffs in securities class action litigation adds significant value to the outcome of those cases. Professor Perino found that when public pension funds serve as lead plaintiff, the class achieved larger settlements, measured a higher percentage of the potential total damages, produced greater effort from their attorneys and secured lower attorney fee requests and awards. The implications and motivations in cases pre dating was post-dating the enactment of the Private Securities Litigation Reform Act ("PSLRA") of 1995 in an effort to evaluate whether the legislation achieved its stated purpose of protecting investors with the most at stake in more meritorious actions a lead plaintiff. The ...
to confirm the success of the PSLRA. For a full copy of Professor Perino's ... visit: http://ssrn.com/abstract=934528



## SBTK BULLETIN

The SBTK Bulletin is a quarterly newsletter for our clients and all investors and consumers. In our continuing effort to educate our clients and keep them informed the SBTK Bulletin strives to not only provide updates on the cases we are litigating, but also on trends in the law and other issues that are important to our readers. Our attorneys regularly contribute articles about the cases they are litigating, important legal precedents, and other issues relevant to our practice. Copies of the current issue and all previous issues of the Bulletin are available on our website and we welcome you to contact us to obtain a free subscription and receive the Bulletin by mail.

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Attorneys at Law

# SBTK INSTITUTIONAL CLIENTS

*Below is a partial list of SBTK's institutional clients from around the globe.*
*Please contact us for more information or for references from our clients.*

## U.S. Pension Funds and Institutional Investors

Alameda County (California) Employees Retirement Association
Ardsley Partners, L.P.
City of Bethlehem (Pennsylvania) Retirement System
Brockton (Massachusetts) Retirement Board
Bucks County (Pennsylvania) Retirement Board
City of Fort Lauderdale General Employees' Retirement System
City of Philadelphia Board of Pensions & Retirement
City of Tallahassee Pension Plan
Erie County (Pennsylvania) Employees Retirement System
Georgia Division of Investment Services
Harrisburg Police Pension Board
Imperial County (California) Employees' Retirement System
Lehigh County (Pennsylvania) Employees Retirement Fund
Logan Capital Management
Luzerne County  (Pennsylvania) Retirement System
Maine State Retirement System
Miami Beach Employees' Retirement Plan
Mississippi Public Employees' Retirement System
Montgomery County  (Pennsylvania)
    Employees Retirement Board
New Orleans Harbor Police Retirement System
Oakland (California) Municipal Employee's Retirement System
Oklahoma Firefighters Pension & Retirement System
Oklahoma Police Pension & Retirement System
Oklahoma School Land Commission
Pembroke Pines (Florida) Fire & Police Pension Fund
Pennsylvania Public School Employees Retirement System
Pennsylvania State Employees' Retirement System
Pennsylvania Turnpike Commission
Plymouth County (Massachusetts) Retirement Association
Puerto Rico Government Employees Retirement System
Retirement Board of Allegheny County (Pennsylvania)
SEPTA (Southeastern Pennsylvania Transportation Authority)
State of New Jersey and its Division of Investment
U.S. Army Nonappropriated Fund Employee Retirement Plan
Westmoreland County (Pennsylvania)
    Employees Retirement Board
Wilkes-Barre (Pennsylvania) Aggregated Pension Trust Fund

## Multi-Employer Funds

American Federation of Television & Radio Artists Retirement Fund
Buffalo Laborers Pension Fund
Denver Area Meat Cutters and Employers Pension Plan
International Brotherhood of Boilermakers
    Local 154 Retirement Fund
International Brotherhood of Electrical Workers,
    Local 237
International Brotherhood of Electrical
    Workers, Local 380

Joint Council #53 Teamsters Health & Welfare Fund
Laborers District Council Construction Industry Pension Fund
League – ATPAM Welfare & Pensions Funds
Rocky Mountain UFCW Unions & Employers Pension Plan
Roofers Local Union No. 74
SEIU Pension Plans Master Trust
Teamsters Local #500 Severance Fund
Washington State Plumbers & Pipefitters

## International Pension Funds and Institutional Investors

AFA Insurance
Alecta pensionsförsäkring, ömsesidigt
AMF Pension
Seventh Swedish National Pension Fund (AP7)
ARCA S.G.R. S.p.A.
ATP
Cominvest Asset Management GmbH
Danske Invest Administration A/S
Deutcher Investment Trust (dit)
ERSTE - Sparinvest GmbH
Healthcare Employees' Pension Plan - Manitoba
Industriens Pension
Kathrein & Co. Privatgeschäftsbank-AG
KP Pensions
Monte Paschi Asset Management S.G.R. S.p.A.
Nordea Invest Fund Management A/S
Nottinghamshire County Council, Local Authority Pension Fund
PKA Pension Funds Administration Ltd.
Raiffiesien Capital Management
SEB IM AB
Swedbank Robur Fonder AB
Universities Superannuation Scheme
Varma Mutual Pension Insurance Company



# PARTNERS



## Richard S. Schiffrin

Richard S. Schiffrin, founding partner of the firm, is licensed to practice law in Illinois and Pennsylvania, and has been admitted to practice before numerous United States District Courts. In his seven years of practice with the Office of the Public Defender of Cook County, Illinois, Mr. Schiffrin represented hundreds of clients in both bench and jury trials, as well as appeals. Mr. Schiffrin has also taught legal writing and appellate advocacy at John Marshall Law School and has served as a faculty member at numerous legal seminars, including the Annual Institute on Securities Regulation, NERA: Finance, Law & Economics — Securities Litigation Seminar, the Tulane Corporate Law Institute, and the CityBar Center for CLE (NYC): Ethical Issues in the Practice of Securities Law.

Most recently, Mr. Schiffrin spoke at the MultiPensions 2005 Conference in Amsterdam, Netherlands; the Public Funds Symposium 2005 in Washington, D.C.; the European Pension Symposium in Florence, Italy; and the *Pennsylvania Public Employees Retirement Summit (PAPERS)* in Harrisburg, Pennsylvania. Mr. Schiffrin oversees all aspects of litigation on behalf of the firm. Mr. Schiffrin has been recognized for his expertise in numerous cases, including most prominently:

### In re AremisSoft Corp. Securities Litigation, C.A. No. 01-CV-2486 (D.N.J. 2002):

Schiffrin Barroway Topaz & Kessler is particularly proud of the results achieved in this case before the Honorable Joel A. Pisano. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, some of whom remain fugitives. In settling the action, Schiffrin Barroway Topaz & Kessler, as sole Lead Counsel, assisted in reorganizing the Company as a new Company which allowed for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The Settlement, approved by the court, enabled the class to receive the majority of the equity in the new Company, as well as their pro rata share of all amounts recovered by the litigation trust. The court-appointed co-trustees, Joseph P. LaSala, Esq. and Fred S. Zeidman, retained Schiffrin Barroway Topaz & Kessler to further assist with prosecuting the actions on behalf of the litigation trust.

After filing an action in the Isle of Man, where the trust successfully froze more than $200 million of stolen funds from one of the fugitives, the trust achieved a settlement of this action for $200 million, which was returned to the United States and paid to the trust. Recently, the trust commenced another action in Cyprus, where it obtained a Mareva injunction and interim ancillary relief against bank accounts and assets owned and/or controlled by the other principal wrongdoer.

Thus far, counsel on behalf of the trust and its beneficiaries have achieved settlements with the Company and certain of its directors and officers as well as the Company's auditors, lawyer and underwriters, for a total of more than $250 million. The beneficiaries of the trust have already received in excess of 28% of their recognized losses.

### Henry v. Sears, et al., Case No. 98 C 4110 (N.D. Ill. 1999):

Schiffrin Barroway Topaz & Kessler served as Lead Counsel on behalf of the largest class of credit card holders in history. At stake was the right of Sears and its newly formed affiliate, Sears National Bank ("SNB"), to retroactively increase the interest rates on eleven million credit card accounts with outstanding balances resulting from purchases made prior to the accounts being transferred to SNB. Schiffrin Barroway Topaz & Kessler alleged that such conduct violated the Truth-in-Lending Act, the National Banking Act and state consumer fraud statutes. After extensively litigating various aspects of liability, an additional nine months were then spent determining damages. The extraordinary complexity of the damage calculations required Mr. Schiffrin and experts from both parties to develop, test and utilize a novel computer model to ascertain total damages for the class and individualized damages for each class member. Ultimately, Mr. Schiffrin and his partner, Mr. Kessler, were able to negotiate a $156 million settlement, which represented approximately 66% of total damages. In approving the settlement, District Court Judge Leinenwebber of the Northern District of Illinois stated:

> . . . I am pleased to approve the settlement. I think it does the best that could be done under the circumstances on behalf of the class. . . . The litigation was complex in both liability and damages and required both professional skill and standing which class counsel demonstrated in abundance.

The entire settlement fund of $156 million was distributed without the filing of a single proof of claim form by any class member.

### Wanstrath v. Doctor R. Crants, et al., C.A. No. 99-1719-III (Tenn. Chan. Ct., 20th Judicial District, 1999):

Schiffrin Barroway Topaz & Kessler served as Lead Counsel in

a derivative action filed against the officers and directors of Prison Realty Trust, Inc., challenging the transfer of assets from the Company to a private entity owned by several of the Company's top insiders. Numerous federal securities class actions were pending against the Company at this time. Through the derivative litigation, the Company's top management was ousted, the composition of the Board of Directors was significantly improved and important corporate governance provisions were put in place to prevent future abuse. Mr. Schiffrin, in addition to achieving these desirable results, was able to personally effectuate a global settlement of all pending litigation against the backdrop of an almost certain bankruptcy. The case was resolved in conjunction with the federal securities cases for the payment of approximately $50 million by the Company's insurers and the issuance of over 46 million shares to the class members.

*Jordan v. State Farm Insurance Company,*
*Case No. 97 CH 11 (Cir. Ct., McLean County, Ill. 1998):*
Schiffrin Barroway Topaz & Kessler brought a claim on behalf of multiple plaintiffs alleging that State Farm had engaged in fraudulent sales practices by "churning" policies and marketing and selling "vanishing premium" policies that never "vanished." After several years of discovery, motion practice and settlement negotiations, Mr. Schiffrin played a critical role in resolving the action for $225 million in cash, dividend enhancements and other monetary benefits for current and former State Farm policyholders. Schiffrin Barroway Topaz & Kessler also has achieved substantial settlements in 20 additional cases alleging fraudulent sales practices by various insurance companies.

Mr. Schiffrin has also represented defrauded shareholders and companies in complex class and derivative actions, including the following:

*Huscher v. Curley, et al., No. 00 Civ. 21379*
*(Mich. Cir. Ct., 2000) (In re Sotheby's Holdings, Inc.*
*Derivative Litigation):*
Schiffrin Barroway Topaz & Kessler served as Lead Counsel in a derivative action arising out of Sotheby's alleged antitrust price fixing conspiracy with auction house rival Christie's International PLC. A multi-million dollar settlement was negotiated by Mr. Schiffrin whereby Diana Brooks (Sotheby's President at the time of the alleged wrongdoing) agreed to relinquish all of her Sotheby's stock options, and the Company's insurance carrier made a substantial monetary payment to the Company. In addition, significant changes in the Company's top management and Board of Directors were achieved in conjunction with the settlement of the litigation.



# Andrew L. Barroway

Andrew L. Barroway, managing partner of the firm, received his law degree from the University of Pennsylvania Law School, where he was a member of the ABA Negotiation team. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Mr. Barroway frequently lectures on securities class action and lead plaintiff issues, and recently spoke at the 2005 Institutional Investor Hedge Fund Workshop in New York City and the Public Funds Summit 2005 in Phoenix, Arizona. Mr. Barroway has been actively involved in all aspects of litigation on behalf of the firm, and co-manages the firm's securities department. Of his numerous successful representations of shareholders, the following stand out as exceptional:

*In re The Interpublic Group of Companies Securities*
*Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002):*
Schiffrin Barroway Topaz & Kessler served as sole Lead Counsel in this action on behalf of an institutional investor and recently received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock. As of February 2005, the stock had an approximate value of $87 million, resulting in a total settlement value of approximately $107 million. In granting its approval, the Court praised Schiffrin Barroway Topaz & Kessler for acting responsibly and noted the firm's professionalism, competence and contribution to achieving such a favorable result.

*In re Digital Lightwave, Inc. Securities Litigation,*
*Consolidated Case No. 98-152-CIV-T-24E*
*(M.D. Fla. 1999):*
The firm served as Co-Lead Counsel in one of the nation's most successful securities class actions. After extensive litigation and negotiations, a settlement consisting primarily of stock ultimately grew to a value of over $170 million between the time in which the settlement was negotiated and the time at which it was distributed. Schiffrin Barroway Topaz & Kessler took on the primary role in negotiating the terms of the equity component, insisting

that the class have the right to share in any upward appreciation in the value of the stock after the settlement was reached. This recovery represented an astounding approximately two hundred percent (200%) of class members' losses. Schiffrin Barroway Topaz & Kessler believes that this represents the largest percentage recovery for shareholders in securities class action history.

Mr. Barroway, along with his partner, Mr. Kessler, has also negotiated substantial settlements of securities class actions in which Schiffrin Barroway Topaz & Kessler was Lead or Co-Lead Counsel against Pinnacle Holdings, Cell Pathways, Gateway, Mercator and NetSolve. Mr. Barroway currently represents numerous public pension funds, private investment funds, money management firms, and individuals in securities fraud litigation as Lead or Co-Lead Counsel.



## Marc A. Topaz

Marc A. Topaz, a senior partner of the firm, received his law degree from Temple University School of Law, where he was an editor of the Temple Law Review and a member of the Moot Court Honor Society. He also received his Master of Law (L.L.M.) in taxation from the New York University School of Law, where he served as an editor of the New York University Tax Law Review. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Mr. Topaz manages the firm's derivative, transactional and antitrust departments. In this regard, Mr. Topaz has been actively involved in litigating the following prominent cases:

***In re MTC Electronic Shareholder Litigation,***
***No. CV-93-0876 (E.D.N.Y. 1993):***
Schiffrin Barroway Topaz & Kessler served as Co-Counsel in a case involving securities fraud by MTC, its officers and directors, underwriters and accountants. The case presented novel issues of Chinese law, and required the construction of a database of hundreds of thousands of documents utilized in numerous party and non-party depositions. A $72 million settlement was achieved on the eve of trial.

***In re Oppenheimer Capital, L.P., Unitholders Litigation,***
***Consolidated No. 16022NC (Del. Ch. 1997):***
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs alleging that a merger proposed by Pimco Advisors benefitted certain Pimco insiders by disproportionately allocating tax benefits achieved from the restructuring of a limited partnership, and failing to provide adequate compensation to the Oppenheimer shareholders. Plaintiffs moved to enjoin the transaction and a settlement was reached whereby defendants agreed to pay a special dividend to Oppenheimer limited partners of approximately $16 million.

***Wanstrath v. Doctor R. Crants, et al., C.A. No. 99-1719-III***
***(Tenn. Chan. Ct., 20th Judicial District, 1999):***
*(see description on pages 18 and 19)*



### David Kessler

David Kessler, a senior partner of the firm, graduated with distinction from the Emory School of Law. He is licensed to practice in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey. Prior to practicing law, Mr. Kessler was a Certified Public Accountant in Pennsylvania. Mr. Kessler is the co-managing partner of the firm along with Mr. Barroway and manages the firm's nationally recognized securities department. In addition, Mr. Kessler lectures on securities litigation and was a featured speaker on hot topics in securities litigation in a seminar entitled "The Explosion and Evolution of Class Action Law" in December 2004 in Philadelphia, Pennsylvania, and the Corporate Governance Summit on Corporate Accountability in July 2003 in New York City. Mr. Kessler has achieved the following outstanding results in federal securities cases:

*In re Initial Public Offering Securities Litigation, Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002):*
Mr. Kessler, along with Mr. Schiffrin, is presently heading up the firm's litigation efforts in its prominent position as an Executive Committee member in this action. Of the sixty plaintiffs firms which originally filed actions in these coordinated proceedings, Schiffrin Barroway Topaz & Kessler was one of only six selected to serve on the Executive Committee. The coordinated actions, which have been filed against 309 separate issuers of publicly traded securities, challenge the legality of the practices which accompany the allocations of shares in initial public offerings. In addition to suing the issuers of such securities, the 309 coordinated actions also name as defendants the primary investment banking firms which underwrote the offerings. This case, which has received a great deal of national and international media attention, is widely considered the largest securities class action litigation in history. At the present time, the court has preliminarily approved a $1 billion settlement with the issuers and their officers and directors. The class has also reached an agreement in principle to resolve the action against JP Morgan for $425 million, which is in the process of being memorialized and submitted to the Court for approval. The case is proceeding against the remaining underwriting defendants.

*In re PNC Financial Services Group, Inc. Litigation, Case No. 02-CV-271 (W.D. Pa. 2002):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel and was instrumental in obtaining a $30 million recovery for class members from PNC and the assignment of certain claims it may have had against its audit and other third party law firms and insurance companies, with respect to an alleged fraudulent scheme wherein non-performing assets were removed from PNC's books and transferred to special purpose entities that PNC allegedly still controlled. An additional $6.6 million was recovered from the insurance company and the law firms and an agreement in principle has now been reached with the audit to resolve all claims for another $9.075 million, providing for a total recovery from the securities litigation of $45.675 million upon approval of the auditor settlement. When coupled with the $156 million restitution fund established through government actions against some of the same defendants and third parties, the total recovery for class members exceeds $200 million.

*In re Assisted Living Concepts, Inc. Securities Litigation, Lead Case No. 99-167-AA (D. Or. 1999):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel and was instrumental in obtaining a $30 million recovery for class members from the Company, its executive officers and directors, and several underwriters for their role in an alleged complex accounting fraud involving the use of a purportedly independent joint venture to absorb the Company's startup losses. Even after this $30 million recovery, through counsel's efforts, an additional $12.5 million was obtained from the auditors providing for a total recovery of $42.5 million.

*In re Cumulus Media Inc. Securities Litigation, Lead Case No. 00-C-391 (E.D. Wis. 2000):*
Schiffrin Barroway Topaz & Kessler served as Lead Counsel and successfully litigated the action and negotiated a settlement of $13 million in cash and 240,000 shares of freely tradable stock in Cumulus Media, which traded for approximately $19 per share, for a total settlement value of $17.5 million at the time the settlement was approved by the Court.



### Katharine M. Ryan

Katharine M. Ryan, a partner of the firm, graduated *cum laude* from Villanova University School of Law in May 1984. Ms. Ryan is admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the Court of Appeals for the Third Circuit and the United States Supreme Court. Ms. Ryan recently participated as a speaker in a legal teleconference entitled "Is the PSLRA's Safe Harbor Provision Safe?" Ms. Ryan is actively involved in litigating several of the firms most prominent cases and was integral in the excellent results achieved in the following cases:

*In re The Interpublic Group of Companies Securities Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002):*
Schiffrin Barroway Topaz & Kessler served as sole Lead Counsel in this action on behalf of an institutional investor and recently received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock. As of February 2005, the stock had an approximate value of $87 million, resulting in a total settlement value of approximately $107 million. In granting its approval, the Court praised Schiffrin Barroway Topaz & Kessler for acting responsibly and noted the firm's professionalism, competence and contribution to achieving such a favorable result.

*In re New Power Holdings, Inc. Securities Litigation, No. 02 Civ. 1550 (S.D.N.Y. 2002):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel and was instrumental in obtaining a recovery of $41 million in cash for class members against a bankrupt company, certain of its officers and directors and the underwriters of the Company's offering. Claims involved New Power, an offshoot of Enron, that was formed to re-enter the deregulated energy market and pursued an IPO with no viable plan to hedge against volatile energy prices.



### Stuart L. Berman

Stuart L. Berman, a partner of the firm, received his law degree from George Washington University National Law Center, and his undergraduate degree from Brandeis University. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey. Mr. Berman manages the firm's lead plaintiff department and has been instrumental in courts appointing many of the firm's institutional and individual clients as lead plaintiffs in important cases, such as:

*In re Tenet Healthcare Corp. Securities Litigation, No. CV-02-8462- RSWL (C.D. Cal. 2002),*

*State of New Jersey and its Division of Investment v. Sprint Corporation, et al., No. 2:03-CV-02071-JWL (D. Kan. 2003),*

*In re The Interpublic Group of Companies Securities Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002), State of New Jersey and Its Division of Investment v. Sprint Corporation, et al., No. 03-2071-JWL (D. Kan. 2003),*

*In re Delphi Corp. Sec. Litig., 1:05-CV-2637 (NRB) (S.D.N.Y. 2005),*

*In re Vaxgen Inc. Securities Litigation, No. C 03-01129 JSW (N.D. Cal. 2003),*

*In re American Business Financial Services, Inc., No. 04- 0265 (E.D. Pa. 2004)* and

*In re Autobytel, Inc. Securities Litigation, No. CV04-8987 MMM (JWJx) (C.D. Cal. 2004).*

Mr. Berman represents institutional investors worldwide in securities litigation and other related matters. In addition, Mr. Berman is a frequent speaker on securities issues, especially as they relate to institutional investors, at The European Pension Symposium in Florence, Italy; the Public Funds Symposium 2005 in Washington, D.C.; the Pennsylvania Public Employees Retirement (PAPERS) Summit in Harrisburg, Pennsylvania; the New England Pension Summit in Newport, Rhode Island; the Rights & Responsibilities of Institutional Investors 2006 in Amsterdam, Netherlands; and the European Investment Roundtable 2006 in Barcelona, Spain. He speaks with institutional investors located around the world regarding their rights and obligations associated with securities fraud class actions and individual actions. Mr. Berman works closely with the firm's institutional investors and counsels them on fulfilling their fiduciary obligations and exercising their rights in all types of securities related actions.

Mr. Berman has specialized in the area of securities litigation for the past nine years. He is particularly proud of the results achieved in In re AremisSoft Corp. Sec. Litig., C.A. No. 01-CV-2486 (D.N.J. 2002), a case on which Mr. Berman and his partner, Richard Schiffrin, have worked extensively. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, some of whom are now fugitives. In settling the action, Schiffrin Barroway Topaz & Kessler, as sole Lead Counsel, assisted in reorganizing AremisSoft as a new Company which allowed for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The Settlement, which was approved by the Court, called for the class to receive the majority of the equity in the new Company, as well as their pro rata share of all amounts recovered by the litiga-

tion trust. The Court-appointed co-trustees, Joseph P. LaSala, Esq. and Fred S. Zeidman, retained Schiffrin Barroway Topaz & Kessler to continue prosecuting the actions on behalf of the litigation trust. After extensive litigation in the Isle of Man, including the successful freezing of more than $200 million of stolen funds, the trust recently settled its action against one of the principal wrongdoers and recovered approximately $200 million. Thus far, the trust has distributed to beneficiaries of the trust more than 28% of their recognized losses (excluding the value of the equity of the new Company), and is poised to recover even more. Recently, the trust commenced further litigation in Cyprus, where it obtained a Mareva injunction and interim ancillary relief against bank accounts and assets owned and/or controlled by the other principal wrongdoer.



## Gregory M. Castaldo

Gregory M. Castaldo, a partner of the firm, received his law degree from Loyola Law School, where he received the American Jurisprudence award in legal writing. He received his undergraduate degree from the Wharton School of Business at the University of Pennsylvania. He is licensed to practice law in Pennsylvania and New Jersey. Mr. Castaldo has been actively involved in litigating the following cases:

### *In re Tenet Healthcare Corp., 02-CV-8462 (C.D.Cal.):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Tenet Healthcare and certain of its officers and directors defrauded Medicare out of hundreds of millions of dollars, materially overstated Tenet's revenues, and performed unnecessary cardiac surgeries to increase the Company's earnings. After three years of hard-fought litigation and complex mediation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement involving a $216.5 million payment from Tenet and the Company's former CEO and COO, and specific corporate governance improvements.

### *In re Liberate Technologies Securities Litigation, No. C-02-5017 (MJJ) (N.D. Cal. 2005):*
Plaintiffs alleged that Liberate engaged in fraudulent revenue recognition practices to artificially inflate the price of its stock, ultimately forcing it to restate its earnings. As sole Lead Counsel, Schiffrin Barroway Topaz & Kessler successfully negotiated a $13.8 million settlement, which represents almost 40% of the damages suffered by the class. In approving the settlement, the district court complimented Lead Counsel for its "extremely credible and competent job."

### *In re Sodexho Marriott Shareholders Litigation,*
Consol. C.A. No. 18640-NC, Delaware Chancery Court, in which Class Counsel was partially responsible for creating an aggregate financial benefit of approximately $166 million for members of the class.

Mr. Castaldo is also presently litigating *State of New Jersey and Its Division of Investment v. Sprint Corporation, et al.,* No. 03-2071-JWL (D. Kan. 2003) among other actions.



## Michael K. Yarnoff

Michael K. Yarnoff, a partner of the firm, received his law degree from Widener University School of Law. Mr. Yarnoff is licensed to practice law in Pennsylvania, New Jersey, and Delaware and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey. He serves in the firm's securities litigation department and has been actively involved in a number of federal securities cases in which outstanding results were achieved, including the following:

### *In re CVS Corporation Securities Litigation, C.A. No. 01-11464 JLT (D.Mass.):*
After more than three years of contentious litigation and a series of protracted mediation sessions, Schiffrin Barroway Topaz & Kessler, serving as co-lead counsel, secured a $110 million recovery for class members in the CVS Securities Litigation. Specifically, the suit alleged that CVS violated accounting practices by delaying discounts on merchandise in an effort to prop up its earnings. In addition, the suit charged that in 2001, the Company and its Chief Executive Officer, Thomas M. Ryan, improperly delayed announcement of its intention to close approximately 200 underperforming stores, and that an industrywide pharmacist shortage would have a materially negative impact on the Company's performance. Settlement was reached just days prior to the commencement of trial, and shortly after the district court had denied the defendants' motions for summary judgment. This substantial recovery, which represents the third-largest settlement in a securities class action case in the First Circuit, received final approval from District Judge Joseph Tauro on September 27, 2004.

### *In re InfoSpace, Inc. Securities Litigation, Master File No. C-01-0913-Z (D. Wash. 2001):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs alleging that InfoSpace and certain of its officers and directors overstated revenues by using improper accounting methods, overstated the demand for InfoSpace's wireless services, misstated InfoSpace's financial relationships with major customers, and falsely represented that InfoSpace would receive subscription fees from users of web-enabled cell phones. After two years of hard-fought litigation and complex mediation, a settlement of $34.3 million was obtained for members of the class.

*In re Riverstone Networks, Inc. Securities Litigation,*
*Case No. CV-02-3581 (N.D. Cal. 2002):*
Schiffrin Barroway Topaz & Kessler served as Lead Counsel on
behalf of plaintiffs alleging that Riverstone and certain of its offi-
cers and directors sought to create the impression that the
Company, despite the industry-wide downturn in the telecom
sector, had the ability to prosper and succeed and was actually
prospering. In that regard, plaintiffs alleged that defendants issued
a series of false and misleading statements concerning the
Company's financial condition, sales and prospects, and used
inside information to personally profit. After extensive litigation,
the parties entered into formal mediation with the Honorable
Charles Legge (Ret.). Following five-months of mediation, the
parties reached a settlement of $18.5 million.



## Joseph H. Meltzer

Joseph H. Meltzer, a partner of
the firm, received his law degree,
*with honors,* from Temple University
School of Law. He is licensed to
practice law in Pennsylvania and
New Jersey, and has been admitted
to practice before the United
States District Court for the
Eastern District of Pennsylvania,
the United States District Court
for the District of New Jersey
and the United States Court of
Appeals for the Third Circuit.

Mr. Meltzer concentrates his practice in the areas of ERISA
and antitrust complex litigation, and manages the firm's ERISA
litigation department, which has excelled in the highly specialized
area of prosecuting claims on behalf of retirement savings plans.
Mr. Meltzer is Lead Counsel in several pending nationwide class
actions brought under ERISA.

Mr. Meltzer has helped obtain several multi-million dollar
settlements on behalf of class members, including the recent
settlements in *In re Global Crossing ERISA Litigation*, No. 02
Civ. 7453 (S.D.N.Y.) ($79 million settlement) and *In re Augmentin
Antitrust Litigation*, No. 02-442 (E.D. Va.) ($29 million settle-
ment). Mr. Meltzer also prosecutes claims on behalf of third-party
payors and consumers and is currently serving as Lead Counsel
in *In re Remeron Antitrust Litigation*, No. 02-CV-2007 (D.N.J.)
and *In re Wellbutrin SR/Zyban Antitrust Litigation* (E.D. Pa.).

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr.
Meltzer practiced at Barrack, Rodos & Bacine in Philadelphia,
where he had prominent roles in prosecuting several complex
class actions to successful conclusions, including *In re Sorbates
Direct Purchaser Antitrust Litigation*, No. C 98-4886 (N.D. Cal.
2001) ($92 million settlement) and also defended clients in
antitrust and commercial litigation.



## Darren J. Check

Darren J. Check, a partner of the
firm, concentrates his practice in the
area of securities litigation and insti-
tutional investor relations. He is a
graduate of Franklin & Marshall
College where he received a degree
in History, *with honors.* Mr. Check
received his law degree from
Temple University School of Law
and is licensed to practice law in
Pennsylvania and New Jersey, and
has been admitted to practice before
the United States District Court for the Eastern District of
Pennsylvania, the United States District Court for the District of
New Jersey, and the United States District Court for the District
of Colorado. Mr. Check began his career at Schiffrin Barroway
Topaz & Kessler by working extensively with partner David
Kessler on In re Initial Public Offering Securities Litigation, No.
21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002), widely considered the
largest securities class action in history.

Currently, Mr. Check concentrates his time as the firm's
Director of Institutional Relations. He consults with institutional
investors from around the world regarding their rights and
responsibilities with respect to their investments and taking an
active role in shareholder litigation. Mr. Check assists clients in
evaluating what systems they have in place to identify and moni-
tor shareholder litigation that has an affect on their investments,
and also assists them in evaluating the strength of such cases and
to what extent they may be affected by the conduct that has been
alleged. He currently works with clients in the U.S., Canada,
United Kingdom, France, Italy, Sweden, Denmark, Finland,
Norway, Germany, Austria, and the Netherlands. Mr. Check regu-
larly speaks on the subjects of shareholder litigation, corporate
governance, investor activism, and how Schiffrin Barroway Topaz
& Kessler's services can be of use to investors. Recently, Mr. Check
spoke at the MultiPensions 2005 Conference in Amsterdam,
Netherlands; the European Pension Symposium in Florence, Italy;
the Public Funds Summit in Phoenix, Arizona; the European
Investment Roundtable in Barcelona, Spain; The Rights &
Responsibilities Of Institutional Investors: European and U.S.
Approaches To Active Ownership in Amsterdam, Netherlands; the
Corporate Governance & Responsible Investment Summit,
Stockholm, Sweden; and Pension Fund Investment World –
Germany in Frankfurt, Germany.



## Tobias L. Millrood

Tobias L. Millrood, a partner of the firm, manages the mass tort department at Schiffrin Barroway Topaz & Kessler. Mr. Millrood has been actively involved in mass tort litigation involving Prempro (Hormone Therapy), Guidant Cardiac Devices, Medtronic Cardiac Devices, Vioxx, Fen-Phen, Baycol, Meridia, Thimerosal, Ephedra and Zyprexa.

Mr. Millrood has been distinguished with leadership roles in several national products liability actions. Mr. Millrood currently serves as Liaison Counsel in *In Re Hormone Therapy Litigation*, Philadelphia Court of Common Pleas. Mr. Millrood also serves on the Plaintiffs' Steering Committee in *MDL 1507 – In Re Prempro Products Liability* and is Chair of the Association of Trial Lawyers of America (ATLA) Hormone Therapy Litigation Group. Mr. Millrood served as a Co-Chair of the Expert Committee in *In Re Baycol Litigation*, Philadelphia Court of Common Pleas. In Meridia, Mr. Millrood is Co-Chair of the ATLA Meridia Litigation Group. He also served on the Executive Committee of *MDL 1481, In re Meridia Products Liability*. In Thimerosal, Mr. Millrood serves on the Executive Committee of the Omnibus Autism Proceedings before the National Vaccine Injury Compensation Program. In August 2003, Mr. Millrood's article on Hormone Therapy was published in *Trial* magazine. Mr. Millrood speaks frequently at various seminars, on the topics of Mass Tort Litigation, Hormone Therapy, Cardiac Device Litigation, Meridia, the Ethics of Settling Mass Tort Cases and Electronic Discovery. Mr. Millrood has helped his clients to achieve millions of dollars in settlement of their product liability claims.

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Millrood practiced at Anapol Schwartz. While at Anapol Schwartz, Mr. Millrood garnered several notable achievements, including serving as co-counsel in a $22 million medical malpractice verdict in *Wallace v. Fraider* (Phila. CCP Mar. 2001), one of the highest in state history. He also wrote and argued cases resulting in significant changes to Pennsylvania law: *Cullen v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n*, 760 A.2d 1198 (Pa. Commw. 2000) (Pennsylvania workers' compensation carrier could not assert a subrogated claim for benefits that its insured's employee was precluded from recovering in settlement of a related medical malpractice claim); and *Estate of Magette v. Goodman*, 2001 WL 218981 (Pa. Super. 2001) (failure to retain evidence of EKG strip during orthopedic surgery that resulted in death of patient required new trial where court failed to give jury adverse inference instruction).

Mr. Millrood received his law degree from University of Tulsa College of Law. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the District of New Jersey and the United States Court of Appeals for the Third Circuit. Mr. Millrood is a former member of the Pennsylvania Trial Lawyers Board of Governors and the Executive Committee of the Philadelphia Bar Association Young Lawyers' Division.



## Andrew L. Zivitz

Andrew L. Zivitz, a partner of the firm, received his law degree from Duke University School of Law, and received a Bachelor of Arts degree, with distinction, from the University of Michigan, Ann Arbor. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Zivitz practiced with the Philadelphia law firms of Klehr, Harrison, Harvey, Branzburg & Ellers, LLP and Drinker Biddle & Reath, where he litigated complex commercial and environmental matters.

Mr. Zivitz is admitted to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey. Mr. Zivitz concentrates his practice in the area of securities litigation, and is Lead or Co-Lead Counsel in several of the largest class action securities cases currently pending nationwide. In addition, Mr. Zivitz has been actively involved in a number of federal securities cases in which outstanding results were achieved, including the following:

*In re Tenet Healthcare Corp., 02-CV-8462 (C.D.Cal.):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Tenet Healthcare and certain of its officers and directors defrauded Medicare out of hundreds of millions of dollars, materially overstated Tenet's revenues, and performed unnecessary cardiac surgeries to increase the Company's earnings. After three years of hard-fought litigation and complex mediation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement involving a $216.5 million payment from Tenet and the Company's former CEO and COO, and specific corporate governance improvements.

*In re Computer Associates, No. 02-CV-1226 (E.D.N.Y.):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Computer Associates and certain of its officers misrepresented the health of the company's business, materially overstated the company's revenues, and engaged in illegal insider selling. After nearly two years of litigation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement of $150 million from the company.

*In re McLeod USA Inc., No. C02-0001-MWB (N.D. Iowa):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that McLeod USA and certain of its officers misrepresented the health and prospects of the company's business. After more than three years of litigation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement of $30 million from the defendants.

*In re Ligand Pharmaceuticals, Inc., 04-CV-1620-DMS (S.D. Cal.):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel and was instrumental in obtaining a recovery of $8.0 million for class members against Ligand Pharmaceuticals and certain of its officers. Plaintiffs brought claims against the defendants on the grounds that they touted the financial condition of the company and their ability to predict and monitor inventory returns when, in fact, the Company's revenues and earnings were artificially inflated and defendants had no ability to meaningfully predict or gauge inventory returns.

*In re Aon Corp., No. 02-CV-5631 (N.D. Ill.):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel and was instrumental in obtaining a recovery of $7.25 million for class members against Aon Corp. and certain of its officers. Plaintiffs brought claims against the defendants on the grounds that they touted the prospects and successes of the company's multi-million dollar "Business Transformation Plan," when in fact they knew that the plan was damaging the company's business.



## Sean M. Handler

Sean M. Handler, a partner of the firm, received his Bachelor of Arts degree from Colby College, graduating *with distinction* in American Studies. Mr. Handler then earned his Juris Doctor, *cum laude,* from Temple University School of Law.

After law school, Mr. Handler practiced labor law at Reed Smith, LLP in Philadelphia. Since joining Schiffrin Barroway Topaz & Kessler, Mr. Handler has concentrated his practice in the area of securities litigation, with a particular emphasis on client development, litigation strategy and lead plaintiff litigation. In this role, Mr. Handler has been responsible for numerous reported decisions.

In addition to these responsibilities, Mr. Handler also spends considerable time litigating ongoing securities litigation matters on behalf of institutional clients, including:

*In re Delphi Corporation Securities Litigation, No. 06-10026 (GER) (E.D. MI.)*

*Smajlaj v. Brocade Communications Systems, Inc., et al., No. 05-cv-02042 (CRB) (N.D. Cal.)*

*State of New Jersey and Its Division of Investment v. Sprint Corporation, et al., No. 03-2071-JWL (D. Kan. 2003).*



## John A. Kehoe

John A. Kehoe, a partner of the firm, received his B.A. from DePaul University and an M.P.A., *with high honors,* from the University of Vermont. He earned his J.D., *magna cum laude,* from Syracuse University College of Law, where he was Associate Editor of the Syracuse Law Review, Associate Member of the Moot Court Board and Alternate Member of the National Appellate Team.

During his legal career, Mr. Kehoe has litigated high profile securities and antitrust actions in federal and state courts, including *Ohio Public Employees Retirement System et al. v. Freddie Mac et al.,* 03-CV-4261 (S.D.N.Y.) (resulting in a $410 million combined class and derivative settlement); *In re Bristol-Myers Squibb Sec. Litig.,* 02-CV-2251 (S.D.N.Y.) (resulting in a $300 million class settlement); *In re Adelphia Communications Corp. Sec. & Der. Litig.,* No. 03 MD 1529 (S.D.N.Y.) (resulting in a $460 million class settlement); and *In re Vitamins Antitrust Litig.,* MDL No. 1285 (D.D.C.) (resulting in more than $2 billion in federal and state class and direct action settlements).

Mr. Kehoe is currently among the lead trial attorneys representing individual and institutional investors in 309 separate class actions that have been consolidated for pretrial purposes in *In re Initial Public Offering Sec. Litig.,* No. 21 MC 92 (S.D.N.Y.) (resulting in over $1 billion in class settlements with additional claims pending against various underwriter defendants). He is also serving as lead or co-lead counsel in *Reynolds v. Repsol YPF S.A.,* 06-CV-00733 (S.D.N.Y.); *Mizzaro v. Home Depot Inc.,* 06-CV-1151 (N.D. Ga); and *In re AremisSoft Corp. Sec. Litig.,* 01-CV-2486 (D.N.J.).

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Kehoe spent six years as an associate at Clifford Chance LLP, where he represented Fortune 500 corporations and their officers and directors in complex commercial litigation and in actions brought by the Department of Justice, the Securities and Exchange Commission and the Federal Trade Commission.

Mr. Kehoe is a member of the Association of the Bar of the City of New York and the New York Bar Association and is admitted to practice before the courts of New York State (1999) and the U.S. District Court for the Southern District of New York (2000).



### Lee D. Rudy

Lee D. Rudy, a partner of the firm, received his law degree from Fordham University in 1996. In law school he was a senior editor of the Fordham Urban Law Journal and published *A Procedural Approach to Limited Public Forum Cases,* 22 Ford. Urb. L.J. 1255 (1995). He received his undergraduate degree, *cum laude,* from the University of Pennsylvania in 1992. Mr. Rudy is licensed to practice law in Pennsylvania and New York. From 1996 to 2002, Mr. Rudy was an Assistant District Attorney in the Manhattan District Attorney's Office, where he prosecuted dozens of felony jury trials to verdict. From 2003 to 2005, Mr. Rudy was an Assistant United States Attorney in the District of New Jersey, where he investigated and prosecuted numerous fraud and violent crime cases, and where he tried several major fraud cases to verdict in federal court. Mr. Rudy co-manages the firm's mergers and acquisition and shareholder derivative litigation department along with Marc Topaz and Eric Zagar.



### Kay E. Sickles

Kay E. Sickles, a partner of the firm, received her law degree from the University of Pennsylvania School of Law. She received her undergraduate degree from Colgate University, graduating, *with honors,* from the History department. Prior to joining the firm, Ms. Sickles was an associate with Sandals & Langer, LLP, where she litigated complex class actions arising out of violations of the ERISA and antitrust statutes. She is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the Ninth and Seventh Circuit Courts of Appeal, the United States District Court for the Eastern District of Pennsylvania, and the United States District Court for the District of New Jersey.

Ms. Sickles concentrates her practice in the area of securities litigation and specializes in settlement matters. She has played a lead role in effectuating some of the most significant settlements of securities class actions in recent years, including the partial settlement with Tenet Healthcare Corp. and certain officer of that corporation for $216.5 million in *In re Tenet Healthcare Corp. Sec. Litig.,* No. CV-02-8462-RSWL (Rzx) (C.D. Ca. 2006); the settlement for cash and common stock worth over $90 million in *In re Interpublic Sec. Litig.,* Civ. 6527 (DLC) (S.D.N.Y. 2004); and the settlements for securities worth over $133.5 million in *In re Computer Associates Class*

*Action Securities Litigation,* Master File No. 98 Civ. 4839 (TCP), and *In re Computer Associates 2002 Class Action Securities Litigation,* Master File No,.02-CV-1226 (TCP) (E.D.N.Y.).

### Eric L. Zagar

Eric L. Zagar, a partner of the firm, received his law degree from the University of Michigan Law School, *cum laude,* where he was an Associate Editor of the Michigan Law Review. He has practiced law in Pennsylvania since 1995, and previously served as a law clerk to Justice Sandra Schultz Newman of the Pennsylvania Supreme Court. He is admitted to practice in Pennsylvania.

Mr. Zagar concentrates his practice in the area of shareholder derivative litigation. Mr. Zagar has served as Lead or Co-Lead counsel in numerous derivative actions in courts throughout the nation, including *David v. Wolfen,* Case No. 01-CC-03930 (Orange County, CA) (Broadcom Corp. Derivative Action); *In re PolyMedica Corporation Shareholder Derivative Litigation,* Case No. 01-3446 (Middlesex County, MA); *In Re Dynacq Int'l. Shareholder Derivative Litigation,* Case No. 2002-07135 (Harris County, TX); and *Castillo v. Cavallaro, et al.,* Case No. A467663 (Clark County, NV) (Station Casinos, Inc. Class and Derivative Action). Mr. Zagar has successfully achieved significant monetary and corporate governance relief for the benefit of shareholders, and has extensive experience litigating matters involving Special Litigation Committees.

# Associates and Other Professionals



**JULES D. ALBERT**, an associate of the firm, received his J.D. in 2005 from the University of Pennsylvania Law School, where he was a Senior Editor of the University of Pennsylvania Journal of Labor and Employment Law and recipient of the James Wilson Fellowship. Mr. Albert also received a Certificate of Study in Business and Public Policy from The Wharton School at the University of Pennsylvania. Mr. Albert graduated *magna cum laude* with a Bachelor of Arts in Political Science from Emory University. Mr. Albert is licensed to practice law in Pennsylvania, and concentrates his practice in the mergers and acquisitions and shareholder derivative actions department.



**KATIE L. ANDERSON**, an associate of the firm, received her law degree from Widener University School of Law. She received her undergraduate degree from the University of Pittsburgh. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Anderson served as a Deputy Attorney General for the Pennsylvania Office of Attorney General, Bureau of Consumer Protection, where she was responsible for enforcing a wide range of consumer oriented laws.

Ms. Anderson is licensed to practice law in Pennsylvania and is admitted to practice in the United States District Court for the Eastern District of Pennsylvania. She concentrates her practice in the area of mass tort litigation.



**MICHELLE M. BACKES**, an associate of the firm, received her law degree from Villanova University School of Law. Ms. Backes received her undergraduate degrees in Finance and Art History from Loyola College in Maryland in 2002. Ms. Backes is licensed to practice law in Pennsylvania and New Jersey. She concentrates her practice at Schiffrin Barroway Topaz & Kessler in the area of securities litigation.



**IAN D. BERG**, an associate of the firm, received his J.D. and B.A. from Northwestern University. Mr. Berg concentrates his practice in the area of securities litigation and he plays a significant role in investigating and evaluating potential cases, including proprietary claims and direct actions on behalf of institutional clients. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Berg primarily practiced in the areas of commercial litigation and land use on behalf of corporations and real estate investment trusts. He is licensed to practice law in Pennsylvania and Illinois.



**ROBERT W. BIELA**, an associate of the firm, received his law degree from the Penn State Dickinson School of Law, where he served on the editorial board of the Environmental Law and Policy Journal. Mr. Biela received his undergraduate degree from West Chester University. Prior to joining the firm, Mr. Biela was an associate at Mager White and Goldstein, LLP. Mr. Biela is licensed to practice law in the Commonwealth of Pennsylvania and the United States District Court for the Eastern District of Pennsylvania. His practice focuses primarily in the area of securities litigation.



**KATHERINE B. BORNSTEIN**, an associate of the firm, received her law degree from Emory University School of Law. Ms. Bornstein received her undergraduate degree from the University of Maryland. She is licensed to practice law in Pennsylvania and Maryland. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Bornstein was an associate at Provost & Umphrey Law Firm, LLP, where she worked on a number of complex litigation issues. Ms. Bornstein concentrates her practice at Schiffrin Barroway Topaz & Kessler in the areas of ERISA, antitrust and consumer protection.



**TREVAN BORUM**, an associate of the firm, received his B.A. from Wake Forest University in 1987, and his J.D. from Widener University Law School in 1992. Mr. Borum was the valedictorian of his law school class, and served as a Wolcott fellow with the Delaware Supreme Court. He is licensed to practice law in Pennsylvania, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Borum served as an Assistant District Attorney in Philadelphia for ten years. Mr. Borum also practiced criminal defense after leaving the District Attorney's office. At Schiffrin Barroway Topaz & Kessler, Mr. Borum concentrates his practice in the mergers and acquisitions and shareholder derivative actions department.



**JONATHAN R. CAGAN**, an associate of the firm, received his law degree from the Temple University School of Law. Mr. Cagan received his undergraduate degree, *cum laude,* from Temple University. Mr. Cagan is licensed to practice law in New Jersey, and is admitted to the Third Circuit Court of Appeals. Mr. Cagan concentrates his practice in the area of securities litigation and specializes in discovery matters.

28



**EDWARD W. CIOLKO**, an associate of the firm, received his law degree from Georgetown University Law Center, and an MBA from the Yale School of Management. Prior to joining the firm, he served as an Attorney Advisor to Commissioner Sheila F. Anthony at the Federal Trade Commission. He is licensed to practice law in the State of New Jersey, and has been admitted to practice before the United States District Court for the District of New Jersey. Mr. Ciolko concentrates his practice in the areas of antitrust, ERISA, and consumer protection.



**ALISON K. CLARK**, an associate of the firm, received her law degree, *cum laude*, from Boston University School of Law, and received her undergraduate degree in Political Science, with honors, from Lehigh University. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Clark was an attorney with a Fairfield County, Connecticut law firm, where she practiced in the areas of civil and commercial litigation, and real estate transactions.

Ms. Clark is licensed to practice law in Connecticut, and has been admitted to practice before the United States District Court for the District of Connecticut. Ms. Clark concentrates her practice in the mergers and acquisitions and shareholder derivative department.



**STEPHEN E. CONNOLLY**, an associate of the firm, received his law degree from Villanova University School of Law, and is a graduate of The Pennsylvania State University. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Connolly was an associate at a Philadelphia firm where he practiced in the areas of complex litigation, securities and antitrust litigation. Mr. Connolly is licensed to practice law in Pennsylvania, and concentrates his practice in the area of antitrust litigation.



**MARK S. DANEK**, an associate of the firm, received his undergraduate degree in Architecture from Temple University in 1996 and his law degree from Duquesne University School of Law in 1999. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Danek was employed as in-house counsel of a real estate investment trust corporation that specialized in the collection of delinquent property tax receivables.

He is licensed to practice law in the Commonwealth of Pennsylvania and has been admitted to practice before the Courts of the Commonwealth of Pennsylvania, the United States District Court for the Western District of Pennsylvania and the Supreme

Court of the United States of America. Mr. Danek concentrates his practice in the area of securities litigation.



**BRADLEY A. DIRKS**, an associate of the firm, received his J.D. from The University of Akron School of Law and a B.A. in Journalism and Political Science, *cum laude*, from the University of Wisconsin. He is a member of the State Bar of New Jersey, and has been admitted to practice before the United States District Court for the District of New Jersey.

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Dirks worked for an Atlantic City, New Jersey-based law firm where he focused on administrative law and regulatory issues in the casino gaming industry. Mr. Dirks concentrates his practice in the area of shareholder derivative litigation.



**JENNIFER L. ENCK**, an associate of the firm, received her law degree, *cum laude*, from Syracuse University College of Law in 2003 and her undergraduate degree in International Politics from The Pennsylvania State University in 1999. Ms. Enck also received a Masters degree in International Relations from Syracuse University's Maxwell School of Citizenship and Public Affairs. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Enck was an associate with Spector, Roseman & Kodroff, P.C. in Philadelphia, where she worked on a number of complex antitrust, securities and consumer protection cases.

Ms. Enck is licensed to practice law in Pennsylvania. She concentrates her practice in the areas of securities litigation and settlement matters.



**ROBERT J. GRAY**, an associate of the firm, received his law degree from the Temple University School of Law. Mr. Gray received Bachelor of Sciences degree from La Salle University with a dual major of Accounting and Finance. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Gray was an associate at Philadelphia boutique litigation firm practicing in the areas of complex commercial litigation and corporate transactions. Mr. Gray also worked as in-house counsel for a small, publicly-traded holding company.

Prior to beginning his law career, Mr. Gray worked as a forensic accountant for six years, conducting a variety of investigations for numerous governmental agencies and law firms. He received his C.P.A. license in 1997.

Mr. Gray is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. He concentrates his practice in the area consumer protection.

29



**JOHN GROSS**, an associate of the firm, received his law degree from Widener School of Law, and his undergraduate degree from Temple University. Mr. Gross is licensed to practice law in Pennsylvania, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Gross was an insurance defense litigation associate at a large, Philadelphia based firm. Mr. Gross now concentrates his practice in the area of antitrust litigation.



**MARK K. GYANDOH**, an associate of the firm, received his undergraduate degree from Haverford College and his law degree from Temple University School of Law. While attending law school Mr. Gyandoh served as the research editor for the Temple International and Comparative Law Journal. He also interned as a judicial clerk for the Honorable Dolores K. Sloviter of the U.S. Court of Appeals for the Third Circuit and the Honorable Jerome B. Simandle of the U.S. District Court for New Jersey. After law school Mr. Gyandoh was employed as a judicial clerk for the Honorable Dennis Braithwaite of the Superior Court of New Jersey Appellate Division.

Mr. Gyandoh is the author of "Foreign Evidence Gathering: What Obstacles Stand in the Way of Justice?," 15 Temp. Int'l & Comp. L.J. (2001) and "Incorporating the Principle of Co-Equal Branches into the European Constitution: Lessons to Be Learned from the United States" found in *Redefining Europe* (2005). Mr. Gyandoh is licensed to practice in New Jersey and Pennsylvania and concentrates his practice in the area of ERISA, antitrust and consumer protection.



**BENJAMIN J. HINERFELD**, an associate at the firm, and concentrates his work in securities litigation. In 1996, he graduated from the University of Pittsburgh School of Law, where he served as Lead Note and Comment Editor of the Journal of Law and Commerce. From 1996 to 1997, he clerked for the Hon. Sandra Schultz Newman of the Supreme Court of Pennsylvania. Prior to joining SBTK, Mr. Hinerfeld worked in a securities litigation firm in Wilmington, Delaware.

From 2000 to 2003, Mr. Hinerfeld was a writing consultant with the Undergraduate Writing Center at the University of Texas at Austin. During that time he also co-authored, with Dr. Sarah Jane Rehnborg and Catherine Fallon, "Investing in Volunteerism: The Impact of Service Initiatives in Selected Texas State Agencies" a report prepared by The RGK Center for Philanthropy and Community Service, LBJ School of Public Affairs. He received his bachelor's degree from Vassar College and a master's degree in American History from the University of Texas at Austin.

Mr. Hinerfeld is licensed to practice law in Pennsylvania.



**MICHAEL J. HYNES**, an associate of the firm, received his law degree from Temple University School of Law, and is a graduate of Franklin and Marshall College. Mr. Hynes is licensed to practice law in Pennsylvania, New Jersey and Montana, and has been admitted to practice in the United States Court of Appeals for the Ninth Circuit, and the United States District Courts for the Eastern and Middle Districts of Pennsylvania.

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Hynes practiced law at Cozen O'Connor, where he concentrated on bankruptcy and commercial litigation. He was an attorney with the Defenders' Association of Philadelphia from 1991 to 1996, where he defended thousands of misdemeanor and felony cases. At Schiffrin Barroway Topaz & Kessler, Mr. Hynes concentrates his practice in the areas of securities litigation and shareholder derivative litigation.



**TARA P. KAO**, an associate of the firm, received her J.D. from Villanova University School of Law, where she was a Managing Editor of Student Works for the Villanova Law Review. Ms. Kao received her Bachelor of Science in Business/Finance, *with honors*, from Carnegie Mellon University. She is licensed to practice law in Pennsylvania and concentrates her practice in the areas of mergers and acquisitions and shareholder derivative actions.



**D. SEAMUS KASKELA**, an associate of the firm, received his law degree from Rutgers School of Law -- Camden, and received his undergraduate degree in Sociology from Saint Joseph's University. Prior to graduating from law school and joining Schiffrin Barroway Topaz & Kessler, Mr. Kaskela was a law clerk with a large Philadelphia law firm, where he worked in the complex civil litigation department. Mr. Kaskela is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania (pending) and the United States District Court for the District of New Jersey. Mr. Kaskela works in the firm's case development department.



**JENNIFER L. KEENEY**, an associate of the firm, received her law degree, *cum laude,* from Temple University Beasley School of Law, where she was the Special Projects Editor for the Temple International and Comparative Law Journal. Ms. Keeney earned her undergraduate degree in History, *with honors,* from Washington University in St. Louis in 2003. She is licensed to practice law in Pennsylvania and concentrates her practice at Schiffrin Barroway Topaz & Kessler in the area of securities litigation.



**HAL J. KLEINMAN**, an associate of the firm, received his law degree from The John Marshall Law School, and his undergraduate degree from Ithaca College. Mr. Kleinman is licensed in Illinois and Pennsylvania, and has been admitted to practice before the United States District Court for the Northern District of Illinois, the United States District Court for the Eastern District of Pennsylvania, the Court of Appeals for the Seventh Circuit, the Court of Appeals for the Third Circuit, and the United States Court of Claims. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Kleinman practiced law in Chicago, where his practice concentrated in the area of Complex Litigation, Mass Torts and Class Actions. Mr. Kleinman was a member of the law and briefing committee that successfully obtained class certification in *In re Hartmarx Securities Litigation,* Case No. 01 C 7832 (N.D. Ill.). In addition, he was appointed to the Class Counsel Management Committee in *Cress, et al. v. Sara Lee Corporation,* Case No. 98 L 15072 (Cir. Ct., Cook County, Ill.). For his work in this matter, Mr. Kleinman was asked to be a guest lecturer at the University of Chicago Law School's Class Action Controversies Seminar and to discuss the Sara Lee litigation. He also was responsible for representing hundreds of clients in various Mass Torts, including MDL-1431, *In re Baycol Products Liability Litigation;* MDL-1373, *In re Bridgestone/Firestone, Inc. ATX, ATX II and Wilderness Tires Products Liability Litigation;* MDL-1203, *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation;* and MDL-926, *In re Silicone Gel Breast Implants Product Liability Litigation.* Mr. Kleinman concentrates his practice in the area of Mass Torts.



**ERIC LECHTZIN**, an associate of the firm, received his law degree from the Temple University School of Law. Mr. Lechtzin received his undergraduate degree in Political Science and Economics, *magna cum laude,* from Temple University, where he received Phi Beta Kappa honors. Mr. Lechtzin is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey.

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Lechtzin was an associate with the firm of Grant & Eisenhofer, P.A., where his practice was concentrated in federal securities class actions and corporate governance litigation. Mr. Lechtzin spent the first ten years of his career at two large Philadelphia law firms where he represented corporate and public sector clients in a wide range of complex commercial litigation, including toxic torts, labor and employment, insurance, and environmental law. Mr. Lechtzin has extensive trial experience and has argued appeals before the Supreme Court of Pennsylvania and other appellate courts. Mr. Lechtzin concentrates his practice with Schiffrin Barroway Topaz & Kessler in the area of securities class action litigation and is Lead or Co-Lead Counsel in several class action securities cases currently pending nationwide. In addition, Mr. Lechtzin has been actively involved in a number of federal securities cases in which outstanding results were achieved, including the following: *In re Global Crossing Access Charge Litigation, No. 04-MD-1630 (S.D.N.Y.),* in which Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs and helped obtain a settlement of $15 million from the company; *In re Van der Moolen Holding N.V. Securities Litigation, No. 1:03-CV-8284 (S.D.N.Y.),* in which Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs and helped obtain a settlement of $8 million from the company; and *Scott Tanne v. Autobytel, Inc., et al, No. CV 04-8987 (C.D. Cal.),* in which Schiffrin Barroway Topaz & Kessler served as sole Lead Counsel on behalf of plaintiffs and obtained a settlement of $6.75 million from the company.



**JAMES A. MARO, JR.**, an associate of the firm, received his law degree from the Villanova University School of Law in 2000. He received a B.A. in Political Science from the Johns Hopkins University in 1997. Mr. Maro is licensed to practice law in Pennsylvania and New Jersey and is admitted to practice in the United States District Court for the Eastern District of Pennsylvania. He concentrates his practice in the area of mergers and acquisitions and shareholder derivative actions.



**RICHARD A. MANISKAS**, an associate of the firm, received his law degree from Widener University School of Law, and received his undergraduate degree from the University of Pittsburgh. While in law school, Mr. Maniskas served as Internal Editor of the *Widener Journal of Public Law.* He is licensed to practice law in Pennsylvania and the District of Columbia, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Mr. Maniskas works in the firm's case development department.

31



**JAMES H. MILLER**, an associate of the firm, received his J.D. in 2005 from Villanova University School of Law, where he was enrolled in Villanova University's J.D./M.B.A. program. Mr. Miller received his Master of Business Administration from Villanova University in 2005, and received his Bachelor of Chemical Engineering from Villanova University in 2002. Mr. Miller is licensed to practice law in Pennsylvania and concentrates his practice in the areas of mergers and acquisitions and shareholder derivative actions.



**CASANDRA A. MURPHY**, an associate of the firm, received her law degree from Widener University School of Law and her undergraduate degree from Gettysburg College. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Murphy was an associate at Post & Schell, P.C. where she practiced general casualty litigation. Ms. Murphy is licensed to practice in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Ms. Murphy has lectured for the Pennsylvania Bar Institute and the Philadelphia Judicial Conference. She concentrates her practice at Schiffrin Barroway Topaz & Kessler in the area of consumer protection, ERISA, pharmaceutical pricing and antitrust.



**CHRISTOPHER L. NELSON**, an associate of the firm, received his law degree from Duke University School of Law, and his undergraduate degree in Business, Economics, and the Law from Washington University in St. Louis. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Nelson practiced with the Philadelphia law firm of Berger & Montague, P.C., where he was a securities litigator.

Mr. Nelson is admitted to practice law in the Commonwealth of Pennsylvania, the Supreme Court of the United States, the United States Court of Appeals for the Fourth, Fifth and Ninth Circuits, and the United States District Court for the Eastern District of Pennsylvania.

Mr. Nelson concentrates his practice in the area of securities litigation, and is Lead or Co-Lead Counsel in numerous pending nationwide class action securities cases.



**NICHOLAS S. PULLEN**, an associate of the firm, received his law degree, *cum laude,* from the Georgetown University Law Center in 2000. Upon graduation, Mr. Pullen worked at two prominent Philadelphia law firms. In 2003, he joined the administration of Governor Edward G. Rendell, where he served as Chief Counsel to the Pennsylvania Commission on Crime and Delinquency. Most recently, Mr. Pullen served as campaign manager for the Jim Eisenhower for Attorney General Campaign. He is licensed to practice law in Pennsylvania, and has been admitted to practice in the United States District Court for the District of Colorado. Mr. Pullen serves in the firm's Institutional Relations department.



**KAREN E. REILLY**, an associate of the firm, received her law degree from Pace University School of Law, where she was a member of the Moot Court Board and National Moot Court Team. Ms. Reilly received her undergraduate degree from the State University of New York College at Purchase. She is licensed to practice law in Pennsylvania, New Jersey, New York, Connecticut and Rhode Island, and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania, District of New Jersey, Southern and Eastern Districts of New York, and the District of Connecticut.

Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Reilly practiced at Pelino & Lentz, P.C., in Philadelphia, where she litigated a broad range of complex commercial cases. Ms. Reilly concentrates her practice in the area of securities litigation.



**STEVEN D. RESNICK**, an associate of the firm, received his law degree from The Dickinson School of Law of The Pennsylvania State University, and his undergraduate degree, *cum laude,* from West Chester University. Mr. Resnick is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States Court of Appeals for the Third Circuit, the United States District Court for the District of New Jersey and the United States District Court for the District of Nebraska. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Resnick was an associate at the firm of German, Gallagher & Murtagh, where his practice concentrated in the defense of medical malpractice, products liability and premises liability. Mr. Resnick now concentrates his practice in the area of mass tort and product liability litigation.



**EMANUEL SHACHMUROVE**, an associate of the firm, received his law degree from The University of Michigan Law School, where he was an Associate Editor of the Michigan Journal of Law Reform. Mr. Shachmurove received his Bachelor of Science in Economics, *cum laude*, from The Wharton School at the University of Pennsylvania, where he was a Joseph Wharton Scholar. Mr. Shachmurove concentrates his practice in mergers and acquisitions and shareholder derivative litigation.



**BHARATI O. SHARMA**, an associate of the firm, received her law degree from the American University Washington College of Law, a Master of Public Administration from The George Washington University, and her undergraduate degree from the University of Pittsburgh. Ms. Sharma is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the District of New Jersey.

Ms. Sharma is a former judicial law clerk to the Honorable Stephen Skillman, Superior Court of New Jersey, Appellate Division, and a former member of American University's International Law Review. She is the founder and current President of the South Asian Bar Association of Philadelphia. Ms. Sharma also serves on the Executive Committees of the North American South Asian Bar Association and the Philadelphia Bar Association Young Lawyer's Division.

Prior to joining Schiffrin & Barroway, Ms. Sharma practiced complex civil litigation at a Philadelphia law firm. She now concentrates her practice in the areas of pharmaceutical and product liability litigation.



**BENJAMIN J. SWEET**, an associate of the firm, received his juris doctor from The Dickinson School of Law, and his BA, *cum laude*, from the University Scholars Program of The Pennsylvania State University. While in law school, Mr. Sweet served as Articles Editor of the Dickinson Law Review, and was also awarded Best Oral Advocate in the ATLA Junior Mock Trial Competition. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Sweet practiced in the Pittsburgh office of Reed Smith LLP, where he specialized in complex civil litigation. While at Reed Smith, Mr. Sweet co-authored "Assignability of Non-Compete Covenants," 74 Pa. Bar. Q. 64 (April 2003). Mr. Sweet is licensed to practice law in the Commonwealth of Pennsylvania, the United States District Court for the Western District of Pennsylvania and the United States Court of Appeals for the Ninth Circuit.

Mr. Sweet concentrates his practice in the area of securities litigation and has helped obtain several multi-million dollar settlements on behalf of class members in several nationwide federal securities class actions, including *In re CVS Pharmacy, Inc. Secs. Litig.*, No. 01-11464 (D.Mass. 2005) ($110 million recovery for Class members), *In re Zomax Inc. Secs. Litig.*, No. 04-cv-1155 (D.Minn. 2005) (multi-million dollar cash and stock recovery for Class members), *In re Flextronics Int'l Ltd. Secs. Litig.*, No. 03-cv-2102 (N.D. Cal. 2004) ($4.25 million recovery for Class members) and *In re Black Box Corp. Secs. Litig.*, No. 03-cv-412 (W.D. Pa. 2004) (multi-million dollar recovery for Class Members). Mr. Sweet is currently Lead or Co-Lead Counsel in several pending nationwide class action securities cases, including *In re Tyco Int'l Ltd. Secs. Litig.*, MDL Docket No. 02-1335-B (D.N.H.) and *In re PNC Financial Services Group, Inc. Secs. Litig.*, No. 02cv271 (W.D. Pa.).



**NICOLETTE TROPIANO**, an associate of the firm, received her law degree from Temple University School of Law. Ms. Tropiano received her undergraduate degree in Economics and Business Administration with a concentration in Accounting and Finance from Ursinus College in 2001.

Ms. Tropiano is licensed to practice law in Pennsylvania. She concentrates her practice in the area of securities litigation, and serves in the firm's lead plaintiff department which involves working with clients, litigation strategy and lead plaintiff issues.



**MICHAEL WAGNER**, an associate of the firm, received his undergraduate degree in Government from Franklin & Marshall College, and his law degree from the University of Pittsburgh School of Law in 1996. Mr. Wagner is licensed to practice law in Pennsylvania, and he has been admitted to practice in the United States Court of Appeals for the Third Circuit, and United States District Courts for the Eastern and Western Districts of Pennsylvania, for the Eastern District of Michigan, and for the District of Colorado.

Before joining Schiffrin Barroway Topaz & Kessler, Mr. Wagner worked at Rubin, Fortunato & Harbison, a boutique law firm in Paoli, PA, representing Fortune 100 corporations, as well as individuals and small businesses, in employment matters across the country. Mr. Wagner earlier worked for several years at Spector, Gadon & Rosen, in Philadelphia, concentrating his practice in complex commercial and corporate litigation. At Schiffrin Barroway Topaz & Kessler, Mr. Wagner focuses his practice in the areas of securities litigation and shareholder derivative litigation.



**JOSEPH A. WEEDEN**, an associate of the firm, received his law degree from the University of North Carolina School of Law, where he received the Gressman-Politt Award for outstanding oral advocacy. Mr. Weeden also received his undergraduate degree from the University of North Carolina at Chapel Hill, where he was a Joseph E. Pogue Scholar. Prior to joining the firm, Mr. Weeden was an associate at Kaufman & Canoles, P.C., where he practiced in the areas of commercial and business law. Mr. Weeden is licensed to practice law in Virginia, and concentrates his practice in the areas of complex ERISA and consumer litigation.



**ROBIN WINCHESTER**, an associate of the firm, received her law degree from Villanova University School of Law, and received her undergraduate degree in Finance from St. Joseph's University. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Winchester served as a law clerk to the Honorable Robert F. Kelly in the United States District Court for the Eastern District of Pennsylvania. Ms. Winchester is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. She concentrates her practice in the area of shareholder derivative actions.



**GERALD D. WELLS, III**, an associate of the firm, received his law degree from Temple University School of Law, where he served on the editorial board of the Environment Law & Technology Journal. He is licensed to practice in Pennsylvania and New Jersey and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the District Court of New Jersey, and the United States District Court for the Eastern District of Michigan.

Mr. Wells concentrates his practice in the areas of antitrust, ERISA, consumer protection, and FLSA/overtime litigation and has helped obtain several multi-million dollar settlements on behalf of class members, including settlements in *In re Bristol-Myers Squibb ERISA Litigation*, No. 02-CV-10129 (LAP) ($41.22 million in cash plus structural remedies valued at up to $52 million); *Falk v. Amerada Hess Corp., et al.*, No. 03-CV-2491-FSH-PS ($2.25 million in cash plus structural remedies valued at up to $23.8 million); and *In re Westar Energy Inc. ERISA Litig.*, No. 03-4032-JAR (D. Kan.) ($9.25 million cash settlement). Mr. Wells currently serves as counsel in several pending nationwide class and collective actions.



**TERENCE S. ZIEGLER**, an associate of the firm, received his law degree from the Tulane University School of Law. Mr. Ziegler received a Bachelor of Business Administration degree with a concentration in Finance from Loyola University. Mr. Ziegler is licensed to practice law in the State of Louisiana, and has been admitted to practice before the United States Court of Appeals for the Fifth Circuit, the United States District Court for the Eastern District of Louisiana and the United States District Court for the Middle District of Louisiana. Mr. Ziegler concentrates his practice in the areas of consumer protection, ERISA, pharmaceutical pricing and antitrust.

# Of Counsel

**CHRISTI A. CANNON,** of counsel to the firm, received her law degree from Emory University School of Law and her undergraduate degree from Auburn University, *magna cum laude*. In law school Ms. Cannon was named to the Order of the Barristers, was one of twelve people from her class chosen to be on the Moot Court Special Teams, and served as the Director of Special Teams on the Moot Court Board of Directors. Ms. Cannon also served as one of three team members for the Georgia Intrastate Moot Court competition and as an alternate member for the National Moot Court Team.

Ms. Cannon has spent her legal career representing both plaintiffs and defendants in complex litigation around the United States and overseas, with a prominent emphasis on securities litigation under federal and state securities laws. Ms. Cannon is licensed to practice law in Georgia and has been admitted to practice before the Eleventh Circuit Court of Appeals, the United States District Court for the Northern District of Georgia, and all Georgia trial and appellate courts. In 2005, Ms. Cannon was voted by her peers and named by *Atlanta Magazine* and *Law and Politics Magazine* to be a Georgia Super Lawyer, placing her in the top five percent of attorneys and among the top 15 securities litigation attorneys in Georgia.

Ms. Cannon is working extensively with partner David Kessler on *In re Initial Public Offering Securities Litigation,* Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002), currently pending in the Southern District of New York.

**ROBERT M. BRAMSON,** of counsel to the firm, has more than twenty-five years of experience in the litigation of antitrust and consumer cases, class actions and other complex litigation. Mr. Bramson received his undergraduate degree in economics, *summa cum laude,* from the University of California at Berkeley in 1977, and obtained his law degree from the Boalt Hall School of Law in 1981. Mr. Bramson is a member of the California Bar.

Mr. Bramson has represented both plaintiffs and defendants in numerous antitrust cases, and has acted as lead counsel in two such actions taken to trial — *Pacific West Cable Co. v. City of Sacramento, et al.* (E.D. Cal.) ($12 Million settlement on 24th day of trial, at close of plaintiff's case; Sherman Act §2 monopolization claims) and *Coleman et al. v. Sacramento Cable Television* (Sacramento Sup. Ct.) ($2.4 Million judgment after 17-day trial; class action/B & P §17200 case; B & P §17204 discriminatory pricing claims).

Mr. Bramson specializes in antitrust, business torts and communications litigation, as well as in class action cases. He served for many years on the Board of Directors of the National Association of Consumer Advocates and co-chaired its class action committee. He is a contributing author to the National Consumer Law Center's publication Consumer Class Actions. He acted as reporter for the National Association of Consumer Advocates in preparing its influential Standards and Guidelines for Consumer Class Actions, 176 F.R.D. 375 (1997).

Mr. Bramson's lecture topics have included "Strategic and Ethical Issues in Litigating 17200 Cases" (Bar Association of San Francisco, San Francisco 2001), "Equitable Remedies in Class

Actions and Under California's Section 17200 Statute" (National Association of Consumer Advocates, Chicago 2000), "Ethical Issues Arising in Class Action Settlements" (National Consumer Law Center, Wash., DC and San Diego 1999 and 1998), "California's Business & Professions Code Section 17200" (California Bar Association, Lake Tahoe 1997), "Preparation of Competitive Business Practices Cases" (Continuing Education of the Bar, Sacramento 1997), and "The Cable Communications Policy Act of 1984" (California State University, Fullerton 1993).

In addition to serving as Of Counsel to Schiffrin Barroway Topaz & Kessler, Mr. Bramson is a partner in the law firm of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, of Walnut Creek, California.

**ALAN R. PLUTZIK,** of counsel to the firm, specializes in complex business litigation in state and federal courts throughout the United States. Areas of particular emphasis include class actions, securities fraud and corporate governance litigation, consumer law, antitrust, constitutional and communications law. Mr. Plutzik is admitted to practice in California and the District of Columbia (inactive member), and is a member of the bars of the United States Supreme Court, the Second, Eighth, Ninth, Tenth and District of Columbia Circuits and numerous federal district courts throughout the United States.

Mr. Plutzik received his law degree from the University of California at Berkeley's Boalt Hall School of Law in 1977. He received his undergraduate degree from St. John's College, Annapolis, Maryland, in 1971, and also holds an M. A. from Stanford University. Over the course of his twenty-nine year career, Mr. Plutzik has also handled a wide variety of class actions and derivative cases. He has represented, among other clients, corporate shareholders and limited partners challenging conduct by their general partners, officers or directors; consumers and businesses harmed by price-fixing and other anti-competitive conduct; consumers in actions against insurance companies, banks and other lenders; investors in securities fraud cases and derivative suits; employees in ERISA and wage/hour cases; purchasers of mislabeled and defective products; victims of toxic pollution; persons harmed by defective products; and cellular telephone and cable television subscribers.

Mr. Plutzik has also handled a substantial number of cases that raise First Amendment and other constitutional issues, and has represented broadcasters, cable television companies, communications common carriers and consumers in litigation and in administrative proceedings before the Federal Communications Commission and the California Public Utilities Commission.

Mr. Plutzik has written or lectured on topics that include class actions, California consumer law, substantive and procedural issues under the federal securities laws, First Amendment issues applicable to new media, cable television franchising and cable television companies' access to utility poles and real estate developments. He has appeared as a guest radio commentator on the Len Tillem Show on KGO-Radio in San Francisco, discussing class actions, consumer protection law and investor rights.

Mr. Plutzik has served as a judge pro tem on the Contra Costa County Superior Court. He is also President of the Warren W. Eukel Teacher Trust, a community-based charity that honors outstanding teachers in Contra Costa County, California.

In addition to serving as Of Counsel to Schiffrin Barroway Topaz & Kessler, Mr. Plutzik is a partner in the law firm of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, of Walnut Creek, California.

**L. TIMOTHY FISHER,** of counsel to the firm, specializes in consumer and securities class actions and complex business litigation. He has been actively involved in several cases in which multi-million dollar recoveries were achieved for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and fraud. Mr. Fisher is a member of the California Bar.

Mr. Fisher received his Juris Doctorate from Boalt Hall at the University of California at Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first year moot court competition.

In 1992, Mr. Fisher graduated *with highest honors* from the University of California at Berkeley and received a degree in political science. Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council." He is also a member of Phi Beta Kappa.

In addition to serving as Of Counsel to Schiffrin Barroway Topaz & Kessler, Mr. Fisher is an associate in the law firm of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, of Walnut Creek, California.

# Consultants



**KEVIN P. CAULEY** serves in the firm's business development and institutional relations department. Mr. Cauley is a graduate of Temple University. Prior to joining the firm, Mr. Cauley was Director of Business Development for a multi-family office in New York City. Mr. Cauley also has prior experience in institutional fiduciary investment consulting, money manager selection, best trade executions, and asset allocation modeling. He has held the Series 7, 24, 63, and 65 licenses with the NASD. Mr. Cauley has also done political consulting in coordinating and directing various aspects of field operations for local, state, and national campaigns in Southeastern Pennsylvania. He is also an active member of The Pennsylvania Future Fund, A.O.H. Division 88 "Officer Danny Boyle Chapter," The Saint Andrews Society, The Friendly Sons of Saint Patrick, The Clover Club of Philadelphia, The Foreign Policy Research Institute, a Board Member of The Princeton Committee on Foreign Relations, and is an elected member to The Pennsylvania Society and The Union League of Philadelphia, where he serves on the Armed Services Committee.

**DAVID RABBINER** serves as Schiffrin Barroway Topaz & Kessler's Director of Investigative Services. As the firm's lead investigative fact finder, Mr. Rabbiner plans, oversees, and conducts investigations necessary to further and strengthen the firm's class-action litigation efforts. Although his investigative services are primarily devoted to securities matters, Mr. Rabbiner routinely provides litigation support, conducts due diligence, and lends general investigative expertise and assistance to the firm's other class-action practice areas. Mr. Rabbiner plays an integral role on the firm's legal team, providing critical investigative services to obtain evidence and information to help ensure a successful litigation outcome. Before joining Schiffrin Barroway Topaz & Kessler, Mr. Rabbiner enjoyed a broad-based, successful career as an FBI Special Agent, including service as an Assistant Special Agent in Charge, overseeing multiple criminal programs, in one of the Bureau's largest field offices. He holds an A.B. in English Language and Literature from the University of Michigan and a Juris Doctor from the University of Miami School of Law.

**SKIP HETTEL,** an investigator for the firm, received his undergraduate degree in Political Science from Syracuse University. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Hettel was a paralegal for Miller, Alfano & Raspanti, P.C., where he worked on white-collar criminal defense and in the Special Master's office for Fen-Phen litigation. Previously, he served on the Jim Eisenhower for Attorney General Campaign.



280 King of Prussia Road, Radnor, Pennsylvania 19087
610-667-7706 · Fax: 610-667-7056

2125 Oak Grove Road, Suite 120, Walnut Creek, California 94598
925-945-0770 · Fax: 925-945-8792

**www.sbtklaw.com**

# EXHIBIT C

1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
2                      TOPEKA, KANSAS            ORIGINAL

3        _____
                                        )
4        In Re:  WESTAR ENERGY, INC.   )   Case No.
         ERISA LITIGATION              )   03-4032-JAR
5        _____)

6
                 TRANSCRIPT OF FAIRNESS HEARING
7
              PROCEEDINGS had before the Honorable
8        Julie A. Robinson, United States District
         Court Judge, for the District of Kansas,
9        Topeka, Kansas, on the 27th day of July,
         2006.
10
         APPEARANCES:
11
         For the            Joseph H. Meltzer, Esq.
12       Plaintiffs:        SCHIFFRIN & BARROWAY, LLP
                            280 King of Prussia Road
13                          Radnor, PA  19087

14                          Ronald P. Pope, Esq.
                            Ralston, Pope & Diehl, LLC
15                          2913 S.W. Maupin Lane
                            Topeka, KS  66614
16
         For Defendant      Sharon Katz, Esq.
17       Westar Energy:     Antoinette Ellison, Esq.
                            DAVIS POLK & WARDWELL
18                          450 Lexington Avenue
                            New York, NY  10017
19
                            Jason M. Hans, Esq.
20                          ROUSE HENDRICKS
                              GERMAN MAY PC
21                          One Petticoat Lane Building
                            1010 Walnut Street
22                          Suite 400
                            Kansas City, MO  64106
23
         For Defendant      Stanley M. Burgess, Esq.
24       Koupal:            ARMSTRONG TEASDALE LLP - KC
                            2345 Grand Boulevard
25                          Suite 2000
                            Kansas City, MO  64108-2617
```

2

```
 1        For Defendant        Kathryn A. Lewis, Esq.
 2        Terrill:             WARDEN TRIPLETT GRIER PA
                               9401 Indian Creek Parkway
 3                             Suite 1100
                               Overland Park, KS  66210
 4
          Court Reporter:      Sherry A. Berner, C.S.R.
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                         PROCEEDINGS
 2                  THE COURT:  All right.  We will call
 3       In Re:  Westar Energy, Inc. ERISA Litigation,
 4       case number 03-4032.  Your appearances.
 5                  We'll begin with you, Ms. Lewis,
 6       you're on the phone.
 7                  MS. LEWIS:  Yes.  It's Kathryn Lewis
 8       for Defendant Richard Terrill.
 9                  THE COURT:  All right.  And other
10       appearances, please.
11                  MR. MELTZER:  Good afternoon, Your
12       Honor.  Joseph Meltzer of Schiffrin &
13       Barroway on behalf of the plaintiffs.  Joined
14       with me is cocounsel, Ron Pope.
15                  MS. KATZ:  And Sharon Katz of Davis
16       Polk & Wardwell, and my colleague, Antoinette
17       Ellison, from Davis Polk & Wardwell, for
18       Westar Energy.  And Mr. Hans on--
19                  MR. HANS:  Jason Hans on behalf of
20       Westar Energy.
21                  THE COURT:  All right.
22                  MR. BURGESS:  I'm Matthew Burgess
23       from Armstrong Teasdale on behalf of Carl
24       Koupal.
25                  THE COURT:  All right.  And we're
```

4

```
 1          here for the fairness hearing on the
 2          settlement of the class action in this case.
 3                  On May 15th of this year I held a
 4          preliminary settlement hearing and
 5          preliminarily approved the settlement,
 6          ordered that notice be given, as set forth in
 7          the order preliminarily approving settlement.
 8          And in preliminarily approving the settlement
 9          I conditionally certified the class,
10          preliminarily approved the terms of the
11          settlement, and set this date for today's
12          hearing, and, of course, approved the class
13          notice of proposed settlement.
14                  You all have now submitted a
15          proposed order and final judgment.  And in
16          addition we've received the motion of the
17          plaintiffs for final approval; a memorandum
18          in support of class counsel's motion for
19          award of attorneys' fees, expenses, and case
20          contribution compensation as well; a
21          declaration of Mr. Meltzer in support of the
22          motions for settlement and awarded fees,
23          compensation, and reimbursement of expenses;
24          a declaration of Mr. Pope concerning that as
25          well.
```

5

| | |
|---|---|
| 1 | All right.  Mr. Meltzer or Ms. Katz, |
| 2 | who is going to proceed? |
| 3 | MR. MELTZER:  I will, Your Honor. |
| 4 | THE COURT:  All right, go ahead. |
| 5 | MR. MELTZER:  Thank you.  Your |
| 6 | Honor, we are pleased to be here today.  And |
| 7 | as you stated, we're here to present a |
| 8 | settlement of all claims in the Westar ERISA |
| 9 | litigation.  As Your Honor has alluded to, a |
| 10 | lot of papers have been filed in our |
| 11 | presentation so I won't cover everything in |
| 12 | those papers or it would drag on far too |
| 13 | long; but I think I'll hit the relevant |
| 14 | points. |
| 15 | As I stated, we have a settlement of |
| 16 | all claims in the Westar ERISA case.  It |
| 17 | was-- the settlement was the product of some |
| 18 | rather strenuous and extensive negotiations |
| 19 | between the parties.  We're proud to present |
| 20 | the settlement.  We think in light of the |
| 21 | litigation risk and the damage analogies in |
| 22 | this case that it's an excellent result for |
| 23 | the ERISA class. |
| 24 | The settlement calls for a payment |
| 25 | of 9.25 million that will be paid by the |

6

```
1       defendants into the Westar Energy 401(k)

2       savings plan.  That money will then be

3       distributed to class members and plan

4       participants in accordance with the plan of

5       obligation that we've submitted in

6       conjunction with the settlement.

7               Two points I would want to make

8       quickly.  First, the settlement has been

9       reviewed by an independent fiduciary.  The

10      independent fiduciary was retained by Westar

11      in its corporate capacity and as a fiduciary

12      of the plan.  The independent fiduciary in

13      this case is Independent Fiduciary Services,

14      Incorporated.  Essentially what they do is

15      they come in to look and see that the

16      settlement meets the DOL class exemption, and

17      also that it's not a prohibited transaction

18      under Section 406 of ERISA.  Essentially,

19      they need to make a determination that the

20      release given in consideration for the value

21      of the settlement is fair and that the

22      fiduciaries were not engaged in self-dealing.

23              They have authorized the settlement.

24      Your Honor has, obviously, the ultimate

25      discretion to approve.  But in a case such as
```

7

```
1      this it's usually a good sign when the

2      independent fiduciary gives its blessing to

3      the settlement.

4              The other point I would make is that

5      there have been no objections to either the

6      motion for approval or for the application of

7      fees.  That's especially telling in this case

8      because we have a -- as Mr. Pope would tell

9      you -- a very active, interested class.  They

10     were very involved, very engaged in this

11     entire process.  And they have unanimously

12     endorsed the settlement, and no one has

13     lodged any objections to any of the motions

14     pending today.

15             The two motions that are on calendar

16     for today, as Your Honor stated, are a motion

17     for final approval of settlement,

18     certification of the settlement class and

19     approval of the plan of allocation; and a

20     second motion for an award of attorneys'

21     fees, reimbursement of expenses and case

22     contribution compensation.  And, Your Honor,

23     with your permission, I can address the

24     settlement first.

25             THE COURT:  Go ahead.
```

8

```
1              MR. MELTZER:  The-- Your Honor,

2       would it be helpful if I gave a background of

3       the claims and the history of the litigation?

4       That's set forth at length in the papers, but

5       I would be happy to do it for the record.

6              THE COURT:  No.  I think you can

7       summarize that.

8              MR. MELTZER:  Okay.  Your Honor,

9       just briefly, the first case in the Westar

10      ERISA litigation was filed in March of 2003.

11      The central claim is that the plan

12      fiduciaries breached their duties under ERISA

13      by allowing investments in the company stock

14      at a time when they knew or should have known

15      that those investments were imprudent.

16              There were many cases that were

17      filed after the Toledo case, the first case

18      filed in March.  There were several cases

19      filed afterwards.

20              Your Honor consolidated those cases

21      in September of 2003.  We filed a

22      consolidated pleading -- which is the

23      operative complaint for today -- in October

24      of 2003, and that touched off a flurry of

25      briefings, several motions to dismiss,
```

```
 1        consolidated response, numerous replies.

 2               Your Honor, we started informal

 3        settlement negotiations in the summer of

 4        2004.  We continued those through the fall to

 5        essentially pick a mediator.  Our first

 6        mediation -- there wound up being four total

 7        -- was in December of 2004 with Gary McGowan,

 8        who presided over each and every mediation in

 9        this case.

10               Unable to resolve the case, we went

11        back into litigation posture in 2005.  We

12        essentially engaged in a formal

13        discovery protocol at that point that was

14        presided over by Magistrate Judge O'Hara.

15        The defendants produced a large volume of

16        documents.  We prepared, we analyzed, and

17        coded some of those documents.  We set up an

18        electronic database for further analysis.

19               We also continued on a settlement

20        track, fortunately, as we were going through

21        formal discovery.  We had another mediation

22        -- excuse me -- in the spring of 2005 that

23        was, obviously, unsuccessful.  We pressed

24        forward with a lot of discovery in the case.

25               We had yet another mediation in
```

10

```
1        October of 2005.  And while we weren't able

2        to resolve the case at that time, it did

3        break some of the log jam, frankly.  There

4        was a fair amount of progress in October of

5        2005.  That may partly be the result of Your

6        Honor's ruling in September of 2005 on the

7        motions to dismiss.  Gave people a better

8        sense of what the claims were going to be in

9        this litigation.

10               We scheduled a final mediation for

11       January 31st of this year.  We were able to

12       reach an agreement at that time.  We signed

13       the term sheet on that day and began the

14       settlement process which leads us to today's

15       hearing.

16               In terms of the approval process,

17       the Tenth Circuit has established a

18       four-factor test to determine whether the

19       settlement is fair, reasonable, and adequate.

20       The test is set forth in the Tenth Circuit

21       case Jones v. Nuclear Pharmacy.

22               I'll go through them briefly.  The

23       first factor is whether the proposed

24       settlement was fairly and honestly

25       negotiated.  Your Honor, as I just explained,
```

SHERRY A. BERNER
Official Court Reporter

11

1      there were multiple mediations.  There were

2      formal negotiations with an experienced

3      mediator.  There were informal negotiations.

4      The negotiation process in this case was

5      arms-length, to say the least, and was

6      strenuous and was fair and honest.

7              The second factor is whether serious

8      questions of law and facts exist, placing the

9      ultimate outcome of the litigation in doubt.

10     Your Honor, as a lot of courts have noted,

11     these are difficult cases.  ERISA itself is a

12     very difficult statute.  There are complex

13     questions.  And when you factor in the class

14     certification aspects of this case, you find

15     a way to make an ERISA case even more

16     complicated.  So I think that factor also

17     militates in favor of approval.

18             The third factor is whether the

19     value of an immediate recovery outweighs the

20     mere possibility of future relief after

21     protracted and expensive litigation.  Your

22     Honor, in this particular case, given what

23     our prospects were for success, even if we

24     overcame every legal hurdle by very capable

25     opposing counsel, I'm not sure that we would

12

1    have done any better; and we may have wound

2    up getting a little bit less for the class

3    settlement.  This factor is particularly in

4    favor of approval here because we were able

5    to get a recovery which may well exceed what

6    we would have gotten even if we would have

7    won through judgment.

8         The fourth factor is the judgement

9    of the parties that the settlement is fair

10   and reasonable.  I think everyone here today

11   will essentially endorse the settlement as

12   fair and reasonable.  I know I do.  I'm

13   fairly confident that my colleagues on the

14   defense side will as well.  And I think those

15   four factors are what the Tenth Circuit views

16   in terms of assessing whether a settlement

17   should be approved.  I think they're all met

18   here.

19        The only other point that I would

20   make with respect to the settlement, Your

21   Honor, again, is that there have been no

22   objections.  So the reaction of the class has

23   been overwhelmingly and unanimously, frankly,

24   in support of approval.

25        The other aspect of the settlement

| | |
|---|---|
| 1 | approval is for certification of the |
| 2 | settlement class.  We think that Your Honor |
| 3 | mentioned that you preliminarily certified |
| 4 | the settlement class.  We think that the |
| 5 | class certification in this case is very |
| 6 | appropriate.  A 23(b)(1) class should be |
| 7 | certified.  The class that we're seeking to |
| 8 | certify for settlement purposes is a |
| 9 | participant or beneficiary in the Westar |
| 10 | Energy employees' 401(k) savings plan from |
| 11 | July 1st, '98, through January 1st, 2003, |
| 12 | whose account included investments in Westar |
| 13 | stock. |
| 14 | Your Honor, as our papers explain in |
| 15 | some length, I think all the factors of 23(a) |
| 16 | are met, as well as the factors of 23(b)(1) |
| 17 | have also been satisfied.  There have been a |
| 18 | number of these cases both in a settlement |
| 19 | context and in a litigation context, this |
| 20 | ERISA employer stock type of case.  I believe |
| 21 | they have all been certified under 23(b)(1) |
| 22 | as a non opt-out class.  And we think that's |
| 23 | appropriate here. |
| 24 | Your Honor, I don't-- I don't have |
| 25 | anything more on the settlement itself unless |

14

```
1        Your Honor has any questions.
2                    THE COURT:  I don't believe so.
3                    Would anyone else like to weigh in
4        on this matter?
5                    MS. KATZ:  If I might just for a
6        second, Your Honor, just to say on behalf of
7        Westar that we are very pleased to be here at
8        what we hope is now the conclusion of the
9        trilogy of civil cases that had originally
10       been presented to Your Honor, and we are very
11       pleased with the settlement.  We do believe
12       that it is fair, reasonable, and adequate.
13                   The settlement negotiations were
14       very, very hard-fought.  This was a very,
15       very difficult case for us to resolve.  But
16       we are very pleased with the results, and we
17       think that they will be of great benefit to
18       the members of the class, and we just urge
19       that Your Honor approve the settlement as
20       described by Mr. Meltzer and the
21       certification of the class.  Thank you.
22                   THE COURT:  All right.  Thank you.
23                   Anyone else?
24                   All right.  I'll begin with the
25       matter of the certification of the class.
```

15

| | |
|---|---|
| 1 | And, yes, there have been no objections by |
| 2 | any single class member to the certification |
| 3 | of the class, to the settlement, or to the |
| 4 | related matters concerning allowance of fees |
| 5 | and expenses and compensation.  I did |
| 6 | conditionally certify the class at the |
| 7 | preliminary hearing.  I'll now reiterate my |
| 8 | findings that class certification is proper |
| 9 | for the class, as defined in the preliminary |
| 10 | order. |
| 11 | The requirements of Rule 23(a) are |
| 12 | met.  The numerosity requirement is met. |
| 13 | This class consists of several thousand |
| 14 | potential class members.  Joinder is not |
| 15 | practicable. |
| 16 | The requirement of commonality is |
| 17 | met.  There are common issues of fact and |
| 18 | law, including whether the defendants |
| 19 | breached fiduciary duties owed to the plan |
| 20 | and their participants in allowing the |
| 21 | maintenance of existing, and the addition of |
| 22 | new, investments in the company stock during |
| 23 | the proposed class period; issues concerning |
| 24 | whether the defendants knew or should have |
| 25 | known of problems besieging the company that |

16

```
1        negatively affected the prudence of Westar

2        stock as an investment of the plan during the

3        class period.

4                  Other common issues:  Whether

5        defendants were fiduciaries of the plan

6        and/or the participants; whether defendants

7        breached their fiduciary duties, if they were

8        fiduciaries; whether the plans and the

9        participants were injured by such breaches;

10       and whether the class is entitled to damages

11       and injunctive relief.

12                 The requirement of typicality is met

13       in that the claims of the class

14       representatives are typical of the claims of

15       the class as a whole.  The plaintiffs in this

16       case and the proposed class are all employees

17       of Westar, a participant of the plan during

18       the class period, and each had part of his or

19       her individual plan investment portfolio

20       invested in Westar stock during the class

21       period.

22                 All of them-- all of the plaintiffs

23       sustained injury during the class period; and

24       all of the plaintiffs bring their claims

25       pursuant to ERISA Sections 409 and 502(a)(2)
```

1          for plan-wide relief, so any relief obtained

2          would inure to the plan as a whole and,

3          derivatively, to its participants during the

4          class period.

5                    And the requirement for adequacy of

6          representation is also met.  The named

7          plaintiffs and their counsel are adequate

8          representatives of the interests of the class

9          as a whole.  I find that plaintiffs have no

10         interest antagonistic to the interests of the

11         absent class members.

12                   Plaintiffs have retained attorneys

13         that are highly qualified and experienced in

14         this type of litigation, ERISA breach of

15         fiduciary class actions, specifically.  And

16         based on all of the pleadings in the entire

17         record, I find that they have diligently

18         represented the class before the Court as

19         well as in negotiations with defendants'

20         counsel that resulted in this settlement.  So

21         all of the requirements of 23(a) are met.

22                   Also, the requirements of 23(b)(1)

23         are met in that the only remedy available to

24         the plan participants is in fact plan-wide

25         relief, including the restoration of losses

1          to the plan.  Actions such as this are by law

2          representative actions which, if successful,

3          will cause defendants to be obligated to

4          provide relief applicable to all participants

5          in the plan.

6                    And given the unique group based

7          relief offered under ERISA for violations of

8          the fiduciary duties owed to participants in

9          covered benefit plans, these actions are

10         appropriate for class treatment under

11         Rule 23(b)(1) to avoid the risk of

12         inconsistent outcomes and inconsistent

13         standards of conduct for defendants; as well

14         as, the prosecution of separate individual

15         actions would, as a practical matter, be

16         dispositive of the interests of other class

17         members who were not parties to the action.

18                    Thus, I will certify the proposed

19         class pursuant to Rule 23 for settlement

20         purposes.  The class being defined as set out

21         in the pleadings.  In short:  Any person who

22         was a participant in or beneficiary of the

23         Westar 401(k) employees' savings plan from

24         July 1, 1998, through January 1, 2003, and

25         whose account in the plan included

19

1      investments in the Westar Energy, Inc.

2      company stock fund.

3              Excluded from the settlement class

4      are all defendants named in the action, their

5      subsidiaries and affiliates, members of their

6      immediate family, the legal representatives,

7      heirs, successors or assigns of any excluded

8      person, as well as any entity in which the

9      company has or has had a controlling

10     interest.

11             All right.  And then turning to the

12     proposed settlement itself, first of all,

13     I'll find that notice to prospective class

14     members was adequate.  I approved the

15     proposed class notice of proposed settlement

16     at the last hearing.

17             The administrator filed an affidavit

18     on July 17, 2006, establishing that notice

19     was mailed to the class, as ordered, and it

20     was also published in accordance with the

21     terms of the preliminary order.  Notice was

22     sent to 3,871 current and former participants

23     of the plan on May 26, 2006, and the approved

24     publication notice was published nationally

25     in *USA Today* and locally in *The Kansas City*

```
 1        Star, The Wichita Eagle, and The Topeka
 2        Capital-Journal.  Also, plaintiffs created a
 3        dedicated settlement website, which is
 4        identified in the pleadings.
 5             The form and method of notice was
 6        agreed to by the parties; it was approved by
 7        the Court; it was effectuated by the
 8        plaintiffs, consistent with the order; and it
 9        satisfies all due process considerations and
10        meets the requirements of 23(e)(1)(B).
11             All right.  Turning to final
12        approval of the settlement, as Mr. Meltzer
13        has indicated, under the Tenth Circuit
14        prevailing case law there are four factors
15        the Court must address and consider when
16        determining whether the proposed settlement
17        is fair, reasonable, and adequate.
18             The first such factor is that the
19        settlement was fairly and honestly
20        negotiated.  As the pleadings set out in
21        detail, and as Mr. Meltzer summarized, this
22        settlement is the product of lengthy
23        litigation as well as mediation and
24        negotiation:  18 months or more of formal and
25        informal negotiations; multiple mediation
```

1      sessions with an experienced mediator, who

2      was also the mediator in the Westar

3      securities litigation; voluminous discovery;

4      as well as intense advocacy and litigation

5      through this stage of motions to dismiss and

6      responses to that.

7              In addition, the Court finds that

8      class counsel had an in-depth understanding

9      of the merits of plaintiffs' claims and the

10     defenses available to defendants.  Plaintiffs

11     counsel had the same.  The Court-- in

12     addition, of course, there was this oversight

13     or independent evaluation by a third party

14     experienced in this type of litigation.  So

15     based on all of these things, the Court

16     concludes that the settlement was fairly and

17     honestly negotiated.

18              The second factor is that there be

19     existence of serious questions of law and

20     fact.  This is obviously evident to the Court

21     based on having reviewed and considered and

22     ruling on a number of issues that arose in

23     the context of the motions to dismiss.

24              In addition, more generally, as

25     plaintiffs point out, ERISA is a developing

```
1     and esoteric area of the law.  It does

2     present many difficult issues of law and fact

3     made more complex, of course, in the context

4     of a class action such as this one.  Although

5     plaintiffs survived defendants' motions to

6     dismiss, by and large, defendants would

7     likely have raised serious defenses at the

8     summary judgment phase as well as at trial,

9     if the case proceeded that far.  Many of

10    these issues were legally and factually

11    complex issues that militate in favor of

12    settlement.

13              Also, of course, this case had yet

14    to be certified as a class action, and

15    plaintiffs and defendants, obviously,

16    recognize that courts have not

17    uniformly certified a proposed class to all

18    claims in ERISA cases of this nature.

19              Also, the risks of establishing

20    damages are always complex and generally

21    recognized in the context of these types of

22    actions.  Very complex and require the

23    completion of full discovery and evaluation

24    of the relevant time period by the Court.

25              And there were questions as to
```

23

```
1        whether the losses alleged by plaintiffs

2        could be compensated under ERISA.  There were

3        questions as to the proper measure of

4        damages.  All of which, again, militated in

5        favor of settlement.

6               Had this case gone to trial, likely

7        there would have been a battle of experts.

8        Would be difficult for the parties to

9        anticipate the outcome or the decision that

10       would be made after hearing expert testimony

11       from both sides.

12              A third factor is the value of

13       immediate recovery.  The Tenth Circuit has

14       held that the value of immediate recovery is

15       simply the monetary worth of the settlement.

16       This settlement is for $9.25 million.  And

17       the Court agrees that this amount may well

18       have been in excess of what the class may

19       have obtained even through trial.  This

20       recovery is in addition to the payment the

21       plan will receive from the recovery garnered

22       in the securities litigation and

23       substantially increases the recovery for the

24       individual class members.

25              It is-- it is clear that continued
```

1       litigation would have been protracted,

2       complex, and expensive; requiring more

3       discovery; requiring the battle over class

4       certification; requiring hiring and vetting

5       and discovery of experts; and ultimately, of

6       course, the expenses and time associated if

7       this case went all the way to trial.

8               And then the final factor the Court

9       must look at is the judgment of the parties

10      that the settlement is fair and reasonable.

11      And I've heard from both parties that after

12      -- as Ms. Katz said -- protracted mediation

13      and negotiation and intense negotiation

14      advocacy, they are satisfied that the

15      settlement is fair and reasonable to all.

16              Both parties are represented by

17      nationally-known counsel with extensive

18      experience in ERISA class actions.  This has

19      been vetted by a third party.  It's been

20      mediated.  The Court is convinced that the

21      settlement is fair and reasonable.  Thus, the

22      settlement will be approved at this hearing

23      on final approval of settlement.

24              And now we'll turn to the motion for

25      award of fees, expenses, and contribution of

25

```
1          compensation to class members.

2                    MR. MELTZER:  Thank you, Your Honor.

3          Your Honor, we put in an application

4          for award of attorneys' fees, reimbursement

5          of expenses and case contribution

6          compensation.  Our request is for 30 percent

7          of the settlement fund.  That amounts to

8          2.775 million, plus reimbursement of expenses

9          of $76,715.59, and a $1,000 award for each

10         named plaintiff for their contribution to

11         this case.

12                    With respect to the request for

13         fees, there is a-- again, there's a test that

14         the Tenth Circuit employs to determine

15         whether-- whether the request is reasonable.

16         That-- that test is set out, among others, in

17         Brown v. Phillips Petroleum.  This test is

18         quite a bit longer than the test relating to

19         approval of the settlement so I'll try and

20         run through the factors as quickly as I can.

21         There are, I believe, 10 or so that apply

22         here.

23                    First is the time and labor

24         required.  As the application states, Your

25         Honor, the class counsel has spent over 4,000
```

```
 1          hours in prosecuting this case.  It was a

 2          case that was heavily litigated both on the

 3          litigation side as well as on the mediation

 4          settlement front.

 5                  The lodestar in the case is a little

 6          bit over $1.4 million.  That translates into

 7          a multiplier, a lodestar multiplier, of 1.88.

 8          I would submit that that is a very modest

 9          multiplier.  In comparison, Your Honor, I

10          believe in the Westar securities case the

11          30 percent awarded by Your Honor, I believe

12          that amounted to something like a 3.9

13          multiplier.  So here it is far, far less.

14                  The second factor is the novelty and

15          difficulty of the questions presented by the

16          case.  As we've stated in this hearing

17          before, ERISA is a difficult case-- ERISA is

18          a difficult statute to prosecute a case.

19          There are a lot of trapdoors in ERISA.  The

20          legal questions that get presented in a case

21          like this are complex.  They are novel and

22          they are developing.  And unless you practice

23          in it, it is a very difficult area of the law

24          to navigate correctly.

25                  The third factor is somewhat related
```

```
 1           to that -- the skill requisite to perform the

 2           legal service properly.  Again, ERISA cases

 3           are not easy.  When you build in a class

 4           action component to them, they go from

 5           complicated to extremely complicated.

 6                    It is difficult to present the case

 7           properly both in pleadings as well as in what

 8           were essentially summary trials during all of

 9           these mediations.  Getting a damage analysis

10           that's credible and gives you a, you know,

11           hope for recovery is not easy.  Navigating

12           the statute and the legal issues that are

13           compounded by difficult issues of fact,

14           again, is not an easy proposition.

15                    The fourth factor, the preclusion of

16           other employment by the attorneys due to

17           acceptance of the case.  As I stated

18           previously, we dedicated 4,000-- over 4,000

19           hours.  That obviously has an opportunity

20           cost that prevents us or precludes us from

21           working on other matters during the two-plus

22           years or almost three years of litigation

23           that we dedicated here.  I retract that.

24           Three-plus years of litigation here.

25                    The-- whether the fee is fixed or
```

1       contingent is another factor.  Here, there

2       was no guarantee that we would receive

3       payment for anything.  I believe that is

4       particularly telling here because with Your

5       Honor's ruling on the motion to dismiss and

6       in a developing area of the law, there's no

7       certainty that you're going to overcome the

8       initial Rule 12 challenge.  Did not come

9       until September of 2005, several years into

10      the litigation, after we had expended a lot

11      of time and a lot of money in prosecuting

12      these claims.  So there was a great deal of

13      uncertainty, and there was certainly a fairly

14      large risk that we were going to get no

15      payment whatsoever.

16            The next factor is the amount

17      involved and the results obtained.  Your

18      Honor, it's a settlement for $9.25 million.

19      I believe it does substantially increase

20      recovery to the class members.  It is in

21      addition to the recovery that the plan will

22      make as part of the Westar securities case.

23      I believe it is an excellent result.  And I

24      believe that factor also supports the

25      requested fee.

```
 1              The next factor is the experience,
 2      reputation, and ability of the attorneys.  My
 3      firm and-- my firm is an experienced--
 4      Schiffrin & Barroway is an experienced class
 5      action firm.  Mr. Pope and his firm, Ralston,
 6      Pope & Diehl, are very experienced
 7      litigators, especially in this particular
 8      court.  We-- I'll leave the rest of it to the
 9      papers so that I don't stand up and sort of
10      trumpet my success and abilities.
11              The next factor is the
12      undesirability of the case.  Your Honor, it's
13      not a difficult leap to say that an ERISA
14      class action to many practitioners would be
15      viewed as undesirable.  Sometimes my wife
16      feels the same way.  The desirability is--
17      frankly, when cases are easy and not so
18      complex, they become a lot easier to jump
19      into and dedicate your time and resources to.
20      But where they are difficult and complex, as
21      here, it becomes a little more of a-- a
22      little more of a challenge.  And, frankly, I
23      think that factor supports the requested fee
24      as well.
25              Awards in similar cases.  When you
```

| | |
|---|---|
| 1 | look at what the multiplier is in this case, |
| 2 | I think it compares extremely favorably to |
| 3 | both awards in the Tenth Circuit in class |
| 4 | action cases -- I think that's a very modest |
| 5 | multiplier, the 1.88 -- as well as cases |
| 6 | across the country.  I think you'll see |
| 7 | multipliers that are closer to three, four, |
| 8 | and five for this type of case.  So I think |
| 9 | the requested fee compares very favorably. |
| 10 | The final point, Your Honor, is we |
| 11 | have no objections to the award of the fees |
| 12 | to the class, as unanimously endorsed in our |
| 13 | application. |
| 14 | The second component is for |
| 15 | expenses.  We have expended $76,715.59.  We |
| 16 | submitted an application to detail the |
| 17 | categories of expense.  A lot of that is |
| 18 | discovery related.  Much of-- some of that is |
| 19 | travel.  It's travel related.  There are also |
| 20 | copying expenses and the like.  I think the |
| 21 | expenses, given the length of the case and |
| 22 | the complexity of the case, were minimal, |
| 23 | fortunately, because we were able to resolve |
| 24 | the case before we got further into expert |
| 25 | discovery.  So resolving the case before we |

31

```
1        went into really a deposition protocol and

2        before we started submitting summary judgment

3        papers helped keep expenses to a relative

4        minimum.

5              The final component of the

6        application is for case contribution awards.

7        We've asked for $1,000 apiece.  That is a low

8        amount relative to what awards have been in

9        other cases.  But essentially it recognizes

10       that there are quite a few named plaintiffs.

11       In fact, more in this case than in almost any

12       other that I've seen.  But the one thing I

13       will say for the named plaintiffs is they

14       were very active.  They played a big role.

15       They were a large part of us being able to

16       hold the line in settlement negotiations.  I

17       think they did a really excellent job and

18       served the rest of the class very well.

19             THE COURT:  All right.  Thank you.

20             MR. MELTZER:  If you have any

21       questions, I'll be happy to address them.

22             THE COURT:  I don't.

23             Anyone else?

24             All right.  The so-called Johnson

25       factors that have been-- come from a Fifth
```

SHERRY A. BERNER
Official Court Reporter

32

1        Circuit case but have been adopted in the

2        Tenth Circuit are those as outlined by

3        Mr. Meltzer.  In the Tenth Circuit the

4        percentage-of-recovery method has been

5        endorsed as an appropriate method for

6        determining an award of attorneys' fees in

7        these types of cases and in other types of

8        cases as well.

9              Based on the entire record, and

10       particularly the parties' pleadings

11       concerning these fees and expenses, I find

12       that the fees requested are reasonable.  The

13       expenses are also reasonable and customary.

14       And the compensation requested for the

15       members, the named plaintiffs, is also

16       reasonable.

17             Many of these factors have already

18       been addressed in summarizing the propriety

19       of the settlement that was approved.  But

20       I'll note further that there was extensive

21       time and labor involved in this case.  Over

22       4,000 combined hours in prosecuting the case

23       that culminated in the settlement.

24             As already addressed, the questions

25       legally and factually were novel and

1    difficult and complex.

2            Class counsel is experienced,

3    nationally recognized in this field, and had

4    the requisite skill necessary to perform the

5    legal services required in cases as complex

6    as this.

7            Based on the number of hours spent

8    over the last three-plus years, it's clear

9    that other employment was precluded to a

10   large degree by the attorneys that

11   represented the class.

12           The 30 percent request is in keeping

13   with the range of reasonable fee awards or

14   fee awards that have been found reasonable in

15   the Tenth Circuit.  And the multiplication

16   factor as well.

17           The-- as I've already addressed, the

18   $9.25 million settlement is very favorable to

19   the class.  Given the complexity of the legal

20   and factual issues, the need for protracted

21   and intense advocacy, it's fair to say that

22   this case would have been viewed as

23   undesirable, perhaps, to many.  And that

24   factor needs to be taken into account.

25           The nature and length of the

1    professional relationship with the client is

2    evident, given the length of time that has

3    been spent to date on this case taking it

4    through settlement.

5            Again, the 33 percent-- or, rather,

6    the 30 percent requested is in line with the

7    range of awards in similar cases in this

8    circuit, including the range of awards given

9    by this particular Court.

10            As far as the expenses, we've

11    reviewed those.  They appear to be reasonable

12    and customary expenses associated with

13    discovery and litigation and mediation.

14            And finally, with respect to the

15    request for $1,000 each as a case

16    contribution award to each of the 27 named

17    plaintiffs, I'll find that that is also

18    reasonable and appropriate, given the

19    litigation support that they provided over

20    the last three-plus years to class counsel to

21    the benefit of all other members of the

22    class.

23            So the motion for award of

24    attorneys' fees, reimbursement of expenses

25    and case contribution compensation is

granted.

You all had, I think, presented a proposed order.  I think my law clerk talked to you about some language that needed to be changed.  And as soon as you can get that-- I suppose we could change that, if need be, and we can get this order out right away.

I do commend all of you.  I know that you-- I know this was a difficult case for everyone involved.  And I had some sense of that deciding the motion to dismiss, how difficult many of these-- all of these issues really were.  So I do appreciate the obvious, you know, commitment you all made to securing a fair and reasonable settlement that, you know, benefitted the members of the class and benefitted the company.  And I know it took a lot of work and a lot of intense lawyering. And you all, obviously, did a very excellent job in all respects.  So I commend you.  And it's nice to have lawyers such as yourselves appear in this court.  I look forward to seeing you again someday in another complex class action, no doubt.

MR. MELTZER:  Thank you, Your Honor.

36

1              THE COURT:  All right.  We'll be in

2      recess.

3                      (THEREUPON, the hearing

4      concluded).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

```
 1        UNITED STATES OF AMERICA  )
                                    )    ss:
 2        DISTRICT OF KANSAS        )

 3

 4                C E R T I F I C A T E

 5

 6            I, Sherry A. Berner, Certified Shorthand

 7        Reporter in and for the State of Kansas, do

 8        hereby certify that I was present at and

 9        reported in machine shorthand the proceedings

10        had the 27th day of July, 2006, in the

11        above-mentioned court; that the foregoing

12        transcript is a true, correct, and complete

13        transcript of the requested proceedings.

14            I further certify that I am not attorney

15        for, nor employed by, nor related to any of

16        the parties or attorneys in this action, nor

17        financially interested in the action.

18            IN WITNESS WHEREOF, I have hereunto set

19        my hand and official seal at Topeka, Kansas,

20        this  2ND  day of    AUGUST    , 2006.

21

22                    _____
                      Sherry A. Berner
23                    Certified Shorthand Reporter

24

25
```

SHERRY A. BERNER
Official Court Reporter

# EXHIBIT D

Mirant Final Approval.txt

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE:  MIRANT CORP. | ) DOCKET NO. 1:03-CV-1027-RWS |
| ERISA, ET AL. | ) |
|     PLAINTIFFS | ) ATLANTA, GEORGIA |
| | ) |
|       V. | ) NOVEMBER 16, 2006 |
| | ) |
| MIRANT CORPORATION, ET AL | ) |
|     DEFENDANTS. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

TRANSCRIPT OF FINAL APPROVAL HEARING
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:                    GERALD WELLS, ESQ.
                                       DEREK W. LOESER, ESQ.
                                       GARY GOTTO, ESQ.
                                       JOSEPH H. MELTZER, ESQ.
                                       JOSHUA A. MILLICAN, ESQ.


FOR THE DEFENDANTS:                    HOWARD DOUGLAS HINSON, ESQ.
                                       MICHAEL G. MONNOLLY, ESQ.


COURT REPORTER:                        SHARON D. UPCHURCH
                                       2114 U. S. COURTHOUSE
                                       ATLANTA, GEORGIA 30303-3361
                                       (404) 215-1354


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

Page 1

Mirant Final Approval.txt

2

```
 1                  P R O C E E D I N G S
 2              (NOVEMBER 16, 2006; IN OPEN COURT)
 3             THE COURT:  GOOD MORNING.  WE ARE HERE FOR PURPOSES
 4    OF A FINAL HEARING ON THE SETTLEMENT IN THIS MATTER.  AND I
 5    HAVE, OF COURSE, RECEIVED A MOTION AND OTHER DOCUMENTATION
 6    SUBMITTED BY COUNSEL; BUT I WILL HEAR FROM PLAINTIFF AT THIS
 7    TIME.  MR. WELLS, IF YOU WANT TO PROCEED ON BEHALF OF THE
 8    PLAINTIFF.
 9             MR. WELLS:  GOOD MORNING, YOUR HONOR.  WE ARE VERY
10    PLEASED TO BE HERE.  WE ARE HAPPY TO PRESENT TO THE COURT FOR
11    FINAL APPROVAL THIS SETTLEMENT WHICH RESOLVES ALL CLAIMS IN THE
12    MIRANT ERISA LITIGATION.  THE SETTLEMENT IS A PRODUCT OF
13    INTENSE NEGOTIATIONS BETWEEN THE PARTIES THAT INVOLVED AN
14    EXPERIENCED NEGOTIATOR AND WAS DONE OVER THE COURSE OF SEVERAL
15    MEDIATION SESSIONS AS WELL AS SUBSEQUENT TELEPHONE
16    CONVERSATIONS AND THE LIKE.
17             PLAINTIFFS BELIEVE THAT THIS SETTLEMENT IS EXCELLENT
18    BECAUSE IT RECOVERS A SUBSTANTIAL AMOUNT OF DAMAGES AND
19    PROVIDES A CASH SETTLEMENT IN THE AMOUNT OF $9.7 MILLION THAT
20    WILL BE DISTRIBUTED ON A PRO RATA SHARE TO THE PLAN
21    PARTICIPANTS; THAT IS, EACH PARTICIPANT WILL RECEIVE A PORTION
22    OF THE SETTLEMENT IN PROPORTION TO THE TOTAL LOSSES THAT THEY
23    SUSTAINED DUE TO THEIR HOLDINGS IN MIRANT STOCK AND THE MIRANT
24    401K PLANS.  THE SETTLEMENT ITSELF WAS REVIEWED EXTENSIVELY BY
25    AN INDEPENDENT FIDUCIARY, FIDUCIARY COUNSELORS, INC.  THAT
```

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

3

Mirant Final Approval.txt

1    REPORT WAS FINALIZED, AND WE SENT THAT TO YOUR HONOR FOR REVIEW

2    YESTERDAY.

3          BEFORE THE COURT IS APPROVAL OF THE SETTLEMENT ITSELF

4    AS WELL AS APPROVAL OF ATTORNEY'S FEES AND REIMBURSEMENT OF

5    EXPENSES AS WELL AS CASE CONTRIBUTION AWARDS TO THE NAMED

6    PLAINTIFFS.  IF I MAY PROCEED, YOUR HONOR, WE WOULD LIKE TO GO

7    DIRECTLY TO THE FAIRNESS OF THE SETTLEMENT.

8          THE COURT:  YES, SIR.

9          MR. WELLS:  THANK YOU.  WOULD YOUR HONOR LIKE A BRIEF

10   HISTORY OF THE LITIGATION ITSELF OR SHALL WE PROCEED?

11          THE COURT:  YOU MAY PROCEED TO THE FAIRNESS.

12          MR. WELLS:  UNDERSTOOD, YOUR HONOR.

13          THE SETTLEMENT FACTORS THAT ARE CONSIDERED, YOUR

14   HONOR, ARE THE BENNETT FACTORS THAT WERE ENUMERATED BY THE

15   ELEVENTH CIRCUIT.  AND THOSE SIX FACTORS IN ORDER ARE AN

16   ASSESSMENT OF THE LIKELIHOOD THAT PLAINTIFFS WOULD PREVAIL AT

17   TRIAL.  I SUBMITTED IN OUR PAPERS, YOUR HONOR, ALTHOUGH

18   PLAINTIFFS BELIEVE VERY STRONGLY IN THIS CASE AND IN THE MERITS

19   OF THIS CASE, PLAINTIFFS UNDERSTAND THAT NO PLAINTIFF HAS

20   RECOVERED WHEN A CASE HAS BEEN TAKEN THROUGH TRIAL.  THAT BEING

21   SAID, PLAINTIFFS DO BELIEVE STRONGLY IN THEIR CLAIMS AND THAT

22   THEY WOULD, IN FACT, BE ABLE TO PREVAIL.  HOWEVER, GIVEN THE

23   CASE LAW OUT THERE AS WELL AS THE SETTLEMENT AMOUNT ITSELF, WE

24   BELIEVE THAT THIS FACTOR MILITATES IN APPROVING THE SETTLEMENT.

25          THE SECOND FACTOR IS THE RANGE OF POSSIBLE RECOVERY.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

4


1    HERE, YOUR HONOR, I SUBMITTED IN OUR PAPERS DAMAGES RANGE FROM

2    THE MAXIMUM POSSIBLE RECOVERY OF APPROXIMATELY $30 MILLION

Mirant Final Approval.txt

3   TO -- AND THAT IS A BREACH DATE AT THE INCEPTION OF THE CLASS

4   PERIOD -- TO A DAMAGE PERIOD OF ABOUT $11 MILLION IF YOUR HONOR

5   WOULD FIND THAT THE BREACH DATE, THAT IS, WHEN MIRANT STOCK WAS

6   IMPRUDENT, WAS NOT UNTIL SEPTEMBER OF 2002; AND DAMAGES THEN

7   RANGE IN THE NEIGHBORHOOD OF $11 MILLION.  HOWEVER, IF THE

8   BREACH DATE WAS TAKEN EVEN FURTHER OUT, FOR INSTANCE, INTO MAY

9   OF '03 WHEN THE GOING CONCERN ISSUE REGARDING MIRANT WAS

10   ISSUED, DAMAGES WOULD BE SUBSTANTIALLY LOWER.

11        THAT BEING SAID, YOUR HONOR, PLAINTIFFS HAVE

12   RECOVERED ANYWHERE FROM THE MAXIMUM OF 30 PERCENT OF THE

13   RECOVERY TO UPWARDS OF 88 PERCENT OF THE RECOVERY.  THAT IN

14   ITSELF, WE THINK, SPEAKS HIGHLY OF THE SETTLEMENT AND, AGAIN,

15   FACTORS STRONGLY IN APPROVING THE SETTLEMENT.

16        THE THIRD FACTOR, YOUR HONOR, IS CONSIDERATION

17   PROVIDED TO CLASS MEMBERS PURSUANT TO THE SETTLEMENT AS

18   COMPARED TO THE RANGE OF POSSIBLE RECOVERY.  AGAIN, YOUR HONOR,

19   THE CONSIDERATION HERE IS BETWEEN 30 PERCENT AND 88 PERCENT OF

20   THE TOTAL DAMAGES.  WE, AGAIN, BELIEVE THAT THIS FACTORS

21   STRONGLY IN APPROVING THE SETTLEMENT.

22        THE FOURTH IS THE COMPLEXITY, EXPENSE AND POSSIBLE

23   DURATION OF THE LITIGATION HAD IT PROCEEDED.  AS YOUR HONOR IS

24   WELL AWARE, THE CASE WAS ADMINISTRATIVELY CLOSED AFTER BRIEFING

25   ON DEFENDANT'S MOTIONS TO DISMISS AS WELL AS MOTION ON JUDGMENT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

5

1   OF THE PLEADINGS WAS COMPLETED.  THAT BEING SAID, IF THIS

2   LITIGATION WERE TO CONTINUE, THOSE MOTIONS WOULD HAVE TO BE

3   DECIDED; DISCOVERY, WHICH WOULD BE INTENSE BECAUSE THE

Mirant Final Approval.txt

4    DISCOVERY WOULD FACTOR IN TWO SUCH THINGS AS WHETHER OR NOT

5    MIRANT WAS A PRUDENT INVESTMENT FOR PLANS FROM THE INCEPTION,

6    WHETHER OR NOT THE DEFENDANTS THAT WE ALLEGED IN OUR COMPLAINT

7    WERE, IN FACT, FIDUCIARIES OF THE PLAN AND EXERCISED CONTROL

8    AND WERE ABLE TO, IN FACT, DIVEST THE PLANS OF MIRANT STOCK;

9    THROUGH SUMMARY JUDGMENT WHICH, AGAIN, WOULD BE VERY FACT

10   INTENSIVE, AND AS WE HAVE NOTED, THERE ARE A NUMBER OF

11   DECISIONS THAT GO BOTH IN FAVOR OF PLAINTIFFS AS WELL AS

12   AGAINST PLAINTIFFS IN THIS CASE; AND THROUGH TRIAL.

13         CONSERVATIVELY, YOUR HONOR, WE WOULD ESTIMATE THAT

14   TRIAL THROUGH LITIGATION WOULD ESTIMATE BETWEEN THREE OR FOUR

15   YEARS.  AGAIN, THIS EARLY SETTLEMENT IN THIS STAGE OF

16   LITIGATION FACTORS IN FAVOR OF APPROVING THE SETTLEMENT.

17         THEN THE FIFTH FACTOR, YOUR HONOR, IS THE NATURE AND

18   EXTENT OF ANY OBJECTIONS TO THE SETTLEMENT.  AS WE SUBMITTED,

19   THERE IS ONLY ONE OBJECTION SUBMITTED BY ARTHUR LANKFORD TO THE

20   SETTLEMENT ITSELF.  NOTABLY, YOUR HONOR, THE CLASS MEMBER DOES

21   NOT OPPOSE APPROVAL OF THE ATTORNEY'S FEES WHICH THE ORIGINAL

22   REQUESTED WERE 30 PERCENT, NOR DOES HE OPPOSE REIMBURSEMENT OF

23   EXPENSES OR THE CASE CONTRIBUTION AWARDS TO NAMED PLAINTIFFS.

24   RATHER, IN HIS LETTER HE SAID THAT THE SETTLEMENT SHOULD BE

25   HIGHER BECAUSE CERTAIN DEFENDANTS RECEIVED GOLDEN PARACHUTES.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


6


1         RESPECTFULLY, YOUR HONOR, ALL PLAINTIFFS' COUNSEL

2    AGREE THAT THE SETTLEMENT SHOULD BE HIGHER.  HOWEVER, GIVEN THE

3    OTHER FACTORS HERE AS WELL AS THE CASE LAW AS IT CURRENTLY

4    STANDS, THIS IS A SETTLEMENT THAT WE SIMPLY COULD NOT TURN OUR

5    BACK ON.  MOREOVER, OVER 3500 NOTICES WERE SENT OUT TO CLASS

Page 5

Mirant Final Approval.txt

6    MEMBERS, AND ONLY ONE PERSON FOUND OBJECTION.  WE THINK THIS

7    COUNSELS IN FAVOR OF APPROVING THE SETTLEMENT.

8              FINALLY, YOUR HONOR, THE STATE OF PROCEEDINGS IN

9    WHICH THE SETTLEMENT WAS REACHED.  AS I STATED EARLIER,

10   BRIEFING ON THE MOTION TO DISMISS WAS COMPLETED.  HOWEVER, THIS

11   WOULD STILL BE A VERY LONG ROW TO HOE, AS WELL AS THE FACT THAT

12   WE CLEARLY UNDERSTOOD THE POSITIONS OF THE RESPECTIVE PARTIES

13   THROUGH THE MEDIATION EFFORTS.  MEDIATION SUBMISSIONS WERE

14   SUBMITTED TO THE MEDIATOR, AND MEDIATION SESSIONS TOOK OVER

15   THREE DAYS IN TWO SEPARATE SESSIONS.

16             COMBINED, YOUR HONOR, WE THINK EACH OF THE SIX

17   FACTORS ENUMERATED IN BENNETT SEPARATELY, AS WELL AS COMBINED,

18   FACTOR IN APPROVING THIS SETTLEMENT; AND WE SUBMIT THIS

19   SETTLEMENT FOR APPROVAL.

20             THE COURT:  I WILL HEAR FROM YOU, AS WELL, ON THE

21   REQUEST FOR ATTORNEY'S FEES AND EXPENSES.

22             MR. WELLS:  BEFORE WE TURN TO THAT, YOUR HONOR, THERE

23   IS THE ISSUE OF CERTIFICATION OF CLASS; AND WE WOULD SUBMIT TO

24   THE COURT AS WE SUBMITTED IN THE PAPERS THAT SETTLEMENT HERE IN

25   CERTIFICATION OF A (B)(1) CLASS IS APPROPRIATE GIVEN THE NATURE


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


7


1    OF THE PLAN-WIDE BREACH AND THE HARM SUBMITTED.

2              WITH RESPECT TO THE REQUEST FOR ATTORNEY'S FEES, WE

3    WOULD PUT FORTH THAT EACH OF THE 12 FACTORS, JOHNSON FACTORS,

4    FAVOR IN APPROVING THIS SETTLEMENT.  THE FIRST FACTOR IS THE

5    TIME AND LABOR REQUIRED.  AS PUT FORTH IN OUR PAPERS, OVER 2700

6    HOURS OF BOTH ATTORNEY AND PROFESSIONAL TIME WAS COMMITTED TO

Mirant Final Approval.txt

7    THIS CASE.  THOSE ARE SUBSTANTIAL RESOURCES WITH A LODESTAR

8    THAT AT THIS POINT IS JUST OVER 1.17 MILLION.

9          THE SECOND FACTOR, YOUR HONOR, IS THE NOVELTY AND

10   DIFFICULTY OF THE QUESTIONS PRESENTED.  AS STATED BY MANY

11   COURTS, ERISA CASES IN PARTICULAR AND CLASS ACTIONS IN GENERAL

12   ARE COMPLEX CASES THAT REQUIRE SPECIALIZED EXPERTISE AS WELL AS

13   A GREAT DEAL OF, FOR LACK OF A BETTER TERM, HEAVY LIFTING ON

14   BEHALF OF PLAINTIFF'S COUNSEL.  WE SUBMIT THAT WE'VE DONE THAT

15   HERE AND THAT THE SETTLEMENT EXEMPLIFIES THAT.

16          THIRD IS THE SKILL REQUISITE TO PERFORM THE LEGAL

17   SERVICES.  HERE, YOUR HONOR, CLASS COUNSEL, AS STATED BY

18   INDEPENDENT FIDUCIARY, ARE SOME OF THE -- ARE TWO OF THE FIRMS

19   THAT ARE AT THE FOREFRONT OF THIS TYPE OF LITIGATION AND HAVE

20   PUT FORTH TREMENDOUS EFFORT; AND IT IS THROUGH OUR EFFORT THAT

21   THE SETTLEMENT WAS ABLE TO BE ACHIEVED.

22          FOURTH, YOUR HONOR, IS THE PRECLUSION OF OTHER

23   EMPLOYMENT.  RESPECTFULLY, OVER 2700 HOURS WERE EXPENDED SOLELY

24   ON THIS CASE.  THOSE 2700 HOURS COULD HAVE BEEN PUT FORTH ON

25   OTHER MATTERS THAT HAD A GREATER LIKELIHOOD OF RECOVERY.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


8


1          WHAT IS UNIQUE TO THIS CASE IS, UNLIKE ANY OTHER, TO

2    MY KNOWLEDGE, FIDUCIARY BREACH CASE OUT THERE, WE HAVE ASSERTED

3    THAT THE COMPANY STOCK WAS IMPRUDENT FROM THE INCEPTION.  THAT

4    IS A UNIQUE FACTOR TO THIS CASE THAT WE THINK, WHILE WE COULD

5    HAVE PROVED AT TRIAL, WOULD RAISE OTHER SUBSTANTIAL HURDLES

6    UNLIKE ANY OTHER CASE AND BECAUSE OF THESE UNIQUE FACTORS,

7    AGAIN, COUNSELS IN FAVOR OF APPROVING THE SETTLEMENT.

8          THE FIFTH FACTOR, YOUR HONOR, IS THE CUSTOMARY FEE.

Page 7

Mirant Final Approval.txt

9    AS THE ELEVENTH CIRCUIT PUT FORTH IN CAMDEN I, THE CUSTOMARY

10   FEE IN COMMON FUND CASES IS BETWEEN 20 AND 30 PERCENT OF THE

11   TOTAL SETTLEMENT RECOVERED.  HERE PLAINTIFFS ARE REQUESTING

12   27-AND-A-HALF PERCENT OF THE COMMON FUND.

13        THE SIXTH FACTOR IS WHETHER THE FEE IS FIXED OR

14   CONTINGENT.  PLAINTIFF'S COUNSEL TOOK THIS FEE -- TOOK THIS

15   CASE, RATHER, COMPLETELY ON A CONTINGENT-FEE BASIS; THAT IS,

16   HAD THERE BEEN NO RECOVERY OBTAINED, WE WOULD HAVE BEEN WITHOUT

17   RECOURSE.  WE HAVE FURTHER PUT FORTH OVER $52,000 WORTH OF

18   EXPENSES WITH NO GUARANTEE THAT THOSE EXPENSES WOULD BE

19   REIMBURSED.  AGAIN, OVER 2700 HOURS WITH A LOADSTAR OF 1.17

20   MILLION AS WELL AS OUT-OF-POCKET EXPENSES THAT COULD HAVE BEEN

21   PUT FORTH TO CASES WITH A SUBSTANTIALLY HIGHER LIKELIHOOD OF

22   RECOVERY COUNSELS IN FAVOR OF APPROVING THIS SETTLEMENT.

23        THE SEVENTH FACTOR, YOUR HONOR, IS THE TIME

24   LIMITATIONS IMPOSED BY THE CLIENT UNDER THE CIRCUMSTANCES.

25   RESPECTFULLY, YOUR HONOR, CLASS COUNSEL READILY ADMITS THAT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


9


1   THIS IS A CLASS CASE; AND, THEREFORE, THE CLIENT EXPECTATIONS

2   WERE THAT THEY WOULD LIKELY RECOVER, AND THERE WAS NO FIX DATE.

3        MOVING ON, YOUR HONOR, TO THE EIGHTH FACTOR, THE

4   AMOUNT INVOLVED AND THE RESULTS OBTAINED.  AS I STATED EARLIER,

5   THE TOTAL OUTWARD RECOVERY IS BETWEEN A MAXIMUM OF 30 MILLION

6   TO A MORE REALISTIC NUMBER OF 11 MILLION.  HERE THE $9.7

7   MILLION RESULTS IN A SUBSTANTIAL AMOUNT OF THE RECOVERY.

8        THE NINTH FACTOR, YOUR HONOR, IS THE EXPERIENCE,

9   REPUTATION AND THE ABILITY OF THE ATTORNEYS.  AS PUT FORTH AND

Page 8

Mirant Final Approval.txt

10    SEEN IN OUR PAPERS, AS WELL AS THE COMMENTS MADE BY THE

11    INDEPENDENT FIDUCIARY, THESE FIRMS HERE BEFORE YOUR HONOR ARE

12    AT THE FOREFRONT OF THIS TYPE OF PRACTICE AND HAVE USED THEIR

13    KNOWLEDGE HERE TO PUT FORTH AND GO AGAINST SOME OF THE MOST

14    EMINENT DEFENSE ATTORNEYS WITH RESPECT TO THIS FIELD AND WERE

15    ABLE TO PUSH FOR AND ACHIEVE THIS MAGNIFICENT SETTLEMENT.

16         THE TENTH FACTOR, YOUR HONOR, IS THE UNDESIRABILITY

17    OF THIS CASE.  YOUR HONOR, HERE CLEARLY THIS WAS A BANKRUPTCY

18    CASE; SO YOU HAD THE ISSUES INHERENT IN BANKRUPTCY WHICH

19    PLAINTIFF'S COUNSEL WENT THROUGH AND SPENT SUBSTANTIAL TIME IN

20    DEALINGS IN THE BANKRUPTCY COURT ENSURING THAT THE SETTLEMENT

21    HERE WAS PRESERVED AND THESE CLAIMS WERE PRESERVED.

22         FURTHER, YOUR HONOR, BECAUSE OF THE NATURE OF THE

23    CASE, ASSERTING THAT IMPRUDENCE WAS FROM THE INCEPTION, THIS,

24    TOO, COUNSELS IN FAVOR THAT THIS CASE WAS, IN FACT, UNDESIRABLE

25    IN THAT IT WAS NOT THE EASIEST CASE, IT WAS NOT THE EASIEST


                SHARON D. UPCHURCH, OFFICIAL COURT REPORTER



                                                    10


1     ERISA CASE, AND IT HAD UNIQUE FACTORS.

2          THE ELEVENTH FACTOR, YOUR HONOR, IS THE NATURE AND

3     LENGTH OF THE PROFESSIONAL RELATIONSHIP WITH THE CLIENT.

4     AGAIN, RESPECTFULLY, YOUR HONOR, THIS IS A CLASS CASE; AND WE

5     SUBMIT THAT WHILE OUR CLIENTS HAVE BEEN FULLY INFORMED AND

6     ADVISED OF THE CASE THROUGHOUT THE COURSE OF THE LITIGATION,

7     THIS IS NOT AN ONGOING RELATIONSHIP.

8          MOVING, YOUR HONOR, TO THE FINAL AND TWELFTH FACTOR,

9     THE AWARDS IN SIMILAR CASES.  AS PUT FORTH IN OUR PAPERS, THERE

10    ARE NUMEROUS CASES OUT THERE IN WHICH SIGNIFICANTLY HIGHER

11    PERCENTAGES WERE OBTAINED AND ACHIEVED IN SIMILAR ERISA CASES;

Mirant Final Approval.txt

12    NOTABLY, ADC AND WESTSTAR IN WHICH 30 PERCENT RECOVERY WAS

13    APPROVED.  HOWEVER, YOUR HONOR, AGAIN, AS NOTED BEFORE, THE

14    ELEVENTH CIRCUIT HAS SAID BETWEEN 20 AND 30 PERCENT IS

15    APPROPRIATE.  HERE WE SUBMIT THAT OUR REQUEST FOR 27-AND-A-HALF

16    PERCENT, IT FALLS WITHIN THAT NORM; AND AS DEMONSTRATED BY THE

17    AMOUNT OF WORK PUT INTO THE CASE AND THE END RESULT ACHIEVED,

18    THAT THIS FACTORS IN FAVOR OF APPROVING THE SETTLEMENT.

19            YOUR HONOR, THE ELEVENTH CIRCUIT HAS NOTED IN CAMDEN

20    THAT THERE ARE SEVERAL OTHER FACTORS THAT MAY BE UTILIZED IN

21    DETERMINING WHETHER OR NOT A SETTLEMENT IS APPROPRIATE; AND IF

22    YOUR HONOR WOULD LIKE, I CAN GO THROUGH THOSE FIVE ADDITIONAL

23    FACTORS.

24            YOUR HONOR, THE FIRST ONE IS THE TIME REQUIRED TO

25    REACH SETTLEMENT.  AS I STATED EARLIER, THIS INVOLVED TWO


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


11


1     FORMAL MEDIATION SESSIONS, THE FIRST MEDIATION SESSION

2     OCCURRING IN APRIL OF '05.  THAT WAS A TWO-DAY ALL-DAY

3     MEDIATION SESSION.  PRIOR TO THAT SESSION, THERE WERE NUMEROUS

4     PHONE CALLS AND TELEPHONIC CONFERENCES WITH BOTH THE MEDIATOR

5     AS WELL AS DEFENSE COUNSEL TRYING TO SEE IF SETTLEMENT MAY BE

6     AN APPROPRIATE AVENUE.  SUBSEQUENT TO THE APRIL MEDIATION,

7     THERE WAS ANOTHER ALL-DAY MEDIATION IN NOVEMBER OF 2005; AND

8     THAT WAS ABLE TO PUSH THE CASE FURTHER ALONG.  HOWEVER,

9     SETTLEMENT WAS NOT OBTAINED UNTIL EARLY OF 2006.  THAT

10    DEMONSTRATES THAT THERE WAS SUBSTANTIAL TIME PUT FORTH IN

11    OBTAINING THE SETTLEMENT.

12            THE SECOND ONE IS WHETHER OR NOT THERE ARE ANY

Page 10

Mirant Final Approval.txt

13  SUBSTANTIAL OBJECTORS BY THE CLASS.  AGAIN, THERE'S ONLY ONE

14  OBJECTOR FROM THE CLASS OF OVER 3500.

15       THE THIRD IS WHETHER OR NOT THERE'S ANY NONMONETARY

16  BENEFITS CONFERRED UPON THE SETTLEMENT CLASS.  HERE, YOUR

17  HONOR, AS PUT FORTH IN THE STIPULATION OF SETTLEMENT, THERE IS

18  A SPECIFIC CARVE-OUT SAYING THAT THE RECOVERY HERE WILL IN NO

19  WAY AFFECT THE SECURITIES-RELATED -- SECURITIES LITIGATION, NOR

20  WILL IT ADVERSELY AFFECT THE RELATED SOUTHERN ERISA LITIGATION.

21       THE FOURTH FACTOR, YOUR HONOR, IS THE ECONOMICS

22  INVOLVED IN PROSECUTING THIS CASE.  SIMPLY PUT, YOUR HONOR,

23  CLASS CASES SUCH AS THIS WILL REQUIRE THE EXPENDITURE OF TENS

24  OF THOUSANDS, IF NOT HUNDREDS OF THOUSANDS OF DOLLARS.  BECAUSE

25  WE WERE ABLE TO ACHIEVE THE SETTLEMENT RELATIVELY EARLY IN THAT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

0

12

1   PROCESS, WE WERE ABLE TO KEEP EXPENSES TO A MINIMUM; BUT WE DID

2   PUT FORTH EXTREME AMOUNTS OF MONEY.

3        THE FIFTH IS ARE THERE ANY OTHER FACTORS UNIQUE TO

4   THIS CASE.  AS I SAID EARLIER, THIS INVOLVES A BANKRUPTCY CASE

5   AS WELL AS IMPRUDENCE FROM THE INCEPTION.  BOTH OF THOSE

6   FACTORS ARE UNIQUE TO THIS ERISA CASE AND STRONGLY SUPPORT THIS

7   SETTLEMENT.

8        THE COURT:  THANK YOU.

9        MR. WELLS:  YOUR HONOR, IN ADDITION, THERE IS ALSO

10  THE MATTER OF THE REIMBURSEMENT OF EXPENSES, IF YOU'D LIKE ME

11  TO ADDRESS THAT.

12       AS PUT FORTH IN OUR PAPERS, WE HAVE EXPENDED OVER

13  $52,000 WORTH OF EXPENSES THAT INCLUDE THE LIKES OF TRAVEL,

14  LODGING, FILINGS AND THE LIKE.  WE THINK THEY ARE REASONABLE

Page 11

Mirant Final Approval.txt

15    AND APPROPRIATE, AND WE NOTE FOR YOUR HONOR THAT THERE'S BEEN

16    NO OBJECTION TO THE REIMBURSEMENT OF EXPENSES.

17          THE OTHER MATTER BEFORE YOUR HONOR IS THE ISSUE OF

18    THE CASE CONTRIBUTION AWARD.  AS PUT FORTH IN OUR PAPERS, CASE

19    CONTRIBUTION AWARDS IN THIS CASE, ON THESE TYPE OF CASES, ARE

20    EMINENTLY REASONABLE BECAUSE THESE PLAINTIFFS -- BUT FOR THESE

21    PLAINTIFFS, THIS CASE WOULD NOT BE BROUGHT.  THESE PLAINTIFFS

22    WERE ABLE TO STEP FORWARD, PROVIDE PLAN DOCUMENTS TO CLASS

23    COUNSEL, PROVIDE INFORMATION TO CLASS COUNSEL AS TO THE INNER

24    WORKINGS OF BOTH THE COMPANY IN GENERAL AS WELL AS THE PLANS IN

25    PARTICULAR.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


13


1          AND WITH THESE CASES, THEY HAVE HELPED FOSTER AND

2    ACHIEVE A $9.7 MILLION SETTLEMENT THAT WOULD BENEFIT OVER 3500

3    CLASS MEMBERS; AND WE THINK THEIR EFFORTS SHOULD BE RECOGNIZED

4    AND AWARDED BY THIS COURT.  RESPECTFULLY, YOUR HONOR, WE ASK

5    THAT A CASE CONTRIBUTION AWARD OF $2,000 FOR EACH OF THE TWO

6    NAMED PLAINTIFFS BE APPROVED.

7          AND WITH THAT, YOUR HONOR, IF THE COURT HAS ANY

8    QUESTIONS, I WOULD BE HAPPY TO ADDRESS THOSE.

9          THE COURT:  I DO NOT.  THANK YOU.

10          MR. HINSON, ANYTHING FROM THE DEFENDANT?

11          MR. HINSON:  YOUR HONOR, AS WE SAID IN OUR WRITTEN

12    SUBMISSION, WE ONLY WOULD ADD THAT WE BELIEVE WE WOULD PREVAIL

13    HAD THE LITIGATION MOVED FORWARD; AND WE BELIEVE THAT IN THAT

14    LIGHT, THIS DEFENSE -- I MEAN THIS SETTLEMENT IS, IN FACT, A

15    FAIR AND REASONABLE SETTLEMENT.  WE TAKE NO POSITION ON THE

Mirant Final Approval.txt

16    ATTORNEY'S FEES ISSUES.  AND, THEREFORE, WE HAVE VERY LITTLE TO

17    ADD.

18         THE COURT:  THANK YOU.  I WOULD NOTE FOR THE RECORD

19    AND AS HAS BEEN ALLUDED TO BY MR. WELLS, THERE WAS ONE

20    OBJECTION FILED TO THE SETTLEMENT BY MR. LANKFORD.  AND THE

21    COURT HAS REVIEWED THAT OBJECTION; AND LIKE MR. WELLS, I

22    UNDERSTAND MR. LANKFORD'S DISSATISFACTION WITH THE TOTAL AMOUNT

23    THAT WILL BE COMING TO HIM AS A MEMBER OF THIS CLASS.  I CAN

24    UNDERSTAND AND APPRECIATE HIS CONCERN, HAVING LOST A

25    SUBSTANTIAL AMOUNT OF HIS LIFE SAVINGS.  HOWEVER, WHILE I


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

14

1    APPRECIATE HIS POSITION, I DO NOT THINK IT JUSTIFIES REJECTION

2    OF THE SETTLEMENT.

3         FOR THE REASONS THAT HAVE BEEN STATED, I DO FIND THAT

4    THE SETTLEMENT IS FAIR AND IS A GOOD SETTLEMENT FOR THE MEMBERS

5    OF THE CLASS.  CERTAINLY THE QUESTION OF LIABILITY, THE RANGE

6    OF POTENTIAL RECOVERIES, PARTICULARLY THE DETERMINATION OF WHEN

7    WE WOULD FIND THEY HAD BREACHED THEIR DUTIES REALLY COULD HAVE

8    HAD A SUBSTANTIAL EFFECT.  AND I KNOW PROBABLY FROM THE

9    PERSPECTIVE OF NEGOTIATION, THAT HAD TO BE A DIFFICULT MATTER

10   TO GRAPPLE WITH, AS WELL.  BUT IT CERTAINLY MILITATES IN FAVOR

11   OF THE SETTLEMENT THAT HAS BEEN REACHED.

12        I WILL APPROVE THE SETTLEMENT.  I WILL CERTIFY THE

13   CLASS AS A (B)(1) CLASS.  I FIND THAT THE ATTORNEY'S FEES ARE

14   ALSO REASONABLE.  COUNSEL, CLASS COUNSEL, ARE OBVIOUSLY

15   EMINENTLY QUALIFIED TO BRING AND PURSUE THIS LITIGATION.  I

16   THINK THAT WHEN ONE VIEWS THE LODESTAR INVOLVED IN THE CASE AS

17   COMPARED TO THE AMOUNT OF RECOVERY, THIS IS A FAIR

Page 13

Mirant Final Approval.txt

18    COMPENSATION, PARTICULARLY WHEN ONE CONSIDERS, AS WE DISCUSSED

19    EARLIER, THE LIKELIHOOD OF SUCCESS, THE RISK THAT WAS ACCEPTED

20    BY COUNSEL IN TAKING ON THIS LITIGATION AND TAKING IT ON

21    TOTALLY ON A CONTINGENT-FEE BASIS; SO THEY BORE THE ENTIRE

22    RISK.  AND I THINK THERE IS A PUBLIC POLICY ISSUE AT STAKE HERE

23    IN THAT COUNSEL NEED TO BE ENCOURAGED TO TAKE THESE CASES WHEN

24    THEY'RE MERITORIOUS; AND IF THERE'S NOT FULL, COMPLETE AND

25    APPROPRIATE COMPENSATION, THERE WILL NOT BE THAT INCENTIVE TO


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


15

1    TAKE THESE CASES.

2            I DO APPRECIATE THE FACT THAT COUNSEL HAS ADJUSTED

3    ITS REQUEST TO 27.5 PERCENT OF THE COMMON FUND, AND I WILL

4    AWARD FEES OF 27.5 PERCENT OF THE COMMON FUND.  I WILL ALSO

5    AWARD TO COUNSEL THE FULL AMOUNT OF EXPENSES AS REQUESTED IN

6    THE PAPERS FILED WITH THE COURT AND WILL ALSO MAKE THE CASE

7    CONTRIBUTION AWARDS TO THE NAMED PLAINTIFFS OF $2,000 EACH AS

8    REQUESTED.  I THINK THAT'S EMINENTLY FAIR FOR THE PEOPLE WHO

9    CHOOSE TO ALLOW THEMSELVES TO BE PUT OUT THERE AS

10    REPRESENTATIVES OF THE CLASS.  AND WHILE I REALIZE IN A CASE OF

11    THIS TYPE, THEY ARE NOT INTIMATELY INVOLVED IN THE PROCEEDINGS,

12    THEY ARE THERE TO REPRESENT THEIR COLLEAGUES AND TO BE IN TOUCH

13    WITH COUNSEL AND DO HAVE SOME RESPONSIBILITIES AND ROLES IN

14    THAT REGARD.  SO I THINK THAT'S A VERY FAIR AMOUNT TO PROVIDE

15    TO THOSE TWO.

16            YOU HAD SUBMITTED PROPOSED ORDERS ON THESE MATTERS,

17    AND I FIND THEM TO BE APPROPRIATE AND AM INCLINED TO EXECUTE

18    THOSE AS SUBMITTED.  THE QUESTION I WOULD HAVE IS THERE ARE

Mirant Final Approval.txt

19  BLANKS TO BE FILLED IN.  I DID NOT KNOW IF YOU HAVE COMPLETED

20  ONE THAT FILLS IN THE BLANKS OR IF YOU WANTED TO GET IT TO US

21  BY E-MAIL AND WE WOULD DO IT.

22          MR. WELLS:  YOUR HONOR, NOT TO BE PRESUMPTUOUS, BUT

23  WE DID HAVE ONE THAT HAS THE BLANKS FILLED IN.  I WOULD BE

24  HAPPY TO SUBMIT IT TO YOUR HONOR.

25          THE COURT:  I AM NOT OFFENDED BY YOUR PRESUMPTION AT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER



                                                    16


1   ALL.  I APPRECIATE IT, AS DOES MY STAFF.

2           MR. WELLS:  THANK YOU, YOUR HONOR.

3           (PAUSE IN THE PROCEEDINGS.)

4           THE COURT:  I HAVE SIGNED THE ORDER OF FINAL

5   JUDGMENT, AND THIS WILL BE -- I'LL LET COUNSEL FILE IT WITH THE

6   CLERK SINCE MY CLERK IS NOT HERE TODAY.  HE'S OUT SICK.  I'LL

7   LET YOU FILE IT WITH THE CLERK.

8           LET ME, HOWEVER, CONCLUDE BY EXPRESSING TO COUNSEL

9   FOR BOTH THE PLAINTIFFS AND THE DEFENDANT MY SINCERE

10  APPRECIATION FOR YOUR LABORS IN THIS CASE.  YOU POINTED OUT,

11  MR. WELLS, THE LAYERS OF THIS LITIGATION AND THE FACT THAT YOU

12  HAD THE BANKRUPTCY ASPECT OF THIS TO DEAL WITH AS WELL AS THE

13  OTHER ISSUES THAT ARE INVOLVED IN THIS CASE.  THIS WAS NOT A

14  SIMPLE CASE.  IT HAD THE EXTRA LAYERS THAT MADE IT MORE

15  DIFFICULT.

16          BUT IT'S VERY CLEAR TO ME THAT ALL OF YOU WORKED VERY

17  HARD AT THIS.  NUMBER ONE, YOU HAD WORKED VERY HARD BEFORE I

18  STAYED THE CASE IN THE MOTION PRACTICE THAT HAD ALREADY BEGUN.

19  I AM CONFIDENT THAT YOU WOULD HAVE WORKED EQUALLY AS HARD HAD

20  THE CASE BEEN REOPENED AND WE HAD GONE THROUGH THE DECIDING OF

Page 15

Mirant Final Approval.txt

21  THOSE MOTIONS AND IF THE CASE SURVIVED, THE ENTIRE ROUTE THAT

22  YOU'VE DESCRIBED, MR. WELLS, THROUGH SUMMARY JUDGMENT, TRIAL,

23  ET CETERA.  AND FROM A JUDGE'S PERSPECTIVE, IT'S JUST REALLY

24  NICE TO HAVE LAWYERS WHO ARE CAPABLE, WHO ARE PROFESSIONAL, WHO

25  WORK TOGETHER, WHO SEEK TO FIND A GOOD RESOLUTION TO A


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


17


1   DIFFICULT CONFLICT; AND I FEEL THAT YOU HAVE IN THIS CASE.

2           I FEEL VERY GOOD ABOUT THIS SETTLEMENT IN EVERY

3   RESPECT.  I THINK THE AMOUNT OF MONEY THAT'S GOING INTO THE

4   POCKETS OF THE MEMBERS OF THE CLASS, WHILE, AGAIN, I WOULD LOVE

5   TO SEE, AS I KNOW YOU WOULD, MORE MONEY GOING INTO THEIR

6   POCKETS, THIS IS COMING OUT A LOT BETTER THAN WHAT COULD HAVE

7   BEEN; AND I THINK YOU FOLKS HAVE DONE A GREAT JOB.

8           AND I KNOW THAT THERE ARE OBSERVERS WHO WOULD

9   CRITICIZE THE AMOUNT OF ATTORNEY'S FEES AND THEY WOULD SAY THIS

10  IS ALL ABOUT LAWYERS MAKING MONEY.  BUT THE REALITY IS IF YOU

11  HAD REPRESENTED EVERY ONE OF THESE FOLKS INDIVIDUALLY, A 27.5

12  CONTINGENT FEE WOULD HAVE BEEN A STEAL ON THEIR PARTS.  THEY

13  COULD NOT HAVE RETAINED COUNSEL TO REPRESENT THEM INDIVIDUALLY

14  ON THAT KIND OF CONTINGENT FEE.  NUMBER ONE, MOST OF THEIR

15  CLAIMS WOULD NOT HAVE BEEN SUFFICIENT TO JUSTIFY THAT.  THEY

16  WOULD HAVE HAD TO PAY AN HOURLY FEE; AND LOOKING AT YOUR

17  LODESTAR, THE TIME THAT WOULD HAVE HAD TO GO INTO IT, THEY

18  WOULDN'T HAVE GOTTEN ANYTHING OUT OF IT.  THEY WOULD HAVE HAD

19  TO PAY A HIGHER CONTINGENCY.

20          SO WHILE I RECOGNIZE MANY FOLKS OUT THERE DON'T

21  APPRECIATE THE ROLE THAT YOU HAVE PLAYED IN THIS AND THEY SEE

Mirant Final Approval.txt
22    THIS AS LAWYERS JUST GETTING RICH AT THE EXPENSE OF THE VICTIMS

23    OF WHAT HAS OCCURRED HERE, I HONESTLY SEE BEYOND THAT AND THINK

24    THAT YOU HAVE DONE A REAL SERVICE BY REPRESENTING THESE FOLKS,

25    AND I THINK THEY HAVE GOTTEN A DEAL IN IT.  AND SO THANK YOU


                 SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

⧠

                                                           18


 1    FOR YOUR WORK ON THE FILE.

 2              AND I APPRECIATE THE DEFENDANTS, AS WELL, BEING

 3    WILLING TO COME TO THE TABLE AND GET A RESOLUTION OF THIS.

 4              I'VE SIGNED THE ORDER.  I WILL LET YOU FILE IT, AND

 5    THAT WILL CLOSE THE MATTER.  THANK YOU, AND HAVE A GOOD DAY.

 6    WE'RE ADJOURNED.

 7              (PROCEEDINGS CONCLUDED.)

 8                              * * *

 9                     REPORTER'S CERTIFICATION

10    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
      RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.
11

12

13                          _____
                            SHARON D. UPCHURCH, RPR
                            OFFICIAL COURT REPORTER
14                          UNITED STATES DISTRICT COURT
                            NORTHERN DISTRICT OF GEORGIA
15

16

17    DATE: _____

18

19

20

21

22

23
                            Page 17

Mirant Final Approval.txt

24

25


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

# EXHIBIT E

6BFAACITC.txt

1

6BFAACITC                    Conference
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  IN RE: CITIGROUP LITIGATION,
3
4
4                      03 CV 2932 (LTS)
5
5  ------------------------------x
6                                    New York, N.Y.
6                                    November 15, 2006
7                                    4:30 p.m.
7
8  Before:
8
9                  HON. LAURA TAYLOR SWAIN,
9
10                                  District Judge
10
11                     APPEARANCES
11
12  SCHIFFRIN & BARROWAY, LLP
12       Attorneys for  Plaintiff
13  BY:  EDWARD W. CIOLKO BY:  MARK K. GYANDOH
13
14  LAW OFFICES OF CURTIS V. TRINKO, LLP
14       Attorney for Plaintiff
15  BY:  CURTIS V. TRINKO
15
16  PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
16       Attorneys for Defendant
17  BY:  JONATHAN H. HURWITZ BY:  LEWIS R. CLAYTON
18
19
20  ALSO PRESENT:  MICHAEL T. HEYRICH, ESQ. Citigroup Inc.
21
22
23
24
25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                          2
   6BFAACITC                    Conference
1            (Case called)
2            THE COURT:  We're here in the matter of Citigroup
3  litigation.  For a conclusion of plaintiff's hearing on
4  approval of the settlement and related applications.  Counsel
5  would be good enough to introduce yourselves again to me.
6            MR. TRINKO:  Curtis Trinko for the plaintiff and with
7  me are Edward Ciolko, Mark Gyandoh, both from the Schiffrin &
8  Barroway firm in Philadelphia.
9            MR. CLAYTON:  Lew Clayton, your Honor, from Paul Weiss
10  for the defendants.  I am here with John Hurwitz of Paul Weiss
11  and also Michael Heyrich of the Citigroup.
12            THE COURT:  Good afternoon.
13            I have received your supplemental submission which
14  I've reviewed carefully and for which I thank you.
15            Do you wish to make statements at this point?
16            MR. TRINKO:  I believe that Mr. Ciolko will be
                          Page 1

6BFAACITC.txt

```
17    addressing the points for supplemental memorandum and any
18    questions that your Honor may have.
19              THE COURT:  Thank you.
20              MR. CIOLKO:  Good after, your Honor.
21              Thank you for giving us the opportunity for providing
22    the supplemental memorandum, the additional report by Professor
23    Ramaswamy.  I'll dispense with going over what was, I think,
24    laid out in maybe painstaking detail in our 140 pages of
25    briefing and maybe just concentrate on the supplemental filing
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```
                                                                        3

6BFAACITC          Conference
```
1     and then, of course, I will be very brief and any questions
2     your Honor might have.
3               So I know, to be frank, Professor Ramaswamy in his
4     analysis is complex, so it took me a bit of time to make sure I
5     understand stood every nook and cranny.  I think our
6     supplemental memorandum sets out both the supplemental filing
7     done by Professor Ramaswamy as well as any potential impact of
8     the pension -- on the settlement itself.
9               If it please your Honor just as a quick review, the
10    settlement negotiated by the parties essentially or structural
11    changes to the plan and educational opportunities to be being
12    afforded to plan participants under the Citigroup 401 K plan,
13    formerly, there was two forms, for want of a better term, lot
14    Citigroup or company stock that was held by the plan.  One
15    originated from predecessor plan, The Travellers' had a 401 K
16    plan which came from a predecessor company that Citicorp became
17    Citigroup, and the plans merged to be become the Citigroup 401
18    K plan.  That lock stock under the terms of the plan generally
19    had to stay invested in company stock until a participant from
20    that 401 plan was aged 55.  A second source of locked
21    investment of company stock in the plan was from ongoing
22    Citigroup matching contributions under the plan which formerly
23    had to stay invested in Citigroup stock, generally, again, for
24    five years.
25              The parties engaged in a lengthy and detailed and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```
                                                                        4

6BFAACITC          Conference
```
1     spirited negotiations.  We tried to come to a meeting of the
2     minds on the case that provided particular challenges on both
3     sides, I believe, because of both the recovery of Citigroup
4     stock during the relevant time period, the novel area of the
5     case law, the large scale investment of the company stock in
6     the plan.  I think the parties wanted to reach an amicable
7     settlement that would both address some of the issues that
8     plaintiffs had raised and protect the participants going
9     forward.  I think that's what we did.
10              Essentially, under the original terms of the
11    settlement The Traveller's plan stock was immediately to be --
12    from the predecessor plan and the previous, the prior stock in
13    the plan that originated from Citigroup matching contributions
14    that had to be invested in company stock for five years would
15    only have to remain in investment in Citigroup for one year
16    after, essentially, for one year after grant.
17              In addition to that, Citigroup had agreed to provide
18    financial advice and financial investment educational services
19    to active participants in the plan and as well as provided
20    educational materials on the benefits of diversification,
21    retirement plan investments to class members who are no longer
```
                                Page 2

6BFAACITC.txt

22    participants in the plan or employees in the Citigroup.  They
23    provided access to that material through their web site to the
24    people that wanted to gain insight on the advantages of
25    diversification of retirement assets which is at the heart of
          SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                                    5
6BFAACITC                        Conference
1    what that settlement case is.
2         As parties brought to your attention at our last final
3    fairness hearing, in our view Congress had kind of caught up
4    with what was forward thinking on our part, I think, and
5    thought that it would be a good thing to eliminate any mandated
6    investment in company stock in these type of defined
7    contribution plans.
8         In general, the Pension Protection Act which was
9    signed into law after the final -- the relevant portions to a
10   settlement here are -- and I am sure my colleagues either next
11   door or behind me will correct me if I get it wrong but I am
12   trying to present it as simply as possible as I understand it.
13   Under the law any plan holdings that previously were locked in
14   the company stock that were generated from company matching
15   contributions before December 31, 2006, have to be allowed to
16   be unlocked or diversified on other plan investments on a
17   graduated scale.  At least a third of these assets have to be
18   divested by the end of 2007, a third by 2008 and the remaining
19   third by 2009.  And that for stock that had been in the plan
20   subject to restriction or lock employer's qualifying, employer
21   security such as the one at issue in this case.
22        So at your Honor's behest we went back to our
23   Professor Ramaswamy and asked him to take a look at the numbers
24   he had already created and if your Honor would remember I think
25   he initially had estimated the value of the unlocks negotiated
          SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                                    6
6BFAACITC                        Conference
1    by the parties was somewhere between $23 and $43 million.  He
2    took a look at those numbers again and ran those numbers under
3    a number of different scenarios.  One of which I believe my
4    colleagues behind me at the defense table are better able to
5    discuss, but under three scenarios, one, under the original --
6    I know the terminology in the report is a little confusing, at
7    least was for me at first -- but under the proposed settlement
8    he reran numbers that he had run before trying to be even more
9    conservative than before and came out to essentially the same,
10   21 to 41 million dollar valuation.
11        Then he ran the numbers with the assumption that the
12   parties knew the act would be passed which it did with the
13   mandated divestment of company security -- He ran those numbers
14   and came to the conclusion that the negotiated settlement still
15   worked between, I believe, it's eight and $15 million -- eight
16   and $16 million.
17        Then after the independent fiduciary who had done an
18   11 month investigation into the original set of terms to the
19   original settlement said it would pass muster in their view
20   also took a look at Professor Ramaswamy's new numbers and had
21   asked that he also run additional calculations that -- I have
22   to back up a second.  I apologize.  Since our final fairness
23   hearing Citigroup has sua sponte, not as part of the
24   settlement, changed the 401 K plan where the Citigroup matching
25   contributions that were formally locked for five years and that
          SOUTHERN DISTRICT REPORTERS, P.C.
                    Page 3

6BFAACITC.txt
(212) 805-0300

7

6BFAACITC                 Conference
1   unlocked was moved to one year under the settlement, now is
2   subject to immediate diversification.  That is so that the
3   independent fiduciary wanted Professor Ramaswamy to also run
4   some calculations to take into account that change in the plan
5   that's not part of the settlement.
6           And you know while I think informative, I'm not sure
7   it actually has any bearing one way or another on whether or
8   not the settlement was beneficial to the classes.  We believe
9   it is.  In Professor Ramaswamy's final conclusion, even in his
10  supplemental report, is that given that the parties had reached
11  this agreement I believe in the fall of 2004 the better view of
12  the value of the unlocking under the original settlement is
13  that it was worth conservatively $25 million given the amount
14  of lock stock that was then owned by the plan and that would
15  have been added to the plan, the five years come enhanced after
16  the settlement.
17          So the independent fiduciary has reviewed the new
18  numbers that Professor Ramaswamy has put forth and continues to
19  believe that the settlement is fair and the result and
20  beneficial to the class and the result in arms length
21  negotiation.
22              THE COURT:  The independent fiduciary is who?
23              MR. CIOLKO:  Great Bank Trust.
24              THE COURT:  OK.  Thank you.
25              MR. CLAYTON:  And their counsel, your Honor, is Hogan
            SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

8

6BFAACITC                 Conference
1   and Hartsen --
2               MR. CIOLKO:  Yes.
3               THE COURT:  Now, the one sort of premise or structural
4   element of the Ramaswamy supplemental report that I'm not quite
5   sure I followed to my complete satisfaction was his pegging of
6   the valuations to a December 31, 2004 date.  It wasn't clear to
7   me whether in running the numbers on the diversification as
8   against risk value of unlocking stock he was making some sort
9   of, including some sort of assumption as to the opportunity for
10  additional, capturing of additional market value in some
11  retroactive period that isn't applying here.
12              MR. CIOLKO:  Do you mean -- and I actually had a
13  similar question, your Honor.  I think the assumptions that
14  Professor Ramaswamy made when starting in 2004 he was working
15  on the assumption, one, that the one year lock would be in
16  place going forward for five years, and, two, that he estimated
17  the amount of matching contributions that would be made in
18  those five years and took the value of the additional monies
19  that would be unlocked versus the five year unlock.  I don't
20  think he was taking any additional figures in a pretty
21  retroactive manner.  Maybe the easiest way to say this I thing
22  he utilized the same assumptions in his first calculations as
23  in his second.  If anything his numbers are conservative
24  because he would not take into account either the immediate
25  unlock that was negotiated after the settlement or the fact
            SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

9

6BFAACITC                 Conference
1   that the -- I think the simply answer is that that was the
2   numbers that he has given, the latest numbers that we had for
                         Page 4

6BFAACITC.txt

```
 3  the plan that he could define what future contributions would
 4  be compared to what past contributions were.
 5          THE COURT:  So as far as you know none of the numbers
 6  that go into his new eight to 16 or 17 million dollar range
 7  assume that a participant would have been able to reinvest at
 8  some point between December 31, 2004 and today stock that
 9  actually remained locked up during all or part of that period
10  that could not physically have been taken to the bank as it
11  were and actually diversified.
12          MR. CIOLKO:  I think that's right.  I think that's
13  exactly right under both.  I don't think he could.  I think in
14  his mind he did -- I think I understand your question and I
15  apologize, your Honor.  He wanted to, in order to do that he
16  would have made the calculations more complicated.  I think he
17  wanted a more conservative approach.  He assumed that the value
18  of the stock that was unlocked could be diversified, but that
19  was it.  There was no additional -- in his supplemental
20  analysis there was no additional stock he said would be able to
21  be unlocked even though effectively it couldn't have been cause
22  it wasn't unlocked.
23          THE COURT:  All right.  Just another question.  Where
24  does the implementation of the unlocking provisions stand as of
25  today when I haven't yet signed the final order approving?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

6BFAACITC                    Conference

```
 1  Have accounts actually been unlocked or accounts still unlocked
 2  and awaiting the great release as it were?
 3          MR. CIOLKO:  That might be a question better answered
 4  by Mr. Clayton.
 5          MR. CLAYTON:  Yes, your Honor.
 6          We have not yet implemented that as the papers
 7  indicate under the stipulation in part of the settlement in
 8  part of the New Pension Act and some other factors Citi
 9  decided, not as matter of compulsion under the settlement but
10  as a matter of administration, completely to unlock these
11  shares to go beyond even the one year restriction and that is,
12  we believe, scheduled to happen at the start of the new year
13  '07.
14          THE COURT:  1/1/07?
15          MR. CLAYTON:  Maybe a few days after 1/1/07 but it's
16  January '07.
17          THE COURT:  Thank you.  Now, that gives me the
18  predicate for asking one more time the question that I was
19  trying to formulate.
20          Does any of the numbers, to counsel's knowledge, in
21  the Ramaswamy report assume that participants could have at any
22  point prior to today invested stock that is in Citigroup stock
23  and locked under the current terms of the plan in some other
24  investment that would match their assumed risk and target
25  return profile?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

6BFAACITC                    Conference

```
 1          MR. CIOLKO:  No, your Honor.  What I think the
 2  assumption was that once your Honor signed the settlement and
 3  the -- were put into effect certain previously locked stock
 4  would be available for divestment at that date, and that number
 5  was included in Professor Ramaswamy's calculations because it
 6  would be.  Formerly, there had been stock that say was, granted
 7  in 2003, subject to a five year lock, that assuming that the
```

Page 5

6BFAACITC.txt
```
 8  defendants had not, Citigroup had not changed their locking
 9  provision it would be subject to one year locking and
10  effectively would have been immediately available for
11  investment.  So he took that into account, but immediately
12  available for investment upon the date of the change.
13              THE COURT:  Yes.  Prospectively.
14              MR. CIOLKO:  Prospectively.
15              THE COURT:  All right.  Thank you.  Is that it?  That
16  was my one question.
17              MR. CIOLKO:  That's it.  One other thing.
18          I know we had given your Honor a modified final
19  order --
20              THE COURT:  Yes.
21              MR. CIOLKO:  -- for your review.  And thank you for
22  the suggested revision.  Mr. Trinko also has a modified fee
23  award quarter which we have shown to defendants and they're
24  fine with the substance of it.  But we literally had just
25  finalized this today.
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                    12
```
    6BFAACITC            Conference
 1              THE COURT:  It's been modified proposed fee order
 2  accompanied by an affidavit that lays out whatever additional
 3  work you want me to factor into the Loadstar calculation on the
 4  supplemental analysis?
 5              MR. CIOLKO:  To be honest with you, your Honor, we
 6  didn't actually include that.  Because the Loadstar number was
 7  so close to one effectively we're asking for our fees which in
 8  this type of case we think it's reasonable in this situation,
 9  in fact, the defendants had agreed to a fee request up to a
10  million dollars.  We thought that given the tally and the
11  circumstances that what we were asking for was essentially what
12  our fees would be with no multiplier.  So any additional work
13  that we put in would just be clarifying something that came
14  along out of the blue.  We could put the additional hours in
15  and it would actually be a fractional multiplier.
16              THE COURT:  Let me put it this way, if you are asking
17  me to award a greater amount of dollars then you asked me the
18  last time on account of what you had done have you documented
19  that if you are asking me the same number?
20              MR. CIOLKO:  Same number.
21              MR. TRINKO:  The only revision that was made to our
22  fee order, your Honor, was just to note that we're having the
23  supplemental hearing and just to indicate just as to why.
24              THE COURT:  Thank you.
25              MR. TRINKO:  If I could approach, your Honor, I'll
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                    13
```
    6BFAACITC            Conference
 1  hand it up.
 2              THE COURT:  Yes.
 3          (Pause)
 4              THE COURT:  Mr. Clayton, did you or any of your
 5  colleagues wish to be heard?
 6              MR. CLAYTON:  Very little to say, your Honor.
 7          We appreciate the Court's time and the fact that we
 8  have been able to make some supplemental submissions so that
 9  the Court has a full record before it.  We think this is a
10  quite reasonable settlement.  We did make it sufficient, as
11  your Honor knows, concerning some recent changes to the Citi
12  plans.  We wanted that to be on the record here, but we do not
```
                            Page 6

6BFAACITC.txt

13  believe that those changes have any effect on this settlement.
14  Thank you, your Honor.
15          MR. CIOLKO:  Your Honor, one more thing.
16          You asked at the previous hearing that we also answer
17  a question whether any portion or provision of Pension
18  Protection Act was violated by term of settlement or was in
19  conflict with and we've reviewed it and it is not.
20          THE COURT:  Thank you.  And I think you also made that
21  representation in the written submission.
22          Well, I do thank you for your extensive original and
23  supplemental submissions in support of this proposed
24  settlement.  The proposed orders cover much, if not all, of the
25  technical ground that I need to cover in terms of approving the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              14

     6BFAACITC              Conference
 1  settlement.  I will make a few further remarks on the record
 2  and these remarks and the orders that I will sign will
 3  constitute the Court's findings of fact and conclusions of law
 4  for purposes of Rule 52.
 5          I note that the Court has jurisdiction of these
 6  matters pursuant to Section 1132 of Title 29 of ARISSA as well
 7  as Section 1331 of Title 28 of the U.S.C.
 8          I find for the reasons documented at some length in
 9  the submissions that these were arms length negotiations.
10          I also find that the parties and their attorneys were
11  creative in approaching the legal issues presented and the
12  challenge of coming up with meaningful and constructive relief
13  for plan members in the context of a settlement and that it was
14  the product of arms length bargaining.
15          I have considered the requisite ^gran nel factors in
16  relation to the substantive terms of the settlement.  Just to
17  remark with respect to the reaction of the class as documented,
18  again, at some length in the original submissions there were
19  very few objections filed, a fraction of one percent of the
20  class and only eight of those, something like 11 objections
21  made specific comment on features of the settlement.
22          At least one of those letters requested that there be
23  no lock up at all, as I recall, and I note that the ultimate
24  result here including the voluntary plan changes eliminating
25  the lock up provisions address or would moot even that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              15

     6BFAACITC              Conference
 1  objection.
 2          The Court has taken seriously its obligation to
 3  consider the propriety and fairness of the settlement even as
 4  to non objecting class members and finds that the requisite
 5  factors are well and properly addressed here, that the risks of
 6  litigation are well responded to and balanced in this
 7  settlement.  It is a non monetary settlement.
 8          I find that it is reasonable under the circumstances,
 9  given the nature of the litigation and the legal risks and
10  novel issues presented here, I do find based on the analyses by
11  Professor Ramaswamy that there is real monetary value going to
12  class members in connection with the settlement by virtue of
13  the elimination of what we had been calling the lock up
14  provisions in the plan, that the settlement provisions for
15  elimination and or carve back of the lock up provisions are
16  more generous than those now mandated by law under the Pension
17  Protection Act of 2006.  And that the additionally voluntary
                            Page 7

6BFAACITC.txt

18  step taken by Citigroup improves that benefit to plan
19  participants even more.
20          I also find that the educational investment -- I'm
21  going to say advisory but not necessarily in the technical
22  sense of word -- provisions of the settlement are also
23  beneficial to and meaningful for class members.
24          I also find that final certification of the class in
25  connection with this settlement is appropriate and that the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    16
6BFAACITC                   Conference
1  requisite factors are met pursuant to Rules 23(A) and 23 (B)
2  (1) and (2) of the Federal Rules of Civil procedure.
3          I further find having considered the Loadstar
4  calculations with respect to the fee application and the
5  Goldberger factors that the fees request is both reasonable and
6  appropriate in relation to the work performed in risks faced by
7  class counsel here, and, therefore, I find that it's
8  appropriate to approve the proposed settlement, certify in
9  connection with that settlement the class and award the
10  requested attorney's fees and expenses.
11          Is there anything further that counsel feel I should
12  address orally on the record in addition to the matters that
13  are covered in the proposed orders?
14          MR. CIOLKO:  Thank you very much, your Honor.
15          The matter of the case contribution award for the
16  individual plaintiffs.
17          THE COURT:  Yes.  I have considered carefully as well
18  the proposed case contribution award and I find that it is
19  reasonable and appropriate in structure and amount and so that
20  application is approved as well.
21          Now, that is not covered in these revised orders that
22  you gave me, is it?  I don't remember it being covered in the
23  revised orders, the final judgment order dismissal.
24          MR. CIOLKO:  It maybe in the separate proposed fee
25  order.  That's right.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    17
6BFAACITC                   Conference
1          THE COURT:  It's in the --
2          MR. TRINKO:  Paragraph five, your Honor.
3          THE COURT:  Yes.  Thank you.
4          All right, then, give me just one moment.
5          Let's see.  And the request I have to confess that
6  that was an aspect of it that I focused on at least one hearing
7  ago.  So the specific request for the case contribution award
8  the amount requested was what?
9          MR. CIOLKO:  It was $2500 per plaintiff.
10          THE COURT:  Yes.  And I had considered that and had
11  concluded that it was an appropriate amount.  So I will fill
12  that in.  And the figure that you were seeking in attorney's
13  fees and expenses.
14          MR. CIOLKO:  The attorney's fees I believe were
15  $750,000.
16          THE COURT:  And the expenses number is what?
17          MR. CIOLKO:  31,921.
18          THE COURT:  31,921?
19          MR. CIOLKO:  That's right.
20          THE COURT:  And on the final judgment and order of
21  dismissal I've crossed out the word "corrected" in the title
22  since I've never entered one before, so this can be the final
                            Page 8

6BFAACITC.txt

23  judgment.  I'm also crossing out the reference to "correction"
24  in paragraph one and the reference to objectors having appeared
25  by counsel and having -- I'm just going to cross out "having
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
                                                          18
6BFAACITC              Conference
 1  appeared by counsel".  Just for the record, no one was here to
 2  speak at the August hearing but I have heard the objector by
 3  way of reviewing their objections.
 4          So with those changes I have also dated the final
 5  judgment and order of dismissal with today's date and signed
 6  that as well as the attorney fee and class representative case
 7  contribution award order and I wish to thank and congratulate
 8  all of you.
 9          I know it has been a very long road for you and it's
10  got to be fun to work on something that's precedent setting as
11  well as challenging and that reaches a result that is so
12  beneficial all around.  So congratulations to all of you.  I am
13  glad to have met you and I am sure that we will all live long
14  enough to see each other again.
15          Ms. Cypher will organize getting copies to you.  Will
16  it be acceptable to you if she faxed them out to your
17  respective firms rather than doing the Xeroxing tonight?
18          All right.  Again, thank you all.  Good night.
19                          o O o
20
21
22
23
24
25


            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

# EXHIBIT F

1

1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
2             CIVIL ACTION  2:03-cv-01214-DRD-SDW

3

IN RE: HONEYWELL ERISA        : TRANSCRIPT OF PROCEEDINGS
4     LITIGATION                    :
                                    :       M O T I O N
5     - - - - - - - - - - - - -
                                       Pages 1 - 45
6
                                    Date:  July 19, 2005
7                                   Newark, New Jersey

8

B E F O R E:    HONORABLE DICKINSON R. DEBEVOISE,
9                       SENIOR UNITED STATES DISTRICT JUDGE

10

A P P E A R A N C E S:
11
DRINKER BIDDLE & SHANLEY
12    BY:  JOHN J. FRANCIS, ESQ., and
      ROBERT ECCLES, ESQ.,
13    Attorney for Honeywell Corporation

14
      TRUJIILLO RODRIQUEZ & RICHARDS
15    BY:  LISA RODRIGUEZ, ESQ. and
      SCHIFFRIN & BARROWAY
16    BY:  JOSEPH MELTZER, ESQ.,
      Attorney for the Plaintiffs

17

18    _____

19    Pursuant to Section 753 Title 28 United States Code, the
      following transcript is certified to be an accurate record as
20    taken stenographically in the above entitled proceedings.

21    _Mollie Ann Giordano_
      MOLLIE ANN GIORDANO
22    Official Court Reporter

23

24

25

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.   (973) 220-9465

Colloquy                                    2

1        THE COURT:  Good morning.  I gather you've given your

2   appearances to Miss Giordano, so we're ready to proceed.

3        Let me ask before we start in, the gentlemen back

4   here, are you here to make any comments about the settlement?

5        VOICE:  No, sir.

6        THE COURT:  All right.  So we have nobody appearing at

7   this point anyway to address the approval of the settlement?

8   Any other applications?  All right, well, Miss Rodriguez, are

9   you presenting this?

10       MS. RODRIGUEZ:  Actually, your Honor, Mr. Meltzer will

11  be presenting on behalf of the plaintiffs today.

12       THE COURT:  All right.  Mr. Meltzer, go ahead.

13       MR. MELTZER:  Good morning, your Honor.  We are very

14  pleased to be here today.  We are here to present the

15  settlement in all the claims in the Honeywell ERISA litigation.

16  The settlement is a product of a rather lengthy, sometimes

17  rather intense negotiations between the parties.  Your Honor,

18  to summarize what the settlement provides for, monetary and

19  structural relief.  On the monetary side, it calls for 14

20  million dollars to pay into the Honeywell plans.  It will be

21  distributed to the participants and further pro rata share, and

22  in accordance with how much they may have lost due to their

23  investments in Honeywell stock.  Your Honor, if I could, one

24  bit of housekeeping.  We had submitted a plan.

25       THE COURT:  And I gather you propose not to pursue

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                    3

1    that this morning?

2              MR. MELTZER:  That's right.

3              THE COURT:  We will address that question later.

4              MR. MELTAER:  It's largely worked out, and I think

5    there's some details that I think we need to finalize, and the

6    parties will get together and submit something in due course.

7              With respect to the structural part of the settlement,

8    previously the Honeywell plan provided that participants cannot

9    invest their honey in anything but Honeywell stock until they

10   were 55, and had accumulated 10 years of service in the plan.

11   Those restrictions have been lifted or unlocked, so to speak,

12   so now participants can move their money about in any of the

13   plans in investment alternatives.

14             The other motion before your Honor today is counsel's

15   motion for fees, expenses, and payment of case contribution

16   orders; namely, plaintiffs.

17             With respect to the motion for approval of settlement,

18   we seek the Court's finding that the settlement is fair,

19   adequate, and reasonable under Rule 23 and the Third Circuit

20   standards.  We also seek final certification of settlement

21   class, and I can give you a brief background of the litigation

22   to this point.

23             THE COURT:  All right.

24             MR. MELTZER:  Okay.  The cases were initially filed in

25   March, 2003.  They allege breaches of fiduciary duty under

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                        4

1    ERISA, specifically Section 409 and 502 of ERISA.  There were

2    two cases filed.  They were ultimately consolidated in May of

3    2003.  There was a consolidation and organizational order

4    entered by the Court.  At that time, my firm and Ms. Rodriguez

5    leads with the liaison counsel, and we secured certain

6    documents, ERISA-related documents that relate to the governing

7    of the plan.  They are essentially the trust agreement and all

8    the governing instruments under which the plans are operated.

9            We then continue by our investigation of the claims,

10   and essentially to prepare the filing of the consolidated

11   complaint.  The consolidated pleading was filed on July 28,

12   2003.  It is fairly long, it's fairly detailed, it essentially

13   groups three sets of defendants, Honeywell International,

14   members of the retirement plan's committee, members of the

15   company's investment committee, and it sets out a variety of

16   allegations relating to why Honeywell stock, at least

17   plaintiffs allege, was imprudent during that period.  Problems

18   that the company was having related to certain mergers, Allied

19   Signal mergers.  Also a contemplated merger with General

20   Electric.  Claims for relief based on breach of fiduciary

21   duties under ERISA; to monitor fiduciaries under ERISA; and

22   also prohibit transactions.

23           Following the filing of that consolidated pleading,

24   that touched off some motion practice.  Defendants moved to

25   dismiss the complaint, and we of course opposed it.

```
                          Colloquy                        5

1           THE COURT:  You're familiar with what took place here

2    in court?

3           MR. MELTZER:  That ultimately resulted in oral

4    argument before your Honor, and ultimately an order granted in

5    part, denied in part, defendant's motion.

6           At that time the parties were also engaged in class

7    certification discoveries as a result of the magistrate waiting

8    to enter an order bifurcating discovery in the matter.  We were

9    engaged in propounded discovery, compounded discovery.  We had

10   several meet and confer sessions, some rather lengthy, some

11   rather contentious, but we ultimately framed a couple of issues

12   for the Court.  We had a couple of motions to compel pending

13   the time the settlement was reached.

14          The other aspect of the litigation that I would point

15   out is that the ERISA plaintiffs and counsel here today appear

16   before your Honor in the securities case because there was some

17   questions if they were reached in their case.

18          THE COURT:  What was the settlement figure in that

19   case?

20          MR. MELTZER:  In the securities litigation?

21          THE COURT:  Yeah.

22          MR. MELTZER:  I believe it was a hundred million

23   dollars.

24          Yeah, we appeared at the fairness hearing in the

25   securities litigation to make sure the relief was not -- could
```

Colloquy                                          6

1    not be read to the certain defense in this litigation.

2    Settlement discussions began sometime in the spring of '04, and

3    frankly, your Honor, I believe they were touched off by an

4    inquiry you made during the contest of a securities hearing as

5    to whether class counsel in the ERISA case has begun a

6    settlement dialogue.  And we're appreciative of that fact,

7    because sometimes that's just the kind of push the parties need

8    to talk about settlement in a fruitful way.  We had rather

9    protracted settlement discussions.

10              There is essentially two grounds, if you will, in

11   negotiation.  We had asked your Honor to refrain from issuing

12   his opinion on the motion to dismiss, sort of insuring the

13   maximum amount of uncertainty while settlement talks were

14   proceeding.  We reached an impasse at some point.  We then

15   contacted your Honor and asked that you issue your opinion.

16   And after it's received, we sort of picked up on settlement

17   negotiations at that time.

18              Beyond the settlement, we went over the terms of the

19   actual agreement.  We proceeded with some confirmatory

20   discovery that involved largely the production of.  Corporate

21   minutes, there are two committees I mentioned before,

22   Retirement Plan Committee that deal with operations an

23   administration of the plans.  We reviewed some of those

24   minutes.  We talked to a large --

25              THE COURT:  How far will discovery proceed in the

```
                          Colloquy                    7

1      securities class action?  Have they gotten into merits

2      discovery.

3              MR. MELTZER:  My involvement was limited, your Honor.

4      But as I understand it, I think they were well into merits --

5              THE COURT:  Well, the point of my question is, were

6      you able to draw on the information and discovery in that case

7      to assist you in this case?

8              MR. FRANCIS:  Judge, if I may, I was the only one who

9      was in both cases.  There were a limited number of depositions

10     in the securities litigation, fair amount of document

11     discovery, and very little depositions.

12             THE COURT:  And the document discovery?

13             MR. FRANCIS:  Yes, yes, a fair amount of that.

14             MR. MELTZER:  The only thing I can say, your Honor, in

15     direct response, I didn't have access to anything that went on

16     in the securities litigation, with the exception of pleadings

17     that were filed.

18             THE COURT:  And there were motions filed --

19             MR. MELTZER:  Right.

20             THE COURT:  -- in that case.  And I assume you've

21     followed whatever was going on in the court?

22             MR. MELTZER:  Yes, especially with respect to

23     settlement.  You do what you have to do.

24             THE COURT:  All right.

25             MR. MELTZER:  Beyond that, that's sort of where our
```

```
                          Colloquy                        8
```

1    involvement ended.

2              THE COURT:  All right.

3              Well then, what was the data on which you relied in

4    determining the merits of your case?

5              MR. MELTZER:  Your Honor, we got both the

6    ERISA-related documents, we did a lot of precomplaint sort of

7    informal discovery.  Anything that we were able to obtain from

8    probable available sources, SEC filings, the DOL, anything that

9    we got from the defendants, both before the complaint was filed

10   and in the context of discussing settlement.  That's the kind

11   of information we relied upon.  There included information with

12   regard to the insurance that the company had taken out for

13   fiduciary claims, it included information regarding the plans,

14   purchases, and sales of Honeywell stock during the time period.

15   Again, the minutes of the committees that were assessing the

16   propriety in investing in Honeywell stock were produced the day

17   after the agreement was reached in a confirmatory capacity.

18   There was, in addition to whatever we got in the context of

19   class certification, the discovery, in the way of discovery

20   responses.  Frankly speaking, I'm not sure how much that

21   dovetails to the merits of the claim.  It did somewhat, but

22   that's not entire overlapping.

23              THE COURT:  All right.

24              MR. MELTZER:  There was a fairly substantial amount of

25   information that we were -- that we had access to, both in the

Colloquy                                    9

1    context of preparing for our complaint and the motion practice,

2    and in proceeding with settlement negotiations that I think

3    span settlement -- six or seven months.

4            THE COURT: Good. Okay.

5            MR. MELTZER: Your Honor, I would just like to touch

6    real briefly on the structural relief part of the settlement.

7    We are particularly pleased with that. There is a -- there is

8    a report that we would draw your Honor's attention to that

9    we've submitted with our approval papers. It's from a

10   Professor Ramaswamy. He is a professor -- he sort of is a

11   specialist in trying to quantify what value it brings. He puts

12   a broad range in terms of value, less concerned about what the

13   actual value is, and more concerned that people are going to be

14   able to kind of spread our investments out over a variety of

15   investments, especially if they see some kind of down turn in

16   any particular sector of the market. It helps to mitigate

17   against these kinds of claims going forward, otherwise I can

18   rely on the submission, and we're not seeking a fee on the

19   value that he quantifies, fairly large.

20           THE COURT: And it's pretty speculative --

21           MR. MELTZER: Yeah, it is.

22           THE COURT: -- value?

23           MR. MELTZER: Well, it's speculative in one sense

24   because obviously you're not dealing with people and their

25   investment decisions in the future. And on the other hand,

Colloquy                                    10

1    it's fairly empirical, and it's at least well reasoned, and

2    it's actually based on actual data.

3            With respect to settlement as a whole, both the

4    monetary and structural components of it, we would ask that the

5    Court enter a finding that it's fair, reasonable, and adequate,

6    under Rule 23E, within the Third Circuit.  There is a nine

7    factor test.  Frankly, preliminarily, your Honor, the

8    settlement is presumptively fair under Third Circuit case law.

9    It was negotiated at arm's length.  There was sufficient

10   discovery so counsel could assess the merits, and counsel has

11   experienced a similar action, and only a small portion of the

12   class objected.  And those are inadequate notice to the class

13   participants, and I'll touch on that in a second.  Those are

14   the elements for sort of a presumptive finding of fairness.

15           With respect to notice, the notice in this case, and

16   it's a non-class, those standards are lower or somewhat

17   relaxed.  Frankly, the notices in this case were outstanding.

18   There were individual notices mailed out to over a hundred

19   thousand participants.  There was publication in the USA Today,

20   the Minneapolis Star Union.  There was a web site that we made

21   available through the claims administrator which gave everybody

22   information regarding the settlement, including court

23   documents, that had twenty-thousand, two hundred hits in the

24   small amount of time since notice was effectuated.

25           Despite the notice efforts, there were roughly 18

Colloquy                                    11

1    objections, as I counted them.  Given the size of the class,

2    that's a rather small number.

3             With respect to the Dirsh factors, I can run through

4    those fairly quickly.  The first factor, and this is the

5    nine-factor test that the Third Circuit has enunciated, I think

6    it's a 1975 case, but it's been reiterated and reiterated.  The

7    first factor is complexity and likely duration of the

8    litigation.  Your Honor, these are fairly novel claims, and

9    these are fairly new lines of cases.  The case law, as your

10   Honor probably knows from issuing the opinion, is very

11   unsettled.  There is a lot of inherent complexities.  Courts in

12   this district alone have noted the difficulties in trying to

13   prove one of these cases and advance it all the way to trial.

14   The expense and likely duration of the litigation, had we not

15   settled at this point, the litigation probably would have gone

16   on for at least another year.  And a factor of that, the

17   expense would have been very considerable.  Experts in this

18   kind of case alone are in the hundreds of thousand of dollars.

19   Document production would have cost some factor of that.  So

20   that factor militates in favor of approval of the settlement.

21            The second Dirsh factor is the reaction of the class

22   to the settlement.  As I say, your Honor, there were roughly 18

23   objectors.  Given the size, winds up to be .01 percent of the

24   class.  The other thing to note about the reaction of the

25   class, some say too little in terms of settlement, some say

```
                        Colloquy                    12
```

1    it's far too much.  We seem to obstruct that.

2             THE COURT:  Well, I guess you had a few people who

3    just don't like class action or class action lawyers.

4             MR. MELTZER:  Unfortunately, your Honor, the person in

5    my position is always the case.  There are always people who

6    are dissatisfied with the way Rule 23 operates.  By and large

7    the class is -- by not objecting is sort of affirming the

8    reasonableness of the settlement, and I think that factor also

9    militates in favor of the finding fair and reasonable.  The

10   proceedings and the amount of discovery, as we discussed

11   previously, the case was settled after your Honor issued the

12   motion to dismiss.  Class certification, the discovery was

13   ongoing at the time.  The class, as I addressed briefly,

14   earlier, class certification and discovery was proceeding

15   because it hadn't bifurcated at that point.  Merits discovery

16   has been stayed, despite our objection.  We lost on that one.

17   Class certification discovery was determined first, and then

18   subsequent to a finding on class certification, we were to move

19   into merits discovery.  We had discovery that was produced

20   informally] before the complaint was filed.  We had a lot of

21   publicly available information.  We had dozens and dozens of

22   participants who had contacted my firm, who gave us

23   information.  We also ad information that was produced in the

24   context of negotiating the settlement.  All of those factors

25   essentially amounts to us having clearly a considerable amount

Colloquy                          13

1    of information and enough information that we can assess the

2    propriety of moving forward with this settlement today.

3          The fourth and fifth test of the Dirsh test is showing

4    liability.  These are difficult cases, as I touched on briefly.

5    There is a dirth of case law with respect to whether the cases

6    are meritorious and can go forward on any number of fronts,

7    whether it's in the face of a presumption or in terms of

8    standing to bring the claims.  There is a District Court

9    opinion, your Honor, in this district shortly before you issued

10   your opinion on the motion to dismiss, which dismissed all the

11   claims in analogous actions based on standing and the inability

12   to proceed in this type of action.  There is a limited number

13   of circuit court decisions that guide us.  And frankly, I have

14   felt we had strong claims with respect to liability, as the

15   defendants I'm sure think they have very strong offenses with

16   respect to liability.

17          In terms of damages, this particular case is not a

18   sort of fraud of the century, if you will.  It's not an Enron

19   or Worldcom.  It's not a case where the company spiraled into

20   bankruptcy.  I think the close, the trade was somewhere up to

21   forty dollars a share.  It's obviously a viable company.

22   Factor that with the sort of performance of the stock, visa-vis

23   the market during the time period, and whether it

24   underperformed or out performed certain indexes, damages would

25   be a very difficult proposition for us to prove.  There was a

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                    14

1    drop in the stock obviously between the beginning and end of

2    our class period.  Whether we could tie that to the specific

3    fiduciary action or inaction, obviously is something that we

4    would only ote if we proceed through an entire trial.  But

5    based upon our experience in other cases, this was a difficult

6    case in terms of trying to prove up the actual damages.  And

7    frankly, your Honor, if you look at the memorandum that the

8    defendants filed yesterday, we would have been lucky to prove

9    any damages at all, based on the statements made in that

10   memorandum.

11          The sixth Dirsh factor is the risk of maintaining a

12   class action through trial.  Frankly, your Honor, I think the

13   class would have been certified.  I think these cases make for

14   perfect class actions under 23D-1.  I think they said all the

15   elements of 23A pretty clearly, and the cutting against that of

16   course is that the defendants had already undertaken a very

17   aggressive class certification.  And in light of that, they

18   would have attacked the accuracy of our named plaintiffs.  We

19   were preparing for depositions at the time we settled.  There

20   was certainly a risk that we wouldn't be able to maintain a

21   class at trial, albeit I think a small one.

22          The seventh Dirsh factor is the ability of the

23   defendants to withstand a greater judgment.  Your Honor, we

24   don't challenge whether Honeywell could sustain a greater

25   judgment than what we would have secured here.  This factor

```
                            Colloquy                    15
1     standing alone doesn't preclude the entry of a settlement.  I
2     think the waiver and anti-trust case in the Third Circuit, just
3     because the company could pay more, doesn't mean that the
4     settlement shouldn't be approved.  You have to look at all the
5     other compliments and all the other factors.
6          The eighth and ninth factors within the Dirsh test are
7     the range of reasonableness of the settlement in light of the
8     best possible recovery and the range of reasonableness of the
9     settlement fund to possible recovery in light of the attendant
10    risks of litigation.  Frequently they are analyzed together.
11    The Third Circuit has pointed out that this settlement, these
12    factors should be interpreted essentially as to whether the
13    settlement represents a good value for a relatively weak case.
14    In light of some of the problems, not only in terms of the law,
15    but as they apply to the facts of this particular case, clearly
16    a solvent company and very viable company.  I think this is an
17    excellent result, both in terms of securing almost all the
18    fiduciary liability policies, despite the fact that there was a
19    denial of coverage and very -- essentially, when you -- base it
20    again on the risk that we wouldn't be able to get anything at
21    all, it's an excellent recovery.  And when you base it against
22    the best possible recovery, and the problem we would have, I
23    think again the factor is clearly supportive of approving the
24    settlement.
25          Finally, the motion for approval seeks final
```

```
                          Colloquy                      16
 1    certification of the settlement classes.  Obviously it's not

 2    opposed by the defendant's settlement classes.  Any person who

 3    is a participant in the --

 4            THE COURT:  I don't think you have to read the

 5    definition over.

 6            MR. MELTZER:  That's set forth in the papers.  We

 7    think it clearly meets all the Rule 23 requirements, and we

 8    would seek certification of the settlement class under 23A, and

 9    then 23B(1) and B(2).

10            THE COURT:  All right.

11            MR. MELTZER:  There's all I have with respect to

12    approval, your Honor.

13            THE COURT:  Then we get to the application for fees

14    and expenses.

15            MR. MELTZER:  Okay.

16            Your Honor, we submitted a motion for attorney's fees,

17    reimbursement for expenses and case contribution.  We requested

18    25 percent of the settlement fund that nets out to 3.5 million

19    dollars, as well as reimbursement of forty-three thousand,

20    eight hundred and eighty-seven dollars in expenses as well as

21    an award of twenty-five hundred dollars for each of the named

22    plaintiffs.

23            THE COURT:  In the securities class action I awarded

24    20 percent.

25            MR. MELTZER:  Yes.
```

Colloquy                                17

1          THE COURT:  Is there some reason why there should be a

2    higher percent in this case than in that case?

3          MR. MELTZER:  Your Honor, the answer I guess is, given

4    the higher number, sometimes when you have higher awards,

5    courts will take the percentages down and the Third Circuit

6    called it frankly the range of settlement.  The fee awards in

7    these types of cases have been between 20 and 30.  I think 25

8    is reasonable.  I think it is, in light of the multiplier, it

9    is certainly reasonable.  I think these are a little more novel

10   in terms of whether we'd ever be able to to recover anything,

11   including our times, as opposed to security litigation --

12         THE COURT:  You see a greater risk.

13         MR. MELTZER:  There's somewhat of a greater risk in

14   this action.  Beyond that, I think -- you know, if you look at

15   the factors, the Third Circuit sets out, I think, given the

16   complexity, and I think your Honor said the risk of not payment

17   all at all, and there was a fairly substantial risk of

18   nonpayment, particularly after that District Court opinion in

19   New Jersey that dismissed the claims, which came down before --

20   before we settled.  I think that militates in favor of a

21   slightly higher percentage, especially when you couple that

22   with the fact that it's a smaller aggregate amount, which

23   doesn't require sort of a slide back.  They call it a slide

24   back on a mega settlement fund.  And there's also fairly --

25   again, I believe very substantial and valuable structural

```
                              Colloquy                        18
```

1    relief that is attendant to the settlement, for which we're not

2    seeking any fee at all.

3            THE COURT:  All right.  And I guess that's to the --

4    to the case contribution payment to the named plaintiffs.  I

5    don't see that as much of a problem.  How many named plaintiffs

6    do you have?

7            MR. MELTZER:  Six.

8            THE COURT:  All right.  I guess that's all the

9    applications you've got.

10           MR. MELTZER:  I believe so.

11           THE COURT:  Mr. Francis.

12           MR. FRANCIS:  Your Honor, Mr. Eccles has a few brief

13   remarks to make.

14           MR. ECCLES:  Thank you, your Honor.  And I will be

15   brief.

16           Let me exercise the main points why we think this

17   settlement should be approved.  First, it's clearly an arm's

18   length settlement.  This was an adversarial process the way

19   it's supposed to be.  I say not at all uncivil, but contentious

20   is not a bad word to use.  We were litigating this hard and the

21   settlement stopped there.  It's also that both Mr. Meltzer's

22   firm and my firm have many other cases that look a little like

23   this, and we've been through this, and have the able to assess

24   what cases are worth, and what cases should go forward.  And

25   from a procedural viewpoint, I don't think that's any question

Colloquy                                    19

1    that all the class proceedings and notice were more than

2    adequate to provide notice to the class.

3           From our point of view, and we put this in submission,

4    so I'll be very brief, from the defendant's point of view, we

5    thought we had terrific defenses.  And the court defense in a

6    nutshell was the stock market went down, and the Honeywell

7    stock went down with it, and there's nothing extraordinary

8    about that.  No fraud, no nothing else.  And we cited that one

9    of the other funds, a gross equity fund within these plans the

10   participants could have put their money in, actually it went

11   down more than the Honeywell stock over each of the three big

12   years involved here.

13          And so we thought we had an excellent set of defenses,

14   your Honor.  But like most cases, nothing certain, except that

15   they'll be a lot of expenses, I think an additional year of

16   litigation would have been an extremely optimistic viewpoint.

17   There would have been a lot of depositions and a lot more

18   document discovery.  And so from our viewpoint, it made sense

19   for both sides to get together and talk, and that's exactly

20   what we did.  And reached a settlement, which I think is

21   definitely an arm's length settlement, definitely a fair

22   settlement to the class.

23          The one other point we make, your Honor, is although

24   some of the objectors did focus on the fees, which is not our

25   issue, it's a separate issue from the fairness of the rest of

```
                              Colloquy                    20
```

1    the settlement, and I think will effectively get taken care of

2    when the Court approves whatever fee is fair.  And unless the

3    Court has questions with that, we ask the settlement be

4    approved.

5              THE COURT:  All right.  Thank you.

6              Anyone else at the counsel table want to speak.

7              MR. MELTZER:  Only to point out for the record, and I

8    think Mr. Eccles knows this, to the point where I was

9    contentious, to the extent I say contentious, and it was not

10   well taken on the other side, it was not my intent.  It was a

11   hard fight, I should have said.

12             THE COURT:  I didn't take it in any invidious sense.

13   Is there a Mr. Smith in the courtroom?  I think he filed a

14   notice and wanted to be heard.  All right.  And there's nobody

15   else who has appeared either in favor of, or in opposition to

16   the settlement.

17             I think it's important or useful at least to resolve

18   the matter at this point, so I'm going to impose upon you to

19   read a rather lengthy opinion into the record.  I'll reserve

20   the opportunity to correct any transcript which results from

21   that before it's officially made a part of the record.

22             This action was commenced on March 17th, 2003, when

23   Plaintiff Richard Ramseyer, a participant in the Honeywell

24   Savings and Ownership Plan I, filed a class action complaint

25   asserting claims under the Employee Retirement Income Security

```
                              Colloquy                    21
 1    Act of 1974 (ERISA).  The Ramseyer action sought relief for

 2    losses to the Honeywell Savings and Ownership Plans I and II,

 3    (collectively the "Plan").  On May 8th, 2003, the Ramseyer

 4    action was consolidated with Freund v. Honeywell International,

 5    Inc., et al., 03-cv-1626 (District of New Jersey), a related

 6    action involving similar allegations and claims.  The order of

 7    consolidation also appointed Shiffren & Borroway, LLP and

 8    Trujillo Rodriguez & Richards, LLC as lead and liaison counsel

 9    for plaintiffs, respectively.  Plaintiffs filed a consolidated

10    complaint for breach of fiduciary duty on July 28th 2003.

11            After extensive investigation, and a motion to dismiss

12    the complaint, a hearing on the motion, class discovery and

13    settlement discussions, the parties arrived at a settlement.

14    Upon motion of the plaintiffs, the Court preliminarily approved

15    the settlement, conditionally certified a settlement class

16    pursuant to Federal Rule of Civil Procedure 23, approved a

17    notice plan and scheduled a final fairness hearing.  The case

18    is now before the Court for certification of a settlement

19    class, a ruling upon the fairness, reasonableness and adequacy

20    of the settlement, approval of the cash contribution awards for

21    named plaintiffs, and award of attorneys' fees and expenses.

22    Originally plaintiffs moved for final approval of a plan of

23    allocation, but both plaintiffs and defendants have requested

24    this motion be a adjourned for a brief period to permit

25    refinement to be made in the plan.
```

```
                          Colloquy                    22

 1            First, proceedings.  The consolidated complaint names

 2       the defendants Honeywell, members of the Company's Retirement

 3       Plans Committee, members of the Company's Pension Investment

 4       Committee, and Michael R. Bonsignore, Chairman and CEO of

 5       Honeywell from April 2000, through June, 2001.  The

 6       consolidated complaint alleges, inter alia,, that defendants

 7       breached their fiduciary duties by allowing the Plan to

 8       purchase and hold Honeywell common stock at a time when

 9       Honeywell stock was an imprudent investment.  In particular,

10       plaintiffs allege that the Plan was allowed to accumulate and

11       maintain, through company-encouraged participant investments

12       and company-matching contributions, a large position in

13       Honeywell common stock.

14            According to plaintiffs, such a heavy single-equity

15       investment, in addition to being inherently risky, was

16       particularly imprudent, given the persuasive problems that

17       beset the company stemming from the consummated Allied Signal

18       transaction, and the failed General Electra merger, the

19       ramifications of which defendants were fully aware.  Further,

20       plaintiffs allege that Honeywell and certain individual

21       defendants made material misrepresentations through Securities

22       and Exchange Commission filings and other public

23       pronouncements, and withheld pertinent information, that

24       compromised participants' ability to make informed investment

25       decisions.  When the company finally disclosed that the Allied
```

Colloquy                    23

1    Signal transaction resulted in expensive operational problems

2    and substantial customer losses, and that the General Electric

3    merger would not be effectuated, the Plan's assets were

4    depleted as the value of the Honeywell stock declined.

5           The consolidated complaint further alleges that

6    defendants are liable under ERISA as a result of their:  One,

7    engaging in prohibited transactions involving the Plan's assets

8    with parties-in-interest; two, failing to properly monitor and

9    provide material information to the Pension Investment

10   Committee; three, allowing or abetting fiduciary breaches of

11   their cofiduciaries; and four, failing to avoid or remedy

12   inherent conflicts of interest between their corporate

13   interests and their fiduciary responsibilities to the Plan

14   under ERISA.  The consolidated complaints seeks plan-wide

15   relief under Section 409 and 502 of ERISA.

16          Plaintiffs' counsel conducted a thorough investigation

17   into these allegations.  They reviewed documents produced by

18   defendants and publicly-available materials related to the

19   company and the Plan.  They analyzed specific corporate

20   transactions and interviewed Plan participants.  In addition,

21   counsel derived certain information from a securities class

22   action initiated in 2000 in this court and which involved many

23   factual allegations relevant to the claims in this action.  In

24   re Honeywell Securities Litigation, No. 00-3605.

25          Defendants vigorously contested the litigation.  On

Colloquy                              24

1   September 29th, 2003, they filed a motion to dismiss.  After

2   extensive briefing, oral argument was heard on January 26,

3   2004, after which there was further briefing.

4            During this period the parties engaged in a extensive

5   litigation concerning class action discovery issues.  On

6   January 14th, 2004, Magistrate Judge Wigenton, over plaintiffs'

7   objections, bifurcated class and merits discovery, staying

8   merits discovery pending resolution of plaintiffs' motion for

9   class certification.

10           Also during this period the parties to the parallel

11  Securities Class Action settled.  It was necessary for

12  plaintiffs' counsel in the instant case to ensure that the

13  settlement in that action and its release of claims did not

14  affect plaintiffs' ability to pursue relief in this case.

15           Beginning in the spring in 2004, the parties commenced

16  settlement negotiations and exchanged information relevant to

17  that subject, such as performance of Plan investments during

18  the relevant period, insurance available to satisfy any

19  possible judgment, including documents evidencing denial of

20  coverage under the fiduciary insurance policy, settlement in

21  analogous cases, the precise number of Honeywell shares held by

22  the Plan, and demographic information for participants as a

23  means of measuring the impact of proposed structural changes to

24  the Plan.

25           The parties requested the Court to refrain from

```
                            Colloquy                    25

 1     issuing its ruling on defendants motion to dismiss while

 2     settlement negotiations were ongoing.  In early September 2004,

 3     the parties reached an impasse.  Notified of this development,

 4     the Court on September 16, 2004, issued its opinion and order

 5     granting the motion to dismiss with respect to plaintiffs'

 6     prohibited transaction claims and claims for monetary relief

 7     under ERISA, Section 502(a)(3) and denying the motion in all

 8     other respects.  In re Honeywell International ERISA

 9     litigation, 2004, U.S. District, LEXIS 21585, (District of New

10     Jersey, 2004).

11            Upon issuance of the court's opinion, the parties

12     resumed class certification discovery and resumed settlement

13     negotiations.  Ultimately agreement was reached, resulting in

14     the agreement now before the Court for approval.  Two, the

15     proposed settlement.

16            The settlement agreement provides the defendants shall

17     pay $14 million into an interest-bearing escrow account, (the

18     "Settlement Fund").  The principal (less amounts expended for

19     certain approved costs) will accrue interest between

20     preliminary approval and distribution.  The net amount of the

21     settlement funds, including interest, and after payment of, and

22     establishment of reserves for, any taxes and Court-approved

23     costs, fees and expenses (including and Court-approved

24     compensation to be paid the named plaintiffs), will be paid to

25     the Plan.  After payment of implementation expenses, the
```

Colloquy                                        26

1    remaining amount will be allocated to the Plan accounts of

2    members of the settlement class according to a Plan of

3    allocation to be approved by the Court.

4            In addition, the settlement agreement provides for

5    certain structural changes in the Plan.  The operative

6    documents of each Plan will be amended to state that each Plan

7    participant who is or has become one hundred percent vested in

8    his or her Company Matching Contribution Account shall have the

9    right to direct the investment of his or her Company Matching

10   Contribution Account balance in the same manner and among the

11   same investment alternatives as are available for the

12   investment of employee contributions to the respective plans.

13   This provides participants with the ability to diversify rather

14   than being required to remain invested in Honeywell stock.

15   Plaintiffs retained Professor Krishna Ramaswamy of the Wharton

16   School at the University of Pennsylvania to analyze the

17   structural term of the settlement and estimate the value to the

18   Plan and its participants of the unlocking of Company matching

19   contributions, past and future.  The expert provided a detailed

20   report of his analysis and estimated that allowing the Plan's

21   participants to diversify company-matching contributions

22   previously "locked" into Honeywell stock would provide a

23   benefit of between $34.1 million to $211.4 million, depending

24   primarily on the percentage of the Plan's Honeywell equity

25   investments originating from company-matching contributions.

```
                         Colloquy                    27
```

1       The notice to Plan participants advised that class

2   counsel would file a motion for payment of attorneys' fees of

3   up to 30 percent of the settlement fund, plus expenses of

4   litigation, notice and settlement administration, and case

5   contribution awards for the named plaintiffs.

6       Three, class certification.  Plaintiffs urge

7   certification of the following class for settlement purpose.

8   "Any person who was a participant in the Honeywell Savings and

9   Ownership Plan I and II and/or the predecessor Plan named the

10  Data Instruments, Inc. Employee Stock Ownership Plan, the

11  Honeywell DMC Savings Plan, and the Honeywell Savings and Stock

12  Ownership Plan (collectively the "Plan" or "Plan,") at any time

13  between December 20, 1999 and February 28, 2005 (the "class

14  period") and whose Plan accounts included investments in the

15  Honeywell Common Stock Fund, or a beneficiary, alternate payee

16  representative, or successor-in-interest of any such person

17  (the "settlement class")."

18      Rule 23(a) sets forth four prerequisites to class

19  certification:  One, numerosity; two, commonality; three,

20  typicality; and four, adequacy of representation.  Each of

21  these requirements is met.

22      The class is sufficiently numerous because the number

23  and diverse location of putative class members is such that it

24  is impractical to join all of the class members in one action.

25  There are more than 100,000 potential class members, which

Colloquy                                          28

1    clearly satisfies the numerosity requirement.

2         There is commonality when the proposed class

3    representatives share at least one question of law or fact with

4    the claims of the prospective class.  In the present case, the

5    principal question of law and fact applicable to all

6    participants is whether the defendant breached fiduciary duties

7    owed to the Plan and its participants in allowing the

8    maintenance of existing, and addition of new, heavy investments

9    in Honeywell common stock when defendants knew or should have

10   known of its operational problems and accounting irregularities

11   which negatively affected the prudence of Honeywell stock as an

12   investment of the Plan during the class period.  It is

13   unnecessary to catologue the several other commons question of

14   law and fact that exist as to all members of the class and

15   predominant over any questions affecting solely individual

16   class members.

17        The proposed class representatives' claims arise from

18   the same event or course of conduct that gives rise to the

19   claims of the other class members and are based on the same

20   legal theories.  Class plaintiffs share the incentives of the

21   absent class members to pursue this action to its conclusion.

22   Typicality can be met in class actions brought for breaches of

23   fiduciary duty under ERISA and is met here.  In re Ikon Office

24   Solutions, Inc., 191 Federal Rule of Decisions, 457, 465

25   Eastern District of Pennsylvania, 2002).  Each class member was

Colloquy                              29

1    an employee of Honeywell, a participant in the Plan during the

2    class period, and had part of his or her individual Plan

3    investment portfolio invested in Honeywell stock during that

4    time.  All Plan participants sustained injury arising out of

5    defendants' alleged wrongful conduct and plaintiffs bring their

6    claims pursuant to ERISA Sections 409 and 502(a)(2) for

7    Plan-wide relief; so any relief obtained for such claims would

8    enure to the Plan as a whole and, derivatively, its

9    participants during the class period.

10             The class representatives meet the adequacy

11    requirement of Rule 24(a)(4).  They have represented and will

12    represent the members of the class so as to fairly and

13    adequately protect the interest of the class.  The named

14    plaintiffs have no interest antagonistic to the class and are

15    in the same position as all all other members.  Class counsel,

16    Schiffren & Barroway, LLP has had extensive experience in

17    litigating complex ERISA breach of fiduciary duty class

18    actions.

19             While it is necessary for class certification to

20    qualify under only one of the requirements of Rule 23(b),

21    plaintiffs in the instant case qualify under all three.

22             They qualify under Rule 23(b)(1)(a) and (B).  The

23    relief to be accorded is Plan-wide.  Failure to certify could

24    expose defendants to multiple lawsuits and risk inconsistent

25    decisions.  Failure to certify would create the risk that

Colloquy                                30

1    future plaintiffs would be without relief.  Rankin v. Rots, 220

2    Federal Rule of Decisions 511, 523 (Eastern District of

3    Michigan, );, Ikon 191 F.R.D. at 466.

4         Although the proposed class meets the requirements of

5    Rule 23(b)(2), and Rule 23(b)(3), no further discussion is

6    warranted, as the Court will rely on Rule 23(b)(1) alone.

7         In sum, the action will be certified as a class action

8    under Rule 23(a) and (b) on behalf of the plaintiffs' proposed

9    class.

10        Four, Objections to Settlement.  Eighteen persons have

11   lodged specific objections to the settlement terms and/or to

12   plaintiffs' request for attorneys' fees and expenses, and case

13   contribution awards for the named plaintiffs.  One person, Mr.

14   Steven K. Smith, wished to be heard at the hearing to express

15   his objections.  He did not appear at the hearing.  These 18

16   objectors represent .016 percent of the more than one hundred

17   and fifteen thousand settlement class members to whom

18   individual notice of the settlement was sent.  The Court has

19   read and considered each objection with care.

20        A few are from persons who object to this class action

21   proceedings per se, either because they do not believe in class

22   actions as a matter of principle, or because the concept of

23   awarding substantial attorneys' fees to attorneys who take on

24   class action cases offends them, or because they believe

25   Honeywell voluntarily turned over shares of its stock to the

Colloquy                                    31

1    Plan, and employees who benefited from these contributions

2    should not sue their benefactor Honeywell.  While these views

3    are entitled to respectful consideration, they have in effect

4    been rejected when the Court did not grant defendants' motion

5    to dismiss and proceeded with the case.  They cannot be

6    advanced again at this time.

7              There are objections either to the settlement or to

8    the payment of attorneys fees.  The objections must be treated

9    with utmost sympathy, because they are submitted by persons who

10   believe that they have been grievously injured by the conduct

11   of the defendants as charged in the complaint.  Some are by

12   employees who had worked loyally for the company for many years

13   and had counted on their interests in the Plan to provide

14   comfortable old age, an expectation that in some cases has not

15   been fulfilled.  A few others assert that they had been close

16   to the management of the Plan and had expressed doubts about

17   the way they were being handled during the class period,

18   warnings that had been ignored.

19             The objections generally address three aspects of the

20   settlement.  A number of them attack the adequacy of the

21   settlement award, others challenge the 30 percent potential

22   attorneys' fee request; a few challenge payment of a cash

23   contribution award to the named plaintiffs.  In their

24   submissions, plaintiffs have discussed each objector's

25   contentions, explaining why they believe they are not a basis

Colloquy                                         32

1    for rejection of the proposed settlement.  Each of these

2    objections will be addressed generally in the context of the

3    discussions of these subjects in the sections of the opinion

4    that follow.

5              Five, Fairness, Reasonableness and Adequacy.  The

6    fairness reasonableness and the adequacy of the settlement

7    agreement is supported by the prevailing circumstances.

8    Settlement of disputed claims, especially those advanced in

9    complex class action litigation, are favored by the courts.

10   The Court of Appeals affords an initial procedural presumption

11   of fairness of a settlement if adequate notice was given to

12   affected members of the proposed settlement class and "if the

13   Court finds that (1) the negotiations occurred at arm's length;

14   (2) there was sufficient discovery; (3) the proponents of the

15   settlement are experienced in similar litigation; and (4) only

16   a small fraction of the class objected."

17             In re Cendant Corporation Litigation, 264 F. 3d 201,

18   223, Note 18 (3rd Circuit 2001).  As described above, each of

19   these four factors was fully met in this case.

20             Beyond these procedural criteria, courts in this

21   Circuit apply the nine-factor test enumerated in Girsh v.

22   Jepson, 521 F. 2d 153, 157 (3rd Circuit 1975).  Applying these

23   factors, the Court concludes that the settlement for $14

24   million in cash, plus significant structural changes in the

25   Plan, is fair, reasonable and adequate.

Colloquy                                    33

1          A.   Complexity, expense and likely duration.  All

2     defendants have denied wrongdoing and liability.  They

3     vigorously through able counsel, defended the action up to the

4     point of settlement and would no doubt continue to do so,

5     absent a settlement, defending through continued class action

6     and merits discovery, class certification, objections, trial,

7     and, if unsuccessful at trial, on appeal.  This action is

8     complex and raises novel issues in the ERISA context, issues

9     that have not been decided definitively by the Supreme Court

10    and Courts of Appeals.  If successful, plaintiffs' ultimate

11    recovery would be delayed for years during which enormous

12    attorneys' fees and expenses would be incurred.  Settlement

13    ensures prompt payment and enjoyment of the restructured

14    provisions of the Plan.

15         B.   Reaction of the Class to the Settlement.  As noted

16    above, only .016 percent of the more than one hundred fifteen

17    thousand class members submitted objections to the settlement

18    agreement, which reinforces the fairness and adequacy of its

19    provisions.

20         C.   Stage of Proceedings and Discovery.  The extensive

21    investigation of the circumstances of this case was described

22    above.  It is apparent the plaintiffs' counsel had full

23    information relating to the merits of the case and were in a

24    position to negotiate and evaluate the terms of the settlement.

25         D.   Risk of Establishing Liability and Damages.

Colloquy                                              34

1    Plaintiffs' counsel who have thoroughly familiarized themselves

2    with the facts of this case and the applicable law have

3    concluded that the terms of the settlement represent an

4    appropriate balance of the amount that might ultimately be

5    recovered if successful and the risks of not recovering at all.

6    There are novel and complex issues, some of which the Court

7    recognized when it addressed defendants' motion to dismiss.

8    ERISA law is in the process of development.  In re Xcel Energy,

9    Inc. Securities, Derivative & ERISA Litigation, 364 F. Supp.

10   2d, 980, (District of Minnesota, 2005).  In re Global Crossing

11   Securities and ERISA litigation, 225 F.R.D., 436, 459 Note 13

12   (Southern District of New York 2004).  Computing damages raises

13   distinct problems.  Unlike securities law claims, ERISA

14   provides relief for the imprudent purchase and holding of stock

15   by a Plan during the class period.  In re Ikon Office

16   Solutions, Inc., 191 F.R.D. 457, 464 (Eastern District of

17   Pennsylvania, 2000), but there is little law explaining the

18   basic principle's application to the type of defined

19   contribution Plan at issue here.  Damages calculations in ERISA

20   cases such as this one require a sophisticated computer model

21   of the Plan involved and require consideration of a number of

22   complex interrelated factors.  The legal and factual

23   complexities and uncertainties of calculating and proving ERISA

24   damages point strongly towards approving the settlement.

25          E.   Risk of Maintaining Class Action Through Trial.

Colloquy                    35

1    There is always a risk that class action status might not be

2    maintained through trial.  If it could not be maintained, the

3    value of the action would decline precipitously.  The Court

4    does not consider this to be a very serious risk and by itself

5    it would not be a compelling reason to approve a settlement.

6          F.  Ability of Defendants to Withstand a Greater

7    Judgment.  Undoubtedly Honeywell could withstand a greater

8    judgment, but the other factors weigh sufficiently in favor of

9    approving the settlement.  The risks entailed in seeking a

10   larger recovery through trial militate against rejecting the

11   opportunity to receive prompt payment of a lesser sum.

12          G.  Reasonableness of the Settlement Fund.  One of the

13   principal grounds of those who filed objections is that the

14   case is being settled for an inadequate amount, specifically

15   that plaintiffs should hold out for more than $14 million in

16   cash and the changes in the Plan that will allow for greater

17   diversification among the participant accounts.  This is "in

18   plaintiffs' counsel's estimation, an outstanding result."

19   Considering the skill and extensive experience of counsel and

20   the vigor with which this case has been pursued, this

21   estimation is entitled to considerable deference.

22          The persons who object to the settlement are well

23   aware of the losses incurred and the hurt that the losses have

24   caused to Plan participants.  They cannot be expected to be

25   aware of the legal uncertainties in computing damages for

```
                            Colloquy                        36

 1    recovery purposes and of the legal hurdles to be faced to

 2    secure any recovery at all.  One objector urged that plaintiffs

 3    should have calculated how many additional shares of Honeywell

 4    stock the Plan should have been able to purchase if the

 5    company's equity was not inflated in the settlement class

 6    period and compare that to what the Plan held at the end of

 7    that period as an approach to estimating damages.  It is

 8    relevant to note that the decline in value of the Honeywell

 9    Common Stock Fund was less in each of the three years of the

10    2000 through 2002 bear market than the decline in value of a

11    diversified stock fund that was also an investment option under

12    the Plan.

13          One objector noted that the Plan held about 10 percent

14    of Honeywell's outstanding shares.  Of significance, $14

15    million represents 14 percent of the monetary settlement

16    reached in the related securities case which this Court

17    approved some months ago.  Further, the $14 million represents

18    93 percent of the company's fiduciary liability policy, an

19    obligation which the insurance company originally disclaimed.

20    Although no precise value could be placed upon the negotiated

21    structural relief, the opinion of Professor Ramaswamy

22    establishes that it is substantial, far more than the $14

23    million cash payment.

24          Weighing the various factors, the Court concludes that

25    the settlement is fair, reasonable and adequate.
```

Colloquy                                    37

1        Six, attorneys' Fees and Expenses.  Plaintiffs'

2   attorneys seek fees in the amount of 25 percent of the total

3   recovery and out-of-pocket expenses of $43,887.09 incurred

4   since this lawsuit began.  Several of the objectors filed

5   objections to the maximum amount of 30 percent that the class

6   Notice advised might be requested, but the Court will assume

7   that the objections would be advanced to the 25 percent

8   request.  One objector contended simply that the case does not

9   require extensive legal work or a complicated determination.

10   Another would limit fees to what real estate brokers typically

11   earn, namely 6 percent.  Others objected on principle to fees

12   being paid to attorneys who appear in class actions.  Some

13   simply objected to 30 percent as being too high a percentage.

14        It is understandable that lay persons cannot

15   appreciate both the amount of work and the risk of receiving no

16   fee that enter into representation in a class action case.  In

17   the present case, the work which the attorneys performed is

18   described above.  In accomplishing this work, the three law

19   firms representing plaintiffs devoted 2223.6 hours of attorney

20   and paralegal time (Schiffrin & Barroway LLP - 2212.6 hours;

21   Brodsky & Smith, LLC - 28.3 hours; Trujillo Rodriguez &

22   Richards, LLC - 82.70 hours).

23        It is universally recognized in the courts that

24   attorneys who generate a fund of recovery for the benefit of a

25   class should be fairly compensated.  Boeing Co. v. Van Gemert

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                                    38

1    444 U.S. 472, 478 (1980).  Application of a portion of the

2    collected funds to the payment of attorneys' fees spreads the

3    payment proportionately among those who benefited from the

4    suit.  It encourages attorneys to undertake these kinds of

5    difficult cases.

6            The Court of Appeals for the Third Circuit as well as

7    the courts of many other circuits have expressed a preference

8    for awarding attorneys' fees from a common fund pursuant to the

9    percentage of the fund method of calculation.  In re Prudential

10   Insurance Company Am. Sales Practices Litigation Agent Actions,

11   148 F. 3d 288, 333, (3rd Circuit 1998).  This method is an

12   alternative to the lodestar method in which a fee is computed

13   by multiplying the reasonable number of hours the attorneys

14   expended on the case by the rates charged by comparable

15   attorneys in the area in which the services were rendered.  To

16   arrive at the ultimate fee, this lodestar figure is usually

17   multiplied by a factor to reflect the degree of success, the

18   risk of nonpayment the attorneys faced and perhaps the delay in

19   payment that they encountered.  But, as noted, the preference

20   is for computing the award on the basis of a percentage of

21   recovery, perhaps checking the result against a lodestar

22   computation to ensure that it is not grievously out of line.

23           The amount of the percentage varies case to case, 15

24   percent, 20 percent, 25 percent, 30 percent, 33 1/3 percent, 38

25   percent having been awarded.  Thiry percent or 33 1/3 percent

```
                          Colloquy                    39
```

1    is quite common.  The Court has reviewed the various factors

2    that govern the determination of an appropriate percentage and

3    concludes that the requested 25 percent of the class recovery

4    is reasonable, particularly in light of the fact that the value

5    of the structural changes in the Plan is not included in the

6    amount to which the percentage is applied.  Gunter v. Ridgewood

7    Energy Corporation, 223 F. 3d 195 (3rd Circuit 2000).

8            The proposed settlement appears to be favorable to the

9    class, conferring the immediate benefit of $14 million plus

10   accrued interest less attorneys' fees and expenses and the

11   named plaintiffs case contributions.  In addition, in the

12   future each Plan participant who is or has become 100 percent

13   vested in his or her Company Matching Contribution Account

14   shall have the right to direct the investment of his or her

15   Company Matching Contribution Account balance in the same

16   manner and among the same investment alternatives as are

17   available for the investment of employee contributions.

18            As described above, very few members of the class

19   voiced objections to attorneys' fees with an upper limit of 30

20   percent.  Eighteen out of the 115,000 to whom notices were sent

21   filed objections, and not all of the objections were to

22   attorney's fees.  Understandably these few objectors were

23   unaware of the principles that the courts have developed over

24   the years for awarding attorneys' fees.  The Court recognizes

25   that very few class members are likely to analyze the notices

Colloquy                                40

1    which are sent to them.  Despite every effort to make them

2    readily understandable to lay people, they cannot help but be

3    technical in nature, lengthy and complex.  The vast majority of

4    class members rely upon the good faith of the class

5    representatives and their attorneys and upon the oversight role

6    of the Court.  Thus in the case where the class members do not

7    include institutional investors an absence of a large number of

8    objections to the Plan itself and to the requested attorney's

9    fees is of limited significance.  However, in the present case

10   where the few objections filed did not raise substantial

11   grounds to reject the requested attorney's fees, the absence of

12   a significant number of objections and the lack of merit of the

13   few objections that were filed are factors pointing towards

14   approving the fee application.

15        Plaintiffs' counsel undoubtedly possess great skill

16   and experience in this kind of case and have exhibited that

17   experience during the course of these proceedings.

18        Unlike the typical securities fraud case, a field in

19   which the law has well developed during the prior decades,

20   ERISA class actions are a relatively new phenomenon, presenting

21   complex issues as the courts deal with the complicated ERISA

22   statute.  Faced with this statute, counsel had to engage in

23   extensive factual explorations and address legal problems both

24   in the context of seeking class certification and during the

25   course of the motion to dismiss.  In this context both the

```
                              Colloquy                    41

 1    merits and class litigation, and the settlement negotiations

 2    were conducted with experienced lawyers and powerful law firms

 3    on the opposing side.  The Ramseyer lawsuit was commenced on

 4    March 17, 2003, and was consolidated on May 8, 2003.  The

 5    consolidated complaint was filed on July 28, 2003.  Intense

 6    investigative and litigation activity, described above,

 7    proceeded thereafter and continued until October, 2004 when a

 8    settlement was agreed upon.  Had the case proceeded to

 9    additional class action and merits discovery its duration would

10    have been greater, but one of the objections of the percentage

11    of recovery method of computing attorneys' fees is to encourage

12    early resolution of cases and to bring to an end continued

13    litigation that would generate extensive efforts and increasing

14    attorneys' fees.

15            The risk of not succeeding on the merits (which would

16    result in no recovery by the class members and, of course, no

17    attorneys' fees) was far greater in this case than in a typical

18    securities fraud case.  Apart from the usual difficulties in

19    developing the factual predicates underlying the legal theory

20    on the basis of which recovery is sought, in this, an ERISA

21    case, the legal theories themselves are still subject to

22    challenge.  In particular, the application of long-standing

23    fiduciary principles in the ERISA context has yet to be

24    authoritatively developed.  As the Court stated in In re Global

25    Securities and ERISA Litigation 225 F.R.D 436, 456 (Southern
```

```
                          Colloquy                        42
```

1   District of New York, 2004).

2           "The ERISA cases would pose additional factual and

3   legal issues.  Fiduciary status, the scope of fiduciary

4   responsibility, the appropriate fiduciary response to the

5   Plan's concentration in company stock and defendant's business

6   practicse sould be issues for proof, and numerous legal issues

7   concerning fiduciary liability in connection with company stock

8   in 401(k) Plan remained unresolved.  These uncertainties would

9   substantially increase the ERISA cases' complexity, duration,

10  and expense - and thus militate in favor of settlement

11  approval."

12          The legal and factual contentions of the class members

13  would be challenged vigorously by defendants' able counsel.

14  The risks inherent in this case support approval of the

15  settlement and approval of the attorneys' fees application.

16          Class counsel have described the work they have

17  performed and the hours expended performing that work -

18  specifically 2223.6 hours - see the foregoing sections of this

19  opinion.  They will have to continue expending time finalizing

20  the settlement, overseeing claims administration and dealing

21  with any appellate issues, should they arise.  Without

22  consideration of the additional legal work that will have to be

23  performed the lodestar in this case is $937,160, and the

24  requested fee represents a multiplier of 3.8.  In fund in court

25  cases multipliers have ranged from 1.7 to 2.66 to 3.15 to 6 and

Colloquy                                    43

1    even higher.  Prompt resolution of a case is often reflected in

2    a higher multiplier, rewarding prompt recovery for the members

3    of the class and discouraging unnecessary protracted

4    litigation.  If I were to compute the lodestar in this case for

5    the purpose of actually computing the fee, I might have arrived

6    at a somewhat lesser figure, finding that the rates the

7    attorneys project to be somewhat high.  However, I might well

8    apply a somewhat higher multiplier, and the end result would be

9    substantially the same.

10              Considering all these factors, I find that the

11   attorneys' fees being requested are reasonable and they well be

12   allowed.  No objection has been raised to reimbursement of the

13   attorneys' expenses totaling at least $43,887.09 as of the date

14   of this application.  They appear to have been reasonably

15   incurred and will be allowed.

16              Seven, Named Plaintiffs' Case Contribution Awards.

17   Class counsel seek approval of case contribution awards to the

18   named plaintiffs in the amount of $2500 each.  A few class

19   members objected to the payment of these sums.  However, the

20   persons who agreed to be named as class plaintiffs undertook

21   responsibilities in connection with the litigation.  They had

22   to provide information and subjected themselves to depositions

23   to a greater degree than the other members of the class.

24   Courts frequently allow modest compensation for the role on the

25   occasion of the settlement of a class action.  The modest

Colloquy                                    43

1    cases multipliers have ranged from 1.7 to 2.66 to 3.15 to 6 and

2    even higher. Prompt resolution of a case is often reflected in

3    a higher multiplier, rewarding prompt recovery for the members

4    of the class and discouraging unnecessary protracted

5    litigation. If I were to compute the lodestar in this case for

6    the purpose of actually computing the fee, I might have arrived

7    at a somewhat lesser figure, finding that the rates the

8    attorneys project to be somewhat high. However, I might well

9    apply a somewhat higher multiplier, and the end result would be

10   substantially the same.

11         Considering all these factors, I find that the

12   attorneys' fees being requested are reasonable and they well be

13   allowed. No objection has been raised to reimbursement of the

14   attorneys' expenses totaling at least $43,887.09 as of the date

15   of this application. They appear to have been reasonably

16   occurred and will be allowed.

17         Seven, Named Plaintiffs' Case Contribution Awards.

18   Class counsel seek approval of case contribution awards to the

19   name plaintiffs in the amount of $2500 each. A few class

20   members objected to the payment of these sums. However, the

21   persons who agreed to be named as class plaintiffs undertook

22   responsibilities in connection with the litigation. They had

23   to provide information and subjected themselves to depositions

24   to a greater degree than the other members of the class.

25   Courts frequently allow modest compensation for the role on the

Colloquy                                    44

1    occasion of the settlement of a class action.  The modest

2    amounts suggested for this purpose are reasonable and will be

3    allowed.

4            Eight, Plan of Allocation.  A ruling on a plan of

5    allocation will be deferred for a brief period.

6            Nine, Conclusion.  For the reasons set forth above, an

7    order will be entered:  One, certifying the class; two,

8    approving the settlement as fair, reasonable and adequate;

9    three, approving class plaintiffs' attorneys' petition for

10   payment of attorneys' fees and reimbursement of expenses; and

11   four, approving the requested payment of a case contribution

12   award for the the named plaintiffs.

13           Now, I have one problem here, what is the amount of

14   the expenses which are being requested for reimbursement?  I

15   have two figures, one would seem rather enormous, four hundred

16   thousand dollars, which I don't think is correct.

17           MR. MELTZER:  No, your Honor.  Forty-three thousand,

18   eight hundred and eighty-seven dollars and nine cents.

19           THE COURT:  All right.  I must have had a typo here.

20   That will be contradicted, and the figure which I now have will

21   be inserted.  Forty-three thousand, eight hundred and

22   eighty-seven dollars and nine cents.

23           MR. MELTZER:  Correct.

24           THE COURT:  All right.  That figure will be

25   substituted for the four hundred odd thousand, which I stated

```
                          Colloquy                        45

 1    previously.

 2              THE COURT:  We have orders and what not to be signed.

 3              MR. ECCLES:  Your Honor, assuming that the parties

 4    reach agreement on the allocation, is it agreeable to file

 5    consent orders rather than file a formal motion for approval?

 6              THE COURT:  I went over the plan of allocation as

 7    submitted, I saw nothing wrong with it.  Does anyone have any

 8    comments on the plan, which I assume is a subject of what will

 9    be coming next?

10              MR. ECCLES:  I think there are some expenses that were

11    not considered at our end that need to be plugged in there.

12    That's the only --

13              THE COURT:  They seem to be fairly trivial.  Well,

14    maybe not to you.

15              MR. ECCLES:  Well --

16              THE COURT:  Maybe not to you.

17              MR. ECCLES:  It's not going to change drastically.

18              THE COURT:  Do we need a separate hearing?

19              MR. ECCLES:  I don't think we need a separate hearing.

20              THE COURT:  Could we just submit a consent order?

21              MR. ECCLES:  Yes, your Honor.

22              THE COURT:  I'll look at it and see if there's any

23    other changes in my mind.  I doubt that they would, what you

24    hve given me.

25              MS. RODRIGUEZ:  They're the proposed orders, both with
```

Colloquy                                    46

1    regard to the settlement and the attorneys' fees.

2              THE COURT:  All right.  WeLL, let me see what you have

3    here.

4              In the first paragraph, I'm going to add:  For the

5    reasons stated in the bench opinion.  I'm going to add that

6    after duly reached.

7                        (Matter concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT G

**SB** **TK**

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
Attorneys at Law

280 King of Prussia Road • Radnor, Pennsylvania 19087
(610) 667-7706 • Fax: (610) 667-7056
**www.sbtklaw.com**

Writer's Direct Dial: 610-822-0242
E-Mail: eciolko@sbtklaw.com

November 22, 2007

**VIA FEDERAL EXPRESS**

Plans Administration Committee of Citigroup, Inc.
125 Broad Street, 8th Fl.
New York, NY 10004

  **Re:**   **Citigroup 401(k) Plan and Citibuilder 401(k) Plan for Puerto Rico**

To Whom It May Concern:

  On behalf of our client, Shaun Rose, a participant in and/or on behalf of the Citigroup 401(k) Plan and the Citibuilder 401(k) Plan for Puerto Rico (collectively the "Plans"), I am requesting copies of the following documents: the most recent master Plan Document for each plan, Summary Plan Descriptions for each plan, Summaries of Material Modification, the Plans IRS/DOL Form 5500s and SEC Form 11(k)s, the Plans' annual reports, and any other bargaining agreement, trust agreement, contract or other instrument under which the Plans and/or any related defined contribution plan are established or operated. *See* ERISA § 104(b)(4). Additionally, this request includes any contract or instrument describing the composition and/or role of any person charged with administering the Plans, including, but not limited to The Administrative Committee and the Investment Committee (collectively the "Committees") and any committee of Citigroup, Inc. with oversight/appointment authority over the Committees.

  As you are aware, our client is entitled to these documents under ERISA § 104(b)(4). Please send the requested Plan documents and any invoice for copying charges to me at the above address within thirty (30) days of receipt of this letter.

  Thank you for your prompt attention to this matter.

    Very truly yours,

    Edward W. Ciolko

EWC/lal

# EXHIBIT H

William J. Dealy, Esq. is the founding partner of Dealy & Silberstein, LLP, formerly, Dealy & Trachtman, LLP.

Dealy & Silberstein, LLP is a boutique law firm that handles labor relations, employment law and legal issues concerning multi-employer benefit funds and ERISA. The firm has been involved in complex litigations in state and federal court concerning labor relations and employee benefit fund issues. William J. Dealy, Esq. was previously a partner in the firm of Manning, Raab, Dealy & Sturm, which was a union side labor relations firm in New York City that, at one point, represented numerous unions in New York City, including Local 32BJ, Local 74, Local 2, Local 54, SEIU International, Local 531, the District Council of Carpenters, Local 608 and a wide variety of other union side clients. Also that firm represented a number of health & welfare, pension and annuity funds.

Some of the relevant litigations that Mr. Dealy and Mr. Silberstein have been directly involved in are as follows:

1) Equal Employment Opportunity Commission v. Bloomberg, LP - Case No. 07 CV 08383 - this is a major Title VII case, which has been brought by the EEOC and is currently pending in the Southern District of New York before Judge Lorettta Preska. The case involves claims by our firm's clients that they were subjected to pregnancy discrimination at Bloomberg. The EEOC found probable cause that our clients were discriminated against, and filed this case on behalf of our clients and on behalf of a class similarly situated female executives against Bloomberg in September 2007. Our firm's motion to intervene into the case was granted by Judge Preska in October 2007.

2) Oak Beverages, Inc. v. Tomra, et al. - Case No. 99 Civ. 3102 - this was a RICO case before Judge Colleen McMahon in the Southern District of New York. Mr. Dealy represented three members of the Empire State Beer Distributors Association, which is also a client of the firm. The case was dismissed based upon our firm's motion to dismiss brought together with a large number of other defendants.

3) Ericson, et al. v. Syracuse University, et al. - Case No. 98 CV. - 03435 - this was a major Title IX case before Judge Jed Rakoff in the Southern District of New York that was settled with a Confidential Settlement Agreement on the eve of trial.

4) Amsterdam Tobacco, et al. v. Philip Morris - Case No. 98 CV 03934 - this was a case against Philip Morris concerning the sale of cigarettes in southern states that were being illegally transported to the state of New York without the proper tax stamps which was causing competitive problems for the cigarette tax dealers in New York State.

5) Selas Enterprises, Ltd. v. Local 813, International Brotherhood, et al. - Case No. 97 CV 07448 - this was a Boys' Markets Injunction case in the Eastern District of New York which Judge Platt issued the injunction on behalf of the firm's client, Selas Enterprises, Ltd.

6) <u>Sage Realty Corporation v. ISS Cleaning Services Group, Inc., et al.</u> - Case No. 96 CV 0581 - this was a major anti-trust case brought against companies in the real estate business in New York City by a realty company and Local 32B-32J concerning alleged anti-competitive practices by the real estate companies during a strike by the service employees against the commercial building owners in New York City.  Mr. Dealy represented Local 32B-32J, SEIU, AFL-CIO in that case.

7) <u>Associated Brick Mason Contractors, et al. v. Local Union No. 1</u> - Case No. 96 CV 03275 - this is a Boys' Market Injunction case brought in the Eastern District of New York before Judge Platt and Magistrate Boyle in which Mr. Dealy represented the Associated Brick Mason Contractors of Greater New York, Inc.  The Boys' Markets Injunction was granted by Judge Platt after a fact finding hearing and recommendation by Magistrate Boyle.

8) <u>Biofeedtrac, Inc. v. Kolinor Optical, et al.</u> - Case No. 90-CV-01169 - this was a RICO case against a foreign corporation before Judge Nickerson in the Eastern District of New York in which Mr. Dealy represented the Plaintiff and the case was settled after Plaintiff prevailed on very significant jurisdictional issues.

9) <u>Galbreath Ruffin v. Local 32BJ Pension Fund</u> - This was one of the earliest cases involving an interpretation of MPPAA by Judge John Sprizzo.

Mr. Dealy has also advised a number of clients on substantial assets purchase agreements and the issues concerning multi-employer withdrawal liability related to those transactions. Additionally, Mr. Dealy has handled mergers of multi-employer Taft Hartley Pension, Health & Welfare Funds.

**MILO SILBERSTEIN**
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-0066

## EXPERIENCE

**Dealy & Silberstein, LLP**, New York, NY
Partner, November 1, 2002 to Present

Partner in law firm specializing in ERISA and labor relations matters
including employment law and representation of multi-employer benefit
funds and various employer associations; handle all aspects of litigation in
State and Federal courts, and in arbitrations, including case management
from commencement through disposition and appeal; extensive
experience in preparation of pleadings, pre-trial disclosure and discovery,
including the taking and defense of depositions of party, non-party and
expert witnesses; preparation of comprehensive document requests and
interrogatories and responses thereto; preparation of briefs and records on
appeal; drafting of routine and complex motion papers and argument of
motions, including motions for dismissal, summary judgment, pre-trial
disclosure, protective order, transfer, removal, remand and enforcement of
judgment; trial preparation, including drafting pre-trial briefs and
preparation of witnesses and documents; experience in expedited and
emergency applications, including orders to show cause, and motions for
temporary restraining order and preliminary injunction; prepare
submissions and appear before Federal, State and local administrative
agencies including OSHA, EEOC, NYSDHR, NYCCHR, Campaign
Finance Board and the Workmen's Compensation Board; negotiation and
preparation of settlement agreements, collective bargaining agreements,
employment contracts, separation agreements, stipulations, confidentiality
agreements and restrictive covenants.

**Dealy & Trachtman, LLP**, New York, NY
Associate, September, 1997 to October, 2002

Associate in law firm performing essentially the same functions as listed
above under Dealy & Silberstein, LLP.

**Klein, O'Brien & Trachtman**, New York, NY
Associate, August 1996 to August 1997

Drafted and negotiated real estate contracts, leases, purchases and
refinances. Routinely handled closings on behalf of national mortgage
bank. Worked on real estate and zoning litigation. Drafted mechanics'
liens.

## EDUCATION

**BENJAMIN N. CARDOZO SCHOOL OF LAW,** New York, NY
Juris Doctor, June 1996
Journal:  Cardozo Studies in Law and Literature, Editorial Staff

**SYRACUSE UNIVERSITY,** Syracuse, NY
Bachelors of Arts in Political Science, May 1993
Honor:          Dean's List
Activities:      Syracuse University Men's Basketball, Team Manager

## PROFESSIONAL

Bar Admissions:  New York State, Appellate Division, First Department - 1997
                 United States District Courts for the Southern and Eastern Districts of
                 New York - 1997

**WILLIAM J. DEALY, ESQ.**
**225 Broadway, Suite 1405**
**New York, New York 10007**
**Telephone No. (212) 385-0066**

**WORK EXPERIENCE:**

**November 1, 2002 through present - Dealy & Silberstein, LLP**

Partner in law firm specializing in ERISA and labor relations matters including employment law, representation of Taft Hartley Multi-Employer Health & Welfare Funds and Pension Funds including attending meetings of the Board of Trustees, interfacing with investment advisors and actuarial firms, third party payors and service providers, reviewing contracts with service providers, reviewing employment contracts and dealing with a wide variety of issues concerning the administration of the Funds; pursuing the collection of delinquent contributions and pursuing issues concerning audits and the discovery of individuals working in covered employment who have not been properly reported to the Funds; pursuing claims against Employers and, where appropriate, against individuals and guarantors; pursuing such claims in the bankruptcy courts to protect the rights of the Funds and of the covered beneficiaries of the Funds; dealing with D.O.L. investigations and audits and protecting the rights of the Trustees of the Funds; arbitrations, lawsuits in Federal District Courts and lawsuits in State Courts to enforce the rights of the Funds to collect delinquent contributions; every aspect of labor relations law including, employment contract disputes, sex, age and race discrimination matters and litigations and, additionally, corporate, commercial and business matters including arbitrations, administrative hearings, litigations and appeals

**July 1, 1997 through October 31, 2002 - Dealy & Trachtman, LLP**

Partner in law firm performing same functions as listed above under Dealy & Silberstein, LLP (Essentially the firm is the same; Alan C. Trachtman, Esq. left the firm to become "Of Counsel" to a larger firm).

**1978 through June 30, 1997 - Manning, Raab, Dealy & Sturm**

Partner in law firm specializing in labor relations matters, employment law, employment contract disputes, sex, age and race discrimination matters and litigations, representation of health and welfare funds and pension funds, including attending Trustees meetings and defending Trustees and fiduciaries in major federal lawsuits and governmental investigations, including D.O.L. investigations and government and privately brought ERISA and RICO Actions, corporate, commercial and business matters including arbitrations, administrative hearings and litigations

**1976 through 1978 - General Counsel - American Standards Testing Bureau and related companies**

General Counsel to a group of privately held corporations with common ownership - handled labor relations, commercial, business and corporate matters

**1972 through 1976 - Associate - Booth, Lipton & Lipton**

Handled corporate, commercial and labor relations matters including litigations, labor arbitrations, NLRB trials, negotiations of labor relations contracts and related matters

## MEMBER:

The American Bar Association
The Association of Trial Lawyers of America
New York County Lawyers Association

## ADMISSIONS:

Supreme Court of the United States, 1988
Second Circuit Court of Appeals, 1985
Eastern District of New York, 1973
Southern District of New York, 1973
State of New York, 1972

## EDUCATION:

Fordham University, School of Law, J.D. 1971
Fordham College, B.A. 1968
Brooklyn Prepatory School, 1964
President, Gamma Eta Gamma, Legal Fraternity, 1970-1971

## OUTSIDE INTERESTS AND ACCOMPLISHMENTS:

Past President and one of the Founders - Crestwood Civic Association
Board of Directors - Cooley's Anemia Foundation (Honored as Man of the Year 1992)
C.Y.O. High School Basketball Coach - Annunication, Crestwood
 (With another gentlemen founded C.Y.O. High School Basketball League
 in Westchester County and Northern Bronx)
Hillcrest Lakers Baseball Coach and Basketball Coach - a member of the Board of
 Directors
Crestwood Basketball Coach - Monroe College Summer League
Eastchester Soccer League Coach - a member of the Board of Directors

# EXHIBIT I

William J. Dealy, Esq. is the founding partner of Dealy & Silberstein, LLP, formerly, Dealy & Trachtman, LLP.

Dealy & Silberstein, LLP is a boutique law firm that handles labor relations, employment law and legal issues concerning multi-employer benefit funds and ERISA. The firm has been involved in complex litigations in state and federal court concerning labor relations and employee benefit fund issues. William J. Dealy, Esq. was previously a partner in the firm of Manning, Raab, Dealy & Sturm, which was a union side labor relations firm in New York City that, at one point, represented numerous unions in New York City, including Local 32BJ, Local 74, Local 2, Local 54, SEIU International, Local 531, the District Council of Carpenters, Local 608 and a wide variety of other union side clients. Also that firm represented a number of health & welfare, pension and annuity funds.

Some of the relevant litigations that Mr. Dealy and Mr. Silberstein have been directly involved in are as follows:

1) Equal Employment Opportunity Commission v. Bloomberg, LP - Case No. 07 CV 08383 - this is a major Title VII case, which has been brought by the EEOC and is currently pending in the Southern District of New York before Judge Lorettta Preska. The case involves claims by our firm's clients that they were subjected to pregnancy discrimination at Bloomberg. The EEOC found probable cause that our clients were discriminated against, and filed this case on behalf of our clients and on behalf of a class similarly situated female executives against Bloomberg in September 2007. Our firm's motion to intervene into the case was granted by Judge Preska in October 2007.

2) Oak Beverages, Inc. v. Tomra, et al. - Case No. 99 Civ. 3102 - this was a RICO case before Judge Colleen McMahon in the Southern District of New York. Mr. Dealy represented three members of the Empire State Beer Distributors Association, which is also a client of the firm. The case was dismissed based upon our firm's motion to dismiss brought together with a large number of other defendants.

3) Ericson, et al. v. Syracuse University, et al. - Case No. 98 CV. - 03435 - this was a major Title IX case before Judge Jed Rakoff in the Southern District of New York that was settled with a Confidential Settlement Agreement on the eve of trial.

4) Amsterdam Tobacco, et al. v. Philip Morris - Case No. 98 CV 03934 - this was a case against Philip Morris concerning the sale of cigarettes in southern states that were being illegally transported to the state of New York without the proper tax stamps which was causing competitive problems for the cigarette tax dealers in New York State.

5) Selas Enterprises, Ltd. v. Local 813, International Brotherhood, et al. - Case No. 97 CV 07448 - this was a Boys' Markets Injunction case in the Eastern District of New York which Judge Platt issued the injunction on behalf of the firm's client, Selas Enterprises, Ltd.

6) <u>Sage Realty Corporation v. ISS Cleaning Services Group, Inc., et al.</u> - Case No. 96 CV 0581 - this was a major anti-trust case brought against companies in the real estate business in New York City by a realty company and Local 32B-32J concerning alleged anti-competitive practices by the real estate companies during a strike by the service employees against the commercial building owners in New York City. Mr. Dealy represented Local 32B-32J, SEIU, AFL-CIO in that case.

7) <u>Associated Brick Mason Contractors, et al. v. Local Union No. 1</u> - Case No. 96 CV 03275 - this is a Boys' Market Injunction case brought in the Eastern District of New York before Judge Platt and Magistrate Boyle in which Mr. Dealy represented the Associated Brick Mason Contractors of Greater New York, Inc. The Boys' Markets Injunction was granted by Judge Platt after a fact finding hearing and recommendation by Magistrate Boyle.

8) <u>Biofeedtrac, Inc. v. Kolinor Optical, et al.</u> - Case No. 90-CV-01169 - this was a RICO case against a foreign corporation before Judge Nickerson in the Eastern District of New York in which Mr. Dealy represented the Plaintiff and the case was settled after Plaintiff prevailed on very significant jurisdictional issues.

9) <u>Galbreath Ruffin v. Local 32BJ Pension Fund</u> - This was one of the earliest cases involving an interpretation of MPPAA by Judge John Sprizzo.

Mr. Dealy has also advised a number of clients on substantial assets purchase agreements and the issues concerning multi-employer withdrawal liability related to those transactions. Additionally, Mr. Dealy has handled mergers of multi-employer Taft Hartley Pension, Health & Welfare Funds.

**MILO SILBERSTEIN**
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-0066

## EXPERIENCE

**Dealy & Silberstein, LLP**, New York, NY
Partner, November 1, 2002 to Present

Partner in law firm specializing in ERISA and labor relations matters
including employment law and representation of multi-employer benefit
funds and various employer associations; handle all aspects of litigation in
State and Federal courts, and in arbitrations, including case management
from commencement through disposition and appeal; extensive
experience in preparation of pleadings, pre-trial disclosure and discovery,
including the taking and defense of depositions of party, non-party and
expert witnesses; preparation of comprehensive document requests and
interrogatories and responses thereto; preparation of briefs and records on
appeal; drafting of routine and complex motion papers and argument of
motions, including motions for dismissal, summary judgment, pre-trial
disclosure, protective order, transfer, removal, remand and enforcement of
judgment; trial preparation, including drafting pre-trial briefs and
preparation of witnesses and documents; experience in expedited and
emergency applications, including orders to show cause, and motions for
temporary restraining order and preliminary injunction; prepare
submissions and appear before Federal, State and local administrative
agencies including OSHA, EEOC, NYSDHR, NYCCHR, Campaign
Finance Board and the Workmen's Compensation Board; negotiation and
preparation of settlement agreements, collective bargaining agreements,
employment contracts, separation agreements, stipulations, confidentiality
agreements and restrictive covenants.

**Dealy & Trachtman, LLP,** New York, NY
Associate, September, 1997 to October, 2002

Associate in law firm performing essentially the same functions as listed
above under Dealy & Silberstein, LLP.

**Klein, O'Brien & Trachtman,** New York, NY
Associate, August 1996 to August 1997

Drafted and negotiated real estate contracts, leases, purchases and
refinances.  Routinely handled closings on behalf of national mortgage
bank.  Worked on real estate and zoning litigation.  Drafted mechanics'
liens.

## EDUCATION

**BENJAMIN N. CARDOZO SCHOOL OF LAW,** New York, NY
Juris Doctor, June 1996
Journal: Cardozo Studies in Law and Literature, Editorial Staff

**SYRACUSE UNIVERSITY,** Syracuse, NY
Bachelors of Arts in Political Science, May 1993
Honor:        Dean's List
Activities:    Syracuse University Men's Basketball, Team Manager

## PROFESSIONAL

Bar Admissions: New York State, Appellate Division, First Department - 1997
                       United States District Courts for the Southern and Eastern Districts of
                       New York - 1997

**WILLIAM J. DEALY, ESQ.**
**225 Broadway, Suite 1405**
**New York, New York 10007**
**Telephone No. (212) 385-0066**

**WORK EXPERIENCE:**

**November 1, 2002 through present - Dealy & Silberstein, LLP**

Partner in law firm specializing in ERISA and labor relations matters including employment law, representation of Taft Hartley Multi-Employer Health & Welfare Funds and Pension Funds including attending meetings of the Board of Trustees, interfacing with investment advisors and actuarial firms, third party payors and service providers, reviewing contracts with service providers, reviewing employment contracts and dealing with a wide variety of issues concerning the administration of the Funds; pursuing the collection of delinquent contributions and pursuing issues concerning audits and the discovery of individuals working in covered employment who have not been properly reported to the Funds; pursuing claims against Employers and, where appropriate, against individuals and guarantors; pursuing such claims in the bankruptcy courts to protect the rights of the Funds and of the covered beneficiaries of the Funds; dealing with D.O.L. investigations and audits and protecting the rights of the Trustees of the Funds; arbitrations, lawsuits in Federal District Courts and lawsuits in State Courts to enforce the rights of the Funds to collect delinquent contributions; every aspect of labor relations law including, employment contract disputes, sex, age and race discrimination matters and litigations and, additionally, corporate, commercial and business matters including arbitrations, administrative hearings, litigations and appeals

**July 1, 1997 through October 31, 2002 - Dealy & Trachtman, LLP**

Partner in law firm performing same functions as listed above under Dealy & Silberstein, LLP (Essentially the firm is the same; Alan C. Trachtman, Esq. left the firm to become "Of Counsel" to a larger firm).

**1978 through June 30, 1997 - Manning, Raab, Dealy & Sturm**

Partner in law firm specializing in labor relations matters, employment law, employment contract disputes, sex, age and race discrimination matters and litigations, representation of health and welfare funds and pension funds, including attending Trustees meetings and defending Trustees and fiduciaries in major federal lawsuits and governmental investigations, including D.O.L. investigations and government and privately brought ERISA and RICO Actions, corporate, commercial and business matters including arbitrations, administrative hearings and litigations

**1976 through 1978 - General Counsel - American Standards Testing Bureau and related companies**

General Counsel to a group of privately held corporations with common ownership - handled labor relations, commercial, business and corporate matters

**1972 through 1976 - Associate - Booth, Lipton & Lipton**

Handled corporate, commercial and labor relations matters including litigations, labor arbitrations, NLRB trials, negotiations of labor relations contracts and related matters

**MEMBER:**

The American Bar Association
The Association of Trial Lawyers of America
New York County Lawyers Association

**ADMISSIONS:**

Supreme Court of the United States, 1988
Second Circuit Court of Appeals, 1985
Eastern District of New York, 1973
Southern District of New York, 1973
State of New York, 1972

**EDUCATION:**

Fordham University, School of Law, J.D. 1971
Fordham College, B.A. 1968
Brooklyn Prepatory School, 1964
President, Gamma Eta Gamma, Legal Fraternity, 1970-1971

**OUTSIDE INTERESTS AND ACCOMPLISHMENTS:**

Past President and one of the Founders - Crestwood Civic Association
Board of Directors - Cooley's Anemia Foundation (Honored as Man of the Year 1992)
C.Y.O. High School Basketball Coach - Annunication, Crestwood
  (With another gentlemen founded C.Y.O. High School Basketball League
  in Westchester County and Northern Bronx)
Hillcrest Lakers Baseball Coach and Basketball Coach - a member of the Board of
     Directors
Crestwood Basketball Coach - Monroe College Summer League
Eastchester Soccer League Coach - a member of the Board of Directors