UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
STEPHEN GRAY, individually and on          :
behalf of all others similarly situated,   :
                                           :
          Plaintiff,                       :        Civil Action No: 07 Civ. 9790 (SHS)
                                           :
v.                                         :
                                           :
CITIGROUP INC., CHARLES PRINCE,            :
THE PLANS ADMINISTRATIVE                   :
COMMITTEE OF CITIGROUP INC.,               :
THE 401(k) INVESTMENT                      :
COMMITTEE, and JOHN DOES 1 - 20,           :
                                           :
          Defendants.                      :
---------------------------------------------------x
SHAUN ROSE, Individually and On            :
Behalf of All Others Similarly Situated,   :
                                           :
          Plaintiff,                       :        Civil Action No: 07 Civ. 10294
                                           :
v.                                         :
                                           :
CITIGROUP INC., CHARLES PRINCE,            :
THE PLANS ADMINISTRATIVE                   :
COMMITTEE OF CITIGROUP INC.,               :
THE 401(k) INVESTMENT                      :
COMMITTEE, and JOHN DOES 1 - 10,           :
                                           :
          Defendants.                      :
---------------------------------------------------x
MEREDITH TRANBERG, individually            :
and on behalf of all others similarly situated :
                                           :
          Plaintiff,                       :        Civil Action No: 07 Civ. 10341
                                           :
v.                                         :
                                           :
CITIGROUP INC., CHARLES PRINCE,            :
THE PLANS ADMINISTRATIVE                   :
COMMITTEE OF CITIGROUP INC.,               :
THE 401(k) INVESTMENT                      :
COMMITTEE, and JOHN DOES 1 - 20,           :
                                           :
          Defendants.                      :
---------------------------------------------------x

```
---------------------------------------------------------x
ANTON RAPPOLD, individually and on        :
behalf of all others similarly situated,  :
                                          :
              Plaintiff,                  :     Civil Action No: 07 Civ. 10396
v.                                        :
                                          :
                                          :
CITIGROUP INC., CITIBANK, N.A.,           :
CHARLES PRINCE, THE PLANS                 :
ADMINISTRATIVE COMMITTEE OF               :
CITIGROUP INC., THE 401(k)                :
INVESTMENT COMMITTEE, and JOHN            :
and JANE DOES 1 - 10,                     :
                                          :
              Defendants.                 :
---------------------------------------------------------x
SAMIER TADROS, on Behalf of All           :
Others Similarly Situated,                :
                                          :
              Plaintiff,                  :     Civil Action No: 07 Civ. 10442
v.                                        :
                                          :
                                          :
CITIGROUP INC., CHARLES O.                :
PRINCE, C. MICHAEL ARMSTRONG,             :
ALAIN J.P. BELDA, GEORGE DAVID,           :
KENNETH T. DERR, JOHN M. DEUTCH,          :
 ROBERTO HERNANDEZ RAMIREZ,               :
ANN DIBBLE JORDAN, KLAUS                  :
KLEINFELD, ANDREW N. LIVERIS,             :
ANNE MULCAHY, RICHARD D.                  :
PARSONS, JUDITH RODIN, ROBERT E.          :
RUBIN, ROBERT E. RUBIN, FRANKLIN          :
A. THOMAS, JOHN DOES 1-20 (BEING          :
CURRENT AND FORMER MEMBERS                :
OF THE PLANS ADMINISTRATIVE               :
COMMITTEE OF CITIGROUP INC.)              :
and JOHN DOES 21-40 (BEING                :
CURRENT AND FORMER MEMBERS                :
OF THE INVESTMENT COMMITTEE               :
OF THE CITIGROUP INC. 401(K) PLAN),       :
                                          :
              Defendants.                 :
---------------------------------------------------------x
```

```
------------------------------------------------x
STEPHAN FIORINO, individually and on    :
behalf of all others similarly situated,       :
                                               :
              Plaintiff,                       :      Civil Action No: 07 Civ. 10458
v.                                             :
                                               :
CITIGROUP INC., CITIBANK N.A.,                 :
CHARLES PRINCE, THE PLANS                      :
ADMINISTRATIVE COMMITTEE OF                    :
CITIGROUP INC., THE 401(k)                     :
INVESTMENT COMMITTEE, and                      :
JOHN DOES 1 - 20,                              :
                                               :
              Defendants.                      :
------------------------------------------------x
JAMES BOLLA, individually and on behalf :
  of all others similarly situated,            :
                                               :
              Plaintiff,                       :      Civil Action No: 07 Civ. 10461
v.                                             :
                                               :
CITIGROUP INC., CITIBANK N.A.,                 :
CHARLES PRINCE, THE PLANS                      :
ADMINISTRATIVE COMMITTEE OF                    :
CITIGROUP INC., THE 401(k)                     :
INVESTMENT COMMITTEE, and                      :
JOHN DOES 1 - 20,                              :
                                               :
              Defendants.                      :
------------------------------------------------x
```

```
-------------------------------------------------------x
MARK GEROULO, individually, on behalf :
of the CITIGROUP 401(k) Plan, the      :
CITIBUILDER 401 (K) PLAN FOR           :
PUERTO RICO, and all others similarly, :
                                       :
              Plaintiff,               :          Civil Action No: 07 Civ. 10472
                                       :
v.                                     :
                                       :
CITIGROUP, INC., CITIBANK, N.A.,       :
THE PLAN ADMINISTRATIVE                :
COMMITTEE OF CITIGROUP, INC.,          :
MICHAEL E. SCHLEIN, JOHN DOES          :
1-10, THE CITIGROUP 401(k) PLAN        :
INVESTMENT COMMITTEE and JOHN          :
DOES 10-20, C. MICHAEL                 :
ARMSTRONG, ALAN J.P. BELDA,            :
GEORGE DAVID, KENNETH T. DERR,         :
JOHN M. DEUTCH, ROBERTO                :
HERNANDEZ, ANN DIBBLE JORDAN,          :
ANDREW N. LIVERIS, DUDLEY C.           :
MECUM, ANNE M. MULCAHY,                :
RICHARD D. PARSONS, ANDRALL E.         :
PEARSON, CHARLES PRINCE, JUDITH        :
RODIN, ROBERT E. RUBIN, FRANKLIN       :
A. THOMAS, SANFORD I. WEILL,           :
                                       :
              Defendants.              :
-------------------------------------------------------x
```

```
-------------------------------------------------x
ALAN STEVENS, on Behalf of Himself      :
and All Others Similarly Situated,      :
                                        :
              Plaintiff,                :        Civil Action No: 07 Civ. 11156
                                        :
v.                                      :
                                        :
CITIGROUP INC., CITIBANK, N.A,          :
CHARLES PRINCE, C. MICHAEL              :
ARMSTRONG, ALAIN J.P. BELDA,            :
GEORGE DAVID, KENNETH T. DERR,          :
JOHN M. DEUTCH, PETER JOHNSON,          :
ROBERTO HERNANDEZ RAMIREZ,              :
ANDREW N. LIVERIS, ANNE                 :
MULCAHEY, RICHARD D. PARSONS,           :
JUDITH RODIN, ROBERT E. RUBIN,          :
ROBERT L. RYAN, FRANKLIN A.             :
THOMAS, THE PLANS                       :
ADMINISTRATION COMMITTEE OF             :
CITIGROUP, INC., THE INVESTMENT         :
COMMITTEE and JOHN DOES 1-30,           :
                                        :
              Defendants.               :
-------------------------------------------------x
STEPHEN GOLDSTEIN, on Behalf of         :
Himself and a Class of Persons Similarly :
Situated,                               :
                                        :
              Plaintiff,                :        Civil Action No: 07 Civ. 11158
                                        :
v.                                      :
                                        :
CITIGROUP INC., THE PLANS               :
ADMINISTRATION COMMITTEE OF             :
CITIGROUP, INC., MICHAEL E.             :
SCHLEIN, CHARLES PRINCE, C.             :
MICHAEL ARMSTRONG, ALAIN J.P.           :
BELDA, GEORGE DAVID, KENNETH T.         :
DERR, JOHN M. DEUTCH, ROBERTO           :
HERNANDEZ RAMIREZ, ANDREW N.            :
LIVERIS, ANNE MULCAHEY,                 :
RICHARD D. PARSONS, JUDITH              :
RODIN, ROBERT E. RUBIN, ROBERT L.       :
RYAN, AND FRANKLIN A. THOMAS,           :
And JOHN DOES 1-30,                     :
                                        :
              Defendants.               :
```

```
-------------------------------------------------------x
CHRIS SOUTHARD, on Behalf of All        :
Others Similarly Situated,              :
                                        :
              Plaintiff,                 :      Civil Action No: 07 Civ. 11164
v.                                      :
                                        :
CITIGROUP INC., CHARLES O.              :
PRINCE, C. MICHAEL ARMSTRONG,           :
ALAIN J.P. BELDA, GEORGE DAVID,         :
KENNETH T. DERR, JOHN M. DEUTCH, :
ROBERTO HERNANDEZ RAMIREZ,              :
ANN DIBBLE JORDAN, KLAUS                :
KLEINFELD, ANDREW N. LIVERIS,           :
ANNE MULCAHY, RICHARD D.                :
PARSONS, JUDITH RODIN, ROBERT E. :
RUBIN, ROBERT E. RUBIN, FRANKLIN :
A. THOMAS, JOHN DOES 1-20 (BEING       :
CURRENT AND FORMER MEMBERS              :
OF THE PLANS ADMINISTRATIVE             :
COMMITTEE OF CITIGROUP INC.)            :
and JOHN DOES 21-40 (BEING              :
CURRENT AND FORMER MEMBERS              :
OF THE INVESTMENT COMMITTEE             :
OF THE CITIGROUP INC. 401(K) PLAN), :
                                        :
              Defendants.                :
-------------------------------------------------------
FRANCIA BRICK, individually and on      :
Behalf of all others similarly situated,       :                 :
                                        :
              Plaintiff,                 :      Civil Action No: 07 Civ. 11369
v.                                      :
                                        :
CITIGROUP INC., CHARLES PRINCE,         :
THE PLAN'S ADMINISTRATIVE               :
COMMITTEE OF CITIGROUP, INC.,           :
THE 401(k) INVESTMENT COMMITTEE,:
And JOHN DOES 1-10,                     :
                                        :
              Defendants.                :
-------------------------------------------------------
```

```
------------------------------------------------------x
```
WILLIAM and PATRICIA WOODWARD, :
individually and on Behalf of All Others     :
Similarly Situated,                          :
                                             :
                Plaintiffs,                  :          Civil Action No: 07cv11207
                                             :
v.                                           :
                                             :
CITIGROUP INC., CHARLES PRINCE,              :
ROBERT E. RUBIN, C. MICHAEL                  :
ARMSTRONG, ALAIN J. P. BELDA,                :
GEORGE DAVID, KENNETH T. DERR,               :
JOHN M. DEUTCH, ROBERTO                      :
HERNANDEZ RAMIREZ, ANDREW N.                 :
LIVERIS, ANN MULCAHEY, RICHARD               :
D. PARSONS, JUDITH RODIN, ROBERT             :
L. RYAN, FRANKLIN A. THOMAS, ANN             :
DIBBLE JORDAN, KLAUS KLEINFELD               :
AND DUDLEY C. MECUM, and JOHN                :
and JANE DOES 1-10,                          :
                                             :
                Defendants.                  :
```
------------------------------------------------------
```

## <u>SUPPLEMENTAL DECLARATION OF ROBERT A. IZARD</u>

I, Robert A. Izard, declare as follows:

      1.      I am a Shareholder in the law firm Schatz Nobel Izard, P.C.

      2.      SNI has prevailed as lead counsel on a number of important Motions to

Dismiss in directly analogous ERISA class actions:

- *In re AEP ERISA Litig.*, 327 F.Supp.2d 812 (S.D. Ohio 2004);

- *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. MDL 1500, 02 Civ. 8853 (SWK), 2005 WL 563166 (S.D.N.Y. Mar. 10, 2005)(Kram, J.);

- *In re Cardinal Health, Inc. ERISA Litig.*, 424 F.Supp.2d 1002 (S.D. Ohio 2006);

- *In re JDS Uniphase Corp. ERISA Litig.*, 36 Employee Benefits Cas. 1140 (N.D. Cal. 2005);

- *In re Merck & Co. Inc., Sec., Derivative & "ERISA" Litig.*, 39 Employee Benefits Cas. 1053 (D.N.J 2006);

- *In re Reliant Energy ERISA Litig.*, 336 F. Supp. 2d 646 (S.D.Tex. 2004);

- *In re Sprint Corp. ERISA Litig.*, 388 F.Supp.2d 1207 (D.Kan. 2004);

- *In re Tyco International, Ltd., Sec. Litig.*, No. MDL 02-1335-PB, 02-1357-PB, 2004 WL 2903889 (D.N.H. Dec. 2, 2004);

- *Vivien v. Worldcom, Inc.*, No. C 02-01329 (WHA), 2002 WL 31640557 (N.D.Cal. Jul. 26, 2002).

SNI has similarly prevailed as lead counsel on a number of contested Motions for Class Certification in ERISA company stock cases which, as this Court's ruling in *Fisher v. J.P.Morgan, Chase & Co.*, 230 F.R.D. 370 (S.D.N.Y. 2005) demonstrates, can be difficult to obtain:

- *Furstenau v. AT&T, et al.*, No. 02-5409, slip op. (D.N.J. Sep. 2, 2004);

- *In re Reliant Energy ERISA Litig.,* No. Civ. A. H-02-2051, 2005 WL 2000707 (S.D. Tex. Aug. 18, 2005);

- *In re Tyco International, Ltd., Sec. Litig,* No. MD-02-1335-PB, 2006 WL 2349338 (D.N.H. Aug.15, 2006).

Some of these opinions established ground-breaking principles. For example, in 2002, long before counsel for the Gray Plaintiffs entered this practice area, SNI successfully argued in *Vivien v. Worldcom, Inc,* No. C 02-01329 (WHA), 2002 WL 31640557, *7 (N.D. Cal. Jul. 26, 2002) that SEC filings incorporated by reference into Plan documents become fiduciary communications. Although not properly alleged in the Gray Plaintiffs Complaints, this is now black letter law of ERISA.[1]    In *In re Tyco International, Ltd., Sec. Litig,* No. MD-02-1335-PB, 2006 WL 2349338 *6 (D.N.H. Aug.

---

[1] *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.,* 284 F. Supp. 2d 511, 555-67, 657-62 (S.D. Tex. 2003); *In re Worldcom, Inc. ERISA Litig.,* 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003); *In re Sprint Corp. ERISA Litig.,* 388 F. Supp. 2d 1207, 1227 (D. Kan. 2004); *In re CMS Energy ERISA Litig.,* 312 F. Supp. 2d 898, 915-16 (E.D. Mich. 2004); *Rankin v. Rots,* 278 F. Supp. 2d 853, 875-78 (E.D. Mich 2003); *In re Ferro Corp ,* 422 F. Supp. 2d 850, 865 (N.D. Ohio 2006); *In re Sears Roebuck & Co ERISA Litig,* No. 02 C 8324, 2004 WL 407007, at *6 (N.D. Ill. March 3, 2004); *In re JDS Uniphase Corp. ERISA Litig ,* No. C 03-04743 CW (WWS), 2005 WL 1662131, at *12 (N.D. Cal. July 14, 2005); *Gee v. UnumProvident Corp ,* No. 1:03-CV-147, MDL 1:03-MD-1552, 2005 WL 534873, at *16-17 (E.D. Tenn. Jan. 13, 2005); *Pietrangelo v NUI Corp ,* No. Civ. 04-3223(GEB), 2005 WL 1703200 at *6 (D.N.J. July 20, 2005); *In re Honeywell Int'l ERISA Litig.,* No. Civ. 03-1214 (DRD), 2004 WL 3245931, at *9 (D.N.J. Sept. 14, 2004); *In re Dynegy, Inc. ERISA Litig.,* 309 F. Supp. 2d 861 (S.D. Tex. 2004); *In re Xerox ERISA Litig ,* 483 F. Supp. 2d 206, 218 (D. Conn. 2007); *Pedraza v. Coca-Cola, Inc.,* 456 F. Supp. 2d 1262, 1279-81 (N.D. Ga. 2006); *In re The Goodyear Tire & Rubber Co. ERISA Litig ,* 438 F. Supp. 2d 783, 795 (N.D. Ohio 2006); *In re Cardinal Health, Inc. ERISA Litig.,* 424 F. Supp. 2d 1002, 1045 (S.D. Ohio 2006); *In re AEP ERISA Litig ,* 327 F. Supp. 2d 812, 825 (S.D. Ohio 2004); *In re General Motors ERISA Litig.,* No. 05-71085, 2007 WL 2463233, at *4 (E.D. Mich. Aug. 28, 2007); *In re Schering-Plough Corp. ERISA Litig.,* No. 03-1204 (KSH), 2007 WL 2374989, at *6-7 (D. N.J. Aug. 15, 2007); *In re Coca-Cola Enterprises Inc ERISA Litig.,* No. 06-0953 (TWT), 2007 WL 1810211, at *12-13 (N.D. Ga. June 20, 2007); *Cress v. Wilson,* No. 06-2717 (JGK), 2007 WL 1686687, at *9 (S.D.N.Y. June 6, 2007); *Shannahan v. Dynegy, Inc.,* No. 06-0160, 2006 WL 3227319, at *6 (S.D. Tex. Nov. 6, 2006); *Hill v. The Tribune Co.,* No 06-0741, 2006 WL 2861016, at *19 (N.D. Ill. Sept. 29, 2006).

15, 2006), a district court for the first time applied the presumption of reliance from securities fraud cases in an ERISA company stock case. In *In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002, 1042-1044 (S.D. Ohio 2006), a district court expressly held for the first time that the securities law loss causation principles under *Dura Pharms., Inc. v. Brudo* do not apply in a company stock case.

3.      Attached hereto as Exhibit A is a true and correct copy of *Furstenau v. AT&T, et al.*, No. 02-5409, slip op. (D.N.J. Sep. 2, 2004).

4.      Attached hereto as Exhibit B is a true and correct copy of the ERISA Sec. 104(B)(4) document request sent to the Plans' Administration Committee on November 29, 2007. We have received a copy of the section 104 documents from Defendants.

5.      Attached hereto as Exhibit C is a true and correct copy of the *amicus curiae* brief submitted by the Department of Labor in the *Reliant Energy* appeal.

6.      Attached hereto as Exhibit D is a true and correct copy of final order approving the $264,375,000 *Enron* settlement.

7.      Attached hereto as Exhibit E is a true and correct copy of the [Proposed] Case Management Order No. 1, All Tracks, dated May 24, 2004, in *In re Mutual Funds Investment Litigation*, MDL 1586 (D. Md.).

8.      Attached hereto as Exhibit F is a true and correct copy of the Pacer Docket for *In re Mutual Funds Investment Litigation*, MDL 1586 (D. Md.) (lead case 04-md-15861-CCB) (printed January 9, 2008), paperless order approving Case Management Order No. 1, docket entry 117.

9.      Attached hereto as Exhibit G is a true and correct copy of the Pacer Docket for *Salvato v. Zale Corp., et al.*, Index No. 3:06-CV-1124-D (N.D. Tex.) (printed on December 20, 2007).

10.     Attached hereto as Exhibit H is a true and correct copy of the Order dated July 27, 2006, in *Salvato v. Zale Corp., et al.*, Index No. 3:06-CV-1124-D (N.D. Tex.).

11.     Attached hereto as Exhibit I is a true and correct copy of the Opinion and Order dated January 9, 2004, in *Peterson, et al., v. AT&T Co*, CA No.: 99-4982-JLL-RJH (D.N.J.)

12.     Attached hereto as Exhibit J is a true and correct copy of the Pacer Docket for *Peterson, et al., v. AT&T Co*, CA No.: 99-4982-JLL-RJH (D.N.J.) (printed December 20, 2007).

13.     Attached hereto as Exhibit k is a true and correct copy of the Complaint filed in *Pro v. Countrywide Financial Corporation, et al*, Case No. cv 07-06252 (C.D.Cal.)

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of January, 2008.

Robert A. Izard

# Exhibit A

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| RICHARD R. FURSTENAU and DAVID G. INGBER, on behalf of all persons similarly situated and on behalf of the AT&T Long Term Savings Plan for Management Employees, | : : : : : : | |
| Plaintiffs, | : : | Civ. No. 02-5409 (GEB) |
| v. | : : : | |
| AT&T CORPORATION, AT&T SAVINGS PLAN COMMITTEE, AT&T INVESTMENT MANAGEMENT CORPORATION, FIDELITY MANAGEMENT TRUST CORPORATION, MICHAEL ARMSTRONG, KENNETH T. DERR, M. KATHRYN EICKHOFF, WALTER Y. ELISHA, GEORGE M.C. FISHER, DONALD V. FITES, RALPH S. LARSEN, JOHN C. MALONE, DONALD F, MCHENRY, MICHAEL I. SOVERN, SANFORD I. WEILL, THOMAS H. WYMAN, JOHN D. ZEGLIS, HAROLD W. BURLINGAME, MIRIAN GRADDICK, LAURENCE C. SEIFERT, HOSSEIN ESLAMBOLCHI and BARBARA PEDA | : : : : : : : : : : : : : : : : : : | **MEMORANDUM OPINION** |
| Defendants. | : : : | |

_____

**BROWN, District Judge**

This matter having been opened to the Court by plaintiff Richard R. Furstenau's motion

for class certification[1] pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1) and (3).

_____

[1] David G. Ingber has voluntarily dismissed his claims. The parties represented to the Court that an Order would be forthcoming. In addition, plaintiff amended the class definition to certify a class only on behalf of participants with interests in the AT&T Stock Fund and deletes

This Court exercises jurisdiction over the instant matter pursuant to 28 U.S.C. § 1331. For the reasons discussed herein, plaintiff's motion for class certification is granted.

## I. BACKGROUND

This case alleges claims for breach of fiduciary duty under ERISA. Plaintiff seeks relief under two separate statutory prongs of ERISA. First, under Count One, plaintiff seeks relief on behalf of himself and on behalf of a class of participants in the AT&T Long Term Investment Plan for Management Employees (the "Plan") pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Specifically, plaintiff alleges that defendants violated ERISA by "negligently making misrepresentations and negligently failing to disclose material information" regarding AT&T's business performance. Plaintiff's Complaint ¶¶ 2, 3(a). Plaintiff also seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Specifically, plaintiff alleges that defendants improperly "permitt[ed] the Plan to invest Plan assets in the [AT&T Stock Fund and the [AT&T Wireless Fund] when those funds were not prudent investments." Plaintiff's Complaint ¶¶ 2, 3(b).

Plaintiff asserts that the § 502(a)(2) claim is derivative, but that courts have consistently exercised their discretion in certifying a class under this section.[2] Although § 502(a)(2) is a derivative claim, this Court will proceed to determine whether class certification is proper. *See Piazza v. EBSCO Indus.*, 273 F.3d 1341, 1352 (11th Cir. 2001) (finding that § 502(a)(2) "claims have been allowed to proceed as class actions"); *Kayes v. Pacific Lumber Co*, 51 F.3d 1449,

---

any reference to interests in the AT&T Wireless Fund. Plaintiff's Reply at 16.

[2] In an August 12, 2004 telephone conference call with the Court, defendants also agreed that courts, when faced with a § 502(a)(2) claim, have continued to analyze the claim under Rule 23 to determine whether class certification is proper.

1461-63 (9th Cir. 1995) (allowing § 502(a)(2) claim to be brought as a Rule 23 class); *In re Amsted Indus. Inc. ERISA Litig.*, 263 F. Supp. 2d 1126, 1129 (N.D. Ill. 2003) (finding that § 502(a)(2) claims can be brought as a class). In addition, the Eastern District of Michigan in *Rankin v. Rots*, 220 F.R.D. 511 (E.D. Mich. 2004), recently decided a motion for class certification in which plaintiff was seeking certification under § 502(a)(2) and § 502(a)(3) and the court considered the claims together. This Court finds *Rankin* sufficiently persuasive and adopts its approach.

## II. DISCUSSION

In defining class actions, Fed. R. Civ. P. 23(a) initially requires four elements:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the representative class, (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements, more commonly referred to as numerosity, commonality, typicality, and adequacy of representation, "'are meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances.'" *Barnes v. American Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998) (quoting *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir. 1994)). Once these four pre-requisites have been established, plaintiffs must also demonstrate compliance with one of the requirements of Fed. R. Civ. P. 23(b). *Baby Neal,* 43 F.3d at 58. The burden is on plaintiffs to demonstrate that all four requisites for Rule 23(a) and at least one part of 23(b), have been met. *Morisky v. Public Service Electric and Gas Co.,* 111 F. Supp. 2d 493, 499 (D.N.J. 2000). In addition, the moving party must identify an appropriate proposed class. *In re School Asbestos Litig.,* 56 F.3d 515, 519 (3d

3

Cir. 1995). The proposed class must be adequately defined so individual class members are

readily identifiable. *Id.* Class certification should not be granted where membership in the class

can only be determined by a mini-trial on the merits of each case. *Froman v. Data Transfer Inc.*,

164 F.R.D. 400, 403 (E.D. Pa. 1995). Before certifying a class, courts must undertake "a

rigorous analysis" to ensure that the proposed class and the named representatives satisfy each of

the prerequisites to class certification. *Morisky*, 111 F. Supp. 2d at 499 (citing *General Tel. Co.*

*v. Falcon*, 457 U.S. 147, 161 (1982)). Moreover, when in doubt as to whether to certify a class

action, the district court should err in favor of allowing a class. *Eisenberg v. Gagnon*, 766 F.2d

770, 785 (3d Cir. 1985).

### A. Rule 23(a) Requirements

#### 1. Numerosity

Rule 23(a) requires that the class be "so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). The exact size of a class need not be known, plaintiffs

must only show that the proposed class is sufficiently large to meet the numerosity requirements.

*Collier v. Montgomery County Housing Auth.*, 192 F.R.D. 176, 182 (E.D. Pa. 2000). Here,

plaintiff asserts that there are potentially thousands of members in the proposed class. Plaintiff's

Brief at 10. Defendants do not contest that plaintiff has met this prerequisite to class

certification. Defendants' Brief at 8.

#### 2. Commonality

Rule 23(a)(2) does not require that all issues presented be common, only that common

questions exist. *Id.* This requirement can be satisfied if the named defendants "share at least one

question of fact or law with the grievances of the prospective class." *Baby Neal,* 43 F.3d at 56.

4

There is no requirement that all putative class members share identical claims, and because this requirement may be satisfied by a single common issue, it is easily met. *See id.* Further, putative class members may assert "a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice." *Id.* (emphasis in original).

Defendants argue that there is no commonality here because resolution of Count One, the misrepresentation claim, is dependent upon factual determinations of reliance and materiality that will differ for each and every class member. Defendants' Brief at 9. Defendants further assert that commonality is lacking under Count Two because the Court would have to determine that under § 404(c) each individual did not exercise their own independent control over their own individual plan assets and that lost opportunity damages need to be determined on an individual basis. *Id.* at 12-13. Plaintiff asserts that individual reliance is not a part of his imprudent investor and non-disclosure claims and only one part of his claims involves misrepresentation. Plaintiff's Reply at 4-5. Plaintiff further contends that courts, in breach of fiduciary duty cases involving imprudent investments, courts have still found commonality even though there is a potential issue of reliance. *Id.* at 5. Plaintiff also argues that he is not claiming anything relating to 404 (c) on an individualized basis. *Id.* at 5-6.

Pursuant to *Baby Neal*, in order to meet the commonality requirement, plaintiff only needs to show one common question of law or fact with the proposed class. As noted above, this standard is easily met. *Id.* Here, there are several common questions of law or fact: (1) whether the defendants were fiduciaries of the Plan and/or the Participants; (2) whether the defendants breached their duties; (3) whether the Plan and the Participants were injured by such breaches;

5

and (4) whether the class is entitled to damages and injunctive relief. Thus, plaintiffs have easily

met the commonality standard as set forth by the Third Circuit Court of Appeals ("Third

Circuit").

Moreover, district courts in this circuit have agreed with the proposition that individual

reliance does not defeat commonality. *See e.g. Kolar v. Rite Aid Corp.*, No. Civ. A. 01-1229,

2003 WL 1257272 (E.D. Pa. Mar. 11, 2003); *In re Ikon Office Solutions, Inc.*, 191 F.R.D. 457

(E.D. Pa. 2000); *Feret v. Corestates Financial Corp.*, 1998 WL 512933, *8-9 (E.D. Pa. 1998).

This is not a situation where individual communications are alleged, rather the same

communication was alleged for each individual. As to defendants' alleged individual defenses-

individual control over investment plan and lost opportunity damages- this Court finds

defendants' arguments unpersuasive. While these individual issues may exist, "only one

common question of law or fact must exist to satisfy the commonality requirement of Rule 23."

*Rankin*, 220 F.R.D. at 518 (quoting *In re Ikon Office Solutions, Inc.*, 191 F.R.D. 457, 464

(E.D.Pa. 2000)). As noted above, there are several common questions of law or fact.

### 3. Typicality

_____The typicality inquiry is designed to assess whether the action can be efficiently pursued

as a class and whether the named parties are adequately aligned with the interests of the class.

*See id.* at 57. The typicality requirement is "intended to preclude certification of those cases

where the legal theories of the named plaintiffs potentially conflict with those of the absentees."

*Id.* Typicality looks to whether the claim of the proposed class "arises from the same events or

practice or course of conduct that gives rise to the claims of the class members, and if it is based

on the same legal theory." *Liberty Lincoln Mercury, Inc.*, 149 F.R.D. at 77 (quotation omitted).

6

It is important to not to confuse "typical" with "identical," because "even atypical elements of a claim may often be adequately treated by judicial severance, or the use of subclasses or other separate treatment of individual issues." *Id.* Factual differences among the proposed class members will not defeat certification. *See Baby Neal,* 43 F.3d at 56.

Here, plaintiff asserts that his claims and those of each class member are based on the same legal theory that the defendants breached their ERISA fiduciary duties with regard to investments of Plan assets in the AT&T Stock Fund. Plaintiff's Brief at 13. Defendants assert that because plaintiff is subject to unique defenses (same as asserted in the commonality section) that the typicality requirement is not met. Defendants' Brief at 15. However, this Court finds that the typicality requirement is met. Here, plaintiff's claims are typical because he still has to prove the common issues noted above of whether defendants were fiduciaries and whether they breached their fiduciary duties. *See also McHenry v. Bell Atlantic Corp* , 22 Employee Benefits Cas. 1849, 1998 WL 512942, *4 (E.D. Pa. Aug. 19, 1998) (finding typicality where defendants' alleged imprudent management of savings plan accounts in violation of their fiduciary duties under ERISA deprived plaintiffs and class members alike of "substantial investment earnings on their retirement savings account"). Thus, the typicality requirement is met.

### 4. Adequacy of Representation

The adequacy of representation requirement tests the qualifications of counsel to represent the class, and serves to uncover conflicts of interest between named parties and the class they seek to represent. *See Barnes*, 161 F.3d at 141. In defining what constitutes "fair and adequate representation," the Third Circuit has stated that "[a]dequate class representation depends on two factors: a) the plaintiff's attorney must be qualified, experienced, and generally

7

able to conduct the proposed litigation[3] and b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011 (1975). This requirement serves to "determine that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine,* 846 F.2d at 179 (citing *General Telephone Co.,* 457 U.S. at 157 n.13).

Here, plaintiff meets the requirements of adequacy as noted above in the typicality requirement. Defendants again argue that plaintiff would be subject to unique defenses and therefore plaintiff would not be an adequate representative. Defendants' Brief at 16-17. However, as noted earlier, plaintiff still has to prove the common issues to the proposed class and thus is adequate.

B. Rule 23(b)(1) Requirements

After establishing the requirements of Rule 23(a), plaintiff must also show that the proposed class meets at least one subsection of Rule 23(b). Plaintiff first argues that Rule 23(b)(1) is satisfied. Under Rule 23(b)(1), certification is proper if separate actions by individual class members would risk establishing "incompatible standards of conduct for the party opposing the class, or would "as a practical matter be dispositive of the interests of the other members." Here, plaintiff has met the requirements of Rule 23(b)(1). Plaintiff seeks plan-wide relief, where success necessarily results in plan-wide relief and failure to prove breach of fiduciary duty would necessarily preclude actions by other plan participants. If this Court did not certify the class, then

---

[3] Defendants do not contest the adequacy of plaintiff's counsel.

defendants would be exposed to multiple lawsuits and risk inconsistent decisions. This Court is sufficiently persuaded by the court in *Rankin* which stated,

> [a]lthough there may be factual differences as to whether, in the case of voluntary employee contributions, a class member relied on any alleged misrepresentations, the alleged misrepresentations are alleged to have been made to the entire class of participants. This is not a case where defendants are alleged to have had individualized communications with a participant.

*Rankin*, 2004 WL 831124 * 10. The same holds true here.[4]

C. Time Period and Definition of the Class

_____Defendants argue that the time period of the class should be changed from September 15, 1999 through December 28, 2000 to December 6, 1999 through May 1, 2000. Defendants' Brief at 25. However, it appears that defendants are confusing this ERISA case with a securities case. In the securities context, the class period is determined by the date of an alleged misrepresentation and the subsequent corrective disclosure. However, in an ERISA case, the class period for breach of fiduciary duty claims based on imprudent investments is determined by the time period during which such investments were in fact imprudent. Thus, plaintiff's class period will remain unchanged.

Finally, defendants argue that the class should be limited to purchasers of the AT&T Stock Fund, excluding those that merely held the Fund during the class period. However, defendants again argue in the securities context only. ERISA does not place any "holder claim" limitation on the scope of liability of fiduciaries. *See Ikon*, 191 F.R.D. at 463-465. Thus,

---

[4] Because this Court has found that plaintiff met the requirements for Rule 23(b)(1), there is no need to address plaintiff's contentions regarding Rule 23(b)(3).

9

plaintiff's class of participants will remain the same.[5]

_____

[5] This Court also does not find persuasive defendants' argument that a retention conflict would ensure if the class is certified.  Defendants assert that the conflict pits Participants in the plan who do not wish to liquidate their investments in the AT&T Stock Fund against those that do.  However, this Court disagrees.  The Third Circuit has peripherally confronted the retention issue in noting that district courts must be cognizant of the potential for conflict between the two types of plaintiffs. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 244 n. 25 (3d Cir. 2001).  As a general matter, the Third Circuit noted that Congress has implicitly rejected the potential conflict between plaintiffs that still hold equity and those that do not. *See id.* at 243.  Thus, this Court does not find a potential retention conflict such that would defeat the class certification.  In addition, although there is no basis for defining sub-classes at this time, this Court will not hesitate to exercise its discretion to re-define the class at a later time if it becomes necessary.

## III.    CONCLUSION

Therefore, for the reasons expressed herein, plaintiff's motion for class certification is

granted.  An appropriate form of order is filed herewith.

S/Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.

_____

\_\_\_\_\_

11

Exhibit B

*[Certified mail postage label with handwritten entries:]*

| | |
|---|---|
| Postage | |
| Certified Fee | 2.65 |
| Return Receipt Fee (Endorsement Required) | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 5.21 |

Sent To
Plans Administration Committee of Citigroup In.
Street, Apt. No.; or PO Box No. Corporate Benefits Department
1 Court Sq. 15th floor
City, State, ZIP+4 Long Island NY 11120

PS Form 3800, August 2006       See Reverse for Instructions

20 Church Street   Phone 860.493.6292
Suite 1700   Fax 860.493.6290
Hartford, CT 06103   www.snllaw.com

November 29, 2007

**via certified mail, return receipt requested**

Plans Administration Committee of Citigroup Inc.
Corporate Benefits Department
1 Court Square, 15th Floor
Long Island City, NY 11120

  **Re:**   **§ 104(b)(4) Document Request**

Dear Sir or Madam:

   Our client, Mark Geroulo, is a Participant in the Citigroup 401(k) Plan ("Plan"). Pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), please provide me with the following documents: (1) a complete copy of the latest updated summary plan description(s); (2) the latest annual report(s); and (3) the bargaining agreements, trust agreements, contracts and other instruments under which this Plan is established and/or operated. With respect to documents in the last category, please include "any document or instrument that specifies procedures, formulas, methodologies, or schedules to be applied in determining or calculating a participant's or beneficiary's entitlement" under the Plan. *See* PWBA Opinion Letter No. 96-14A. Because the Plan is a 401(k) plan with various investment options, this category of documents should include any documents under which those options are established and operated: *e.g.*, prospectuses for the various funds policies and guidelines under which they were selected and monitored.

   To the extent you can do so, please expedite this request and deliver the documents to me by overnight mail. We will pay your reasonable copying charges and postage upon receipt. If you require payment in advance, please contact me at the telephone number above to inform me of the same, and I will be happy to transfer funds to you.

   If you are uncertain about the scope of the request, or dispute some part of this request, please, at a minimum send to me the documents identified in Nos. (1) - (3) above, and contact me regarding the documents which are disputed or as to which you believe the request is unclear.

   If you have any questions, comments or concerns about this request, please do not hesitate to contact me. Thank you for your time and attention to this request.

        Sincerely,

        Wayne T. Boulton

# Exhibit C

No. 06-20157

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

BRAD KIRSCHBAUM, et al.,
Plaintiffs-Appellants,

v.

RELIANT ENERGY, INC., et al.,
Defendants-Appellee.

On Appeal from the United States District Court
for the Southern District of Texas

BRIEF OF THE SECRETARY OF LABOR, ELAINE L. CHAO,
AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS

HOWARD M. RADZELY
Solicitor of Labor

TIMOTHY D. HAUSER
Associate Solicitor for
Plan Benefits Security

KAREN L. HANDORF
Counsel for Appellate and
Special Litigation

ELIZABETH HOPKINS
Senior Appellate Attorney
U.S. Department of Labor
200 Constitution Ave., N.W.
Room N-4611
Washington, D.C. 20210
(202) 693-5600

## TABLE OF CONTENTS

Page

Statement of the issue .................................................................................1

Interest of the Secretary of Labor .............................................................1

Statement of the case....................................................................................2

Summary of argument...................................................................................4

Argument:

      The district court erred in holding that the defendants had no
      fiduciary duties with regard to the stock fund .................................................5

    A.    The district court erred to the extent that it held that the
        defendants could not be fiduciaries because they did not have
        discretionary authority with respect to the Stock Fund.........................6

    B.    The district court erred by holding that the defendants had no
        duty to disregard plan terms requiring the plan to invest in
        employer stock if it was imprudent to continue to offer or
        purchase such stock .............................................................................8

Conclusion .........................................................................................14

Certificate of service ............................................................................ 15-16

Certificate of compliance ........................................................................17

i

TABLE OF AUTHORITIES

Cases:                                                      Page

Bannistor v. Ullman,
    287 F.3d 394 (5th Cir. 2002)............................................................3,6,7

Bussian v. RJR Nabisco, Inc.,
    223 F.3d 286 (5th Cir. 2000)..................................................................6

Canale v. Yegen,
    789 F. Supp. 147 (D.N.J. 1992) ..........................................................11

Cent. States, Se. & Sw. Areas Pension Fund v.
    Cent. Transp., Inc.,
    472 U.S. 559 (1985) ..............................................................................9

Cent. Trust Co., N.A. v. Am. Avents Corp.,
    771 F. Supp. 871 (S.D. Ohio 1989)......................................................11

Chao v. Day,
    436 F.3d 234 (D.C. Cir. 2006) ..............................................................7

Donovan v. Bierwirth,
    680 F.2d 263 (2d Cir. 1982)..................................................................5

Donovan v. Cunningham,
    716 F.2d 1455 (5th Cir. 1983)..............................................................10

Eaves v. Penn,
    587 F.2d 453 (10th Cir. 1978)...........................................................5,11

Ershick v. Greb X-Ray Co.,
    705 F. Supp. 1482 (D. Kan. 1989), aff'd,
    948 F.2d 660 (10th Cir. 1991)..............................................................11

Fink v. Nat'l Sav. & Trust Co.,
    772 F.2d 951 (D.C. Cir. 1985) ............................................................10

Cases – continued:                                                      Page

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,
    284 F. Supp. 2d 511 (S.D. Tex. 2003) ..................................................12

In re Ikon Office Solutions, Inc. Sec. Litig.,
    86 F. Supp. 2d 481 (E.D. Pa. 2000) ......................................................12

In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.,
    312 F. Supp. 2d 1165 (D. Minn. 2004) .................................................11

Kuper v. Iovenko,
    66 F.3d 1447 (6th Cir. 1995)...............................................................9,10

Laborers Nat'l Pension Fund v. N. Trust
    Quantitative Advisors, Inc.,
    173 F.3d 313 (5th Cir. 1999)................................................................6,12

LoPresti v. Terwilliger,
    126 F.3d 34 (2d Cir. 1997).......................................................................7

Moench v. Robertson,
    62 F.3d 553 (3d Cir. 1995).....................................................................10

Nelson v. IPALCO Enters., Inc.,
    No. IP02-0477-C-H/K, 2003 WL 402253
    (S.D. Ind. Feb. 13, 2003)................................................................. 11-12

Secretary of Labor v. Fitzsimmons,
    805 F.2d 682 (7th Cir. 1986)...................................................................1

Smith v. Delta Airlines, Inc.,
    422 F. Supp. 2d 1310 (N.D. Ga. 2006) ................................................11

Varity Corp. v. Howe,
    516 U.S. 489 (1996) ................................................................................4

Wright v. Oregon Metallurgical Corp.,
    360 F.3d 1090 (9th Cir. 2004)...............................................................11

Statutes and regulations:

Employee Retirement Income Security Act of 1974,
Title I, 29 U.S.C. §§ 1001 <u>et</u> <u>seq.</u>: ......................................................1,5

Section 3(21)(A), 29 U.S.C. § 1002(21)(A)........................................3,6

Section 402(a)(1), 29 U.S.C. § 1102(a)(1)........................................6,7

Section 403(a), 29 U.S.C. § 1103(a) ..................................................7,8

Section 404, 29 U.S.C. § 1104 ........................................................9,10

Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A)................................5

Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) ..............................5,9

Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).....................4,5,9,10

Title IV, 29 U.S.C. §§ 1301 <u>et</u> <u>seq.</u> .......................................................5

29 C.F.R. § 2509.75-8 ......................................................................6

Miscellaneous:

U.S. Dep't of Labor, Employee Benefits Sec. Admin., <u>In the</u>
<u>Context of Publically Traded Securities, What are the</u>
<u>Fiduciary Responsibilities of a Directed Trustee</u>, Field
Assistance Bulletin 2004-03 (Dec. 17, 2004), <u>available</u> <u>at</u>
http:// www.dol.gov/ebsa/regs/fab_2004-3.html .................................13

U.S. Dep't of Labor Opinion Letter No. 83-6A,
1983 WL 22495 (Jan. 24, 1983)..........................................................13

U.S. Dep't of Labor Opinion Letter No. 90-05A,
1990 WL 172964 (Mar. 29, 1990) .......................................................12

STATEMENT OF THE ISSUE

The plaintiffs in this case allege, among other things, that the fiduciaries of their ERISA-covered 401(k) pension plan breached their fiduciary duties to the plan and to its participants by continuing to offer a company-stock fund as one of the investment options in the plan when they allegedly had inside information that the company's revenue and the price of its stock were artificially inflated as a result of misleading financial statements concerning energy trading practices. The Secretary of Labor files this brief as amicus curiae to address the following issue: whether the district court erred in holding that the fiduciaries had no discretion, and thus no fiduciary duty, with regard to the company stock fund because the relevant plan documents required that the fund be offered and that matching contributions from the employer be invested in the company stock fund.

INTEREST OF THE SECRETARY OF LABOR

The Secretary of Labor has primary authority to interpret and enforce the provisions of Title I of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq. See Secretary of Labor v. Fitzsimmons, 805 F.2d 682, 689-94 (7th Cir. 1986) (en banc) (Secretary's interests include promoting the uniform application of the Act, protecting plan participants and beneficiaries, and ensuring the financial stability of plan assets). The Secretary therefore has a strong interest, both with regard to her own litigation, and with respect to private

1

litigation, in ensuring that ERISA is not interpreted to absolve fiduciaries of all responsibility with regard to offering or maintaining an employer stock fund for a plan merely because plan documents contemplate or require such stock to be offered as an investment option.

## STATEMENT OF THE CASE

This ERISA case is a class action by current and former employees of Reliant Energy, Inc. (Reliant or REI), who are participants in the REI Savings Plan, a 401(k) plan sponsored by Reliant that allowed participants to contribute up to 16% of their compensation to the Plan. Record (R.) 6909. The Plan offered a number of investment options, including one called the Reliant Energy Common Stock Fund (REI Stock Fund or the Fund), which consisted primarily of Reliant common stock, with a small amount of cash. R. 6909. The company also provided varying percentages of matching contributions, which were invested automatically in the REI Stock Fund. R. 6909. Eventually, the REI Savings Plan had over 56% of its assets in the REI Stock Fund. R. 54.

When the price of the stock crashed in 2002 following the disclosure of questionable energy-trading and accounting practices and an SEC investigation and settlement, the Plan suffered corresponding large losses. The plaintiffs sued the Benefits Committee, which was the named fiduciary, the Benefits Committee members, and the company itself. R. 6910. As relevant here, the plaintiffs claim

2

that all defendants were fiduciaries that breached the duties they owed to the Plan

by imprudently and disloyally allowing the Plan to continue to purchase REI stock

in light of inside information that the fiduciaries allegedly had concerning the

company's questionable "roundtrip" energy transactions, which allegedly

artificially inflated the company's revenues.  R. 6910.[1]

The district court granted summary judgment to the defendants and

dismissed the case in its entirety.  The court started from the premise that "[a]

person is a fiduciary and has a fiduciary duty only with respect to those duties

under the plan for which he has discretionary authority or control."  R. 6912 (citing

Bannistor v. Ullman, 287 F.3d 394, 401 (5th Cir. 2002); 29 U.S.C. § 1002(21)(A)).

The court then determined that, because the express terms of the Plan required that

the REI Stock Fund be offered as an investment option and that the employer

match be invested in the Fund, the defendants had no discretion to override the

Plan terms.  R. 6913-6914.  Thus, the court held that "[b]ecause the REI Savings

Plan was originally designed to require the REI Stock Fund to be offered as an

investment option and to require employer matching funds be invested in that fund,

---

[1]  In these transactions, the company's subsidiary, Reliant Resources, Inc., would buy and sell the same amount of energy at the same time and price from the same counterparty, and count the entire amount as revenue for the company.  R. 5756-58, 6910 n.2.

3

REI and its Benefits Committee had no discretion, and therefore no fiduciary duty, to act otherwise." R. 6915. Accordingly, the court dismissed the suit.[2]

## SUMMARY OF ARGUMENT

The district court erred in holding that because the plan documents required investments in REI stock, the defendants had no discretion and thus no fiduciary duty with respect to those investments. Under ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), plan fiduciaries must follow the written plan terms only to the extent that such terms are consistent with the requirements of Title I of ERISA. Among other things, Title I requires that plan fiduciaries act prudently and loyally in managing the assets of the plan and in administering the plan. Consistent with the Secretary's long-standing position, numerous courts applying these provisions,

---

[2] The plaintiffs also allege that the defendants breached their fiduciary duties by making misrepresentations in securities filings that were incorporated by reference into materials distributed to participants. R. 6915. The district court also dismissed this count, stating that the company was not acting in a fiduciary capacity in filing the SEC forms, and finding that "there is no evidence that REI took any action other than that required by the SEC for issuers of stock." R. 6916. The Secretary agrees that a company and its officers do not become ERISA fiduciaries by filing SEC forms, such as the Form 10K or Form 10Q, which all companies that issue stock to the public are required to file. See Varity Corp. v. Howe, 516 U.S. 489, 505 (1996) (an employer does not become a fiduciary "simply because it made statements about its expected financial condition"). That is true even if the securities filings are distributed by others to plan participants or incorporated by reference into plan documents. The Secretary takes no position on the district court's finding that there was no record evidence that the company took any other action that would support a claim for fiduciary breach based on misrepresentations to the plan and its participants. Thus, the Secretary's brief will not address the merits of this primarily fact-bound issue.

have held that fiduciaries to plans that require investment in employer stock are

obligated to consider material inside information indicating that the investment is

imprudent, and may follow plan terms requiring the investment only if prudent to

do so.  The district court's holding to the contrary is thus inconsistent with the

terms of section 404(a)(1)(D), the prevailing case law, and departmental guidance.

### ARGUMENT

### THE DISTRICT COURT ERRED BY HOLDING THAT THE DEFENDANTS HAD NO FIDUCIARY DUTIES WITH RESPECT TO THE STOCK FUND

Although plan fiduciaries generally are required to follow the terms of the

plan documents, they must do so only "insofar as such documents and instruments

are consistent with the provisions" of Title I and Title IV of ERISA.  29 U.S.C. §

1104(a)(1)(D).  Under Title I, ERISA fiduciaries must act exclusively in the

interests of the participants and beneficiaries and exercise the level of "care, skill,

prudence, and diligence . . . that a prudent man acting in a like capacity and

familiar with such matters would use."  29 U.S.C. § 1104(a)(1)(A), (B).  Like all

fiduciaries to ERISA-covered plans, fiduciaries to 401(k) plans are subject to

ERISA's exacting standard of fiduciary care, Eaves v. Penn, 587 F.2d 453, 459-60

(10th Cir. 1978), which has been described as the "highest known to the law."

Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  These provisions

impose upon fiduciaries a responsibility to evaluate plan investments and to invest

5

plan assets prudently.  See Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 299 (5th

Cir. 2000); Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.,

173 F.3d 313, 317 (5th Cir. 1999).  Thus, fiduciaries to plans may not follow plan

terms requiring investment in company stock where it would be imprudent or

disloyal to invest in such stock.

A.    The district court erred to the extent that it held that the defendants could not
      be fiduciaries because they did not have discretionary authority with respect
      to the Stock Fund

      The district court erred to the extent that it held that the defendants could not

be fiduciaries of the Stock Fund because they did not have discretionary authority

or control over the Fund.   See R. 6912 (citing Bannister v. Ullman, 287 F.3d 394,

401 (5th Cir. 2002)).  Individuals serving in certain positions, such as plan

administrator, trustee, or "named fiduciary" under ERISA section 402(a)(1), 29

U.S.C. § 1102(a)(1), are fiduciaries by virtue of their positions.  See 29 C.F.R. §

2509.75-8, at D-2.  In addition, ERISA also provides, in pertinent part, that a

person is a fiduciary "to the extent (i) he exercises any discretionary authority or

discretionary control respecting management of such plan or exercises any

authority or control respecting management or disposition of its assets . . . or (iii)

he has any discretionary authority or discretionary responsibility in the

administration of such plan."  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)

(emphasis added).  In order to qualify as a fiduciary with respect to a plan's assets,

a person need not exercise "discretionary" authority or control, but must simply exercise "<u>any</u> authority or control" over their management or disposition. <u>Chao v. Day</u>, 436 F.3d 234, 236 (D.C. Cir. 2006) (emphasis in original); see also <u>Bannistor</u>, 287 F.3d at 401 (describing fiduciary in terms of authority or control, not "discretionary" authority or control).[3] .Here, the Benefits Committee was a fiduciary by virtue of being named a fiduciary and Plan administrator in the Plan documents, which gave the Committee the responsibility and authority to manage the Plan and its assets.

Furthermore, the district court's holding that defendants' conduct did not implicate ERISA's fiduciary provisions is in significant tension with two other related provisions of ERISA. First, ERISA section 402(a)(1) requires that plans be maintained pursuant to written plan documents that must provide for "one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). Similarly, ERISA section 403(a) mandates that plan assets be held in trust by one or more trustees who "have exclusive authority and discretion to manage and

---

[3] Thus, in addition to defining a fiduciary in terms of specifically conferred authority, ERISA also contains a functional test to determine who is a fiduciary subject to these duties. <u>LoPresti v. Terwilliger</u>, 126 F.3d 34, 40 (2d Cir. 1997); <u>see also</u> <u>Bannistor,</u> 287 F.3d at 401 (fiduciary is defined not only be reference to particular titles "'but also by considering the authority which a particular person has or exercises'"). The district court did not consider whether the company was a fiduciary under this functional test, and the Secretary takes no position on the issue.

control the assets of the plan," subject only to the proper direction of the named

trustee where the plan so provides. 29 U.S.C. § 1103(a). The statute thus requires

that ERISA plan assets be managed at all times by fiduciaries. The district court's

conclusion that no fiduciary was responsible for assessing the prudence of the

employer stock as a plan investment because such an investment was required

under the written terms of the plan is flatly inconsistent with the terms and

structure of ERISA.

    B.    <u>The district court erred by holding that the defendants had no duty to disregard plan terms requiring the plan to invest in employer stock if it was imprudent to continue to offer or purchase such stock</u>

The district court did not address the evidence that the plaintiffs presented

that the defendants had inside knowledge of the alleged corporate misfeasance and

breached their fiduciary duties by allowing the Plan to purchase employer stock

when the price was artificially inflated as a result of misrepresentations made in

securities filings.[4] Instead, the court held that the defendants could not be Plan

fiduciaries with respect to the selection and retention of the REI Stock Fund, and

thus could not be held liable for any imprudence with regard to the Fund, because

the Plan documents specifically required that the Fund be offered as an investment

option and that the employer match be invested in the Fund.

---

[4] The Secretary expresses no view on the proper resolution of these primarily factual issues. As stated in footnote 2, <u>supra</u>, the Secretary believes, however, that the company and its officers did not become fiduciaries by virtue of making required SEC filings.

If upheld, this holding would eliminate fiduciary responsibility for all decisions to invest in company stock for 401(k) plans and other plans in which the plan documents require investment in company stock, thereby immunizing the fiduciaries from all responsibility for even the most imprudent and disloyal of such investments. The decision need not and should not be upheld because it is inconsistent with the plain text of ERISA section 404, 29 U.S.C. § 1104, which requires a fiduciary to reconsider a potentially imprudent investment option even if it is specified in the plan documents. The decision is also contrary to the conclusion of numerous courts that have addressed the issue and to the Secretary's longstanding position on the issue.

Under the plain language of section 404(a)(1)(D), "a fiduciary may only follow plan terms to the extent that the terms are consistent with ERISA." Kuper v. Iovenko, 66 F.3d 1447, 1457 (6th Cir. 1995). In other words, "trust documents cannot excuse trustees from their duties under ERISA." Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559, 568 (1985). This means that plan fiduciaries have the duty to decline to follow the terms of the plan documents where those terms require them to act imprudently in violation of ERISA section 404(a)(1)(B). The court's decision effectively reads the limitation out of 404(a)(D), which permits a fiduciary to follow plan terms only insofar "as such documents and instruments are consistent with the provisions of [title I] and

9

Title IV" of ERISA. Such a construction, if accepted, would permit plan sponsors to mandate imprudent, disloyal or prohibited investments by the simple expedient of mandating them in the plan without regard to their legality.

These principles apply equally to cases involving plan investments in employer stock funds. Thus, under section 404(a)(1)(D), fiduciaries are obligated to follow plan terms requiring investment in employer stock only to the extent that doing so is otherwise consistent with fiduciary duties. Even in the context of employer stock ownership plans (ESOPs), which are designed to be primarily invested in employer securities, this Court has recognized that "ESOP fiduciaries remain subject to the general requirements of [s]ection 404." Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983). See also Moench v. Robertson, 62 F.3d 553, 569 (3d Cir. 1995) ("ESOPs are covered by ERISA's stringent requirements, and except for a few select provisions . . ., ESOP fiduciaries must act with the duties of loyalty and care."). More specifically, most courts to address the issue have recognized that ESOP fiduciaries are obligated to consider whether it continues to be prudent to invest in employer stock, and they may continue to follow plan terms requiring such an investment only if prudent to do so. See, e.g., Kuper, 66 F.3d at 1457; Fink v. Nat'l Sav. & Trust Co., 772 F.2d 951, 954-55 (D.C. Cir. 1985) (ERISA's prudence and loyalty requirements apply to all investment decisions made by employee benefit plans, including those made by

10

plans that may invest 100% of their assets in employer stock); <u>Eaves</u>, 587 F.2d at 459 ("in making an investment decision of whether or not a plan's assets should be invested in employers securities, an ESOP fiduciary, just as fiduciaries of other plans, is governed by the 'solely in the interest' and 'prudence' tests of §§ 404(a)(1)(A) and (B)"); <u>In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.</u>, 312 F. Supp. 2d 1165, 1181 (D. Minn. 2004) (recognizing that, under section 404(a)(1)(D), an ESOP fiduciary cannot "blindly follow plan directives to the obvious detriment of the beneficiary"); <u>Canale v. Yegen</u>, 789 F. Supp. 147, 154 (D.N.J. 1992); <u>Ershick v. Greb X-Ray Co.</u>, 705 F. Supp. 1482, 1487 (D. Kan. 1989) (plan terms authorizing ESOP fiduciary to invest up to 100% of plan assets in employer stock could be followed only if the investment decision was prudent), <u>aff'd</u>, 948 F.2d 660 (10th Cir. 1991); <u>Cent. Trust Co., N.A. v. Am. Avents Corp.</u>, 771 F. Supp. 871, 874-76 (S.D. Ohio 1989) (ESOP trustee properly ignored pass-through voting provisions that would have prevented sale of an ESOP's stock where the trustee determined that such a sale would be prudent).[5]

---

[5]    Some courts have questioned whether a fiduciary must diversify investments in an ESOP, given congressional authorization for ESOPs to invest primarily in employer stock. See <u>Wright</u> v. <u>Oregon Metallurgical Corp.</u>, 360 F.3d 1090, 1097 (9th Cir. 2004); <u>Smith</u> v. <u>Delta Air Lines, Inc.</u>, 422 F. Supp. 1310, 1327-1330 (N.D. Ga. 2006). Those cases are inapposite because the plaintiffs in this case do not complain of a failure to diversify. Occasionally, a district court has also concluded that a fiduciary has no obligation to consider the prudence of investments required by plan documents. See <u>Nelson v. IPALCO Enters., Inc.</u>, No.

Not surprisingly, courts have applied this same rule – that plan fiduciaries can and must override plan terms where it is clearly imprudent to follow them – to plans that are not ESOPs but that hold employer stock.  For instance, the district court in the <u>Enron</u> case correctly held, as the Secretary had urged, that despite plan language that required matching funds for the Enron 401(k) plan to be primarily invested in company stock, the fiduciaries "had an overriding fiduciary duty to monitor the prudence of allowing Enron to continue to match employee contributions with Enron stock if the stock became an imprudent investment."  <u>In re Enron Corp. Sec., Derivative & "ERISA" Litig.</u>, 284 F. Supp. 2d 511, 669-70 (S.D. Tex. 2003); <u>accord</u> <u>In re Ikon Office Solutions, Inc. Sec. Litig.</u>, 86 F. Supp. 2d 481, 492-93 (E.D. Pa. 2000); <u>cf.</u> <u>Laborer's Nat'l Pension Fund</u>, 173 F.3d at 322 (recognizing that prudence may require fiduciaries to override plan documents requiring investment in non-employer securities, but holding that fiduciaries had established the prudence of following the plan documents under the circumstances).  This is consistent with the position long taken by the Department of Labor in opinion letters.  <u>See</u> U.S. Dep't of Labor Opinion Letter No. 90-05A, 1990 WL 172964, at *3 (Mar. 29, 1990) (despite plan provisions to contrary, it is responsibility of fiduciaries to determine, based on all the relevant facts and circumstances, the prudence of investing plan assets in qualifying employer

IP02-0477-C-H/K, 2003 WL 402253, *7-*8 (S.D. Ind. Feb. 13, 2003).  For reasons discussed in text, that view is not persuasive.

securities); U.S. Dep't of Labor Opinion Letter No. 83-6A, 1983 WL 22495, at *1-*2 (Jan. 24, 1983) (same); see also U.S. Dep't of Labor, Employee Benefits Sec. Admin., In the Context of Publicly Traded Securities, What Are the Fiduciary Responsibilities of a Directed Trustee, Field Assistance Bulletin 2004-03 (Dec. 17, 2004)) (directed trustee has duty to question direction to purchase employer stock if it has material non-public information that the price is artificially inflated), available at http://www.dol.gov/ebsa/regs/fab_2004-3.html.

Thus, the plain text of the statute, the prevailing case law and the Department of Labor's longstanding view all support one conclusion:  the district court erred in dismissing appellant's suit on the basis that, "[b]ecause the REI Savings Plan was originally designed to require the REI Stock Fund to be offered as an investment option and to require employer matching funds be invested in that fund, REI and its Benefits Committee had no discretion, and therefore no fiduciary duty, to act otherwise." R. 6915.

13

CONCLUSION

For the reasons stated above, the Secretary of Labor urges this Court to

reverse the district court's decision dismissing this suit.

Respectfully submitted,

HOWARD M. RADZELY
  Solicitor of Labor

TIMOTHY D. HAUSER
  Associate Solicitor for
  Plan Benefits Security

KAREN HANDORF
  Counsel for Appellate and
  Special Litigation


/s/_____
ELIZABETH HOPKINS
  Senior Appellate Attorney
United States Department of Labor
Office of the Solicitor
Plan Benefits Security Division
200 Constitution Avenue, NW
Room N4611
Washington, DC 20210
(202) 693-5600
(202) 693-5610 (fax)

AUGUST 2006

CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d) and 5th Cir. R. 31.1, I hereby

certify that on this 16th day of August, 2006, I served one electronic copy by either

e-mail or 3.5 inch diskette, as indicated below, and two paper copies (sent via

Federal Express) of the Brief of the Secretary of Labor, Elaine L. Chao, as Amicus

Curiae in Support of Plaintiffs-Appellants on the following counsel:

Paul O. Paradis, Esq.
Gina Tufaro, Esq.
Abbey Spanier Rodd Abrams &
  Paradis, LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700
pparadis@abbeyspanier.com
gtufaro@abbeyspanier.com

John G. Emerson, Jr., Esq.
Emerson Poynter LLP
830 Apollo Lane
Houston, TX 77058
(281) 488-8854
john@emersonpoynter.com

Robert Izard, Esq.
Eric Palmquist, Esq.
Schatz & Nobel, P.C.
One Corporate Center
20 Church Street
Hartford, CT 06106
(860) 493-6292
rizard@snlaw.net
epalmquist@snlaw.net

James Edward Maloney, Esq.
Maria Wyckoff Boyce, Esq.
Aaron Michael Streett, Esq.
Baker Botts LLP
910 Louisiana, Suite 3000
Houston, TX 77002
(713) 229 1255
james.maloney@bakerbotts.com
maria.boyce@bakerbotts.com
aaron.streett@bakerbotts.com

Lawrence H. Hunt, Jr., Esq.
Sidley Austin Brown & Wood
Bank One Plaza
10 S. Dearborn, 54th Floor
Chicago, IL 60603
(312) 853-7000
lhunt@Sidley.com

David K. Isaak, Esq.
David Gerger & Associates
700 Louisiana, Suite 2300
Houston, TX 77002
(713) 224 4400
judy@gergerlaw.com

M. Sean Royall, Esq.
Gibson Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
(214) 698-2356
Sroyall@gibsondunn.com

William E. Matthews, Esq.
Gardere Wynne
1000 Louisiana, Suite 3400
Houston, TX 77002-5007
(713) 276 5760
wmatthews@gardere.com

Brant Martin, Esq.
Wick Phillips LLP
500 North Akard Street, Suite 2100
Dallas, TX 75201
(214) 692-6200
brant.martin@wickphillips.com

W. Kelly Puls, Esq.
Puls Taylor
2600 Airport Freeway
Fort Worth, TX 76111
(817) 338-1717
(by 3.5 inch diskette

James V. Bashian, Esq.
Law Offices of James V. Bashian
500 Fifth Avenue, Suite 2700
New York, NY 10110
(212) 921-4110
jbashian@bashianlaw.com

Laurence D. Paskowitz, Esq.
Paskowitz & Associates
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 685-0969
classattorney@aol.com

/s/_____
Karen Handorf
  Counsel for Appellate and Special Litigation
United States Department of Labor
Office of the Solicitor
Plan Benefits Security Division
200 Constitution Avenue, NW
Room N4611
Washington, D.C. 20210
Phone: (202) 693-5600
Fax:  (202) 693-5610
handorf.karen@dol.gov

CERTIFICATE OF COMPLIANCE

I hereby certify that the Brief of the Secretary of Labor, Elaine L. Chao, as Amicus Curiae in Support of Plaintiffs-Appellees complies with the type-volume limitation of Fed. R. App. P.29(d) and 32(a)(7)(B) and contains less than 7,000 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii). Also, this brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. App. P. 32(a)(6) and has been prepared in a proportionally-spaced typeface using Microsoft XP in Times New Roman 14-point font size.

/s/ _____
Karen Handorf
Counsel for Appellate and Special
  Litigation
United States Department of Labor
Office of the Solicitor
Plan Benefits Security Division
200 Constitution Avenue, NW
Washington, D.C. 20210
Phone: (202) 693-5600
Fax:    (202) 693-5610
handorf.karen@dol.gov

17

Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
AT HOUSTON

| | |
|---|---|
| In re ENRON CORPORATION SECURITIES AND ERISA LITIGATIONS | MDL - 1446 |
| This Document Relates To: | |
| PAMELA M. TITTLE, *et al*, | |
| Plaintiffs, | CIVIL ACTION NO. H-01-3913 AND CONSOLIDATED CASES |
| v. | |
| ENRON CORP., *et al*, | |
| Defendants. | |

**AMENDED FINAL ORDER APPROVING AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AN INCENTIVE AWARD TO THE CLASS REPRESENTATIVES**

WHEREAS, this action came before the Court for a fairness hearing, as noticed, on July 24, 2006, pursuant to this Court's Preliminarily Approving Partial Settlement with Northern Trust, Conditionally Certifying Class for Purposes of Settlement, Approving Form and Manner of Notice, and Scheduling Hearing on Fairness of Settlement Pursuant to Federal Rule of Civil Procedure 23(e) entered April 20, 2006, (the "Preliminary Approval Order") to consider and determine the matters set forth in the Preliminary Approval Order;

WHEREAS, among the matters set forth for the Court's determination in the Preliminary Approval Order were whether "Counsels' application for an award of attorneys' fees and expenses pursuant to the common fund doctrine is fair, reasonable, and adequate and should be approved by the Court" and whether "the request by Counsel for additional compensation to the

001544-11 119538 VI

Class Representatives in the amount of $7,000 each for their continued efforts in this litigation is reasonable and fair;"

WHEREAS, due notice of the July 24, 2006 hearing was published and given and all persons and entities were provided an opportunity to present objections to the Court; and

WHEREAS, the Court has considered all objections to Class Counsels' Petition for An Award of Attorneys' Fees, Reimbursement of Expenses, and an Incentive Award to the Named Plaintiffs;

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.    This Order incorporates by reference the definitions in Class Counsels' Memorandum in Support of Petition for An Award of Attorneys' Fees, Reimbursement of Expenses, and an Incentive Award to the Named Plaintiffs.

2.    This Court has jurisdiction over the subject matter of this Action and over all parties to this action, including all members of the Settlement Classes for each of the partial settlements subject to the final approval orders entered by the Court, including the Settlement Classes with respect to the AWSC Settlement, the $85 Million Settlement, the Enron Settlement, and the Arthur Andersen Settlement, as well as the all members of the Settlement Class preliminarily approved by the Court with respect to the Northern Trust Settlement.

3.    Due and adequate notice of the proceedings has been given to the Settlement Classes identified above and each of their members has been given an opportunity to participate in the fairness hearing concerning the subject Petition such that all members of the Settlement Classes are bound by this Order and Judgment.

4.    This Court finds based on the evidence presented, that a 20% fee is reasonable and fair for the work performed and the results achieved in this matter, is fully supported by the common fund doctrine and applicable Fifth Circuit authority, and is otherwise appropriate because:

- 2 -

a.      Class Counsels' expended over 56,500 hours to investigate and prosecute the
        action for a lodestar of $23,020,068.18. That lodestar is reasonable given the
        complex nature of the action, the amount of time reasonably expended to
        accomplish the work involved, and the prevailing hourly rates of Class
        Counsel in the communities in which they practice. That lodestar is the
        equivalent of multiplier of 2.297 relative to the recoveries to the Settlement
        Classes, which totaled $264,375,00.00; and

b.      Based on that multiplier, Class Counsel's fee request for 20% of the recoveries
        is a reasonable enhancement of their lodestar in this litigation based on sworn
        testimony in the Joint Declaration of Co-Lead Counsel, the authorities cited in
        the supporting papers, the work and conclusions reflected in the Court's files,
        the Court's Orders in this consolidated litigation, and the Court's assessments
        with respect to the following:  (1) this consolidated ERISA action presented
        novel and complex issues of law that were litigated by Class Counsel with a
        high level of skill and professionalism against Defendants represented by
        highly skilled and capable counsel; (2) during the five years this action has
        been litigated, Class Counsel were largely precluded from other employment;
        (3) Class Counsel undertook this litigation contingent on the outcome and
        risked the possibility that there could be no recovery of fees despite their
        substantial investments of money and time in the case; (4) Class Counsel are
        comprised of attorneys who have national reputations and are highly skilled in
        complex class actions, and who have concentrated their practices in areas of
        law required in this case, including ERISA pension benefit litigation,
        bankruptcy, and accounting fraud;  (5) the amount recovered in this litigation
        represents a substantial recovery for the Settlement Class given the risks
        involved in proving Defendants' liability and the issues concerning  damages;

- 3 -

and (6) the fee award that is sought is well within the range of fees awarded in other similar cases.

5.    Accordingly, the Court hereby awards Class Counsel 20% of each of the Class Settlement Amounts and Settlement Funds established with respect to the partial settlements, with interest, to be disbursed when this order becomes final and when each of those funds also becomes final or is otherwise available for payment pursuant to the respective settlement agreements for each such fund. For that purpose, the Court awards and orders payment of attorneys' fees in this action, as follows:

    a.  The Enron Settlement Attorneys' Fee Account, together with the interest earned on that account, is hereby awarded to Class Counsel and is to be disbursed to Class Counsel in its entirety upon the finality of this Final Order;

    b.  The Arthur Andersen Attorneys' Fee Account, together with the interest earned on that account, is hereby awarded to Class Counsel and is to be disbursed to Class Counsel in its entirety upon the finality of this Final Order;

    c.  Twenty (20) percent of the $85 Million Class Settlement Amount, with interest, is hereby awarded to Class Counsel and is to be disbursed to Class Counsel upon both the finality of this Final Order and the finality of the Court's June 9, 2005 Amended Order of Final Judgment and Dismissal;

    d.  Twenty (20) percent of the Northern Trust Class Settlement Amount, with interest, is hereby awarded to Class Counsel and is to be disbursed to Class Counsel upon both the finality of this Final Order and the occurrence of the Effective Date of Settlement, as determined in accordance with the terms of the Northern Trust Settlement Agreement; and

    e.  Twenty (20) percent of any amount of the AWSC Settlement Fund approved by the Court as the *Tittle* Plaintiffs' share of that fund (the *Tittle* Settlement Fund), with interest, shall be awarded and disbursed to Class Counsel upon

- 4 -

both the finality of this Final Order and the finality of any Order by the Court apportioning the AWSC Settlement Fund between the *Tittle* and *Newby* Plaintiffs;

6.    Co-Lead Class Counsel, Keller Rohrback, LLP and Hagens Berman Sobol Shapiro, LLP, are ordered to distribute the fees awarded pursuant to this Final Order in their sole discretion to all Class Counsel in accordance with each firm's respective contribution to the results obtained for the Settlement Classes.

7.    The Court finds that the expenses that are the subject of Class Counsels Petition are reasonable and necessary costs of the type commonly incurred and reimbursed in large, complex litigations. The Court hereby awards Class Counsel partial reimbursement of litigation expenses in the total amount of $874,902.74. Those expenses are to be paid from the following funds in the following order until that entire amount has been reimbursed: (a) the amounts remaining in the *Tittle* Expense Fund established pursuant to the AWSC Settlement; (b) the Arthur Andersen Litigation Expense Account; and (c) the Enron Settlement Expense Fund.

8.    The amount remaining in the Enron Settlement Expense Fund will be maintained in that account pending further order of the Court. Any amounts previously authorized for payment with respect to the Deposition Protocol Order pursuant the Court's July 12, 2004 Order [Dkt. No. 783] are in the future authorized for payment from the Enron Settlement Expense Fund.

9.    The Class Representatives Roger W. Boyce, Patrick Campbell, Betty J. Clark, Gary S. Dreadin, Janice Farmer, Steve Lacey, Michael L. McCown, John L. Moore, Thomas O. Padgett, Fanette Perry, Charles Prestwood, Roy Rinard, Catherine Stevens, Wayne M. Stevens, Pamela Tittle, and Norman L. Young, and Named Plaintiff, Dan Shultz, are awarded $7,000 each as an incentive award for their services and role in bringing about the recoveries for the Settlement Classes.

001544-11 119538 V1

10.     All of the foregoing amounts are to be paid without any additional contribution or payment by Settling Defendants in any of the partial settlements approved by the Court. Any appeal from this paragraph shall not affect the finality of any other provision of any other Final Order or Judgment entered in this litigation with respect to any of the partial settlements approved by the Court, including but not limited to the dates on which the Settlements will be deemed final under the terms of the respective Settlement Agreements for those partial settlements.

11.     Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court finds that there is no just reason for delay and therefore directs entry of this Final Order as a final judgment that can be immediately appealed.

12.     Without in any way affecting the finality of this Final Order, the Court hereby retains exclusive jurisdiction over this Action.

**IT IS SO ORDERED**.

Signed this 24th day of July, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

- 6 -

Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION<br><br>[All Tracks] | MDL 1586<br><br>Case Nos.    04-MD-15861<br>04-MD-15862<br>04-MD-15863<br>04-MD-15864 |

[PROPOSED] CASE MANAGEMENT ORDER NO. 1

WHEREAS, by letters dated March 3, 2004, and April 5, 2004, the Court invited submissions from the interested parties herein concerning the proper organizational structure for these Actions, and held hearings on these matters on April 2, 2004, and May 3, 2004;

NOW, THEREFORE, IN CONSIDERATION OF THE PARTIES' SUBMISSIONS AND THE HEARINGS HELD HEREIN, IT IS HEREBY ORDERED AS FOLLOWS:

I.    COORDINATION AND CONSOLIDATION OF RELATED CASES

A.    As stated in the Court's letter to Counsel, dated April 12, 2004, all cases filed in or transferred to this Court pursuant to the MDL Orders (collectively, the "Transferred Actions"), shall be coordinated under the docket numbers and assigned to the Judges set forth below (the "Coordinated Tracks"):

1.    Cases Relating To Excelsior, Federated, or Scudder:  All class actions and derivative actions transferred to the Court involving Excelsior, Federated, or Scudder mutual funds, as well as all cases filed on behalf of purchasers or holders of shares of the corporate parents of any of these entities or their investment advisors, (including all cases brought nominally on behalf of the funds or corporate parents of the funds or their investment advisors and styled as derivative actions), shall be coordinated for pre-trial proceedings under the caption In re Excelsior, Federated, and Scudder, Civil No. 04-md-15861, and assigned to Judge Blake.

2.    Cases Relating To Alliance, Franklin/Templeton, Bank of America/Nations Funds, and Pilgrim Baxter:  All class actions and derivative actions transferred to the Court involving Alliance, Franklin/Templeton, Bank of America/Nations Funds, and Pilgrim Baxter mutual funds, as well as all cases filed on behalf of purchasers or holders of shares of the corporate parents of any of these entities or their investment advisors , (including all cases brought nominally on behalf of the funds or corporate parents of the funds or their investment advisors and styled as derivative actions), shall be coordinated

for pre-trial proceedings under the caption <u>In re Alliance, Franklin/Templeton, Bank of America/Nations Funds, and Pilgrim Baxter</u>, Civil No. 04-md-15862, and assigned to Judge Davis.

        3.      <u>Cases Relating To Alger, Columbia, Janus, MFS, One Group, and Putnam</u>:  All class actions and derivative actions transferred to the Court involving Alger, Columbia, Janus, MFS, One Group, and Putnam mutual funds, as well as all cases filed on behalf of purchasers or holders of shares of the corporate parents of any of these entities or their investment advisors, (including all cases brought nominally on behalf of the funds or corporate parents of the funds or their investment advisors and styled as derivative actions), shall be coordinated for pre-trial proceedings under the caption <u>In re Alger, Columbia, Janus, MFS, One Group, and Putnam</u>, Civil No. 04-md-15863, and assigned to Judge Motz.

        4.      <u>Cases Relating To AIM/INVESCO, Artisan, Strong, and T. Rowe Price</u>:  All class actions and derivative actions transferred to the Court involving AIM/INVESCO, Artisan, Strong, and T. Rowe Price mutual funds, as well as all cases filed on behalf of purchasers or holders of shares of the corporate parents of any of these entities or their investment advisors, (including all cases brought nominally on behalf of the funds or corporate parents of the funds or their investment advisors and styled as derivative actions), shall be coordinated for pre-trial proceedings under the caption <u>In re AIM/INVESCO, Artisan, Strong, and T. Rowe Price</u>, Civil No. 04-md-15864, and assigned to Judge Stamp.

        B.      As stated in the Court's letters to counsel dated April 30, 2004 and May 4, 2004, there will be a chair/chief administrative counsel for plaintiffs for each track as set forth below:

        1.      <u>In re Excelsior, Federated, and Scudder</u>:  David J. Bershad, Milberg Weiss Bershad & Schulman LLP ("Milberg Weiss").

        2.      <u>In re Alliance, Franklin/Templeton, Bank of America/Nations Funds, and Pilgrim Baxter</u>:  Alan Schulman, Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz").

        3.      <u>In re Alger, Columbia, Janus, MFS, One Group, and Putnam</u>:  David J. Bershad, Milberg Weiss.

        4.      <u>In re AIM/INVESCO, Artisan, Strong, and T. Rowe Price</u>:  Alan Schulman, Bernstein Litowitz.

        C.      The chair/chief administrative counsel for plaintiffs for each track will have the following duties and responsibilities:

        1.      Serve as a contact point for defense counsel on track-wide administrative issues (if any);

        2.      Organize on plaintiffs' side monthly conference calls and other track-wide proceedings; and

2

    3.    Serve as primary spokesperson in conferences and hearings on track-wide issues.

    D.    The firm of Tydings & Rosenberg LLP will serve as court liaison counsel for the plaintiffs in each track and will serve as contact to the court on administrative matters.

    E.    Each Coordinated Track will contain a subtrack for each fund family assigned to that track. Within each subtrack, pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3)(B), the Court hereby appoints a lead plaintiff and lead counsel for all class claims as identified below:

    1.    <u>In re Excelsior, Federated, and Scudder</u>, Civil No. 04-md-15861 (Blake, J.):

        a.    <u>In re Excelsior</u>, Civil No. 04-md-15861-01:

            (1)    All class action and other direct cases involving Excelsior mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints James Hauslein as Lead Plaintiff for the consolidated class claims, and approves his selection of Schiffrin & Barroway LLP ("Schiffrin") as lead class counsel for this subtrack.

            (2)    All derivative actions filed on behalf of Excelsior mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Chimicles & Tikellis LLP ("Chimicles") as lead fund derivative counsel for this subtrack.

            (3)    The consolidated class action cases and the consolidated fund derivative actions shall be coordinated for pretrial purposes as set forth herein.

        b.    <u>In re Federated</u>, Civil No. 04-md-15861-02:

            (1)    All class action and other direct cases involving Federated mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Colbart Birnett LP as Lead Plaintiff for the consolidated class claims, and approves its selection of Bernstein Liebhard & Lifshitz LLP ("Bernstein Liebhard") as lead class counsel for this subtrack.

            (2)    All derivative actions filed on behalf of Federated mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Pomerantz Haudek Block Grossman & Gross LLP ("Pomerantz") as lead fund derivative counsel for this subtrack.

197943_5

      (3)     The consolidated class action cases and the consolidated fund derivative actions shall be coordinated for pretrial purposes as set forth herein.

   c.   <u>In re Scudder</u>, Civil No. 04-md-15861-03:

      (1)     All class action and other direct cases involving Scudder mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Post-Retirement Health Insurance Plan as Lead Plaintiff for the consolidated class claims, and approves its selection of Berger & Montague as lead class counsel for this subtrack.

      (2)     All derivative actions filed on behalf of Scudder mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Wolf Haldenstein Adler Freeman & Herz, LLP ("Wolf Haldenstein") as lead fund derivative counsel for this subtrack.

      (3)     The consolidated class action cases and the consolidated fund derivative actions shall be coordinated for pretrial purposes as set forth herein.

2.    <u>In re Alliance, Franklin/Templeton, Bank of America/Nations Funds, and Pilgrim Baxter</u>, Civil No. 04-md-15862 (Davis, J.):

   a.   <u>In re Alliance</u>, Civil No. 04-md-15862-01:

      (1)     All class action and other direct cases involving Alliance mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Philip Erickson as Lead Plaintiff for the consolidated class claims, and approves his selection of Schiffrin as lead class counsel for this subtrack.

      (2)     All derivative actions filed on behalf of Alliance mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Pomerantz as lead fund derivative counsel for this subtrack.

      (3)     All derivative actions filed on behalf of holders of shares of the corporate parent of the investment advisor of the Alliance mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Morris and Morris LLC as lead parent derivative counsel for this subtrack.

4

(4)    The consolidated class action cases, the consolidated fund derivative actions and the consolidated parent derivative actions shall be coordinated for pretrial purposes as set forth herein.

b.    In re Franklin/Templeton, Civil No. 04-md-15862-02:

(1)    All class action and other direct cases involving Franklin/Templeton mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Nassau County Deferred Compensation Plan as Lead Plaintiff for the consolidated class claims, and approves its selection of Wolf Popper LLP as lead class counsel for this subtrack.

(2)    All derivative actions filed on behalf of Franklin/Templeton mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Chimicles as lead fund derivative counsel for this subtrack.

(3)    All derivative actions filed on behalf of holders of shares of the corporate parent of the investment advisor of the Franklin/Templeton mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Bull & Lifshitz LLP as lead parent derivative counsel for this subtrack.

(4)    The consolidated class action cases, the consolidated fund derivative actions and the consolidated parent derivative actions shall be coordinated for pretrial purposes as set forth herein.

c.    In re Bank of America/Nations Funds, Civil No. 04-md-15862-03:

(1)    All class action and other direct cases involving Bank of America/Nations Fund mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Retirement Design Management, Inc. as Lead Plaintiff for the consolidated class claims, and approves its selection of Goodkind Labaton Rudoff & Sucharow LLP ("Goodkind") as lead class counsel for this subtrack.

(2)    All derivative actions filed on behalf of Bank of America/Nations Fund mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Wolf

5

Haldenstein as lead fund derivative counsel for this subtrack.

(3) All derivative actions filed on behalf of holders of shares of the corporate parent of the investment advisor of the Bank of America/Nations Fund mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Bull & Lifshitz LLP as lead parent derivative counsel for this subtrack.

(4) The consolidated class action cases, the consolidated fund derivative actions and the consolidated parent derivative actions shall be coordinated for pretrial purposes as set forth herein.

d. In re Pilgrim Baxter, Civil No. 04-md-15862-04:

(1) All class action and other direct cases involving Pilgrim Baxter mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Ohio Public Employees Deferred Compensation Plan as Lead Plaintiff for the consolidated class claims, and approves its selection of Bernstein Litowitz as lead class counsel for this subtrack.

(2) All derivative actions filed on behalf of Pilgrim Baxter mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Chimicles as lead fund derivative counsel for this subtrack.

(3) The consolidated class action cases and the consolidated fund derivative actions shall be coordinated for pretrial purposes as set forth herein.

3. In re Alger, Columbia, Janus, MFS, One Group, and Putnam, Civil No. 04-md-15863 (Motz, J.):

a. In re Alger, Civil No. 04-md-15863-01:

(1) All class action and other direct cases involving Alger mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Donna Gaffney as Lead Plaintiff for the consolidated class claims, and approves her selection of Schiffrin as lead class counsel for this subtrack.

6

(2)    All derivative actions filed on behalf of Alger mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Wolf Haldenstein as lead fund derivative counsel for this subtrack.

(3)    The consolidated class action cases and the consolidated fund derivative actions shall be coordinated for pretrial purposes as set forth herein.

b.    In re Columbia, Civil No. 04-md-15863-02:

(1)    All class action and other direct cases involving Columbia mutual funds shall be consolidated for pretrial purposes. The Lead Plaintiff and Lead Counsel for the consolidated class action cases will be addressed in a supplemental case management order after a motion for appointment of Lead Plaintiff and approval of Lead Counsel is fully briefed and decided by the Court.

(2)    All derivative actions filed on behalf of Columbia mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Wolf Haldenstein as lead fund derivative counsel for this subtrack.

(3)    The consolidated class action cases and the consolidated fund derivative actions shall be coordinated for pretrial purposes as set forth herein.

c.    In re Janus, Civil No. 04-md-15863-03:

(1)    All class action and other direct cases involving Janus mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints California Financial Advisors as Lead Plaintiff for the consolidated class claims, and approves its selection of Cotchett Pitre Simon & McCarthy ("Cotchett") as lead class counsel for this subtrack.

(2)    All derivative actions filed on behalf of Janus mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Chimicles as lead fund derivative counsel for this subtrack.

(3)    All derivative actions filed on behalf of holders of shares of the corporate parent of the investment advisor of the Janus mutual funds shall be consolidated for pretrial purposes.

7

The Court hereby appoints The Law Offices of Bernard M. Gross, P.C. as lead parent derivative counsel for this subtrack.

(4)    All class action cases filed on behalf of purchasers of the common stock of Janus Capital Group Inc., the corporate parent of the Janus mutual funds' advisor, shall be consolidated for pretrial purposes. The Court hereby appoints First Derivative Traders as Lead Plaintiff for the Janus Capital Group, Inc. investor claims pursuant to the PSLRA, and approves its selection of Kirby McInerney & Squire, LLP as lead counsel for the Janus Capital Group, Inc. investor claims in this subtrack.

(5)    The consolidated class action cases, the consolidated fund derivative actions, the consolidated parent derivative actions and the consolidated parent investor actions shall be coordinated for pretrial purposes as set forth herein.

d.    In re MFS, Civil No. 04-md-15863-04:

(1)    All class action and other direct cases involving MFS mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints the City of Chicago Deferred Compensation Plan as Lead Plaintiff for the consolidated class claims, and approves its selection of Bernstein Litowitz as lead class counsel for this subtrack.

(2)    All derivative actions filed on behalf of MFS mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Pomerantz as lead fund derivative counsel for this subtrack.

(3)    The consolidated class action cases and the consolidated fund derivative actions shall be coordinated for pretrial purposes as set forth herein.

e.    In re One Group, Civil No. 04-md-15863-05:

(1)    All class action and other direct cases involving One Group mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Linda Parker as Lead Plaintiff for the consolidated class claims, and approves her selection of Milberg Weiss as lead class counsel for this subtrack.

8

      (2)    All derivative actions filed on behalf of One Group mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Chimicles as lead fund derivative counsel for this subtrack.

      (3)    All derivative actions filed on behalf of holders of shares of the corporate parent of the investment advisor of the One Group mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints The Law Offices of Bernard M. Gross, P.C. as lead parent derivative counsel for this subtrack.

      (4)    The consolidated class action cases, the consolidated fund derivative actions, and the consolidated parent derivative actions shall be coordinated for pretrial purposes as set forth herein.

    f.    <u>In re Putnam</u>, Civil No. 04-md-15863-06:

      (1)    All class action and other direct cases involving Putnam mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Ohio Tuition Trust Authority ("OTTA") as Lead Plaintiff for the consolidated class claims, and approves its selection of Milberg Weiss as lead class counsel for this subtrack.

      (2)    All derivative actions filed on behalf of Putnam mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Pomerantz as lead fund derivative counsel for this subtrack.

      (3)    All derivative actions filed on behalf of holders of shares of the corporate parent of the investment advisor of the Putnam mutual funds shall be coordinated for pretrial purposes. The Court hereby appoints Morris and Morris LLC as lead parent derivative counsel for this subtrack.

      (4)    The consolidated class action cases, the consolidated fund derivative actions, and the consolidated parent derivative actions shall be coordinated for pretrial purposes as set forth herein.

4.    <u>In re AIM/INVESCO, Artisan, Strong, and T. Rowe Price</u>, Civil No. 04-md-15864 (Stamp, J.):

9

a.    In re AIM/INVESCO, Civil No. 04-md-15864-01:

    (1)    All class action and other direct cases involving AIM/INVESCO mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints the City of Chicago Deferred Compensation Plan as Lead Plaintiff for the consolidated class claims, and approves its selection of Bernstein Litowitz as lead class counsel for this subtrack.

    (2)    All derivative actions filed on behalf of AIM/INVESCO mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Wolf Haldenstein as lead fund derivative counsel for this subtrack.

    (3)    The consolidated class action cases and the consolidated fund derivative actions shall be coordinated for pretrial purposes as set forth herein.

b.    In re Artisan, Civil No. 04-md-15864-02:

    (1)    There are no cases involving the Artisan fund family before this Court.

c.    In re Strong, Civil No. 04-md-15864-03:

    (1)    All class action and other direct cases involving Strong mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Steven J. Friedman as Lead Plaintiff for the consolidated class claims, and approves his selection of Milberg Weiss as lead class counsel for this subtrack

    (2)    All derivative actions filed on behalf of Strong mutual funds shall be consolidated for pretrial purposes. The Court hereby appoints Chimicles as lead fund derivative counsel for this subtrack.

    (3)    The consolidated class action cases and the consolidated fund derivative actions shall be coordinated for pretrial purposes as set forth herein.

d.    In re T. Rowe Price, Civil No. 04-md-15864-04:

    (1)    There is a single case involving T. Rowe Price fund family before the MDL, *Bilski v. AIM*, 03-CV-772. Counsel for

10

plaintiffs in this action are Andrew S. Friedman of Bonnett Fairbourn and George Zelcs of Korein Tillery.

## II.    SUBSEQUENTLY FILED OR TRANSFERRED RELATED CASES

A.    If any other case is filed in this Court, transferred from another court to this Court, or removed to this Court, and is designated as a "Related Case" as defined by Rule 103(b) of the Local Rules of this Court, the Clerk of the Court shall:

1.    File a copy of this Order in the separate file for the Related Case; and

2.    Make an appropriate entry in the docket of the appropriate Coordinated Track and Subtrack.

B.    In the circumstances referred to in paragraph II (A), above, the Co-Chairs of the Horizontal Steering Committee, as defined in paragraph III (B)(1), below, shall:

1.    Mail a copy of this Order to counsel for Plaintiffs in the Related Case; and

2.    Mail a copy of this Order to counsel for each defendant in the Related Case who is not already a party to any case then included in the Coordinated Tracks.

3.    The Court shall consolidate any newly-filed or transferred Related Case involving families of funds identified in I(F) above as appropriate with the cases already filed under the relevant fund family subtrack, within the relevant Coordinated Track. Newly-filed or transferred cases shall be treated as "tag-along actions," as defined in Rule 1.1 of the Rules of Procedure of the MDL Panel.

4.    Upon the filing or transfer of additional Related Cases involving families of mutual funds not included with the Transferred Actions, the Court shall:

a.    Assign the case to a Judge within one of the existing Coordinated Tracks or, as necessary, create a new Coordinated Track to accommodate the newly-filed or transferred Related Cases; and

b.    Establish a subtrack within the Coordinated Track for that fund family. In addition, based upon the submissions of the parties, the Court will identify any appropriate lead plaintiffs and lead counsel.

5.    In the circumstances referred to in paragraph 4, above, the Co-Chairs of the Horizontal Steering Committee, as defined in paragraph III (B)(1), below, shall mail a copy of this Order to counsel for Plaintiffs and Defendants in the newly-filed or transferred Related Case.

C.    This Order shall apply to each Related Case filed in this Court, unless a party objecting to the consolidation or coordination of that case or to any other provision of this Order serves an application for relief from this Order or from any of its provisions within ten (10) days after the date on which the Co-Chairs of the Horizontal Steering Committee, as defined in paragraph III (B)(1), below,

11

mails a copy of this Order to counsel for that party. Notwithstanding the provisions of Rule 103(b)(iii) of the Local Rules of this Court, any dispute regarding the designation of a Related Case shall be decided by the Judge presiding over the relevant Coordinated Track to which the Related Case has been assigned. The provisions of this Order shall apply to such Related Case pending the Court's ruling on the application.

III.    ORGANIZATION AND DUTIES OF COUNSEL FOR PLAINTIFFS

A.    Vertical Committees

1.    Each fund family subtrack will have its own vertical committee composed of lead plaintiffs' counsel for each type of claim involving that fund family (*i.e.*, class claims, fund derivative claims, parent derivative claims and parent investor claims) and Richard M. Heimann of Lieff, Cabraser Heimann & Bernstein, LLP ("Lieff, Cabraser") as liaison counsel – state law claims. The vertical committees will be chaired by an administrative counsel. Lead class counsel identified above in each fund family subtrack will serve as the administrative counsel for that subtrack.

2.    Richard M. Heimann of Lieff Cabraser will serve as liaison counsel – state law claims on each of the plaintiffs' vertical fund family subtrack committees. Mr. Heimann will serve exclusively in a consultative capacity to express any unique interests of state law plaintiffs asserting supplemental state law claims in the consolidated class complaint. Counsel for defendants may communicate with the committee's administrative counsel/lead class counsel on all matters relating to all claims asserted in the class complaint, including any state law claims.

3.    The members of the plaintiffs' vertical committees shall have the following responsibilities in consultation with the other members of the vertical committee as appropriate:

a.    Administrative Counsel: Administrative counsel in each vertical fund family subtrack shall have the following duties and responsibilities:

(1)    Serve as a contact point for defense counsel on family of fund specific administrative issues, including requests for extension and other scheduling issues;

(2)    Draft and negotiate case management orders on family of fund specific issues;

(3)    Coordinate discovery and assign discovery tasks;

(4)    Serve as a primary spokesperson in conferences and hearings on family of fund specific administrative issues; and

(5)    Coordinate settlement discussions (may have a greater role after damage allocation issues have been briefed, argued,

12

and decided at an early stage of the litigation, perhaps with the anticipated motions to dismiss).

       b.    <u>Lead counsel for different types of claims</u>:  Lead counsel for the class, fund derivative, parent derivative and parent investor claims, if any, in each vertical fund family subtrack shall have full authority concerning substantive matters falling within their respective jurisdictions as set forth below:

    (1)    Prepare pleadings and other court documents on issues specific to a particular type of claim and to a particular family of funds;

    (2)    Argue family of fund specific issues during hearings;

    (3)    Conduct discovery particular to claims as assigned by administrative counsel;

    (4)    Represent clients' interests in internal discussions among plaintiffs' counsel; and

    (5)    Settlement role: to be further defined after damage allocation issues have been briefed, argued and decided.

       c.    <u>Liaison counsel – state law claims</u>:  Liaison counsel for the state law claims will have the following duties and responsibilities:

    (1)    Prepare court documents on state law issues specific to a particular family of funds;

    (2)    Argue family of fund specific state law issues during hearings;

    (3)    Conduct discovery particular to state law claims as assigned by administrative counsel;

    (4)    Represent clients and other state claim plaintiffs in internal discussions among plaintiffs' counsel; and

    (5)    Settlement role: to be further determined after damage allocation issues have been briefed, argued, and decided.

    4.    <u>Right To Be Heard By The Court</u>:  If lead plaintiffs' counsel for claims other than class claims believe that discovery assignments (or any other decisions made by administrative counsel) present a conflict, they may submit the issue to the Court for resolution.

    B.    <u>Horizontal Steering Committee</u>

<div align="center">13</div>

197943_5

      1.     To assist in the coordination of this litigation, the Court hereby creates a plaintiffs' "Horizontal Steering Committee," comprised of: (a) plaintiffs' administrative counsel for each vertical fund family subtrack; (b) Mark Rifkin of Wolf Haldenstein, as the representative for the fund derivative claimants; (c) Debbie Gross of The Law Offices of Bernard M. Gross, P.C., as the representative of the parent derivative actions; (d) Ira Press of Kirby, McInerney & Squire, LLP, as the representative of the parent investor claims; (e) David J. Bershad of Milberg Weiss and Alan Schulman of Bernstein Litowitz, who shall serve as the Co-Chairs of the Horizontal Steering Committee and chief administrative counsel for the MDL as a whole; and (f) John B. Isbister of the law firm of Tydings & Rosenberg LLP, who will serve as court liaison counsel for the plaintiffs' horizontal steering committee and serve as the plaintiffs' contact to the Court on administrative issues.

      2.     The members of the Horizontal Steering Committee shall have the following duties and responsibilities in consultation with the other members of the horizontal committee as appropriate:

      a.    <u>Chairs/Chief Administrative Counsel for MDL as a whole</u>:  David J. Bershad of Milberg Weiss and Alan Schulman of Bernstein Litowitz are appointed Chairs/Chief Administrative Counsel for the MDL as a whole and shall have the following duties and responsibilities:

           (1)    Serve as contact point for defense counsel on MDL-wide administrative issues;

           (2)    Draft and negotiate case management orders on MDL-wide issues;

           (3)    Organize plaintiffs' side in MDL-wide hearings and other proceedings;

           (4)    Coordinate cross-track and MDL-wide discovery;

           (5)    Prepare omnibus memoranda and other court documents on MDL-wide class issues (in role as lead counsel for class claims); and

           (6)    Designate counsel to make oral presentations on all MDL-wide class issues (in role as lead counsel for class claims).

      b.    <u>Representatives of fund derivative, parent derivative and parent investor claims</u>:  Representatives of fund derivative, parent derivative and parent investor claims serving on the horizontal steering committee shall have the following duties and responsibilities:

           (1)    Prepare omnibus memoranda and other court documents on MDL-wide issues within their respective subject matter areas;

14

       (2)      Designate counsel to make oral presentations on all MDL-wide issues within their respective subject matter areas.

       c.     <u>Liaison Counsel for Parallel State Proceedings</u>:  Andrew S. Friedman of Bonnett, Fairbourn, Friedman & Balint, PC will serve as a liaison to the plaintiffs' horizontal steering committee for the purpose of coordinating parallel state and federal proceedings.

       C.     This organization of plaintiffs' counsel is subject to reconsideration and revision if the structure of the litigation is substantially changed by rulings on the motions to dismiss.

## IV.   SERVICE OF PLEADINGS AND OTHER PAPERS

       A.     The parties shall effect service of all papers on each other, including motions, briefs, discovery requests, interrogatories, and other disclosures through the CM/ECF Electronic Filing System. For purposes of these Actions, Local Rule 104.5, which prohibits the use of CM/ECF for discovery requests, is hereby waived.

       B.     Whenever a party files a paper more than fifteen (15) pages in length, the party shall provide the Judge(s) presiding over the relevant Coordinated Track(s) with two (2) courtesy copies, in paper form.

15

**IT IS SO ORDERED.**

Dated: _____        _____
                                       J. FREDERICK MOTZ
                                       UNITED STATES DISTRICT JUDGE


Dated: _____        _____
                                       CATHERINE C. BLAKE
                                       UNITED STATES DISTRICT JUDGE


Dated: _____        _____
                                       ANDRE M. DAVIS
                                       UNITED STATES DISTRICT JUDGE


Dated: _____        _____
                                       FREDERICK P. STAMP, JR.
                                       UNITED STATES DISTRICT JUDGE


197943_4

16

Exhibit F

# U.S. District Court
## District of Maryland (Baltimore)
### CIVIL DOCKET FOR CASE #: 1:04-md-15861-CCB

In re: Excelsior, Federated, Scudder, AMCAP
Assigned to: Judge Catherine C. Blake
Member cases:

Date Filed: 04/09/2004
Jury Demand: Both

    1:04-cv-03353-JFM
    1:04-cv-00804-JFM
    1:04-cv-00909-JFM
    1:04-cv-00932-JFM
    1:04-cv-00933-JFM
    1:04-cv-00934-JFM
    1:04-cv-00935-JFM
    1:04-md-15862-AMD
    1:04-md-15863-JFM
    1:04-md-15864-JFM
    1:04-cv-01296-JFM
    1:04-cv-01298-JFM
    1:04-cv-01299-JFM
    1:04-cv-01301-JFM
    1:04-cv-01302-JFM
    1:04-cv-01308-JFM
    1:04-cv-01309-JFM
    1:04-cv-01312-JFM
    1:04-cv-01313-JFM
    1:04-cv-01314-JFM
    1:04-cv-01455-JFM
    1:04-cv-01623-JFM
    1:04-cv-02283-JFM
    1:04-cv-02285-JFM
    1:04-cv-02286-JFM
    1:04-cv-02287-JFM
    1:05-cv-02875-JFM
    1:04-cv-01288-JFM

| Date Filed | # | Docket Text |
|---|---|---|
| 02/23/2004 | 1 | CTO ORDER from the MDL Panel transferring the attached cases to the District of Maryland (cag, Deputy Clerk) (Entered: 04/09/2004) |
| 03/03/2004 | 2 | CTO ORDER No. 1 from the MDL Panel transferring the attached cases |

| | | to the District of Maryland (cag, Deputy Clerk) (Entered: 04/09/2004) |
|---|---|---|
| 04/12/2004 | 3 | NOTICE of Appearance by Mark A Perry on behalf of A Defendant (Perry, Mark) (Entered: 04/12/2004) |
| 04/12/2004 | 4 | MEMORANDUM to Parties re: Tracks. Signed by Judge J. Frederick Motz on 4/9/04. (cag, Deputy Clerk) (Entered: 04/13/2004) |
| 04/12/2004 | 5 | MEMORANDUM to Parties re: Amendment of Tracks. Signed by Judge J. Frederick Motz on 4/12/04. (cag, Deputy Clerk) (Entered: 04/13/2004) |
| 04/15/2004 | 6 | NOTICE of Appearance by Mark Carl Rifkin on behalf of A Plaintiff (Rifkin, Mark) (Entered: 04/15/2004) |
| 04/15/2004 | 7 | NOTICE of Appearance by Nichole Michele Galvin on behalf of A Defendant (Galvin, Nichole) (Entered: 04/15/2004) |
| 04/15/2004 | 8 | NOTICE of Appearance by Lewis J Liman on behalf of A Defendant (Liman, Lewis) (Entered: 04/15/2004) |
| 04/15/2004 | 9 | NOTICE of Appearance by Thomas J Moloney on behalf of A Defendant (Moloney, Thomas) (Entered: 04/15/2004) |
| 04/15/2004 | 10 | NOTICE of Appearance by Breon S Peace on behalf of A Defendant (Peace, Breon) (Entered: 04/15/2004) |
| 04/15/2004 | 11 | NOTICE of Appearance by Price O Gielen on behalf of A Defendant (Gielen, Price) (Entered: 04/15/2004) |
| 04/15/2004 | 12 | NOTICE of Appearance by Nicholas E Chimicles on behalf of A Plaintiff (Chimicles, Nicholas) (Entered: 04/15/2004) |
| 04/15/2004 | 13 | NOTICE of Appearance by Timothy Newlyn Mathews on behalf of A Plaintiff (Mathews, Timothy) (Entered: 04/15/2004) |
| 04/16/2004 | 14 | NOTICE of Appearance by John Bucher Isbister on behalf of A Plaintiff (Isbister, John) (Entered: 04/16/2004) |
| 04/16/2004 | 15 | MOTION to Remand *filed on behalf of Plaintiffs seeking remand* by A Plaintiff. Responses due by 5/3/2004 (Attachments: # 1 Memorandum of Law# 2 Exhibis to Memorandum of Law# 3 Appendix of Unreported Cases)(Sammons, William) (Entered: 04/16/2004) |
| 04/16/2004 | 16 | MOTION to Remand *filed on behalf of Plaintiff Mike Sayegh* by A Plaintiff. Responses due by 5/3/2004 (Sammons, William) (Entered: 04/16/2004) |
| 04/16/2004 | 17 | NOTICE of Appearance by Stanley M Grossman on behalf of A Plaintiff (Grossman, Stanley) (Entered: 04/16/2004) |
| 04/16/2004 | 18 | NOTICE of Appearance by H Adam Prussin on behalf of A Plaintiff (Prussin, H) (Entered: 04/16/2004) |
| 04/16/2004 | 19 | NOTICE of Appearance by Ronen Sarraf on behalf of A Plaintiff (Sarraf, Ronen) (Entered: 04/16/2004) |

| 04/16/2004 | 20 | NOTICE of Appearance by Denise Davis Schwartzman on behalf of A Plaintiff (Schwartzman, Denise) (Entered: 04/16/2004) |
| 04/16/2004 | 21 | NOTICE of Appearance by Robert J Jossen on behalf of A Defendant (Jossen, Robert) (Entered: 04/16/2004) |
| 04/16/2004 | 22 | NOTICE of Appearance by Adam B Rowland on behalf of A Defendant (Rowland, Adam) (Entered: 04/16/2004) |
| 04/19/2004 | 23 | NOTICE of Appearance by Robert Hardy Pees on behalf of A Defendant (Pees, Robert) (Entered: 04/19/2004) |
| 04/19/2004 | 24 | NOTICE of Appearance by Peter Edwards Seidman Sr on behalf of A Plaintiff (Seidman, Peter) (Entered: 04/19/2004) |
| 04/19/2004 | 25 | Plaintiffs' Memorandum in Support of Proposed Organizational Structure by A Plaintiff. Responses due by 5/6/2004 (Attachments: # 1 # 2) (Isbister, John) (Filed in error as a Motion) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 26 | MEMORANDUM in support of 27 MOTION to Appoint Counsel *Proposed Organizational Structure for the MDL Proceeding and Appointment of Lead Counsel for the Parent Derivative Cases* by A Plaintiff. Responses due by 5/6/2004 (Attachments: # 1 Exhibit Parent Derivative Cases Chart# 2 Exhibit Proposed Organizational Structure# 3 Exhibit Resume - Morris and Morris# 4 Exhibit Resume - Offices of Bernard Gross# 5 Exhibit Resume - Bull & Lifshitz LLP)(Morris, Karen) (Filed in error as a motion) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 27 | MOTION to Appoint Counsel *Appointment of Lead Counsel for the Parent Derivative Cases* by A Plaintiff. Responses due by 5/6/2004 (Attachments: # 1 Exhibit Proposed Order)(Morris, Karen) (Entered: 04/19/2004) |
| 04/19/2004 | 28 | MOTION for Other Relief *Adoption of Proposed Organizational Structure for the MDL Proceeding* by A Plaintiff. Responses due by 5/6/2004 (Attachments: # 1 Exhibit Proposed Order)(Morris, Karen) (Entered: 04/19/2004) |
| 04/19/2004 | 29 | COPY OF PRETRIAL ORDER filed in the USDC for New York *Entry of Case Management Order No. 1* by A Plaintiff. (Rifkin, Mark) (FILED IN ERROR AS A MOTION) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 30 | MEMORANDUM IN SUPPORT of Derivative Plaintiffs' Motion for Entry of Case Management Order (Rifkin, Mark) (FILED IN ERROR AS A MOTION) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 31 | DECLARATION of Mark C. Rifkin in support of Fund Derivative Plaintiffs' Motion for Entry of Case Management Order No. 1 (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C)(Rifkin, Mark) (FILED IN ERROR AS A MOTION) Modified on 4/21/2004 (cag, |

| | | Deputy Clerk). (Entered: 04/19/2004) |
|---|---|---|
| 04/19/2004 | 32 | Proposed Case Management Order by A Plaintiff. (Rifkin, Mark)(FILED IN ERROR AS A MOTION) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 33 | Certificate of Service by A Plaintiff. (Rifkin, Mark) (FILED IN ERROR AS A MOTION) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 34 | *Declaration* of Bradley P. Dyer in support of the Individual Fund Plaintiffs' Motion for Appointment as Lead Plaintiffs and Approval of their Selection of Lead Counsel. (Attachments: # 1 Exhibit Exhibit A# 2 Exhibit Exhibit C# 3 Exhibit Exhibit D# 4 Exhibit Exhibit E# 5 Exhibit Exhibit F# 6 Exhibit Exhibit G# 7 Exhibit Exhibit H# 8 Exhibit Exhibit I# 9 Exhibit Exhibit J# 10 Exhibit Exhibit K# 11 Exhibit Exhibit L# 12 Exhibit Exhibit B)(Dyer, Bradley) (FILED IN ERROR AS A MOTION) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 35 | MOTION OF EXCELSIOR, FEDERATED AND SCUDDER LEAD PLAINTIFF MOVANTS FOR APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF THEIR SELECTIONS OF LEAD COUNSEL by A Plaintiff. Responses due by 5/6/2004 (Seidman, Peter) (Entered: 04/19/2004) |
| 04/19/2004 | 36 | MOTION to Appoint Counsel by Individual Fund Plaintiffs. Responses due by 5/6/2004 (Dyer, Bradley) (Entered: 04/19/2004) |
| 04/19/2004 | 37 | PROPOSED ORDER APPOINTING THE EXCELSIOR, FEDERATED, AND SCUDDER LEAD PLAINTIFF MOVANTS AS LEAD PLAINTIFFS AND APPROVING THEIR SELECTIONS OF LEAD COUNSEL by A Plaintiff. Responses due by 5/6/2004 (Seidman, Peter) (FILED IN ERROR AS A MOTION) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 38 | MEMORANDUM OF LAW in support of the individual Mutual Fund Proposed Lead Plaintiffs' MOTION for Appointment as lead Plaintiffs and Approval of their Selection of Lead Counsel(Dyer, Bradley) Modified on 4/20/2004 (FILED IN ERROR AS A MOTION) (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 39 | OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF THE MOTIONS, SUBMITTED PURSUANT TO THE COURT?S DIRECTION AS ISSUED FROM THE BENCH ON APRIL 2, 2004, FOR APPOINTMENT OF LEAD PLAINTIFFS FOR EACH MUTUAL FUND FAMILY, AND APPROVAL OF LEAD PLAINTIFFS? SELECTION OF LEAD COUNSEL by A Plaintiff. Responses due by 5/6/2004 (Seidman, Peter) Modified on 4/20/2004 (FILED IN ERROR AS A MOTION) (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 40 | MOTION DECLARATION OF PETER E. SEIDMAN IN SUPPORT OF THE OMNIBUS MOTIONS, SUBMITTED PURSUANT TO THE COURT?S DIRECTION AS ISSUED FROM THE BENCH ON APRIL |

| | | |
|---|---|---|
| | | 2, 2004, FOR APPOINTMENT OF LEAD PLAINTIFFS FOR EACH MUTUAL FUND FAMILY, AND APPROVAL OF LEAD PLAINTIFFS? SELECTION OF LEAD COUNSEL by A Plaintiff. Responses due by 5/6/2004 (Seidman, Peter) (FILED IN ERROR) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/19/2004 | 41 | MEMORANDUM - DECLARATION OF PETER E. SEIDMAN IN SUPPORT OF THE OMNIBUS MOTIONS, SUBMITTED PURSUANT TO THE COURT?S DIRECTION AS ISSUED FROM THE BENCH ON APRIL 2, 2004, FOR APPOINTMENT OF LEAD PLAINTIFFS FOR EACH MUTUAL FUND FAMILY, AND APPROVAL OF LEAD PLAINTIFFS? SELECTION OF LEAD COUNSEL by A Plaintiff. Responses due by 5/6/2004 (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G,H,I# 8 Exhibit J# 9 Exhibit K# 10 Exhibit L# 11 Exhibit M# 12 Exhibit N# 13 Exhibit O# 14 Exhibit P# 15 Exhibit Declaration of Marc Vellrath# 16 Exhibit Exhibits to Marc Vellrath Declaration)(Seidman, Peter) (Filed in error as a Motion) Modified on 4/20/2004 (cag, Deputy Clerk). (Entered: 04/19/2004) |
| 04/20/2004 | 42 | NOTICE of Appearance by Thomas Lee Allen on behalf of A Defendant (Allen, Thomas) (Entered: 04/20/2004) |
| 04/20/2004 | 43 | NOTICE of Appearance by Demet Basar on behalf of A Plaintiff (Basar, Demet) (Entered: 04/20/2004) |
| 04/20/2004 | 44 | NOTICE of Appearance by Kenneth M Kramer on behalf of A Defendant (Kramer, Kenneth) (Entered: 04/20/2004) |
| 04/21/2004 | 45 | NOTICE of Appearance by Christopher MacNeil Murphy on behalf of A Defendant (Murphy, Christopher) (Entered: 04/21/2004) |
| 04/21/2004 | 46 | MOTION [CORRECTED] OF EXCELSIOR, FEDERATED AND SCUDDER LEAD PLAINTIFF MOVANTS FOR APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF THEIR SELECTIONS OF LEAD COUNSEL by A Plaintiff. Responses due by 5/10/2004 (Seidman, Peter) (Entered: 04/21/2004) |
| 04/21/2004 | 47 | NOTICE of Appearance by Robert Abrams on behalf of A Plaintiff (Abrams, Robert) (Entered: 04/21/2004) |
| 04/21/2004 | 48 | NOTICE by A Plaintiff re 35 MOTION OF EXCELSIOR, FEDERATED AND SCUDDER LEAD PLAINTIFF MOVANTS FOR APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF THEIR SELECTIONS OF LEAD COUNSEL *Notice of Filing Lengthy Exhibit* (Seidman, Peter) (Entered: 04/21/2004) |
| 04/22/2004 | 49 | MOTION by Lead Plaintiffs for Leave to File Exhibit P and I to the Declaration of Peter Seidman in CD Rom form with the Clerk (cags, Deputy Clerk) (Entered: 04/22/2004) |
| 04/22/2004 | 50 | ORDER granting 49 Motion by Lead Plaintiffs for Leave to File Exhibit P and I in CD Rom form with the Clerk. Signed by Judge J. Frederick |

| | | Motz on 4/22/04. (cag, Deputy Clerk) (Entered: 04/22/2004) |
|---|---|---|
| 04/22/2004 | 51 | Letter to counsel re: Administrative matters. Signed by Judge J. Frederick Motz on 4/22/04. (cag, Deputy Clerk) (Entered: 04/23/2004) |
| 04/23/2004 | 52 | TRANSCRIPT of Proceedings held on April 2, 2004 before Judges Blake, Davis, Motz and Stamp. Court Reporter: Zajac. (cag, Deputy Clerk) (Entered: 04/23/2004) |
| 04/23/2004 | 53 | NOTICE of Appearance by Eric A Bensky on behalf of A Defendant (Bensky, Eric) (Entered: 04/23/2004) |
| 04/26/2004 | 54 | NOTICE of Appearance by Robert J Higgins on behalf of A Defendant (Higgins, Robert) (Entered: 04/26/2004) |
| 04/26/2004 | 55 | RESPONSE in Opposition re 27 MOTION to Appoint Counsel *Appointment of Lead Counsel for the Parent Derivative Cases*, 36 MOTION to Appoint Counsel *Plaintiffs' Response to the Individual Fund Movants' and the First Derivative Traders' Motions for Appointment as Lead Plaintiff (also in support of #46)* filed by A Plaintiff. Replies due by 5/10/2004. (Attachments: # 1 # 2 # 3 # 4)(Isbister, John) (Entered: 04/26/2004) |
| 04/26/2004 | 56 | CTO ORDER No. 2 from the MDL Panel transferring the attached cases to the District of Maryland (cag, Deputy Clerk) (Entered: 04/26/2004) |
| 04/26/2004 | 57 | RESPONSE in Opposition *TO FUND CLASS PLAINTIFFS? PROPOSED ORGANIZATIONAL STRUCTURE AND IN FURTHER SUPPORT OF FUND DERIVATIVE PLAINTIFFS? MOTION FOR ENTRY OF CASE MANAGEMENT ORDER NO 1* filed by A Plaintiff. Replies due by 5/10/2004. (Attachments: # 1 Second Declaration of Mark C. Rifkin in Support of Fund Derivative Plaintiffs Motion for Entry of Case Management Order No. 1)(Rifkin, Mark) (Entered: 04/26/2004) |
| 04/26/2004 | 58 | MEMORANDUM of Law in Further Support of Parent Derivative Plaintiffs' MDL and Internal Lead Structure Proposals and in Opposition to Fund Class Action Counsels' [Proposed] Case Management Order No. 1 by A Plaintiff. (Morris, Karen) Modified on 4/27/2004 (FILED IN ERROR AS A MOTION)(cag, Deputy Clerk). (Entered: 04/26/2004) |
| 04/26/2004 | 59 | RESPONSE in Opposition re 28 MOTION for Other Relief *Adoption of Proposed Organizational Structure for the MDL Proceeding Plaintiffs' Response in Support of Proposed Organizational Structure (also in opposition to #30 and in support of #25)* by A Plaintiff. (Isbister, John) (Entered: 04/26/2004) |
| 04/26/2004 | 60 | CERTIFICATE OF SERVICE by A Plaintiff *Fund Derivative Plaintiffs' Memorandum of Law in Opposition to Fund Class Plaintiffs? Proposed Organizational Structure and in Further Support of Fund Derivative Plaintiffs? Motion for Entry of Case Management Order No. 1* (Rifkin, Mark) (Entered: 04/26/2004) |
| 04/26/2004 | 61 | DECLARATION of Karen L. Morris in Further Support of Parent Derivative Plaintiffs' MDL and Internal Lead Structure Proposals and in |

| | | Opposition to Fund Class Action Counsels' [Proposed] Case Management Order No. 1 by A Plaintiff. Responses due by 5/13/2004 (Attachments: # 1 Exhibit Exhibit 1 of Morris Declaration# 2 Exhibit Exhibit 2 to Morris Declaration# 3 Exhibit Exhibit 3 to Morris Declaration)(Morris, Karen) Modified on 4/27/2004 (FILED IN ERROR AS A MOTION) (cag, Deputy Clerk). (Entered: 04/26/2004) |
|---|---|---|
| 04/26/2004 | 62 | RESPONSE to Motion re 46 MOTION [CORRECTED] OF EXCELSIOR, FEDERATED AND SCUDDER LEAD PLAINTIFF MOVANTS FOR APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF THEIR SELECTIONS OF LEAD COUNSEL, 27 MOTION to Appoint Counsel *Appointment of Lead Counsel for the Parent Derivative Cases*, 35 MOTION OF EXCELSIOR, FEDERATED AND SCUDDER LEAD PLAINTIFF MOVANTS FOR APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF THEIR SELECTIONS OF LEAD COUNSEL, 36 MOTION to Appoint Counsel, 28 MOTION for Other Relief *Adoption of Proposed Organizational Structure for the MDL Proceeding . Response of the Federated Defendants to Lead Plaintiff Motions and Proposals* filed by A Defendant. Replies due by 5/10/2004. (Allen, Thomas) (Entered: 04/26/2004) |
| 04/26/2004 | 63 | RESPONSE re 46 MOTION [CORRECTED] OF EXCELSIOR, FEDERATED AND SCUDDER LEAD PLAINTIFF MOVANTS FOR APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF THEIR SELECTIONS OF LEAD COUNSEL, 27 MOTION to Appoint Counsel *Appointment of Lead Counsel for the Parent Derivative Cases*, 35 MOTION OF EXCELSIOR, FEDERATED AND SCUDDER LEAD PLAINTIFF MOVANTS FOR APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF THEIR SELECTIONS OF LEAD COUNSEL, 36 MOTION to Appoint Counsel, 28 MOTION for Other Relief *Adoption of Proposed Organizational Structure for the MDL Proceeding Response of the Canary Defendants to Lead Plaintiff Motions and Proposals in All Tracks* filed by A Defendant. (Jossen, Robert) (Entered: 04/26/2004) |
| 04/26/2004 | 64 | NOTICE of Appearance by Christopher P Hall on behalf of A Defendant (Hall, Christopher) (Entered: 04/26/2004) |
| 04/26/2004 | 65 | RESPONSE to Motion re 46 MOTION [CORRECTED] OF EXCELSIOR, FEDERATED AND SCUDDER LEAD PLAINTIFF MOVANTS FOR APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF THEIR SELECTIONS OF LEAD COUNSEL, 35 MOTION OF EXCELSIOR, FEDERATED AND SCUDDER LEAD PLAINTIFF MOVANTS FOR APPOINTMENT AS LEAD PLAINTIFFS, AND APPROVAL OF THEIR SELECTIONS OF LEAD COUNSEL *on behalf of Deutsche Bank AG, Deutsche Investment Management Americas Inc., Deutsche Asset Management, Inc.* filed by A Defendant. Replies due by 5/10/2004. (Hall, Christopher) (Entered: 04/26/2004) |
| 04/26/2004 | 66 | MEMORANDUM OF LAW in further support of the individual Mutual |

| | | |
|---|---|---|
| | | Fund Proposed Lead Plaintiffs' Motion for Appointment as Lead Plaintiffs and Approval of their selection of Lead Counsel(Dyer, Bradley) Modified on 4/27/2004 (cag, Deputy Clerk). (Entered: 04/26/2004) |
| 04/28/2004 | 67 | NOTICE of Appearance by Brian Barry on behalf of A Plaintiff (Barry, Brian) (Entered: 04/28/2004) |
| 04/29/2004 | 68 | Correspondence re: change of hearing time for May 3, 2004 (Motz, J.) (Entered: 04/29/2004) |
| 04/29/2004 | 69 | Correspondence re: Lead Plaintiff and organization issues, in further support of Docket Nos. 25 and 46 (Sammons, William) (Entered: 04/29/2004) |
| 04/30/2004 | 70 | NOTICE of Appearance by Eric L Zagar on behalf of A Plaintiff (Zagar, Eric) (Entered: 04/30/2004) |
| 04/30/2004 | 71 | NOTICE of Appearance by William C Sammons on behalf of A Plaintiff (Sammons, William) (Entered: 04/30/2004) |
| 04/30/2004 | 72 | Correspondence re: proposed organization of plaintiffs' counsel (Motz, J.) (Entered: 04/30/2004) |
| 04/30/2004 | 73 | RESPONSE in Opposition *to Motion to Remand* filed by A Defendant. Replies due by 5/14/2004. (Attachments: # 1)(Shally, Joanna) (Entered: 04/30/2004) |
| 04/30/2004 | 74 | RESPONSE re 15 MOTION to Remand *filed on behalf of Plaintiffs seeking remand Supplemental Memorandum of Law of Strong Capital Management, Inc. in Opposition to Remand Motions in Actions Not Yet Transferred* filed by A Defendant. (Attachments: # 1 Exhibit Klafter Complaint# 2 Exhibit Dapore complaint# 3 Exhibit Ferris complaint) (Clark, Bruce) (Entered: 04/30/2004) |
| 04/30/2004 | 75 | RESPONSE in Opposition re 16 MOTION to Remand *filed on behalf of Plaintiff Mike Sayegh* filed by A Defendant. Replies due by 5/14/2004. (Moloney, Thomas) (Entered: 04/30/2004) |
| 04/30/2004 | 76 | STATUS REPORT *Of Plaintiffs And Defendants Regarding Document Preservation And Confidentiality Order* by A Defendant, A Plaintiff. (Powell, Wesley) (Entered: 04/30/2004) |
| 04/30/2004 | 77 | RESPONSE in Opposition re 16 MOTION to Remand *filed on behalf of Plaintiff Mike Sayegh* filed by A Defendant. Replies due by 5/14/2004. (Jossen, Robert) (Entered: 04/30/2004) |
| 04/30/2004 | 78 | NOTICE of Appearance by Deborah Clark Weintraub on behalf of A Plaintiff (Clark Weintraub, Deborah) (Entered: 04/30/2004) |
| 04/30/2004 | 79 | RESPONSE in Support *[Amicus Brief] Of The Omnibus Opposition To Remand* by Alliance Capital Management Holding L.P.. (Attachments: # 1 Affidavit Of Wesley Powell In Support Of Amicus Brief In Opposition To Motion To Remand# 2 Exhibit # 3 Exhibit # 4 # 5 Exhibit # 6 Certificate Of Service of Wesley Powell)(Powell, Wesley) (Entered: |

| | | 04/30/2004 |
|---|---|---|
| 04/30/2004 | 80 | RESPONSE in Opposition *Supplemental Memorandum of Amicus Curie Invesco Funds Group, Inc. In Opposition to Plaintiffs' Motion to Remand* filed by Invesco Funds Group, Inc.. Replies due by 5/14/2004. (Attachments: # 1 Exhibit A - Amended Complaint-Vonder Haar# 2 Exhibit B - Notice of Removal - Vonder Haar)(O'Connor, Maeve) (Entered: 04/30/2004) |
| 04/30/2004 | 81 | RESPONSE in Opposition re 15 MOTION to Remand *filed on behalf of Plaintiffs seeking remand Defendants' Omnibus Memorandum of Law in Opposition to Plaintiffs' Motions to Remand* filed by A Defendant. Replies due by 5/14/2004. (Attachments: # 1 Exhibit Exhibits A, B and C)(Meil, Sarah) (Entered: 04/30/2004) |
| 05/04/2004 | 82 | Correspondence re: follow-up to May 3 hearing (Attachments: # 1)(Motz, J.) (Entered: 05/04/2004) |
| 05/04/2004 | 83 | Correspondence re: Exhibit 15, Panel B to the Vellrath Declaration submitted with Plaintiffs' Omnibus Motion for Appointment of Lead Plaintiffs (doc #s 40 and 41) (Isbister, John) (Entered: 05/04/2004) |
| 05/04/2004 | 84 | Correspondence re: Brian Barry's letter to the court (Attachments: # 1 Brian Barry's letter)(cag, Deputy Clerk) (Entered: 05/04/2004) |
| 05/05/2004 | 85 | NOTICE of Appearance by Chet Barry Waldman on behalf of A Plaintiff (Waldman, Chet) (Entered: 05/05/2004) |
| 05/05/2004 | 86 | NOTICE of Appearance by Robert A Kauffman on behalf of A Plaintiff (Kauffman, Robert) (Entered: 05/05/2004) |
| 05/06/2004 | 87 | NOTICE of Appearance by Marshall N Perkins on behalf of A Plaintiff (Perkins, Marshall) (Entered: 05/06/2004) |
| 05/07/2004 | 88 | CTO ORDER No. 3 from the MDL Panel transferring the attached cases to the District of Maryland (cag, Deputy Clerk) (Entered: 05/07/2004) |
| 05/07/2004 | 89 | RESPONSE in Support re 15 MOTION to Remand *filed on behalf of Plaintiffs seeking remand*, 16 MOTION to Remand *filed on behalf of Plaintiff Mike Sayegh* filed by Mike Sayegh. Replies due by 5/21/2004. (Barry, Brian) (Entered: 05/07/2004) |
| 05/07/2004 | 90 | Correspondence re: Funds Covered By the Individual Fund Plaintiffs (Attachments: # 1 List of All Funds Covered by Weiss & Yourman# 2 List of Funds Covered Only by Weiss & Yourman and Stull Stull & Brody# 3 List of Funds Where We Believe the Lead Plaintiffs Proposed by Weiss & Yourman and Stull, Stull & Brody Have the Largest Financial Interest)(Dyer, Bradley) (Entered: 05/07/2004) |
| 05/07/2004 | 91 | REPLY to Response to Motion re 15 MOTION to Remand *filed on behalf of Plaintiffs seeking remand* filed by A Plaintiff. (Attachments: # 1 Exhibit Exhibits 1-4 Omnibus Reply)(Williamson, Julie) (Entered: 05/07/2004) |
| | | |

| 05/07/2004 | 92 | REPLY to Response to Motion re 15 MOTION to Remand *filed on behalf of Plaintiffs seeking remand* filed by A Plaintiff. (Attachments: # 1 Exhibit)(Sweeney, Thomas) (Entered: 05/07/2004) |
| 05/07/2004 | 93 | NOTICE of Appearance by David J Bershad on behalf of A Plaintiff (Bershad, David) (Entered: 05/07/2004) |
| 05/07/2004 | 94 | NOTICE of Appearance by Kim E Levy on behalf of A Plaintiff (Levy, Kim) (Entered: 05/07/2004) |
| 05/10/2004 | 95 | NOTICE of Appearance by David Stanley Frankel on behalf of A Defendant (Frankel, David) (Entered: 05/10/2004) |
| 05/10/2004 | 96 | NOTICE of Appearance by Eric Anders Tirschwell on behalf of A Defendant (Tirschwell, Eric) (Entered: 05/10/2004) |
| 05/11/2004 | 97 | ORDER from the MDL Panel Lifting the Stay and Transferring Vonder Haar, et al v Invesco, et al to the District of Maryland(cag, Deputy Clerk) (Entered: 05/11/2004) |
| 05/11/2004 | 98 | TRANSCRIPT of Proceedings held on May 3, 2004 before Judges Blake, Davis, Motz and Stamp. Court Reporter: M Zajac. (cag, Deputy Clerk) (Entered: 05/11/2004) |
| 05/11/2004 | 99 | Correspondence re: Mr. Brody and Mr. Weiss's 5/7/04 letter (Motz, J.) (Entered: 05/11/2004) |
| 05/11/2004 | 100 | NOTICE of Appearance by Gary Philip Naftalis on behalf of A Defendant (Naftalis, Gary) (Entered: 05/11/2004) |
| 05/11/2004 | 101 | Correspondence re: [Proposed] Case Management Order No. 1 (Attachments: # 1 Text of Proposed Order [Proposed] Case Management Order No. 1)(Clark Weintraub, Deborah) (Entered: 05/11/2004) |
| 05/11/2004 | 102 | NOTICE by Milberg Weiss Bershad & Schulman LLP *of Change of Law Firm Name* (Levy, Kim) (Entered: 05/11/2004) |
| 05/17/2004 | 103 | MOTION for Leave to File *a Surreply* by A Defendant. Responses due by 6/3/2004 (Attachments: # 1 Defendants' Omnibus Surreply Memorandum of Law in Opposition to Plaintiffs' Motions to Remand# 2 Exhibits to Defendants' Omnibus Memorandum of Law in Opposition to Plaintiffs' Motions to Remand# 3 Proposed Order)(Meil, Sarah Fern) (Entered: 05/17/2004) |
| 05/17/2004 | 104 | Correspondence re: July 16, 2004 hearing re: stay of discovery issues (Motz, J.) (Entered: 05/17/2004) |
| 05/17/2004 | 105 | RESPONSE in Support re 15 MOTION to Remand *filed on behalf of Plaintiffs seeking remand*, 16 MOTION to Remand *filed on behalf of Plaintiff Mike Sayegh* filed by Mike Sayegh. Replies due by 6/1/2004. (Barry, Brian) (Entered: 05/17/2004) |
| 05/19/2004 | 106 | NOTICE of Appearance by Elizabeth H Cronise on behalf of A Plaintiff (Cronise, Elizabeth) (Entered: 05/19/2004) |

| 05/19/2004 | 107 | NOTICE of Appearance by Richard M Heimann on behalf of A Plaintiff (Heimann, Richard) (Entered: 05/19/2004) |
| 05/19/2004 | 108 | NOTICE of Appearance by Steven E Fineman on behalf of A Plaintiff (Fineman, Steven) (Entered: 05/19/2004) |
| 05/19/2004 | 109 | Consent REQUEST for Extension of Time to File *Consolidated Complaints and Other Papers* (Isbister, John) (Entered: 05/19/2004) |
| 05/19/2004 | 110 | Correspondence re: Motion to Remand Hearing 5-21-04 (Williamson, Julie) (Entered: 05/19/2004) |
| 05/20/2004 | 111 | NOTICE by A Plaintiff *Notice of Appearance of Robin Howell* (Isbister, John) (Entered: 05/20/2004) |
| 05/21/2004 | 112 | NOTICE of Appearance by Eric David Gill on behalf of A Defendant (Gill, Eric) (Entered: 05/21/2004) |
| 05/21/2004 | 113 | NOTICE of Appearance by John F Pritchard on behalf of A Defendant (Pritchard, John) (Entered: 05/21/2004) |
| 05/21/2004 | 114 | NOTICE of Appearance by Janet A Broeckel on behalf of A Defendant (Broeckel, Janet) (Entered: 05/21/2004) |
| 05/21/2004 | | Motion Hearing held before Judges Blake, Davis, Motz and Stamp. (Court Reporter M. Zajac.) (cag, Deputy Clerk) (Entered: 05/24/2004) |
| 05/24/2004 | 115 | CTO ORDER No. 4 from the MDL Panel transferring the attached cases to the District of Maryland (cag, Deputy Clerk) (Entered: 05/24/2004) |
| 05/24/2004 | 116 | PAPERLESS ORDER APPROVING 109 Consent Request for Extension of Time for filing of consolidated amended complaints and briefing and hearing schedule for motions to dismiss, as proposed. Signed by Judge Catherine C. Blake on May 24, 2004. (Blake, Catherine) (Entered: 05/24/2004) |
| 05/24/2004 | 117 | PAPERLESS ORDER APPROVING 101 Case Management Order No. 1, as proposed and attached to Correspondence of May 11, 2004. Signed by Judge Catherine C. Blake on May 24, 2004. (Blake, Catherine) (Entered: 05/24/2004) |
| 05/24/2004 | 118 | MOTION to Appoint Counsel *Motion for Lead Plaintiff Appointment* by The Ruby Oman Testamentary Trust Proposed Lead Plaintiffs. Responses due by 6/10/2004 (Dyer, Bradley) (Entered: 05/24/2004) |
| 05/24/2004 | 119 | MOTION to Appoint Counsel *Memorandum of Law in Support* by The Ruby Oman Testamentary Trust Proposed Lead Plaintiffs. Responses due by 6/10/2004 (Dyer, Bradley) Modified on 6/8/2004 (FILED IN ERROR AS A MOTION)(cag, Deputy Clerk). (Entered: 05/24/2004) |
| 05/24/2004 | 120 | MOTION to Appoint Counsel *Proposed Order* by The Ruby Oman Testamentary Trust Proposed Lead Plaintiffs. Responses due by 6/10/2004 (Dyer, Bradley) (FILED IN ERROR AS A MOTION) Modified on 6/8/2004 (cag, Deputy Clerk). (Entered: 05/24/2004) |

| 05/24/2004 | 121 | MOTION to Appoint Counsel *Declaration of Aaron L. Brody* by The Ruby Oman Testamentary Trust Proposed Lead Plaintiffs. Responses due by 6/10/2004 (Dyer, Bradley) Modified on 6/8/2004 (FILED IN ERROR AS A MOTION) (cag, Deputy Clerk). (Entered: 05/24/2004) |
| 05/26/2004 | 122 | NOTICE of Appearance by Daniel P Chiplock on behalf of A Plaintiff (Chiplock, Daniel) (Entered: 05/26/2004) |

Exhibit G

CLOSED, ECF, LEAD, STICKNEY

## U.S. District Court
## Northern District of Texas (Dallas)
## CIVIL DOCKET FOR CASE #: 3:06-cv-01124

Salvato v. Zale Corporation et al
Assigned to: Judge Sidney A Fitzwater
Cause: 29:1132 E.R.I.S.A.-Employee Benefits

Date Filed: 06/26/2006
Date Terminated: 10/26/2007
Jury Demand: None
Nature of Suit: 790 Labor: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 06/26/2006 | 1 | COMPLAINT against Sue E Gove, John B Lowe, Jr, Thomas C Shull, David M Szymanski, Mark R Lenz, The Zale Plan Committee, John 1-30 Does, Zale Corporation, Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton filed by Anthony Salvato. (Filing fee $350; Receipt number 1707)(svc, ) (Entered: 06/26/2006) |
| 06/26/2006 | | ***Magistrate Judge Stickney chosen by random selection to handle matters that may be referred in this case. (svc, ) (Entered: 06/26/2006) |
| 06/26/2006 | 2 | CERTIFICATE OF INTERESTED PERSONS by Anthony Salvato. (svc, ) (Entered: 06/26/2006) |
| 07/20/2006 | 3 | MOTION to Consolidate Zale Erisa Cases and for Entry of the Case Management Order by Anthony Salvato (klm, ) (Entered: 07/21/2006) |
| 07/20/2006 | 4 | Memorandum of Law in Support filed by Anthony Salvato re 3 Motion for an Order Appointing Lead Plaintiff; Approving Plaintiff's Selection of Lead and Liaison Counsel; and Establishing Certain Pre-Trial Procedures (see MOTION to Consolidate Cases). (klm, ) (Entered: 07/21/2006) |
| 07/20/2006 | 5 | AFFIDAVIT is Support re 3 Motion for an Order Appointing Lead Plaintiff; Approving Plaintiff's Selection of Lead and Liaison Counsel; and Establishing Certain Pre-Trial Procedures by Anthony Salvato. (klm, ) (Entered: 07/21/2006) |
| 07/27/2006 | 6 | ORDER denying 3 Plaintiff's Motion to Consolidate Zale ERISA Cases and for Entry of the Case Management Order. (see order for specifics) (Signed by Judge Sidney A Fitzwater on 7/27/06) (klm, ) (Entered: 07/27/2006) |
| 08/14/2006 | 7 | Correspondence to the Court re agreement to extend time for all named defendants to return their consent to waiver of service. (klm, ) (Entered: 08/14/2006) |
| 08/14/2006 | 8 | WAIVER OF SERVICE Returned Executed as to Mark R Lenz. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |

| 08/14/2006 | 9 | WAIVER OF SERVICE Returned Executed as to Sue E Gove. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |
| 08/14/2006 | 10 | WAIVER OF SERVICE Returned Executed as to John B Lowe, Jr. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |
| 08/14/2006 | 11 | WAIVER OF SERVICE Returned Executed as to Zale Corporation. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |
| 08/14/2006 | 12 | WAIVER OF SERVICE Returned Executed as to David M Szymanski. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |
| 08/14/2006 | 13 | WAIVER OF SERVICE Returned Executed as to Mary E Burton. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |
| 08/14/2006 | 14 | WAIVER OF SERVICE Returned Executed as to Thomas C Shull. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |
| 08/14/2006 | 15 | WAIVER OF SERVICE Returned Executed as to J Glen Adams. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |
| 08/14/2006 | 16 | WAIVER OF SERVICE Returned Executed as to Mary L Forte. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |
| 08/14/2006 | 17 | WAIVER OF SERVICE Returned Executed as to Richard C Marcus. Waiver sent on 7/10/2006, answer due 9/8/2006. (klm, ) (Entered: 08/14/2006) |
| 08/18/2006 | 18 | Unopposed Motion to Extend Deadlineto Answer, Move, or Otherwise Respond by Sue E Gove, John B Lowe, Jr, Thomas C Shull, David M Szymanski, Mark R Lenz, Zale Corporation, Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton (klm, ) (Entered: 08/21/2006) |
| 08/18/2006 | 19 | ORDER granting 18 Unopposed Motion to Extend Defendants' Deadline to Answer, Move, or Otherwise Respond re 1 Complaint, Sue E Gove answer due 10/9/2006; John B Lowe, Jr answer due 10/9/2006; Thomas C Shull answer due 10/9/2006; David M Szymanski answer due 10/9/2006; Mark R Lenz answer due 10/9/2006; Zale Corporation answer due 10/9/2006; Richard C Marcus answer due 10/9/2006; Mary L Forte answer due 10/9/2006; J Glen Adams answer due 10/9/2006; Mary E Burton answer due 10/9/2006. (Signed by Judge Sidney A Fitzwater on 8/18/06) (klm, ) (Entered: 08/21/2006) |
| 08/18/2006 | 20 | LETTER by M Byron Wilder w/Gibson, Dunn & Crutcher re related cases. (cxb, ) (Entered: 08/21/2006) |
| 09/01/2006 | 21 | Order Designating Case for ECF - see order for specifics. (Signed by Judge Sidney A Fitzwater on 09/01/2006) (tsc, ) (Entered: 09/01/2006) |

| 09/01/2006 | 22 | Application and Order for Admission Pro Hac Vice by Morgan D Hodgson for Sue E Gove, John B Lowe, Jr., Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton, Thomas C Shull, David M. Szymanski, Mark R Lenz, The Zale Plan Committe, Zale Corporation, and John Does 1-30. (Signed by Judge Sidney A Fitzwater on 9/1/06) (klm, ) Modified on 9/5/2006 (klm, ). (Entered: 09/05/2006) |
|---|---|---|
| 09/05/2006 | 23 | Application and Order for Admission Pro Hac Vice by Paul J Ondrasik, Jr for Sue E Gove, John B Lowe, Jr., Richard C Marcus, Mary L Forte, J Glen Adams, Mary Burton, Thomas C Shull, David M Szymanski, Mark R Lenz, The Zale Plan Committee, Zale Corporation, and John Does 1-30. (Signed by Judge Sidney A Fitzwater on 9/1/06) (klm, ) Modified on 9/6/2006 (klm, ). (Entered: 09/05/2006) |
| 09/15/2006 | 24 | Unopposed Motion for Extension of Time to File Answer , *Move or Otherwise Respond* by Sue E Gove, John B Lowe, Jr, Thomas C Shull, David M Szymanski, Mark R Lenz, Zale Corporation, Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton (Attachments: # 1 Exhibit A)(Hartmann, Michelle) (Entered: 09/15/2006) |
| 09/15/2006 | 25 | ORDER granting 24 Unpposed Motion to Extend Defendants' Deadline to Answer, Move or Otherwise Respond re 1 Complaint. Extended until 30 days after the court decides defendants' pending transfer motion. (Signed by Judge Sidney A Fitzwater on 9/15/06) (klm, ) (Entered: 09/18/2006) |
| 11/13/2006 | 26 | Unopposed Motion for Extension of Time to File Answer , *Move, or Otherwise Respond* by Sue E Gove, John B Lowe, Jr, Thomas C Shull, David M Szymanski, Mark R Lenz, Zale Corporation, Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton (Attachments: # 1 Proposed Order) (Hartmann, Michelle) (Entered: 11/13/2006) |
| 11/13/2006 | 27 | ORDER granting 26 defendants' Unopposed Motion for Extension of Time to Answer, move, or otherwise respond. The deadline for defendants to answer, move, or otherwise respond to plaintiff's complaint is extended until 30 days after a ruling on the anticipated motion for reassignment of a related case, motion for consolidation of the related cases, and, if applicable, the filing of a consolidated amended complaint. (Signed by Judge Sidney A Fitzwater on 11/13/06) (klm, ) (Entered: 11/13/2006) |
| 01/09/2007 | 28 | Unopposed MOTION to Withdraw as Attorney *and for Substitution of Counsel* by Anthony Salvato (Claxton, Roger) (Entered: 01/09/2007) |
| 01/09/2007 | 29 | ORDER granting 28 Agreed Motion to Withdraw as Attorney. Attorney John B Scott and Andrew W Yung terminated as counsel for Plaintiff. Attorney Roger F Claxton substituted as counsel for Plaintiff. (Signed by Judge Sidney A Fitzwater on 1/9/07) (klm) (Entered: 01/09/2007) |
| 01/24/2007 | 30 | ORDER CONSOLIDATING CASES: Case consolidated with 3:06-CV-1972-D. All pleadings, motions, or other papers must be filed in Civil Action No. 3:06-CV-1124-D and bear only the caption of that case, together with the legend required by Rule 42.1. (Signed by Judge Sidney |

| | | A Fitzwater on 1/24/07) (klm) (Entered: 01/24/2007) |
|---|---|---|
| 02/06/2007 | 31 | Agreed MOTION for Scheduling Order (Consolidated Complaint and Response) by all parties. (Claxton, Roger) Modified on 2/7/2007 (klm). (Entered: 02/06/2007) |
| 02/06/2007 | | Set/Reset Scheduling Order Deadlines: Amended Pleadings due by 3/5/2007 per doc. no. 32. (klm) (Entered: 02/07/2007) |
| 02/07/2007 | 32 | ORDER granting 31 parties' Agreed Motion for Scheduling Order. Plaintiffs must file their consolidated amended complaint by March 5, 2007, and defendants must answer, move against, or otherwise respond to the consolidated amended complaint within 60 days of the date it is filed. (Signed by Judge Sidney A Fitzwater on 2/6/07) (klm) (Entered: 02/07/2007) |
| 03/05/2007 | 33 | AMENDED COMPLAINT against all defendants filed by Richard A Connell, Anthony Salvato. (Claxton, Roger) (Entered: 03/05/2007) |
| 04/25/2007 | 34 | Application and Order for Admission Pro Hac Vice by Ryan T Jenny for Zale Corporation, Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton, Sue E Gove, John B Lowe Jr, Thomas C Shull, David M Szymanski, Mark R Lenz, The Zale Plan Committee, John Does 1-30. (Mailed copy to Mr. Jenny. Notice turned off - no email address.) (Signed by Judge Sidney A Fitzwater on 4/25/07) (klm) (Entered: 04/26/2007) |
| 05/01/2007 | 35 | Application and Order for Admission Pro Hac Vice by Thomas J McKenna for Anthony Salvato (order mailed to Thomas McKenna) (Signed by Judge Sidney A Fitzwater on 5/1/07) (svc) (Entered: 05/03/2007) |
| 05/04/2007 | 36 | Unopposed MOTION to Extend Page Limits for Brief in Support of Motion to Dismiss by Sue E Gove, John B Lowe, Jr, Thomas C Shull, David M Szymanski, Mark R Lenz, The Zale Plan Committee, Gregory Humenesky, Erv Polze, Steve Massanelli, Steve Strong, Hilary Molay, Paul Logan, Cynthia T Gordon, Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton (Attachments: # 1 Text of Proposed Order) (Ondrasik, Paul) (Entered: 05/04/2007) |
| 05/04/2007 | 37 | NOTICE by Richard A Connell, Anthony Salvato *of Voluntary Dismissal of Defendant Paul Logan Only, Without Prejudice* (Claxton, Roger) (Entered: 05/04/2007) |
| 05/04/2007 | 38 | ORDER granting 36 Unopposed Motion to extend page limits to the extent that they may file a brief that does not exceed 50 countable pages. (Signed by Judge Sidney A Fitzwater on 5/4/07) (cxb) (Entered: 05/04/2007) |
| 05/04/2007 | 39 | ORDER: A notice of dismissal having been filed in this civil action on May 4, 2007, the court, pursuant to Fed. R. Civ. P. 41(a), dismisses this action as to defendant Paul Logan in accordance with the notice of dismissal. [Party Paul Logan, Attorney Paul J Ondrasik, Jr terminated.] (Signed by Judge Sidney A Fitzwater on 5/4/07) (cxb) |

| | | (Entered: 05/04/2007) |
|---|---|---|
| 05/04/2007 | 40 | MOTION to Dismiss *Plaintiffs' Amended and Consolidated Complaint* by Sue E Gove, John B Lowe, Jr, Thomas C Shull, David M Szymanski, Mark R Lenz, The Zale Plan Committee, Gregory Humenesky, Erv Polze, Steve Massanelli, Steve Strong, Hilary Molay, Paul Logan, Cynthia T Gordon, Zale Corporation, Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton with Memorandum in Support. (Attachments: # 1 Memorandum in Support, Part 1 of 2# 2 Memorandum in Support, Part 2 of 2# 3 Text of Proposed Order) (Ondrasik, Paul) (Entered: 05/04/2007) |
| 05/04/2007 | 41 | Appendix in Support filed by Sue E Gove, John B Lowe, Jr, Thomas C Shull, David M Szymanski, Mark R Lenz, The Zale Plan Committee, Gregory Humenesky, Erv Polze, Steve Massanelli, Steve Strong, Hilary Molay, Paul Logan, Cynthia T Gordon, Zale Corporation, Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton re 40 MOTION to Dismiss *Plaintiffs' Amended and Consolidated Complaint* (Attachments: # 1 Appendix Part 2 of 11# 2 Appendix Part 3 of 11# 3 Appendix Part 4 of 11# 4 Appendix Part 5 of 11# 5 Appendix Part 6 of 11# 6 Appendix Part 7 of 11# 7 Appendix Part 8 of 11# 8 Appendix Part 9 of 11# 9 Appendix Part 10 of 11# 10 Appendix Part 11 of 11) (Ondrasik, Paul) (Entered: 05/04/2007) |
| 05/04/2007 | 42 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Sue E Gove, John B Lowe, Jr, Thomas C Shull, David M Szymanski, Mark R Lenz, The Zale Plan Committee, Gregory Humenesky, Erv Polze, Steve Massanelli, Steve Strong, Hilary Molay, Paul Logan, Cynthia T Gordon, Zale Corporation, Richard C Marcus, Mary L Forte, J Glen Adams, Mary E Burton. (Ondrasik, Paul) (Entered: 05/04/2007) |
| 05/14/2007 | 43 | Application and Order for Admission Pro Hac Vice by Marc B Dorfman for Mark R Lenz. (Notice turned off - no email address.) (Signed by Judge Sidney A Fitzwater on 5/14/07) (klm) (Entered: 05/14/2007) |
| 05/23/2007 | 44 | Unopposed MOTION for Extension of Time to Respond to Motion to Dismiss and for Extension of Page Limit by Richard A Connell, Anthony Salvato. (Claxton, Roger) Modified on 5/23/2007 (klm). (Entered: 05/23/2007) |
| 05/23/2007 | 45 | ORDER granting 44 plaintiffs' Unopposed Motion for Extension of Time to Respond to Motion to Dismiss. Responses due by 6/25/2007. Plaintiffs may file a brief that does not exceed 50 countable pages. (Signed by Judge Sidney A Fitzwater on 5/23/07) (klm) (Entered: 05/23/2007) |
| 06/15/2007 | 46 | Unopposed MOTION to Extend Time to Respond to 40 Defendants' Motion to Dismiss by Anthony Salvato. (Claxton, Roger) Modified on 6/15/2007 (klm). (Entered: 06/15/2007) |
| 06/19/2007 | 47 | ORDER granting 46 Plaintiffs' Unopposed Motion for Extension of Time to Respond to Motion to Dismiss. Responses due by 7/25/2007. (Signed by Judge Sidney A Fitzwater on 6/19/07) (klm) (Entered: 06/19/2007) |

| 07/20/2007 | 48 | Agreed MOTION to Extend Time to Respond to Motion to Dismiss by Anthony Salvato (Claxton, Roger) (Entered: 07/20/2007) |
| 07/23/2007 | 49 | Agreed ORDER granting 48 Agreed Motion for Extension of Time to Respond to Motion to Dismiss. Responses due by 8/24/2007. (Signed by Judge Sidney A Fitzwater on 7/23/07) (skt) (Entered: 07/24/2007) |
| 08/21/2007 | 50 | Second MOTION to Extend Time to Respond to Motion to Dismiss by Anthony Salvato (Claxton, Roger) (Entered: 08/21/2007) |
| 08/22/2007 | 51 | ORDER granting 50 Plaintiff's Second MOTION to Extend Time to Respond to Motion to Dismiss. Responses due by 9/24/2007. (Signed by Judge Sidney A Fitzwater on 8/22/07) (klm) (Entered: 08/22/2007) |
| 09/24/2007 | 52 | Agreed MOTION to Extend Time to Respond to Motion to Dismiss by Anthony Salvato (Claxton, Roger) (Entered: 09/24/2007) |
| 09/25/2007 | 53 | ORDER granting 52 Motion for Extension of Time to Respond to Motion to Dismiss. Responses due by 10/24/2007. (Signed by Judge Sidney A Fitzwater on 09/25/2007) (axm) (Entered: 09/25/2007) |
| 10/26/2007 | 54 | ORDER. The parties have advised the court that the parties have settled this case. Accordingly, this case is administratively closed for statistical purposes without prejudice to its being reopened to enter a judgment or order of dismissal or for further proceedings if the settlement is not consummated. (Signed by Judge Sidney A Fitzwater on 10/26/07) (lmp) (Entered: 10/26/2007) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 12/20/2007 09:42:15 | | |
| **PACER Login:** | sn0052 | **Client Code:** | first american |
| **Description:** | Docket Report | **Search Criteria:** | 3:06-cv-01124 |
| **Billable Pages:** | 4 | **Cost:** | 0.32 |

# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANTHONY SALVATO, on Behalf of Himself and All Others Similarly Situated, | § § § | |
| Plaintiff, | § § | Civil Action No. 3:06-CV-1124-D |
| VS. | § § | |
| ZALE CORPORATION, et al., | § § § | |
| Defendants. | § | |

## ORDER

Plaintiff's July 20, 2006 motion to consolidate Zale ERISA cases and for entry of the case management order is denied without prejudice, at least for the following reasons. The court prefers to determine on an individual case basis whether other cases should be consolidated with this one. And plaintiff's proposed order would make his attorneys lead counsel or liaison counsel in all cases later filed in or transferred to this court, without giving the attorneys in those cases the opportunity to be heard in opposition. The proposed order would bind all such other plaintiffs and their attorneys unless the court orders otherwise. Plaintiff may seek this relief anew after additional cases are docketed and the court can determine whether the relief plaintiff seeks is opposed by other plaintiffs and/or defendants.

**SO ORDERED.**

July 27, 2006.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

Exhibit I

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| GERALD H. PETERSON, <u>et al.</u>, | : | |
| | : | |
| Plaintiffs, | : | : |
| | : | |
| vs. | : | Civil Action No.: 99-4982 (JLL) |
| | : | |
| AMERICAN TELEPHONE & | : | |
| TELEPHONE CO., | : | |
| | : | OPINION & ORDER |
| Defendant. | : | |
| | : | |

APPEARANCES:

BRIAN J. MCMAHON, ESQ.
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ 07102-5497

JOEL C. FEFFER, ESQ.
MATTHEW M. HOUSTON, ESQ.
Wechsler Harwood LLP
488 Madison Avenue
New York, NY 10022
(Attorneys for Plaintiffs)

CHRISTOPHER H. MILLS, ESQ.
KATHLEEN MCLEOD CAMINITI, ESQ.
DAVID H. GANZ, ESQ.
Collier, Jacob & Mills, P.C.
580 Howard Avenue
Somerset, NJ 08873
(Attorneys for Defendant)

JOSE L. LINARES, U.S.D.J.

This matter comes before the Court as a putative class action on behalf of former employees of AT&T who retired after April 28, 1997 and before January 1, 1998 under the Special Update to AT&T's Management Pension Plan (the "Plan").  Plaintiffs allege that AT&T breached its fiduciary duties under § 404 (29 U.S.C. § 1104) of the Employee Retirement Income Security Act of 1974 ("ERISA") by encouraging them to retire under terms less advantageous than what could have been obtained shortly thereafter.  Defendant presently seeks a motion for summary judgment pursuant to Fed.R.Civ.P. 56, and in a separate motion Plaintiffs seek certification of the class.  The motion is resolved without oral argument.  Fed.R.Civ.P. 78.  As discussed herein, to the extent that Defendant has complied with its requirements under ERISA, Defendant's motion for summary judgment is GRANTED on all claims, except for Plaintiffs' claim that Defendant made statements that retirees would be eligible for future changes to the Plan.  On that issue, summary judgment is DENIED with respect to Plaintiffs Lando and Wuzniak and GRANTED with respect to all other named Plaintiffs.  Plaintiffs' motion for class certification is DENIED.

### Background

The present dispute arises out of changes made to Defendant AT&T's Management

Pension Plan through the enactment of its Voluntary Retirement Incentive Program ("VRIP").[1]

The VRIP, which will be subsequently discussed in greater detail, provided substantial financial

benefits to departing management employees who were on AT&T's payroll as of January 1,

1998, and employees who retired prior to that date were ineligible for these increased benefits. It

is those employees that retired "prematurely" so as to preclude them from VRIP benefits who

have filed this action.

The AT&T Management Pension Plan is an ERISA-covered defined-benefit pension plan

in which AT&T, and not the employees, makes all contributions. At all relevant times, AT&T

Executive Vice President of Human Resources Harold Burlingame was responsible for making

recommendations to senior executives on changes to the Plan. Burlingame was a member of

AT&T's senior management team, referred to at AT&T as the Operations Group ("OG"). Other

_____

[1]The facts in this case are almost entirely undisputed, as the disagreement between the
parties centrally stems from the proper legal characterization of those facts. The Court will note
particular factual disputes in its discussion when relevant.

It is important to note that Plaintiffs believe the scope of this dispute goes back to 1996
when the former CEO of AT&T announced large employee reductions, and that the pension plan
changes presently under scrutiny are connected to discussions made at that time. Because
Plaintiffs provide no credible evidence of any sort of decision or long-term "master plan" to
reduce the work force, the Court rejects such allegations and limits the discussion of background
facts accordingly. The evidence clearly shows that VRIP was designed and implemented entirely
at Armstrong's directive and cannot be construed as part of the design of his predecessor. Before
the advent of VRIP, there were no plans by AT&T to use pension plan enhancements to reduce
the workforce, but only the policy that AT&T would continue to use its existing severance pay
plan, the Force Management Program to provide benefits to those who were downsized.

than Burlingame, the OG was composed of the CEO, the CFO, and the principal operating heads

of the various business units.  Once the OG approved a change to the pension plan, it would

make recommendations to the Compensation and Employee Benefits Committee, which could

then make recommendations to the Board of Directors.  The full Board had the final and

exclusive authority to amend the Plan.

Prior to 1997, the Plan calculated a participant's pension benefit by using a "modified

career average" formula, in which a participant's pension was based on his annual compensation

during a specified multi-year period (known as the "pay-base averaging period"), his length of

service, and a specified percentage multiplier.  On April 16, 1997, AT&T's Board of Directors

amended the Plan to adopt a "Cash Balance" formula ("Cash Balance"), effective January 1,

1998.[2]  Under Cash Balance, participants would receive hypothetical cash balance accounts that

would be supplemented annually with "interest" and "pay" credits.  In order to transition to Cash

Balance, AT&T simultaneously implemented a program known as "Special Update."  Special

Update was a one-time only fixed increase in the benefits provided under the Plan.[3]  Special

---

[2]AT&T has always reserved the right "to modify, suspend, change or terminate the Plan at any time."  Plaintiffs were advised of this right both in writing and during seminar presentations. (Def. Statement of Material Facts, ¶ 5-6).

[3]The Special Update modified the "compensation base averaging period" (the period upon which benefits were calculated) to be based on the amount earned during the period 1994-1996 rather than 1987-1992.  It also added a special "enhancement factor" to a participant's years of service, and removed age and service requirements for the immediate receipt of a pension so that participants could start receiving their pension at any age.  Finally, it fixed benefit accruals so that time worked by Plan participants after December 31, 1996 would not be factored in to the formula for calculating benefits.  Defendant claims that Special Update amounted to approximately a 25% increase in the pension amounts of long-service participants over the prior Plan formula. (Def. Mot. S.J., 4).  According to Plaintiffs, Special Update increased the traditional pension benefit by 9-11%. (Pl.'s Opp. Mot. S.J., 8).

Update was designed to provide security to those participants who neared retirement before their

benefits under the Cash Balance account could adequately accrue.

On April 28, 1997, Burlingame distributed a letter and fact sheet to eligible AT&T

employees informing them of the impending Special Update/Cash Balance modifications to the

AT&T Management Pension Plan.  The fact sheet stated in pertinent part:

> In general, if you are within 7 years of retirement eligibility under the
> current plan, your special update will most likely provide a greater
> benefit than the cash balance feature.  If you're more than 7 years from
> retirement eligibility under the current plan though, the cash balance
> feature will most likely produce a better benefit than the special
> update.

Dep. Ex. D-7.

The letter encouraged employee participation in company-sponsored seminars to learn

more about the pension changes.  During these seminars, Plaintiffs allege, in various

permutations, that Defendant orally misrepresented that the Special Update would provide the

greatest benefits to retirees over the next four to seven years and that anyone retiring pursuant to

this plan would be given the opportunity to participate in future changes to the Plan.  Over the

next several months, AT&T issued various detailed communications to participants regarding

Special Update and Cash Balance in both paper and electronic form.

C. Michael Armstrong became the new CEO of AT&T on November 1, 1997.  Soon after

taking the helm, Armstrong set out to substantially reduce the company's expenses.  During

November 1997, Armstrong began to outline a series of "bold strokes" he wanted implemented at

AT&T which included various cost-cutting measures.  (Def. Statement of Material Facts, ¶ 48).

Pursuant to this outline, Burlingame then consulted the staff of an AT&T subsidiary, Actuarial

Sciences Associates, Inc. ("ASA") to "think conceptually" about the options that AT&T could use to reduce its workforce.  (Id. at ¶ 50).  ASA responded on December 1, 1997 with various "tools" available, yet none of these approaches resembled what ultimately became the Voluntary Retirement Incentive Program.  At some point in the middle of December, Armstrong asked Burlingame to develop a plan to substantially reduce AT&T's workforce.  By the end of December, the AT&T Director of Benefit Planning met with ASA staff in a "brain storming" session to explore various options that could be used in an early retirement incentive program. Around this period, ASA actuaries also performed cost analyses on several designs involving pension enhancements.  As of the end of 1997, senior-level executives had not yet discussed changing the Plan in order to reduce the number of AT&T employees.

On January 7, 1998, for the first time, the Operations Group was presented with different options for reducing the size of the workforce, which included measures to temporarily increase pension benefits with the goal of persuading employees to retire.  As no consensus was reached at the meeting on how to proceed, the OG instructed Burlingame to further develop and refine the different alternatives discussed.  (Id. at 63-65).  On January 10-11, 1998, members of AT&T's Human Resources, Benefits and Legal departments met with representatives of ASA, during which they examined the feasibility of three downsizing options: 1) using the Plan to create incentives for management employees to leave AT&T (the precursor of the VRIP); 2) implementing an involuntary force reduction; and 3) a combined voluntary/involuntary program. These sessions produced a document that evaluated each option.  (Id. at ¶ 66-68).  At a meeting held on January 14, 1998, the three design options were presented to the entire Operations Group.  No final decision was reached as to which of the three options, if any, would be

approved and recommended to the Board.  (Id. at ¶ 70-72).  On January 16, 1998, the OG

discussed downsizing again and placed the issue on the Board's next agenda.  On January 19,

1998, the OG met to discuss force reduction and agreed to recommend the VRIP concept to the

Compensation and Employee Benefits Committee at its upcoming meeting.  The VRIP plan was

presented to the Committee on January 20, 1998, and the Committee agreed to recommend

resolutions to the Board of Directors that would authorize the development of VRIP and direct

Burlingame to study additional details of the Plan.  The following day, the Board adopted the

Committee's recommendation authorizing the development of VRIP.  On January 26, 1998,

AT&T announced the concept of VRIP to its employees.  (Id. at ¶ 73-78).  Over the next several

months, numerous oral and written communications were made between AT&T senior

management and executives regarding further development of the VRIP design.  On March 18,

1998, the Board approved the final design of VRIP and formally adopted the program.  (Id. at ¶

80).

        The VRIP program as ultimately formulated offered, for a limited period, significant

financial benefits to certain full-time or part-time managers who were participants in the Plan at

any time from January 1, 1998 to January 21, 1998 and who met other eligibility criteria.

Participants who accepted the offer and voluntarily terminated their employment received a one-

time "incentive" added to their pension benefits, regardless of whether it was calculated under

the Special Update or Cash Balance formulas.  VRIP did not constitute a permanent Plan change

for employees who did not accept the package.

        Plaintiffs first filed their putative class action complaint on October 22, 1999, and

amended it on January 28, 2000, seeking to represent a class of management employees who

elected retirement benefits from April 28, 1997 to December 31, 1997 under the Special Update

program.  Because the named Plaintiffs terminated their employment with AT&T prior to

January 1, 1998, they were not eligible for the Voluntary Retirement Incentive Program.  The

amended complaint alleges that AT&T breached its fiduciary duties under § 404 (29 U.S.C. §

1104) of the Employee Retirement Income Security Act of 1974 ("ERISA") by encouraging them

to retire under less favorable conditions than what could have been obtained soon after under the

VRIP.  Plaintiffs filed their motion for class certification on September 23, 2002, and Defendant

filed its summary judgment motion on December 16, 2002.


### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may

be granted only when the evidence shows "that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law."  Serbin v. Bora Corp., 96

F.3d 66, 69, n.2 (3d Cir. 1996).  In determining whether there remain any actual issues of factual

dispute, the court must resolve all reasonable doubts in favor of the nonmoving party.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Meyer v. Riegel Prods.

Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  At the summary judgment stage, "the judge's

function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 249 (1986).

The moving party bears the initial burden of identifying evidence that demonstrates the

absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Once

that burden has been met, it is incumbent upon the nonmoving party to set forth specific facts

showing that there is a genuine issue for trial. Anderson, 477 U.S. at 248. The non-movant must

"do more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita, 475 U.S. at 586. Thus, if the non-movant's evidence on any essential element of the

claims asserted is merely "colorable" or is "not significantly probative," the court should enter

summary judgment in favor of the moving party. Anderson, 477 U.S. at 249-250. In other

words, the non-moving party must "make a showing sufficient to establish the existence of

[every] element essential to that party's case, and on which that party will bear the burden of

proof at trial. Serbin, 96 F.3d at 69, n.2. Keeping in mind the fact that this matter must be

examined in this particular procedural posture, the Court will now turn to the issues presented in

this case.

### Legal Discussion

In the Complaint, Plaintiffs claim that AT&T breached its fiduciary duties under ERISA

by failing to disclose that the VRIP changes were under serious consideration at the time

Plaintiffs retired. Plaintiffs also allege that Defendant violated its fiduciary duties by

misrepresenting the situation to them in three different ways, namely by: 1) falsely representing

that Special Update would provide the greatest benefits to retirees over the next four to seven

years; 2) falsely representing that the Special Update benefits were "frozen"; and 3) falsely

representing that anyone retiring pursuant to Special Update would be given an opportunity to

participate under any enhanced plan. Each of these allegations will be addressed separately

pursuant to the relevant legal framework established by this Circuit. As the Court's resolution of

the summary judgment motion ultimately disposes of the class certification issue, summary

judgment will be addressed first.

## I. Legal Background

Under ERISA, an employer that also serves as a plan administrator, like Defendant in this case, is a fiduciary that is required to "discharge its duties solely in the interests of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1); <u>Fischer v. Phila. Elec. Co.</u>, 994 F.2d 130, 133 (3d Cir. 1993) ("Fischer I"). Therefore, when a plan administrator explains plan benefits to its employees, it acts in this fiduciary capacity. <u>Int'l Union, United Auto.. Aerospace & Agr. Implement Workers</u>, 188 F.3d 130, 148 (3d Cir. 1999). Section 404(a) of ERISA, 29 U.S.C. § 1104, is the touchstone for understanding the scope and object of an ERISA fiduciary's duties. <u>Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund</u>, 12 F.3d 1292, 1299 (3d Cir. 1993). The section establishes that a fiduciary shall act exclusively for the benefit of participants and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

The Third Circuit has repeatedly held that a fiduciary in this context may not materially mislead those to whom these statutory duties of loyalty and prudence are owed. <u>In re Unisys Sav. Plan Litig.</u>, 74 F.3d 420 (3d Cir. 1996); <u>Curcio v. John Hancock Mut. Life Ins. Co.</u>, 33 F.3d 226, 238 (3d Cir. 1994); <u>Bixler v. Central Pennsylvania Teamsters Health and Welfare Plan</u>, 12 F.3d 1292, 1300 (3d Cir. 1994); <u>Fischer I</u>, 994 F.2d at 135. Thus, a plan administrator breaches its fiduciary duty under ERISA if it makes material misrepresentations to plan participants concerning employee benefits. "Put simply, when a plan administrator speaks, it must speak

truthfully." Fischer I, 994 F.2d at 135. The breadth of the fiduciary duty is not limited to a

prohibition of affirmative misrepresentations, as the duty "entails not only a negative duty not to

misinform, but also an affirmative duty to inform when the trustee knows that silence might be

harmful." Bixler, 12 F.3d at 1300. Therefore, the failure to give certain relevant information

regarding benefits to beneficiaries might lead to liability if the administrator fails to communicate

"those material facts, known to the fiduciary but unknown to the beneficiary, which the

beneficiary must know for its own protection." Glaziers & Glassworkers Union Local No. 252

Annuity Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1182 (3d Cir.1996). The knowledge of the

fiduciary may give rise to such a duty to disclose even in the absence of a specific request by the

beneficiary because "absent such information, the beneficiary may have no reason to suspect that

it should make inquiry into what may appear to be a routine matter." Glaziers & Glassworkers

Union Local No. 252, 93 F.3d at 1181.

     Overall, a successful claim for breach of fiduciary duty under ERISA for a

misrepresentation requires that plaintiff demonstrate that: (1) defendant company was acting as a

fiduciary; (2) defendant made affirmative misrepresentations or failed to adequately inform plan

participants and beneficiaries; (3) the information misrepresented or not disclosed was material;

and (4) plaintiffs relied on the misrepresentation to their detriment. See Horvath v. Keystone

Health Plan East, Inc., 333 F.3d 450, 459 (3d Cir. 2003); Daniels v. Thomas & Betts Corp., 263

F.3d 66, 73 (3d Cir. 2001); International Union, United Auto., Aerospace & Agr. Implement

Workers, 188 F.3d at 148; In re Unisys Corp. Retiree Med. Benefits "ERISA" Litig., 57 F.3d

1255, 1264-1265 (3d Cir.1995) ("Unisys I"). A misleading statement or omission is material if

there is a "substantial likelihood" that the misrepresentation would "mislead a reasonable

employee in making an adequately informed decision about if and when to retire." <u>Unisys I.</u>, 57 F.3d at 1264.

One commonly-litigated dispute over ERISA fiduciary responsibilities arises when a plan administrator tells employees that no pension plan improvements are being considered, thereby inducing the employees to retire, when in fact, the company is seriously considering such a change, and implements that change subsequent to the employees' retirement. <u>See e.g.</u>, <u>Fischer v. Phila. Elec. Co.</u>, 96 F.3d 1533, 1538 (3d Cir. 1996) ("Fischer II"). In determining the scope and degree of disclosure required under ERISA in this context, the Third Circuit has recognized that equally important considerations are at cross-purposes. On one hand:

> ERISA does not impose a duty of clairvoyance on fiduciaries. An ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan. Rather, its obligation is to answer participants' questions forthrightly, a duty that does not require the fiduciary to disclose its internal deliberations.

<u>Fischer II</u>, 96 F.3d at 1539 (citations and quotations omitted in original). <u>See also</u> <u>Mushalla v. Teamsters Local No. 863</u>, 300 F.3d 391, 398 (3d Cir. 2002) ("Every business must develop strategies, gather information, evaluate options, and make decisions. Full disclosure of each step in this process is a practical impossibility.") (internal citation omitted). Similarly, imposing liability too quickly for failing to disclose a potential early retirement plan could actually harm employees by deterring employers from ever offering improved benefits. <u>Fischer II</u>, 96 F.3d at 1541. At the same time, however, ERISA was enacted in large part to "ensure that employees receive sufficient information about their rights under employee benefit plans to make well-informed employment and retirement decisions." <u>Harte v. Bethlehem Steel Corp.</u>, 214 F.3d 446, 451 (3d Cir. 2000). Indeed, the very goals of the "fiduciary duty jurisprudence" arising out of

ERISA stem from the need "to protect and strengthen the rights of employees" and "to enforce

fiduciary standards." Jordan v. Federal Express Corp., 116 F.3d 1005, 1014 (3d Cir.1997).

       In attempting to balance the different considerations under these circumstances, this

Circuit has determined that an ERISA fiduciary must disclose information about changes to a

pension plan only when those changes are under "serious consideration."  According to the three-

prong test first set forth in Fischer II, "serious consideration" exists when: 1) a specific proposal;

2) is being discussed for purposes of implementation; 3) by senior management with the

authority to implement the change.  Id. at 1539.  This formulation does not turn on any single

factor but is inherently fact-specific.  Id.

       A specific proposal emerges subsequent to the preliminary steps of "gathering

information, developing strategies, and analyzing options.  Fischer II, 96 F.3d at 1539-1540.  To

be deemed "specific," it must be "sufficiently concrete" to support the consideration by senior

management for implementation.  Id. at 1540.  However, a "specific proposal" can "contain

several alternatives, and the plan as finally implemented may differ somewhat from the

proposal."  Id.  The "discussion for implementation" element "distinguishes serious

consideration from the preliminary steps of gathering data and formulating strategy.  It also

protects the ability of senior management to take a role in the early phases of the process without

automatically triggering a duty of disclosure."  Id.  This factor "recognizes that a corporate

executive can order an analysis of benefits alternatives or commission a comparative study

without seriously considering implementing a change in benefits. Preliminary stages may also

require interaction among upper level management, company personnel, and outside

consultants."  Id.

Finally, to constitute serious consideration for purposes of liability under ERISA, the

proposal must be discussed by those members of "senior management" who have the authority to

implement the change.  This <u>Fischer II</u> prong "ensures that the analysis of serious consideration

focuses on the proper actors within the corporate hierarchy."  <u>Id.</u> at 1540.  As the <u>Fischer II</u> court

noted:

> This focus on authority can be used to identify the proper cadre of
> senior management, but it should not limit serious consideration to
> deliberations by a quorum of the Board of Directors, typically the only
> corporate body that in a literal sense has the power to implement
> changes in benefits packages. It is sufficient for this factor that the plan
> be considered by those members of senior management with
> responsibility for the benefits area of the business, and who ultimately
> will make recommendations to the Board regarding benefits operations.

<u>Id.</u> at 1540.

Because the <u>Fischer II</u> "serious consideration" jurisprudence has tended to develop

separately from the general breach of fiduciary duty cases under ERISA (denominated the <u>Bixler</u>

line after the seminal Third Circuit case so regarding), the Third Circuit has recently attempted to

delineate the boundaries of the different analyses.  In <u>Mushalla v. Teamsters Local No. 863</u>, 300

F.3d 391 (3d Cir. 2002), the court explained that:

> Cases in the <u>Bixler</u> line place an affirmative duty on fund administrators
> to provide fund participants with relevant information regarding
> existing benefits.  The <u>Fischer II</u> line, by contrast, places a duty on fund
> administrators to respond truthfully to the inquiries of fund participants
> regarding potential changes to their benefits which are under 'serious
> consideration.'  While the two lines of cases are consistent, they do not
> overlap.

<u>Mushalla</u>, 300 F.3d at 398.

To put it simply, "<u>Bixler</u> applies to *existing* benefits, <u>Fischer II</u> applies to *possible*

benefits." Id. (emphasis added). As such, this Court's inquiry will be guided by a determination of whether the alleged misrepresentations are best characterized as "existing" or "possible" benefits. Only in the latter of these two situations does the Fischer II serious consideration test apply. Otherwise, the more general discussion of misrepresentation discussed in Bixler and its progeny is more appropriate.

**II. Legal Analysis**

    As previously mentioned, Plaintiffs claim that AT&T breached its fiduciary duties by 1) failing to disclose that there was another plan under serious consideration at the time Plaintiffs retired; 2) falsely representing that the 1997 Special Update pension plan would provide the greatest benefits to retirees over the next four to seven years; 3) falsely representing that benefits under the Special Update were "frozen" and would not grow any larger; and 4) falsely representing that anyone retiring pursuant to Special Update would be given an opportunity to participate under any enhanced plan. The totality of these misrepresentations allegedly induced Plaintiffs to retire under the provisions of Special Update and prior to the enactment of the Voluntary Retirement Incentive Program in 1998. For purposes of analytical clarity, each of these alleged misrepresentations will be examined separately.

    **A. Failing to Disclose the Consideration of VRIP before Plaintiffs Retired**

    Plaintiffs allege that Defendant did not disclose its consideration of the Voluntary Retirement Incentive Plan in a timely manner and thereby breached its fiduciary duties. This claim fits squarely within the confines of the Fischer II "serious consideration" test as it concerns the proper disclosure of potential changes to pension benefits. An examination of the facts set

forth in the record, even when viewed in a light most favorable to Plaintiffs, makes clear to this

Court that as a matter of law, Defendant did not seriously consider the VRIP until after Plaintiffs

had retired, and Defendant was therefore under no duty to disclose information about the VRIP

any earlier.

Prior to January 1998, AT&T's employees were merely involved "in gathering

information, developing strategies, and analyzing options" concerning changes to its Plan.

Fischer II, 96 F.3d at 1539-1540.  Only by January 7, 1998 had a "specific proposal" for VRIP

been formulated.  Before that, in November 1997, staff members were told only to "think

conceptually" about various options that could be used to reduce AT&T's costs.  In late

December 1997, representatives had a "brain storming" session to explore various downsizing

options, including what eventually became VRIP.  On January 7, 1998, however, Vice President

Burlingame first suggested to the Operations Group that voluntary downsizing measures should

be considered in addition to involuntary ones.  The idea appears to have become "sufficiently

concrete" by this time, as the fundamental design elements of the Plan amendment that would

become VRIP were in place, complete with cost analyses and actuarial evaluations.  This specific

proposal was not "discussed for purposes of implementation," however, until January 10th and

11th, 1998, when members of AT&T's Human Resources, Benefits and Legal Organizations

departments met with representatives of ASA to discuss design options and to "brain storm" so

as to evaluate the feasibility of several force reduction alternatives.  At this point, a team had

therefore gathered to analyze the implications of enacting a program like VRIP.  Fischer II does

not require disclosure, however, until "senior management with the authority to implement the

change" have discussed the specific proposal.  At AT&T, the Operations Group is plainly the

relevant senior management, as the OG comprises "those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations." Fischer II, 96 F.3d at 1540. The Operations Group did not consider the VRIP changes for purposes of implementation until January 14, 1998, when a formal presentation was made to the CEO, CFO and other senior management officials regarding the various design options.

Overall, then, the earliest possible date on which it can fairly be said all three elements of the Fischer II test "coalesce[d] to form a composite picture of serious consideration" was January 14, 1998. Fischer II., 96 F.3d at 1539. In all likelihood, the "serious consideration" date actually arose at some point thereafter when the contours of the plan as it would finally be approved were detailed. Plaintiffs have not provided sufficient evidence to counter Defendant's undisputed evidence so as to create genuine issues of material fact and thereby survive a summary judgment motion on this issue of serious consideration.[4] The available evidence cannot support a determination that AT&T senior management had discussed a specific proposal about VRIP with a view toward implementation prior to Plaintiffs' retirement. Because Defendant did not "seriously consider" the VRIP amendments until after Plaintiffs had retired, the Court finds that as a matter of law, Defendant was under no duty to disclose details of the VRIP any earlier, and accordingly, did not violate its fiduciary duties pursuant to ERISA on these grounds. Summary judgment is thereby granted to Defendant on this claim.

---

[4]Plaintiffs' argument that the VRIP was under "serious consideration" as early as 1996 because a prior CEO had expressed the desire to downsize at that time is unpersuasive. One cannot equate "serious consideration" of a specific proposal with such general proclamations.

**B.  Special Update Would Provide a Greater Benefit over Next Four to Seven Years**

Plaintiffs claim that AT&T falsely stated to them in 1997 that Special Update rather than Cash Balance would provide a greater benefit to retirees over the course of the subsequent four to seven years.  Some Plaintiffs allege that such a misrepresentation was made at the pre-retirement seminars that they attended.  Others point to similar comments made in AT&T's April 28, 1997 Fact Sheet, which states:

> In general, if you are within 7 years of retirement eligibility under the current plan, your special update will most likely provide a greater benefit than the cash balance feature.  If you're more than 7 years from retirement eligibility under the current plan though, the cash balance feature will most likely produce a better benefit than the special update.

Pls. Ex. 23.

Unlike the previous allegation, it is not entirely clear whether this claim should be reviewed under the <u>Fischer II</u> "serious consideration" analysis or under the <u>Bixler</u> line concerning misrepresentations generally.  The analytical difficulty stems in part from the fact that a prediction concerning the level of future benefits under different pension programs encompasses both future and present dimensions.  Defendant's alleged statements concerning the prospects of employee pensions over time under Cash Balance and Special Update are certainly future-oriented so as to lend credence to the notion that "serious consideration" analysis is most appropriate.  At the same time, the statements do not relate to proposed benefits, but about actual existing benefits, and how those benefits would fare over time, making <u>Bixler</u> seem more appropriate.  Choosing the proper analysis is also made difficult because it hinges in part on exactly *why* Plaintiffs believe these assertions by Defendant should be considered false.  If these

assertions are considered false because of AT&T's failure to disclose the VRIP discussions

earlier, Plaintiffs' claim probably fits within the confines of <u>Fischer II</u>.  However, if the

statements are considered false for any act of deception that existed concurrently with the

statement, for instance, because Defendant knew that Special Update would not be the best

option for those nearing retirement, but told employees otherwise, the claim requires review

under <u>Bixler</u>.

     There is reason to believe that this claim stems from Defendant's failure to disclose VRIP

and is therefore really just a derivative of the prior claim that VRIP should have been announced

earlier.[5]  If so, Plaintiffs' claim must fail for the reasons already discussed.  Even if the Court

were to give Plaintiffs every benefit of the doubt and construe their claim to allege that

Defendant acted deceptively about existing benefits unrelated to the timing of VRIP's disclosure,

the Court rejects Plaintiff's claim as a matter of law.  This conclusion necessarily follows from

the fact that Defendant's statements concerning its beliefs about the future of Special Update and

Cash Balance do not constitute an actionable misrepresentation.  The Court is guided in its

conclusion that Defendant made no misrepresentation by the similar situation that arose in <u>Taylor</u>

<u>v. Peoples Natural Gas Co.</u>, 49 F.3d 982 (3d Cir. 1995), when a retiree brought suit against his

employer and plan administrator for breach of fiduciary duty under ERISA.  In <u>Taylor</u>, a

supervisor at defendant company told plaintiff that he believed that if an early retirement

_____

[5]For example, certain Plaintiffs stated at deposition that the statements were false because
of the VRIP changes and not because of any event prior to that.  <u>See, e.g.</u>, Dep. of Michael
Mascola, 55: ("Q. Anything other than VRIP led you to conclude that the statement about the
five to seven years was inaccurate? A. Nothing other than the VRIP, that's correct."); Dep. of
David Portzer, 50 ("Q. So is VRIP what made the statement [in the Burlingame April 28 letter],
in your mind, inaccurate? A. Yes.").

program was offered in the future, it might be offered retroactively.  Id. at 989.  After plaintiff

retired, an early retirement program was offered but, contrary to the supervisor's statements, it

was not made retroactive.  The Taylor court declared that an "honest statement of belief

reasonably grounded in fact does not constitute a misrepresentation."  Id. at 990.  Because the

supervisor expressed an honest, reasonable opinion as to the future scope of the possible

amendment, the court found that as a matter of law, no reasonable fact-finder could conclude that

this statement constituted a misrepresentation and granted summary judgment to defendant.  Id.

In the same fashion, Defendant's statements concerning the Special Update and Cash

Balance were not misrepresentations, but constitute honest statements of belief reasonably

grounded in fact.  AT&T was "operating under the premise that this was the plan that would be

in effect for as long as we could see into the future." (Dep. Harold Burlingame, 183).  The

significant boost in benefits offered by Special Update were fixed and would not accumulate any

further.  In contrast, the Cash Balance option would accrue over time, and would inevitably

"catch up" over time to the Special Update levels.  Based on their economic analysis, AT&T

employees reasonably believed that this "catch up" period would take 4-7 years, and fully

disclosed this information to Plaintiffs, replete with the appropriate qualifiers that suggested the

company could make no guarantees as to individual cases.  Plaintiffs have provided no reason to

counter Defendant's solid evidence that these statements were offered honestly and reasonably.

As in the Taylor decision, courts have routinely held that a plan administrator cannot be

held liable for comments honestly and reasonably made, but are only later proved incorrect.  See

McCall v. Burlington N. Sante Fe Co., 237 F.3d 506 (5th Cir. 2000) (employer's statements that

any future retirement packages would not be as good as those contained in the current offering

were not actionable although better benefits were subsequently offered, because the statements were a truthful reflection of management's intentions at the time); Swinney v. General Motors Corp., 46 F.3d 512 (6th Cir. 1995) (employer's statement that those who postponed retirement would not be eligible for special retirement package was not an actionable misrepresentation, even though employer later changed its mind and allowed eligibility, because statement was true at the time); Barnes v. Lacy, 927 F.2d 539 (11th Cir. 1991) (employer's original statement that retirement package was "one-time offer" was not actionable misrepresentation even though more lucrative package was later offered, because the statements were made in good faith and indicated the employer's actual intent at the time); Radley v. Eastman Kodak Co., 19 F. Supp. 2d 89, 99 (W.D.N.Y. 1998) (benefits counselor's statements that there would not be additional retirement incentives offered in the foreseeable future, although eventually proven false, were not misrepresentations because they were reasonable statements at the time and accurate of then-existing facts and personal predictions). Defendant in the present case had every reason to believe that its predictions were correct and should not be held liable because unexpected future actors and future decisions proved those predictions inaccurate. See Swinney, 46 F.3d at 520 ("Changing circumstances . . . might require an employer to sweeten its severance package, and an employer should not be forever deterred from giving its employees a better deal merely because it did not clearly indicate to a previous employee that a better deal might one day be proposed.")

The court in In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 57 F.3d 1255 (3d Cir. 1995) ("Unisys I") did find that a misrepresentation could arise even if the defendant company did not anticipate the changes that were eventually made. Id. at 1265, n.15.

However, the present case materially differs from the circumstances in <u>Unisys I</u>.  In <u>Unisys I</u>,

defendant affirmatively represented that retiree benefits were vested and could never be modified

or terminated, when defendant knew that, in fact, they were terminable at will.  Although the

company had no reason to expect it would change the plan in the future, it was aware that it

retained the right to modify it and knowingly failed to clarify material information about the

retention of that power when responding to employee inquiries.  <u>Id.</u>  The court found a breach of

fiduciary duty because defendant "actively misinformed its employees by affirmatively

representing to them that their medical benefits were guaranteed once they retired, when in fact

the company knew this was not true and that employees were making important retirement

decisions relying upon this information."  <u>Id.</u> at 1266-1267.  In contrast, Defendant AT&T made

no such guarantees, but stated only that "in general" if an employee is within seven years of

retirement eligibility under the current plan, Special Update would "most likely" be the best

option.  <u>See, e.g.,</u> <u>Ballone v. Eastman Kodak Co.</u>, 109 F.3d 117, 125 (2d Cir. 1997) ("Whereas

mere mispredictions are not actionable, false statements about future benefits may be material if

couched as a guarantee, especially where, as alleged here, the guarantee is supported by specific

statements of fact.")  Moreover, unlike the company in <u>Unisys I</u>, Defendant here never made any

representations knowing they were not true.  <u>See, e.g.,</u> <u>Int'l Union, United Auto.. Aerospace &</u>

<u>Agr. Implement Workers</u>, 188 F.3d 130, 148 (3d Cir. 1999) (distinguishing <u>Unisys I</u>

misrepresentation analysis because no competent evidence was presented to suggest that the

company made any affirmative misrepresentations or stood silent when asked about the duration

of retiree benefits).

     ERISA "does not impose a duty of clairvoyance on fiduciaries."  <u>Fischer I</u>, 994 F.2d at

135. Nor does it require an employer to "inform its employees that retiree benefits may at some

point in the future be modified or changed." Int'l Union, United Auto., Aerospace & Agr.

Implement Workers, 188 F.3d at 151. Defendant acted consistently with its fiduciary duties

under ERISA. Because no genuine issues of material fact prevent a ruling as a matter of law, this

Court grants summary judgment to Defendant on this claim.

### C. Accrued Benefits Under Special Update Were "Frozen"

Plaintiffs also claim that AT&T falsely told them in both written communications and

pre-retirement seminars that the accrued benefit under Special Update was "frozen" and would

not grow any larger. They claim that Defendant violated its fiduciary duties in making this

statement, because after they had retired, Defendant subsequently added to the benefits of those

who opted for Special Update by way of the VRIP changes. Once again, the Court will construe

the claim in a light most favorable for Plaintiffs, so that the claim does not relate to the non-

disclosure of VRIP, which would fail under Fischer II, but is directed at a deception concurrent

with the statement regarding the existing benefits of Special Update.

It is important to note that Defendant's statements regarding the "frozen" nature of

benefits under Special Update are not now nor ever were false. Special Update has always been

based on a pay-base averaging window of 1994-1996, the length of a participant's service as of

December 31, 1996, and a 1.6% multiplier. (Def. Statement of Material Facts, ¶ 28-29). Because

all pension accruals under that formula have ceased, any additional accruals derived from a

participant's continuing service after December 31, 1996 were not considered, and no accruals

were made beyond the one-time increase to participants' pensions, the Special Update benefit has

remained a "frozen" benefit. The VRIP amendment in 1998 did not change the static nature of

Special Update but served as a supplementary package to it. Defendant's statements so regarding were and continue to be the actual truth. However, the Court realizes that such a literal interpretation of Defendant's words may run counter to the underlying purpose of ERISA to protect beneficiaries and participants. Certain statements, although factually true, may at the time made, have imparted a different meaning on employees, and consequently may have unfairly induced them to retire prematurely.

Disregarding the literal truthfulness of these statements, the claim should nevertheless be dismissed as a matter of law. For the reasons heretofore discussed, the assertions allegedly made by Defendant simply do not constitute an actionable misrepresentation. Any statements that the level of benefits under Special Update were fixed were "honest statement[s] of belief reasonably grounded in fact" and therefore, not a misrepresentation. Taylor, 49 F.3d at 990. As adopted by the Board on April 16, 1997, the Special Update was designed as a frozen benefit and Defendant's employees properly conveyed that information. Defendant fully complied with its duties of loyalty to the plan beneficiaries by "speaking truthfully" regarding the Special Update benefits. Fischer I, 994 F.2d at 135. Plaintiffs have not suggested any different or additional information that Defendant should have stated or omitted so as to better comply with ERISA in this regards. In fact, if Defendant had *not* disclosed to Plaintiffs the fixed nature of benefits under Special Update, Defendant could very well have been held liable for failing in its "affirmative duty to inform when the trustee knows that silence might be harmful." Bixler, 12 F.3d at 1300. Holding Defendant liable for not disclosing the fact that in the future, the Voluntary Retirement Incentive Program would increase benefits beyond Special Update would effectively "impose a duty of clairvoyance on fiduciaries," an imposition that has been

categorically rejected by the Third Circuit.  As no material disputes prevent a ruling as a matter

of law, summary judgment is granted to Defendant on this claim.


**D. 1997 Special Update Retirees Would be Eligible to Participate in Future Changes to Plan**

Plaintiffs also allege that Defendant falsely stated that if AT&T's pension plan were ever

improved, those retiring in 1997 would be eligible for those improvements.  On a class-wide

basis, there is some doubt as to the validity of this allegation.  Only two of the thirty-six named

Plaintiffs claimed to have been present when a statement was made to that effect.  The remaining

plaintiffs who were deposed either denied or could not recall ever hearing AT&T make such a

representation. (Dep. of David Portzer, 225-226; Ronald Sears 188-189; Ronald Mascola, 153;

Frank Mangone, 214-215; Anthony Schiano, 192; Robert LaFlamme, 136-137; Eugene

Rappoport, 151-152; Gerald Peterson, 222).  One of the two individuals who did testify hearing

the alleged misrepresentation, Plaintiff Lando, stated that he recalls these statements but could

not remember who said the statement nor that person's department or level of management.

(Dep. of Salvatore Lando, 48, 50, 99, 120).  The other individual asserting this claim, Plaintiff

George Wuzniak, testified that he recalls these statements being made at a seminar given by

Defendant's agent Michael Fazio.  He testified that the statements were something to the effect

of "Well, if there was [a future improvement in benefits], you certainly would be made eligible

for it."  He couldn't remember specific words but instead a general "message" that participants in

the plan would be offered an opportunity to partake in a new offering if that came up.  (Dep. of

George Wuzniak, 59-60, 67).  Fazio adamantly denies ever having made such a statement and

adds that "[i]t would have been a stupid thing to say.  If you retired under a benefit you retired as those benefits worked at that time.  You certainly wouldn't be eligible for benefits that were in place after you retired."   (Dep. of Michael Fazio, 43-44).   Moreover, neither Fazio nor any other seminar presenter was authorized to make such a statement.  (Dep. of Michael Fazio, 43; Kenneth Willets, 181).  See also Dep. of Willets, 182. ("Our seminar speakers were very well-trained in knowing that generally when one leaves a company they leave under the rules of a pension plan at the time that exists at that time and, therefore, could not be guaranteed, and generally would not receive any enhancements or changes that would incur to the pension plan after the time that they left.")

However, to raise a genuine issue of material fact, the opponent need not match, item for item, each piece of evidence proffered by the movant.  In re Unisys Sav. Plan Litig., 74 F.3d at 433, n. 10 (citing Big Apple, BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992)).  If the opponent has exceeded the "mere scintilla" threshold, and has offered a genuine issue of material fact, the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  Id.  It remains the duty of the fact finder to ascertain the credibility and weight of the evidence.

Unlike the other alleged misrepresentations in this case that could be dismissed as honest statements reasonably grounded in fact, this one, if proven at trial, would constitute an active misrepresentation in violation of Defendant's fiduciary duties under ERISA.  Viewing the facts in a light most favorable to the non-movants, the Court denies summary judgment to Defendants on this claim with respect to Plaintiffs Lando and Wuzniak.  Issues of fact remain regarding exactly what was said by Defendant and whether Plaintiffs relied on those statements, therefore

the claim for those two Plaintiffs must be assessed by the trier of fact. However, because the

other deposed Plaintiffs specifically denied or do not remember hearing such a comment, the

Court will grant summary judgment to Defendants as to them. As for the other named Plaintiffs

who were not deposed, the Court has been presented with no evidence that any of them heard the

alleged misrepresentations about eligibility. The Court assumes that had such evidence or

testimony existed, it would have been included or referred to in Plaintiffs' papers since it is so

important to Plaintiffs' claim. Consequently, as it pertains to those Plaintiffs, the Court will

grant summary judgment to Defendants. However, since there appears to have been no discovery

as to said Plaintiffs, the Court grants summary judgment without prejudice to those Plaintiffs to

reopen their claims and join in this action with Plaintiffs Lando and Wuzniak if they can

demonstrate that the alleged misrepresentations were also made to them and relied upon.

**E.  Class Certification Issue**

      Inasmuch as the Court has granted summary judgment on almost all the claims, with the

exception of the alleged misrepresentation that the retirees would be eligible to participate in

future changes to the Plan, Plaintiffs' attempts to certify a class of those persons who retired

pursuant to Special Update from April 27, 1997 through December 31, 1997 is not appropriate.

Only two of the ten representative Plaintiffs have made any allegation as to this claim, thus, the

attempt to certify the class certainly fails under the requirements of Federal Rule of Civil

Procedure 23. The putative class as it relates to the alleged misrepresentations does not meet the

"typicality" requirements of 23(a) since the claim of eligibility is not typical among the putative

class members.[6]  In addition, because only two Plaintiffs appear to be eligible for the remaining

issues, the group is not so "numerous"  so to make joinder impracticable.  The class in its present

form cannot meet the requirements of Rule 23(b)(2) in that Defendant has not acted or refused to

act on grounds generally applicable to the class with regards to this misrepresentation.  Neither

can the putative class any longer meet the 23(b)(3) requirements that common questions of law

and fact "predominate" and that the class action is a superior method of adjudicating the

controversy.  This is clearly highlighted by the differing forms of the alleged misrepresentation

and the highly-individualized issues of reliance.  Therefore, the Court denies the motion for class

certification, and the two Plaintiffs can proceed to trial on this issue in their individual capacity.

### Conclusion

Plaintiff includes a laundry list of alleged "genuine issues of material fact" so as to try to

prevent a finding of summary judgment.  However, these issues are either mere allegations

unsupported by evidence (ex. that VRIP was part of a long-term plan, that AT&T intended to

lower expenses by moving long-term management employees off the payroll; that AT&T's

---

[6]Rule 23(a) of the Federal Rules of Civil Procedure sets forth several prerequisites to the maintenance of a class action:

> One or more members of a class may sue or be sued as representative
> parties on behalf of all only if (1) the class is so numerous that joinder
> of all members is impracticable, (2) there are questions of law or fact
> common to the class, (3) the claims or defenses of the representative
> parties are typical of the claims or defenses of the class, and (4) the
> representative parties will fairly and adequately protect the interests of
> the class.

Fed.R.Civ.P. 23(a).  Moreover, the putative class must meet the requirements of either Rule 23(b)(1), 23(b)(2), or 23(b)(3).

statements were designed to assure them that retirement under Special Update was the best option for them), or are supported by evidence, but are simply immaterial to the case (ex. that AT&T tracked workforce by age and service).  Because these statements are not "sufficient evidence for a jury to return a verdict in favor of the non-moving party," summary judgment is appropriate.  <u>Boyle v. County of Allegheny Pennsylvania</u>, 139 F.3d 386, 393 (3d Cir.1998) (quoting <u>Armbruster v. Unisys Corp.</u>, 32 F.3d 768, 777 (3d Cir.1994)).

The Court recognizes the disappointment and frustration of Plaintiffs to have learned only months after they retired that their pensions might have been larger had they delayed their retirement for a short period. However, in light of the absence of a specific proposal discussed by senior management for purposes of implementation, Defendant was under no duty to disclose the VRIP amendments by the time of Plaintiffs' retirement.  Moreover, the statements made by Defendant concerning the projected future of the Special Update and the "frozen" benefits do not constitute an actionable misrepresentation.  Except as to the one outstanding claim, Plaintiffs' claims under ERISA therefore fail as a matter of law and certification of the class must be denied accordingly.

For the reasons set forth above, IT IS on this 9th day of January 2004, hereby,

ORDERED that Defendant's motion for summary judgment is GRANTED on Plaintiffs' claims relating to "serious consideration" and timely disclosure and on Plaintiffs' claims relating to Defendant's statements that the Special Update benefits were "frozen" and would provide the greatest benefits to retirees over the next four to seven years; and it is

FURTHER ORDERED that with respect to Defendant's statements that anyone retiring pursuant to Special Update would be given an opportunity to participate in future enhancements

to the Plan, Defendant's motion for summary judgment is DENIED as to Plaintiffs Lando and

Wuzniak, and GRANTED as to all other named Plaintiffs; and it is

     FURTHER ORDERED that Plaintiff's motion for class certification is DENIED.


It is so ordered.

DATED: January 9th, 2004

          _s/ Jose L. Linares, U.S.D.J._____
          JOSE L. LINARES
          UNITED STATES DISTRICT JUDGE

Exhibit J

12BD, CLOSED, SCHEDO

# U.S. District Court
## District of New Jersey [LIVE] (Newark)
### CIVIL DOCKET FOR CASE #: 2:99-cv-04982-JLL-RJH

PETERSON, et al v. AT&T
Assigned to: Judge Jose L. Linares
Referred to: Magistrate Judge Ronald J. Hedges
Demand: $0
Case in other court: 04-02213, 04-02213
Cause: 29:1001 E.R.I.S.A.: Employee Retirement

Date Filed: 10/22/1999
Date Terminated: 03/29/2004
Jury Demand: None
Nature of Suit: 791 Labor: E.R.I.S.A.
Jurisdiction: Federal Question

**Plaintiff**

**GERALD H. PETERSON**

represented by **BRIAN J. MCMAHON**
GIBBONS, PC
ONE GATEWAY CENTER
NEWARK, NJ 07102-5310
(973) 596-4500
Email: bmcmahon@gibbonslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT A. BRIDGMAN**

represented by **BRIAN J. MCMAHON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FRANK MANGONE**

represented by **BRIAN J. MCMAHON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DAVID A. PORTZER**

represented by **BRIAN J. MCMAHON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICHAEL SLOANE**

represented by **BRIAN J. MCMAHON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT J. LAFLAMME**                    represented by    **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**EUGENE RAPPOPORT**                      represented by    **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT C. ALBERS**                      represented by    **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**BARBARA ATKINS**                        represented by    **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**WILLIAM H. CARTER**                     represented by    **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SONYA COMSTOCK**                        represented by    **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOSEPH G. COUPLAND**                    represented by    **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**WILLIAM J. DANNICH**                    represented by    **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**FRANCIS L. GRIFFITH**                   represented by    **BRIAN J. MCMAHON**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NEIL HABIG**                               represented by    **BRIAN J. MCMAHON**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEORGE R. KELLY**                          represented by    **BRIAN J. MCMAHON**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DAVE KERSHAW**                             represented by    **BRIAN J. MCMAHON**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**WILLIAM P. KUEHNER, JR.**                  represented by    **BRIAN J. MCMAHON**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SALVATORE M. LANDO**                       represented by    **BRIAN J. MCMAHON**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT C. MASCOLA**                        represented by    **BRIAN J. MCMAHON**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GLENN C. MILLER, JR.**                     represented by    **BRIAN J. MCMAHON**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ANDREW J. NAVALANCE**                      represented by    **BRIAN J. MCMAHON**
                                                              (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WALTER E. PRICE**                         represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ANTHONY J. SCHIANO**                      represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GARY J. STOUT**                           represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT A. WELLER**                        represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**RUSSELL D. WILLIAMS**                     represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT B. ZORNETZER**                     represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICHAEL D'ALBERO**                        represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEORGE C. WUZNIAK**                       represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PETE BARLETTO**                          represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**REX O. BARROW**                          represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**O. L. DRINKWATER**                       represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**RONALD J. SEARS**                        represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**RODNEY STOLL**                           represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**RICHARD S. RIGGS**                       represented by   **BRIAN J. MCMAHON**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**AMERICAN TELEPHONE AND**                 represented by   **CHRISTOPHER H. MILLS**
**TELEGRAPH COMPANY**                                       FISHER & PHILLIPS, LLP
                                                            430 MOUNTAIN AVENUE
                                                            3RD FLOOR
                                                            MURRAY HILL, NJ 07974
                                                            (908) 516-1050
                                                            Email: cmills@laborlawyers.com
                                                            *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/22/1999 | 1 | COMPLAINT filed FILING FEE $ 150.00 RECEIPT # 275120 (dr) (Entered: 10/25/1999) |
| 10/22/1999 | 2 | CERTIFICATION Of Ineligibility For Compulsory Arbitration by BRIAN J. McMahon Re: [1-1] complaint filed. (dr) (Entered: 10/25/1999) |
| 10/22/1999 | 3 | NOTICE of Allocation and Assignment filed. Magistrate Judge DENNIS CAVANAUGH (dr) (Entered: 10/25/1999) |
| 10/25/1999 |  | SUMMONS(ES) issued for AT&T ( 20 Days) (Mailed to Counsel) (dr) (Entered: 10/25/1999) |
| 01/05/2000 | 4 | Acknowledgment of WAIVER OF SERVICE RETURNED EXECUTED as to AT&T 11/5/99 Answer deadline projected for 1/4/00 for AT&T (bl) (Entered: 01/07/2000) |
| 01/14/2000 | 5 | Minute entry: Proceedings recorded by Ct-Reporter: Joanne Caruso; Minutes of: 1/14/00; The following actions were taken, Conference. Pltf. to file amended complaint by 1/18/00. Deft. advised they are allowed 1 motion only; indicate they will be filing a sumary judgment motion. Parties to submit discovry schedule. By Judge Alfred J. Lechner, Jr. (bl) (Entered: 01/18/2000) |
| 01/28/2000 | 6 | AMENDED COMPLAINT by GERALD H. PETERSON, ROBERT A. BRIDGMAN, FRANK MANGONE, DAVID A. PORTZER, MICHAEL SLOANE, ROBERT J. LAFLAMME, EUGENE RAPPOPORT, ROBERT C. ALBERS, BARBARA ATKINS, WILLIAM H. CARTER, SONYA COMSTOCK, JOSEPH G. COUPLAND, WILLIAM J. DANNICH, FRANCIS L. GRIFFITH, NEIL HABIG, GEORGE R. KELLY, DAVE KERSHAW, WILLIAM P. KUEHNER JR., SALVATORE M. LANDO, ROBERT C. MASCOLA, GLENN C. MILLER JR., ANDREW J. NAVALANCE, WALTER E. PRICE, ANTHONY J. SCHIANO, GARY J. STOUT, ROBERT A. WELLER, RUSSELL D. WILLIAMS, ROBERT B. ZORNETZER, MICHAEL D'ALBERO, GEORGE C. WUZNIAK, PETE BARLETTO, REX O. BARROW, O. L. DRINKWATER, RONALD J. SEARS, RODNEY STOLL, RICHARD S. RIGGS , amending [1-1] complaint (bl) (Entered: 01/31/2000) |
| 02/01/2000 |  | CASE reassigned from Judge Alfred J. Lechner, Jr. to Judge William G. Bassler (bl) (Entered: 02/04/2000) |
| 02/03/2000 | 7 | ORDER of reassignment from Judge Alfred J. Lechner, Jr. to Judge William G. Bassler. n.m. ( signed by Chief Judge Anne E. Thompson ) (bl) (Entered: 02/04/2000) |
| 02/14/2000 | 8 | ANSWER by AT&T to First amended amended class action complaint |

| | | |
|---|---|---|
| | | (bl) (Entered: 02/15/2000) |
| 02/14/2000 | 9 | CERTIFICATE OF SERVICE by AT&T to amended class action complaint (bl) (Entered: 02/15/2000) |
| 02/22/2000 | 10 | Letter ORDER, setting scheduling conference for 3/10/00 ( signed by Mag. Judge Dennis M. Cavanaugh ) (cs) (Entered: 02/23/2000) |
| 03/13/2000 | 11 | SCHEDULING ORDER setting Status conference 6/5/00 ; Settlement conference 6/5/00 ; n.m. ( signed by Mag. Judge Dennis M. Cavanaugh ) (bl) (Entered: 03/16/2000) |
| 07/11/2000 | 12 | STIPULATION and ORDER, for protective order ( signed by Mag. Judge Dennis M. Cavanaugh ) n/m (DD) (Entered: 07/12/2000) |
| 08/21/2000 | 13 | SCHEDULING ORDER setting Status conference 11/15/00 ; etc. ( signed by Mag. Judge Dennis M. Cavanaugh ) (bl) (Entered: 08/22/2000) |
| 11/20/2000 | 14 | ORDER, reset status conference for 10:30 11/30/00 ( signed by Mag. Judge Ronald J. Hedges ) n/m (DD) (Entered: 11/21/2000) |
| 12/14/2000 | 15 | SCHEDULING ORDER setting Status conference 10:00 5/8/00 ;nm ( signed by Mag. Judge Ronald J. Hedges ) (bl) (Entered: 12/18/2000) |
| 05/30/2001 | 16 | ORDER scheduling a conference for 7/18/01 at 2pm. nm ( signed by Magistrate Judge Madeline C. Arleo ) (bl) (Entered: 06/05/2001) |
| 06/11/2001 | 17 | Amended SCHEDULING ORDER/dates previously set, and re production of documents. nm ( signed by Magistrate Judge Madeline C. Arleo ) (bl) (Entered: 06/13/2001) |
| 07/02/2001 | 18 | AMENDED SCHEDULING ORDER rescheduling scheduling conference to 8/8/01 at 2:00 p.m., etc. ( signed by Magistrate Judge Madeline C. Arleo ) n/m (sr) (Entered: 07/05/2001) |
| 09/28/2001 | 19 | Letter ORDER, set scheduling order deadlines: Discovery deadline on 3:30 11/20/01 nm ( signed by Magistrate Judge Madeline C. Arleo ) (bl) (Entered: 10/03/2001) |
| 01/11/2002 | 20 | Letter Order scheduling a telephone conference to be initiated by M. McMahon on 3/27/02 at 4p.m. nm ( signed by Magistrate Judge Madeline C. Arleo ) (bl) (Entered: 01/16/2002) |
| 02/14/2002 | 21 | ORDER regarding documents withheld or redacted by defts on grounds of privilege. ( signed by Magistrate Judge Madeline C. Arleo ) n/m (sr) (Entered: 02/15/2002) |
| 04/19/2002 | 22 | Case Managment SCHEDULING ORDER setting Discovery cutoff 6/28/02 ; Telephone Status conference 11:30 6/18/02 ; motion for class certification by 9/9/02; opposition to be served by 10/7/02 and reply papers by 10/21/02 ( signed by Magistrate Judge Madeline C. Arleo ) (NM) (bl) (Entered: 04/22/2002) |
| 06/27/2002 | 23 | SCHEDULING ORDER resetting Status conference 3:30 8/28/02 ; |

| | | ( signed by Magistrate Judge Madeline C. Arleo )(NM) (bl) (Entered: 07/01/2002) |
|---|---|---|
| 09/23/2002 | 24 | Notice of MOTION for an Order for class certification by GERALD H. PETERSON, ROBERT A. BRIDGMAN, FRANK MANGONE, DAVID A. PORTZER, MICHAEL SLOANE, ROBERT J. LAFLAMME, EUGENE RAPPOPORT, ROBERT C. ALBERS, BARBARA ATKINS, WILLIAM H. CARTER, SONYA COMSTOCK, JOSEPH COUPLAND, WILLIAM J. DANNICH, FRANCIS L. GRIFFITH, NEIL HABIG, GEORGE R. KELLY, DAVE KERSHAW, WILLIAM P. KUEHNER JR., SALVATORE M. LANDO, ROBERT C. MASCOLA, GLENN C. MILLER JR., ANDREW J. NAVALANCE, WALTER E. PRICE, ANTHONY J. SCHIANO, GARY J. STOUT, ROBERT A. WELLER, RUSSELL D. WILLIAMS, ROBERT B. ZORNETZER, MICHAEL D'ALBERO, GEORGE C. WUZNIAK, PETE BARLETTO, REX O. BARROW, O. L. DRINKWATER, RONALD J. SEARS, RODNEY STOLL, RICHARD S. RIGGS, Motion for 10/28/02 on [24-1] motion and cert. of service . (Brief/PO Subm) (bl) (Entered: 09/25/2002) |
| 09/23/2002 | 25 | AFFIDAVIT of Matthew M. Houston on Re: [24-1] motion for an Order for class certification with exhibits A-E (bl) (Entered: 09/25/2002) |
| 12/06/2002 | 33 | CERTIFICATION of David H. Ganz on behalf of AT&T with exhibits A-B in opposition to pltfs' motion for class certification (bl) (Entered: 12/18/2002) |
| 12/16/2002 | 26 | Notice of MOTION for summary judgment by AT&T, Motion set for 1/13/03 on [26-1] motion and cert. of service . (Brief/PO Subm) (bl) (Entered: 12/17/2002) |
| 12/16/2002 | 27 | CERTIFICATION with Appendix Volumes 1-V.*** (bl) (Entered: 12/17/2002) |
| 12/16/2002 | 28 | CERTIFICATION in opposition to deft's motion for summary judgment with exhibits 1-44*** (bl) (Entered: 12/17/2002) |
| 12/16/2002 | 29 | Reply CERTIFICATION behalf of AT&T*** (bl) (Entered: 12/17/2002) |
| 12/16/2002 | 30 | CERTIFICATE OF SERVICE of brief in opposition to deft's motion for summary judgment, reply cert. with exhibits under seal, statement (bl) (Entered: 12/17/2002) |
| 12/16/2002 | 32 | CERTIFICATION of Brian M. Byrnes on behalf of AT&T in opposition to pltf's motion for class certification. (bl) (Entered: 12/18/2002) |
| 12/16/2002 | 34 | CERTIFICATE OF SERVICE by AT&T of brief in opposition to pltf's motion for class cert., cert. of Brian Byrnes, David H. Ganz and cert. of Judith R. Kramer Esq. in oppositon to class certification. (bl) (Entered: 12/18/2002) |
| 12/16/2002 | 35 | CERTIFICATION of Brian J. McMahon on behalf of GERALD H. PETERSON, ROBERT A. BRIDGMAN, FRANK MANGONE, DAVID A. PORTZER, MICHAEL SLOANE, ROBERT J. LAFLAMME, EUGENE RAPPOPORT, ROBERT C. ALBERS, BARBARA ATKINS, |

| | | WILLIAM H. CARTER, SONYA COMSTOCK, JOSEPH G. COUPLAND, WILLIAM J. DANNICH, FRANCIS L. GRIFFITH, NEIL HABIG, GEORGE R. KELLY, DAVE KERSHAW, WILLIAM P. KUEHNER JR., SALVATORE M. LANDO, ROBERT C. MASCOLA, GLENN C. MILLER JR., ANDREW J. NAVALANCE, WALTER E. PRICE, ANTHONY J. SCHIANO, GARY J. STOUT, ROBERT A. WELLER, RUSSELL D. WILLIAMS, ROBERT B. ZORNETZER, MICHAEL D'ALBERO, GEORGE C. WUZNIAK, PETE BARLETTO, REX O. BARROW, O. L. DRINKWATER, RONALD J. SEARS, RODNEY STOLL, RICHARD S. RIGGS Re: in support of pltf's motion for class certification and exhibits A-I (bl) (Entered: 12/18/2002) |
|---|---|---|
| 12/16/2002 | 36 | CERTIFICATE OF SERVICE by GERALD H. PETERSON Service Re: pltf's reply brief in support of motion for class cert. and cert of Brian J. MacMahon, Esq. in support of pltfs' motion for class cert. (bl) (Entered: 12/18/2002) |
| 12/17/2002 | 31 | ORDER of REASSIGNMENT, from Judge Bassler to Judge Linares ( signed by Chief Judge John W. Bissell ) (NM) (ak) (Entered: 12/17/2002) |
| 12/17/2002 | | CASE reassigned to Judge Jose L. Linares (ak) (Entered: 12/17/2002) |
| 12/20/2002 | 37 | CERTIFICATION of Judith R. Kramer Esq. on behalf of AT&T Re: in opposition to pltfs' motion for class cert. (bl) (Entered: 01/07/2003) |
| 01/13/2003 | 38 | Minute entry: Proceedings recorded by Ct-Reporter: none; Minutes of: 1/13/03; The following actions were taken, resetting motion hearing on [24-1] motion for an Order for class certification by plaintiffs for 2/24/03 Judge Jose L. Linares (bl) (Entered: 01/15/2003) |
| 03/18/2003 | 39 | ORDER deeming certain documents to be filed under seal. ( signed by Judge Jose L. Linares ) (NM) (bl) (Entered: 03/21/2003) |
| 12/22/2003 | 40 | NOTICE of Hearing: resetting settlement conference for 12/30/03 (cs) (Entered: 12/29/2003) |
| 01/09/2004 | 41 | ORDER/0PINION denied [24] Motion for Class certification, granting [26] Motion for Summary Judgment,etc. Signed by Judge Jose L. Linares on 1/9/04. (bl, ) (Entered: 01/22/2004) |
| 01/27/2004 | 42 | SCHEDULING ORDER: Final Pretrial Conference set for 5/4/2004 01:00 PM in Newark - Courtroom 2C before Magistrate Judge Ronald J. Hedges.. Signed by Judge Ronald J. Hedges on 1/26/04. (bl, ) (Entered: 01/30/2004) |
| 02/25/2004 | 43 | ORDER Pretrial Conference set for 3/30/2004 03:30 PM in Newark etc.- Courtroom 2C before Magistrate Judge Ronald J. Hedges.. Signed by Judge Ronald J. Hedges on 2/25/04. (bl, ) (Entered: 03/03/2004) |
| 03/29/2004 | 44 | ORDER of dismissal of action, without prejudice and without costs. Signed by Judge Jose L. Linares on 3/29/04. (bl, ) (Entered: 03/30/2004) |
| 03/29/2004 | | ***Civil Case Terminated. (bl, ) (Entered: 03/30/2004) |

| 04/28/2004 | 45 | NOTICE OF APPEAL as to 44 Order, 41 Order by pla's NEIL HABIG, ROBERT J. LAFLAMME, SALVATORE M. LANDO, FRANK MANGONE, ROBERT C. MASCOLA, GERALD H. PETERSON, DAVID A. PORTZER, EUGENE RAPPOPORT, ANTHONY J. SCHIANO, RONALD J. SEARS, GEORGE C. WUZNIAK. Filing fee $ 255. Copies of Notice of appeal sent to Clerk,USCA and to all counsel on record. (Attachments: # 1 Cert of Service)(ce, ) (Entered: 04/29/2004) |
|---|---|---|
| 05/07/2004 | 46 | NOTICE of Docketing Record on Appeal from USCA re 45 Notice of Appeal, filed by GERALD H. PETERSON, FRANK MANGONE, DAVID A. PORTZER, ROBERT J. LAFLAMME, EUGENE RAPPOPORT, NEIL HABIG, SALVATORE M. LANDO, ROBERT C. MASCOLA, ANTHONY J. SCHIANO, GEORGE C. WUZNIAK, RONALD J. SEARS. USCA Case Number 04-2213 (ce, ) (Entered: 05/10/2004) |
| 05/10/2004 | 47 | TRANSCRIPT REQUEST indicating none (ce, ) (Entered: 05/11/2004) |
| 05/11/2004 | | RECORD COMPLETE FOR PURPOSES OF APPEAL - Supplemental Record on Appeal transmitted to US Court of Appeals re 45 Notice of Appeal, (ce, ) (Entered: 05/11/2004) |
| 04/04/2005 | 48 | USCA JUDGMENT affirming the judgment of the District Court entered March 30, 2004. Costs taxed against Appellants as to 45 Notice of Appeal, filed by GERALD H. PETERSON,, FRANK MANGONE,, DAVID A. PORTZER,, ROBERT J. LAFLAMME,, EUGENE RAPPOPORT,, NEIL HABIG,, SALVATORE M. LANDO,, ROBERT C. MASCOLA,, ANTHONY J. SCHIANO,, GEORGE C. WUZNIAK,, RONALD J. SEARS, (Hicks, Carolyn) (Entered: 04/05/2005) |
| 04/26/2005 | 49 | MANDATE of USCA as to 45 Notice of Appeal, filed by GERALD H. PETERSON,, FRANK MANGONE,, DAVID A. PORTZER,, ROBERT J. LAFLAMME,, EUGENE RAPPOPORT,, NEIL HABIG,, SALVATORE M. LANDO,, ROBERT C. MASCOLA,, ANTHONY J. SCHIANO,, GEORGE C. WUZNIAK,, RONALD J. SEARS, (Attachments: # 1)(Graham, Chanel) (Entered: 04/26/2005) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/20/2007 09:13:56 | | | |
| **PACER Login:** | sn0052 | **Client Code:** | first american |
| **Description:** | Docket Report | **Search Criteria:** | 2:99-cv-04982-JLL-RJH Start date: 1/1/1970 End date: 12/20/2007 |
| **Billable Pages:** | 5 | **Cost:** | 0.40 |

# Exhibit K

1  Michael D. Braun (167416)
2  BRAUN LAW GROUP, P.C.
   12400 Wilshire Blvd., Suite 920
3  Los Angeles, CA 90025
   Telephone: (310) 442-7755
4  Facsimile: (310) 442-7756
5  E-mail: service@braunlawgroup.com

6
   Counsel for Plaintiff
7  *Additional Counsel on Signature Page*

8          UNITED STATES DISTRICT COURT
9       FOR THE CENTRAL DISTRICT OF CALIFORNIA

10 STEVEN PRO, Individually and on
   Behalf of All Others Similarly Situated,          CASE NO.
11                                                    CV07-06252
                                          Plaintiff,
12                                                    CLASS ACTION
13       v.
                                                      COMPLAINT FOR BREACHES
14 COUNTRYWIDE FINANCIAL                              OF FIDUCIARY DUTY UNDER
   CORPORATION, ANGELO R.                             THE EMPLOYEE RETIREMENT
15 MOZILO, KATHLEEN BROWN,                            INCOME SECURITY ACT
16 HENRY G. CISNEROS, JEFFREY M.
   CUNNINGHAM, ROBERT J.
17 DONATO, MICHAEL E.
18 DOUGHERTY, BEN M. ENIS,
   EDWIN HELLER, STANFORD L.
19 KURLAND, MARTIN R. MELONE,
20 ROBERT T. PARRY, OSCAR P.
   ROBERTSON, KEITH P. RUSSELL,
21 HARLEY W. SNYDER, MARSHALL
22 M. GATES, and JOHN AND JANE
   DOES 1-20.
23
                                          Defendants.
24

25
26                 I.    INTRODUCTION

27       1.    Plaintiff Steven Pro alleges the following based upon the investigation of
28 Plaintiff's counsel, which included a review of U.S. Securities and Exchange

-1-

1   Commission ("SEC") filings by Countrywide Financial Corporation ("Countrywide" or

2   the "Company"), including the Company's proxy statements (Form 14A), annual reports

3   (Form 10-K), quarterly reports (Form 10-Q), current periodic reports (Form 8-K),

4   registration statements (Forms S-8), and the annual reports (Form 11-K) filed on behalf

5   of the Countrywide Financial Corporation 401(k) Savings and Investment Plan, as

6   amended and restated effective January 1, 1997, and subsequent amendments one

7   through twelve (attached hereto as Exhibit A) (hereinafter the "Plan"), a review of the

8   Forms 5500 filed by the Plan with the Department of Labor, interviews with participants

9   of the Plan, and a review of available documents governing the operations of the Plan.

10  Plaintiff believes that substantial additional evidentiary support will exist for the

11  allegations set forth herein after a reasonable opportunity for discovery.

12  <center>**II. NATURE OF THE ACTION**</center>

13      2.     This is a class action brought on behalf of the Plan pursuant to §§ 502(a)(2)

14  and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

15  §§1132(a)(2) and (a)(3), against the fiduciaries of the Plan for violations of ERISA.

16      3.     The Plan is a retirement plan sponsored by Countrywide.

17      4.     Plaintiff's claim arises from the failure of Defendants, who are fiduciaries of

18  the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and

19  to exercise the required skill, care, prudence, and diligence in administering the Plan and

20  the Plan's assets during the period January 31, 2006 through the present (the "Class

21  Period").

22      5.     Plaintiff alleges that Defendants allowed the imprudent investment of the

23  Plan's assets in Countrywide equity throughout the Class Period despite the fact that they

24  clearly knew or should have known that such investment was unduly risky and imprudent

25  due to the Company's serious mismanagement and improper business practices,

26  including, among other practices: (a) marketing and extending subprime mortgage loans,

27  made on a "low documentation" basis, without adequate consideration of the borrower's

28  ability to repay and with unreasonably high risk of borrower default; (b) intentionally

<center>-2-</center>

marketing subprime loans with high risk of default to borrowers who qualified for prime-rate loans in order to increase Company profits; (c) encouraging brokers to market excessively high-cost loans with greater risk of default to borrowers by offering incentive commissions; (d) representing that Countrywide had strict and selective underwriting and loan origination practices; (e) representing that Countrywide had sufficient reserves set aside to cover the high-risk loans it was selling; (f) operating with inadequate liquidity in relation to the volatility of Countrywide's business lines and assets; and (g) operating without the requisite internal controls to determine appropriate loan loss provisions; all of which caused Countrywide's financial statements to be misleading and which artificially inflated the value of shares of Countrywide stock and the Countrywide Stock Fund in the Plan ("Fund"), and which have called into serious question Countrywide's continued viability. In short, during the Class Period, the Company was seriously mismanaged and faced dire financial circumstances.

6.    In addition, Plaintiff alleges that the Insider Selling Defendants suffered from serious conflicts of interest when they chose their own interests over those of the Plan's participants and beneficiaries. These Defendants, although they were aware that the Company stock price was over-inflated due to ongoing serious mismanagement and inappropriate lending practices at the Company, failed to discontinue the Plan's investment in Company stock or to inform the Plan participants of the Company's problems. Instead, they benefited from their inside knowledge by selling their personal holdings of Countrywide stock for over $400 million in proceeds during the Class Period and prior to the stock's precipitous decline.

7.    Plaintiff alleges in Count I that the Defendants who were responsible for the investment of the Plan's assets breached their fiduciary duties to the Plan's participants in violation of ERISA by failing to prudently and loyally manage the Plan's investment in Countrywide stock.    In Count II, Plaintiff alleges that the Defendants, who were responsible for the selection, monitoring and removal of the Plan's other fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and

1  replace those whose performance was inadequate.  In Count III, Plaintiff alleges that
2  Defendants breached their fiduciary duty to inform the Plan's participants by failing to
3  provide complete and accurate information regarding the soundness of Countrywide
4  stock and the prudence of investing and holding retirement contributions in Countrywide
5  equity.  In Count IV, Plaintiff alleges that Defendants breached their duties and
6  responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of
7  their duties of prudent and loyal management, complete and accurate communications,
8  and adequate monitoring.  Finally, in Count V, Plaintiff states a claim against
9  Countrywide for knowing participation in the fiduciary breaches alleged herein.

10      8.    As more fully explained below, during the Class Period, Defendants
11  imprudently permitted the Plan to hold and acquire millions of dollars in Countrywide
12  stock. Based on publicly available Plan information, it appears that Defendants' breaches
13  have caused the Plan to lose well over *one hundred million dollars* of retirement savings
14  during the Class Period.

15      9.    This action is brought on behalf of the Plan and seeks to recover losses to the
16  Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2),
17  29 U.S.C. §§ 1109 & 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. §
18  1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without
19  limitation, injunctive relief and, as available under applicable law, constructive trust,
20  restitution, equitable tracing, and other monetary relief.

21      10.    ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiff to
22  sue in a representative capacity for losses suffered by the Plan as a result of breaches of
23  fiduciary duty.  Pursuant to that authority, Plaintiff brings this action as a class action
24  under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan whose
25  Plan accounts were invested in Countrywide stock during the Class Period.

26      11.    In addition, because the information and documents on which Plaintiff's
27  claims are based are, for the most part, solely in Defendants' possession, certain of
28  Plaintiff's allegations are by necessity upon information and belief.  At such time as

1  Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent
2  necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to
3  add such other additional facts as are discovered that further support Plaintiff's claims.

### III. JURISDICTION AND VENUE

4

5      12.    **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction
6  over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C.
7  § 1132(e)(1).

8      13.    **Personal Jurisdiction.**  ERISA provides for nationwide service of process.
9  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of
10 the United States or subject to service in the United States and this Court therefore has
11 personal jurisdiction over them.  This Court also has personal jurisdiction over them
12 pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the
13 jurisdiction of a court of general jurisdiction in the State of California.

14     14.    **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29
15 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the
16 fiduciary breaches for which relief is sought occurred in this district, and/or some
17 Defendants reside and/or transact business in this district.

### IV. PARTIES

18
19 **A.    Plaintiff.**

20     15.    Plaintiff Steven Pro is a resident of Sun Valley, California.  Plaintiff Pro is a
21 participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and
22 was a participant in the Plan throughout the Class Period.  He continues to hold shares of
23 Company stock in his retirement account in the Plan and did so throughout the Class
24 Period.

25 **B.    Defendants.**

26     16.    The Defendants are identified below.  All of the Defendants are fiduciaries
27 of the Plan within the meaning of ERISA, as is explained below in Section VI.
28 ("Defendants' Fiduciary Status"), and all of them breached their fiduciary duties in

1    various ways as is explained in Section XI. ("Causes of Action").

2        17.    **Countrywide Financial Corporation.**    Countrywide is a Delaware

3    corporation, with its principal executive offices located at 4500 Park Granada, Calabasas,

4    California.    According to its website, www.my.countrywide.com, the Company is a

5    diversified financial services company focused primarily on real estate finance and

6    related activities.    Countrywide manages its business through five business segments:

7    Mortgage Banking; Banking; Capital Markets; Insurance; and Global Operations.    The

8    mortgage banking business segment is Countrywide's core business and generated 48

9    percent of the Company's pre-tax earnings in 2006.    Countrywide's common stock is

10   listed on the New York Stock Exchange and trades under the ticker symbol "CFC."    As

11   described more fully below, the Company was a fiduciary for the Plan.

12       18.    **Director Defendants.** The Countrywide Board of Directors (hereinafter the

13   "Board") is the governing body of Countrywide under its charter, its bylaws, and

14   applicable Delaware law, and, unless otherwise noted, comprises the persons who carried

15   out the Company's responsibilities with respect to the Plan.    The members of the Board

16   during the Class Period included:

17           (a).    **Defendant Angelo R. Mozilo** has served as Chairman of the Board

18           since March 1999 and as the Chief Executive Officer of Countrywide since

19           February 1998.    Prior to his current position, Defendant Mozilo served as

20           President of the Company from March 2000 through December 2003.    He

21           has served in other executive capacities since the Company's formation in

22           March 1969. During the Class Period, Defendant Mozilo sold over 6 million

23           shares of Company stock for proceeds of approximately $242 million.    In

24           fact, in the last year alone, Defendant Mozilo made a profit of $129 million

25           from the sale of Company stock, approximately one-third of the amount he

26           has reaped over the past 23 years.    Since Countrywide began trading on the

27           NYSE, Defendant Mozilo has sold $406 million worth of Countrywide

28           stock, but, upon information and belief, has never purchased a share.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

According to the Form 4 filed with the SEC on August 13, 2007, Defendant Mozilo continues to hold approximately 500,000 shares in Countrywide stock. Between 2002 and 2006, Defendant Mozilo received about $387 million from pay and stock option gains according to the Company's filings with the SEC. *See* Definitive Proxy Statement, Form 14A, Apr. 27, 2007 at 35; Definitive Proxy Statement, Form 14A, Apr. 28, 2006; Definitive Proxy Statement, Form 14A, Apr. 29, 2005; Definitive Proxy Statement, Form 14A, Apr. 29, 2004; Definitive Proxy Statement, Form 14A, Apr. 25, 2003.

(b). **Defendant Kathleen Brown** served as a Director of Countrywide from 2005 until her resignation from the Board effective March 29, 2007.

(c). **Defendant Henry G. Cisneros** has served as a Director of Countrywide since 2001. During the Class Period, Defendant Cisneros sold over 79,000 shares of Company stock for proceeds of approximately $3 million.

(d). **Defendant Jeffrey M. Cunningham** has served as a Director of Countrywide since 1998. During the Class Period, Defendant Cunningham sold approximately 75,000 shares of Company stock for proceeds of approximately $3 million.

(e). **Defendant Robert J. Donato** has served as a Director of Countrywide since 1993. During the Class Period, Defendant Donato sold approximately 54,000 shares of Company stock for proceeds of approximately $2.1 million.

(f). **Defendant Michael E. Dougherty** served as a Director of Countrywide from 1998 until June 2007. During the Class Period, Defendant Dougherty sold approximately 227,905 shares of Company stock for proceeds of approximately $9.2 million.

(g). **Defendant Ben M. Enis** served as a Director of Countrywide from 1984 until his resignation from the Board effective June 2006.

1  (h).   **Defendant Edwin Heller** served as a Director of Countrywide from
2  1993 until his resignation from the Board effective June 2006. During the
3  Class Period, Defendant Heller sold approximately 106,500 shares of
4  Company stock for proceeds of approximately $4 million.

5  (i).   **Defendant Stanford L. Kurland** served as a Director of
6  Countrywide from 1999 until his resignation from the Company effective
7  September 7, 2006. Defendant Kurland also served as the President of the
8  Company from 2004 until his resignation and as the Chief Operating Officer
9  of the Company from 1988 until his resignation. Defendant Kurland served
10 in a number of other executive positions during his tenure at the Company,
11 including Executive Managing Director from 2000 to 2003 and Senior
12 Managing Director from 1989 to 2000. In addition, Defendant Kurland
13 served as the Chairman and Chief Executive Officer of the Company's
14 principal operating subsidiary, Countrywide Home Loans, Inc. During the
15 Class Period, Defendant Kurland sold over 400,000 shares of Company
16 stock for proceeds of approximately $15 million.

17 (j).   **Defendant Martin R. Melone** has served as a Director of
18 Countrywide since 2003.

19 (k).   **Defendant Robert T. Parry** has served as a Director of Countrywide
20 since 2004.

21 (l).   **Defendant Oscar P. Robertson** has served as a Director of
22 Countrywide since 2000. During the Class Period, Defendant Robertson
23 sold approximately 152,000 shares of Company stock for proceeds of
24 approximately $6 million.

25 (m).   **Defendant Keith P. Russell** has served as a Director of Countrywide
26 since 2003.

27 (n).   **Defendant Harley W. Snyder** has been a member of Countrywide's
28 Board of Directors since 1991. During the Class Period, Defendant Snyder

-8-

1     sold approximately 170,000 shares of Company stock for proceeds of

2     approximately $6.5 million.

3     19.    During the Class Period, Defendants Mozilo, Cisneros, Cunningham,

4     Donato, Dougherty, Gates, Heller, Kurland, Robertson, and Snyder, (hereinafter, the

5     "Insider Selling Defendants"), sold approximately 7,804,506 shares of Countrywide stock

6     for proceeds of over $294 million.

7     20.    As is explained in more detail below, the Board had certain appointment and

8     oversight responsibilities with respect to the Plan. The Board and it members listed

9     above are referred to as the "Director Defendants."

10     21.    **Compensation Committee Defendants.** As explained more fully below,

11     the Plan assigns certain fiduciary responsibilities and duties to Countrywide's Board of

12     Directors (the "Board"), certain of which, as discussed below, were discharged by the

13     Compensation Committee of the Board of Directors. The Defendants identified in this

14     paragraph are referred to as the "Compensation Committee Defendants." On information

15     and belief, the Compensation Committee Defendants are as follows:

16     (a).   **Defendant Henry G. Cisneros** has served as a member of the

17     Compensation Committee.

18     (b).   **Defendant Jeffrey M. Cunningham** has served as a member of the

19     Compensation Committee.

20     (c).   **Defendant Robert J. Donato** has served as a member of the

21     Compensation Committee.

22     (d).   **Defendant Michael E. Dougherty** has served as a member of the

23     Compensation Committee.

24     (g).   **Defendant Edwin Heller** has served as a member of the

25     Compensation Committee.

26     (h).   **Defendant Oscar P. Robertson** has served as a member of the

27     Compensation Committee.

28

1     (i). **Defendant Harley W. Snyder** has served as a member of the

2    Compensation Committee.

3  22. **Administrative Committee and its members.**  As explained more fully

4 below, the Plan assigns certain fiduciary responsibilities and duties to the Countrywide

5 Financial Corporation Administrative Committee of Employee Benefit Plans

6 ("Administrative Committee").  Administrative Committee members have full authority

7 and power to administer and construe the Plan. On information and belief, the individual

8 Administrative Committee Defendants are as follows:

9     (a). **Defendant Marshall M. Gates** has served as a member of the

10    Administrative Committee. Upon information and belief Defendant Gates is

11    a Senior Managing Director and Chief Administrative Officer at

12    Countrywide. During the Class Period, Defendant Gates sold approximately

13    75,000 shares of Company stock for proceeds of approximately $3 million.

14  23. The identities of the remaining members of the Administrative Committee

15 are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane

16 Does 1-10.  Once the identities of additional Administrative Committee members are

17 ascertained, Plaintiff will seek leave to join them under their true names.  The

18 Administrative Committee and its members (Defendant Gates and John and Jane Does 1-

19 10) are referred to as the "Administrative Committee Defendants."

20  24. **Investment Committee and its members.**  As explained more fully below,

21 the Plan assigns certain fiduciary responsibilities and duties to the Investment Committee

22 of Employee Benefit Plans ("Investment Committee").  Specifically, the Investment

23 Committee has the delegated responsibility for selecting the investment funds in the Plan

24 and for monitoring the performance of those funds.  The identities of the Investment

25 Committee members are currently unknown to Plaintiff and are therefore named

26 fictitiously as John and Jane Does 11 − 20.  Once the identities of these fiduciaries are

27 ascertained, Plaintiff will seek leave to join them under their true names. The Investment

28 Committee and its members (John and Jane Does 11 − 20) are referred to as the

1  "Investment Committee Defendants."

2      25.    As illustrated below in Section VII. E ("Defendants Suffered From Conflicts

3  of Interest"), the individual Defendants' sales of Company stock increased during the

4  Class Period as the financial condition of the Company deteriorated.

5                    **V.  THE PLAN**

6  **A.    Background.**

7      26.    The Plan, sponsored by Countrywide, is an "employee pension benefit plan,"

8  as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plan is a legal entity

9  that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a

10  breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff.

11  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief

12  requested in this action is for the benefit of the Plan and its participants/beneficiaries.

13      27.    The assets of an employee benefit plan, such as the Plan here, must be "held

14  in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the

15  Class Period, the assets of the Plan were held in a trust fund administered by Fidelity

16  Investments ("Fidelity"), the Plan's trustee.  *See* Countrywide Financial Corporation

17  401(k) Savings and Investment Plan, Annual Report (Form 11-K) at 10 (Dec. 31, 2006)

18  (hereinafter the "2006 Form 11-K").

19      28.    The Plan provides benefits, except in limited circumstances, for all

20  employees.  Effective January 1, 2004, "An employee becomes eligible to participate in

21  the Plan as soon as administratively possible following the date he or she meets the

22  following requirements: (A) Attainment of age 21; and (B) Completion of the Eligibility

23  Computation Period, if he or she is then an Eligible Employee."  Amendment Number

24  Three to the Countrywide Financial Corporation 401(k) Savings and Investment Plan §

25  5.04(a) (Dec. 3, 2003) (hereinafter "Plan Amendment Three").

26      29.    Under the Plan, an account is established and maintained for each

27  participant, reflecting the manner in which each account is invested and the value of the

28  investments including withdrawals, distributions, and any charges or credits made to the

1  account. *See* Countrywide Credit Industries, Inc. 401(k) Savings and Investment Plan, as

2  amended and restated effective January 1, 1997 (hereinafter "Plan Document") § 7.01.

3      30.    The Countrywide Stock Fund holds the Plan's shares of Countrywide stock.

4  **B.    Employee and Employer Contributions.**

5      31.    At all relevant times, the Plan had two separate components: (1) employee

6  contributions, and (2) employer contributions.

7      32.    Plan participants could elect, via Salary Deferral Contributions, to contribute

8  to the Plan up to 40 percent of their eligible compensation per year subject to IRS Code

9  limitations. *See* Plan Amendment Three § 4.01(a); Plan Document § 6.02(a).

10      33.    One of the investment options made available to participants by the Plan

11  fiduciaries is the Countrywide Stock Fund. The Plan is not designed to require the

12  Company Stock Fund. Rather, as discussed in more detail below, the Company Stock

13  Fund is an optional feature of the Plan that the Plan Administrator "may select" as it

14  determines appropriate for the investment of participants' accounts. Plan Document §

15  8.02(a).

16      34.    Plan participants could invest up to 50 percent of their Salary Deferral

17  Contributions in Company Stock. *Id.* § 8.04(c).

18      35.    Despite making its contributions in Company Stock throughout the Class

19  Period, the Company had the discretion to make Employer Matching Contributions and

20  Employer Discretionary Contributions **"in cash or in Company Stock"** pursuant to the

21  Plan document. *Id.* § 5.04.[1]

22      36.    Additionally, the Company had discretionary authority for determining the

23  amount, if any, of Employer Matching Contributions and Employer Discretionary

24

25  [1] The Plan was amended in November 2006 so that Employer Matching Contributions

26  were to be made in Company Stock; however, the Company still had the discretion to
make Employer Discretionary Contributions in either cash or Company Stock. *See*

27  Eleventh Amendment to the Countrywide Financial Corporation 401(k) Savings and

28  Investment Plan (hereinafter "Plan Amendment Eleven") § 5.04(a) (Nov. 2, 2006).

-12-

1  Contributions for each eligible Plan participant. *See* Plan Document §§ 5.01, 5.02.

2      37.    Participants were not fully vested in their Employer Contributions Accounts

3  until five years of service.    *See* Plan Document § 9.02; Ninth Amendment to the

4  Countrywide Financial Corporation 401(k) Savings and Investment Plan (hereinafter

5  "Plan Amendment Nine") § 9.02(b) (Jan. 1, 2006).

6  C.    **Company Stock in the Plan.**

7      38.    As stated in the Plan: "The Administrator may select such additional

8  investment vehicles as it determines appropriate for the investment of Participants'

9  Accounts, including, but not limited to, Company Stock." Plan Document § 8.02(a).

10  Hence, whether to offer Company stock as an investment option is a discretionary feature

11  of the Plan over which Plan fiduciaries exercised control.

12      39.    For most Plan participants, "the portions of a participant's account which in

13  [sic] invested in Company Stock shall not be eligible for investment in any other

14  Investment Fund." Plan Document § 8.04(a).

15      40.    The Plan Administrator had the discretion to "adopt rules permitting

16  Participants to elect to invest all or a portion of the Company Stock held in their

17  Accounts in another Investment Fund." *Id.* at § 8.04(b).

18      41.    During the Class Period, Countrywide Company Stock represented more

19  than 30 percent of the Plan's net assets. *See* 2006 Form 11-K.

20      42.    The Plan has incurred substantial losses as a result of the Plan's investment

21  in Countrywide stock. As of December 31, 2006, the Plan held approximately 9 million

22  shares of Countrywide stock, then having a market value of approximately $350 million.

23  *Id.* at 12. Following revelations that Countrywide engaged in predatory subprime lending

24  practices, among other improper practices, Countrywide stock trades at approximately

25  $20 per share as of the date of this Complaint, representing a decline of approximately 40

26  percent since the beginning of the Class Period. Upon information and belief, the value

27  of Countrywide stock in the Plan is now approximately $ 178 million.

28

43.  in the plan, ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2), the fiduciaries remain bound by the other core ERISA fiduciary duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

44.  Hence, if plan fiduciaries know or if an adequate investigation would have revealed that company stock no longer was a prudent investment, the fiduciaries are required to discontinue offering the stock as a plan investment option, provide complete and accurate information to plan participants of the risk of continuing to make and maintain investment in the stock, and, to the extent appropriate under the circumstances, sell the plan's holding of company stock, and invest the plan assets in other suitable investments. Defendants took none of these actions.[2]

**D.    Purported ESOP Component.**

45.  In October, 1991, the "Countrywide Credit Industries, Inc. Profit Sharing Stock Ownership Plan ("ESOP") was merged into the Plan and the ESOP accounts were transferred to the Plan." Plan Document at "Purpose." After the merger, the "Plan consisted of a profit-sharing plan with 401(k) and employee stock ownership plan features. . . ." *Id.*

46.  An employee stock ownership plan is an ERISA plan that is designed to

---

[2] In November, 2006, around the time the Pension Protection Act of 2006 went into effect, the Plan was amended so that a Participant could direct investments in Company Stock out of the Employer Contribution Account, whether or not such contributions had vested. *See* Plan Amendment Eleven § 8.03(e); Pension Protection Act of 2006 § 901(a)(1), I.R.C. § 401(a)(35) (allowing a plan participant with at least three years of service to divest the portion of the account invested in employer securities that is attributable to employer contributions in other investment options). Additionally at this time, the Plan was amended so that a participant could change his or her "investment election with respect to existing investments in Company stock in his or her Account, provided that at the time of such change, including exchanges from other available investment options, the value of the Participants' investment in Company Stock shall not exceed fifty percent (50%) of the total value of the Account." Plan Amendment Eleven § 8.04(c).

1    invest primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). As with
2    a 401(k) plan without an ESOP component, fiduciaries of an ESOP remain bound by core
3    ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the
4    exclusive purpose of providing benefits to plan participants.

5        47.   On information and belief, the Plan did not satisfy all of the statutory and
6    regulatory mandates with respect to ESOP design and/or operation.  For example, the
7    ESOP component is not designed to invest primarily in qualifying employer securities in
8    violation of 29 C.F.R. § 2550.4073-6(b).

9        48.   Yet, even if the Plan is found to have an ESOP component, if the fiduciaries
10   know or if an adequate investigation would reveal that company stock no longer is a
11   prudent investment, the fiduciaries must disregard plan direction to maintain investments
12   in such stock and protect the plan by investing the plan assets in other suitable
13   investments.  Here, this course of action was all the more appropriate because Company
14   stock was not a required feature of the Plan, but, to the contrary, was a discretionary
15   feature made available at the direction of the Plan Administrator.

16                  **VI.  DEFENDANTS' FIDUCIARY STATUS**
17   **A.**    **The Nature of Fiduciary Status.**

18       49.   **Named Fiduciaries.**  Every ERISA plan must have one or more "named
19   fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the
20   "administrator" in the plan instrument is automatically a named fiduciary, and in the
21   absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29
22   U.S.C. § 1002(16)(A).

23       50.   **De Facto Fiduciaries.**  ERISA treats as fiduciaries not only persons
24   explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any
25   other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the
26   extent "(i) he exercises any discretionary authority or discretionary control respecting
27   management of such plan or exercises any authority or control respecting management or
28   disposition of its assets, (ii) he renders investment advice for a fee or other compensation,

1    direct or indirect, with respect to any moneys or other property of such plan, or has any
2    authority or responsibility to do so, or (iii) he has any discretionary authority or
3    discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29
4    U.S.C. § 1002(21)(A)(i).

5      51. Each of the Defendants was a fiduciary with respect to the Plan and owed
6    fiduciary duties to the Plan and the participants under ERISA in the manner and to the
7    extent set forth in the Plan's documents, through their conduct, and under ERISA.

8      52. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C.
9    § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the
10   interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and
11   diligence under the circumstances then prevailing that a prudent man acting in a like
12   capacity and familiar with such matters would use in the conduct of an enterprise of a like
13   character and with like aims.

14     53. Plaintiff does not allege that each Defendant was a fiduciary with respect to
15   all aspects of the Plan's management and administration.  Rather, as set forth below,
16   Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority
17   assigned to or exercised by each of them, and, as further set forth below, the claims
18   against each Defendant are based on such specific discretion and authority.

19     54. Instead of delegating all fiduciary responsibility for the Plan to external
20   service providers, Countrywide chose to assign the appointment and removal of
21   fiduciaries to the monitoring Defendants named herein.  These persons and entities in
22   turn selected Countrywide employees, officers and agents to perform most relevant
23   fiduciary functions.

24     55. ERISA permits fiduciary functions to be delegated to insiders without an
25   automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29
26   U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in
27   the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

28

**B.    The Company's Fiduciary Status.**

56.    Pursuant to the Plan document, up until the Plan was amended in November, 2006, the Company was the "Administrator" of the Plan, as that term is defined under ERISA, and a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA.  Plan Document §§ 14.01, 14.04; Amendment Number Five to the Countrywide Financial Corporation 401(k) Savings and Investment Plan (hereinafter "Plan Amendment Five") § 14.01 (June 15, 2004).

57.    The Company's authority and powers included the following:

(a) to administer and construe the Plan, subject to applicable requirements of law.

***

(ii) To make and enforce such rules and regulations, which shall be uniform and nondiscriminatory, and to prescribe such forms, as it deems necessary or proper for the efficient administration of the Plan;

(iii) To construe and interpret the Plan, to resolve ambiguities, and inconsistencies and to supply omissions with respect to the Plan provisions, which determinations shall be final and conclusive on all persons claiming benefits under the Plan;

(iv) To decide all questions concerning the Plan. . . .

***

(v) To determine the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan;

(vi) To retain such consultants, accountants and attorneys as may be deemed necessary or desirable to render statements, reports, and advice with respect to the Plan and to assist the Administrator in complying with all applicable rules and regulations affecting the Plan; any consultants, accountants and attorneys may be the same as those retained by the Plan; and

(vii) To exercise all other powers specified in the Plan.

(b) The Administrator may adopt such rules for the conduct of its affairs as it deems appropriate.

-17-

1
2
3

(c) Any decisions and determinations made by the Administrator pursuant to its duties and powers described in the Plan shall be conclusive and binding upon all parties. The Administrator shall have sole discretion in carrying out its responsibilities.

4     Plan Document § 14.02.

5
6
7

58.     Such duties were to be performed on behalf of the Company by such "persons or committee as may be appointed by the Board of Directors" of Countrywide. *Id.* at § 14.01.

8
9
10
11

59.     The Company could delegate its duties and could appoint "accountants, actuaries, legal counsel, investment advisors, investment managers, claims administrators, specialists and other persons as the Administrator deems appropriate in connection with administering the Plan." *Id.* at § 14.03.

12
13
14
15
16
17
18
19

60.     Moreover, upon information and belief, in order to comply with ERISA, during at least part of the Class Period the Company exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner, by means of the Plan's Summary Plan Description ("SPD"). *See* ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description). These SPDs incorporated by reference Countrywide's SEC filings, thus converting such materials into fiduciary communications.

20
21
22
23
24
25
26

61.     The Company, as Plan Administrator, was responsible for determining whether to offer Company stock as a Plan investment option. Plan Document § 8.02(a). Furthermore, the Company was responsible for determining the amount, if any, of Employer Matching and Employer Discretionary Contributions, as well as the discretion of allocating the Employer Matching Contributions and/or Employer Discretionary Contributions "in cash or in Company Stock." *Id.* at § 5.04; *see supra* text accompanying note 1.

27
28

62.     Additionally, while the Plan provided that "the portion of a Participant's Account which in [sic] invested in Company Stock shall not be eligible for investment in

-18-

1   any other Investment Fund," the Company had the discretion to "adopt rules permitting
2   Participants to elect to invest all or a portion of the Company Stock held in their
3   Accounts in another Investment Fund." *Id.* at § 8.04(b)-(c).

4       63.    Moreover, Countrywide, at all applicable times, has exercised control over
5   the activities of its employees that performed fiduciary functions with respect to the Plan,
6   including the Administrative Committee Defendants and the Investment Committee
7   Defendants, and, on information and belief, can hire or appoint, terminate, and replace
8   such employees at will.  Countrywide is, thus, responsible for the activities of its
9   employees through traditional principles of agency and *respondeat superior* liability.

10      64.    Finally, under basic tenants of corporate law, Countrywide is imputed with
11  the knowledge that the Defendants had knowledge of the misconduct alleged herein, even
12  if not communicated to Countrywide.

13      65.    Consequently, in light of the foregoing duties, responsibilities, and actions,
14  the Company was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29
15  U.S.C. § 1102(a)(1), and *de facto* fiduciary within the meaning of ERISA § 3(21), 29
16  U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control
17  respecting management of the Plan, exercised authority or control respecting
18  management or disposition of the Plan's assets, and/or had discretionary authority or
19  discretionary responsibility in the administration of the Plan.

20  **C.**    **The Director Defendants' Fiduciary Status Under the Plan.**

21      66.    Countrywide, as a corporate entity, cannot act on its own without any human
22  counterpart.  In this regard, during the Class Period, upon information and belief,
23  Countrywide relied and continues to rely directly on the members of the Board to carry
24  out certain of its fiduciaries responsibilities with respect to the Plan.  As a result, the
25  Director Defendants are functional fiduciaries under ERISA.

26      67.    Moreover, upon information and belief, the Director Defendants established
27  the Compensation Committee, Investment Committee and Administrative Committee to
28  carry out fiduciary duties with respect to the Plan. *Id.* § 14.01; Compensation Committee

1  Charter at 1 (attached hereto as Exhibit B); Plan Amendment Five § 14.01.

2      68.    Pursuant to the Compensation Committee Charter, the Director Defendants
3  delegated to the Compensation Committee the duty to appoint and monitor the
4  Investment and Administrative Committees. Compensation Committee Charter at 3. As
5  the Compensation Committee was to report regularly to the Director
6  Defendants according to the Compensation Committee Charter, the Director Defendants
7  retained fiduciary responsibility in this respect. *Id.* at 1.

8      69.    As a result of this appointment authority, the Director Defendants were
9  required to monitor, provide critical information to their appointees regarding the
10  Company and the Plan, and if prudence so dictated, remove the members of the
11  Compensation Committee, Investment Committee and Administrative Committee who
12  failed to faithfully discharge their responsibilities under ERISA. Plan Document § 14.01;
13  Compensation Committee Charter at 3; Plan Amendment Five § 14.01.

14      70.    Thus, according to Department of Labor regulations, the Director
15  Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

16      71.    Consequently, in light of the foregoing duties, responsibilities, and actions,
17  the Director Defendants were both named fiduciaries of the Plan pursuant to ERISA
18  § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries of the Plan within the
19  meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they
20  exercised discretionary authority or discretionary control respecting management of the
21  Plan, exercised authority or control respecting management or disposition of the Plan's
22  assets, and/or had discretionary authority or discretionary responsibility in the
23  administration of the Plan.

24  **D.    The Compensation Committee Defendants' Fiduciary Status.**

25      72.    During at least part of the proposed Class Period, the Board of Directors was
26  to appoint persons or committees to perform Plan duties on behalf of the Company. Plan
27  Document § 14.01; Plan Amendment Five § 14.01.

28

-20-

73. Pursuant to the Compensation Committee Charter (attached hereto as Exhibit B), the Compensation Committee has the duty "to discharge the responsibilities of the Board of Directors [of Countrywide] relating to the compensation of the Company's Directors, executives, and employees." Compensation Committee Charter at 1.

74. In regards to the Plan, the Compensation Committee has the authority and duty to "appoint or remove individuals authorized to make administrative and investment decisions on behalf of the Company with respect to employee benefit plans, including but not limited to, the Company's 401(k) and pension plans and monitor their performance." *Id.* at 3.

75. Upon information and belief, the Compensation Committee appointed and had a duty to monitor members of the Investment Committee and members of the Administrative Committee. Thus, according to Department of Labor regulations, the Compensation Committee exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

76. Additionally upon information and belief, the Compensation Committee made regular reports to the Board regarding its duties under the Compensation Committee Charter, including its appointment and monitoring duties of the Investment and Administrative Committees. *See* Compensation Committee Charter at 1 ("The Committee shall make regular reports to the Board.").

77. Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

78.    The Compensation Committee also had a duty to report to the Board pursuant to the Compensation Committee Charter at 1.

**E.    The Administrative Committee Defendants' Fiduciary Status.**

79.    The Plan provides that as of November 2006, the Administrative Committee is the "Plan Administrator," and as the Administrator it shall have the following powers and duties:

(i).    To require any person to furnish such information as it may request for the purpose of the proper administration of the Plan as a condition to receiving benefits under the Plan;

(ii).    To make and enforce such rules and regulations, which shall be uniform and nondiscriminatory, and to prescribe such forms, as it deems necessary or proper for the efficient administration of the Plan;

(iii).    To construe and interpret the Plan, to resolve ambiguities, and inconsistencies and to supply omissions with respect to the Plan provisions, which determinations shall be final and conclusive on all persons claiming benefits under the Plan;

(iv).    To decide all questions concerning the Plan, including the eligibility of any person to participate in the Plan and the status and rights of any Participant or Beneficiary under the Plan;

(v).    To determine the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan;

(vi).    To retain such consultants, accountants and attorneys as may be deemed necessary or desirable to render statements, reports, and advice with respect to the Plan and to assist the Administrator in complying with all applicable rules and regulations affecting the Plan; any consultants, accountants and attorneys may be the same as those retained by the Plan; and

(vii).    To exercise all other powers specified in the Plan.

Plan Amendment Eleven § 14.01; Plan Document § 14.02(a)(i) – (vii).

80.    Moreover, upon information and belief, in order to comply with ERISA, during at least part of the Class Period the Administrative Committee exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner, by means of the Plan's SPDs.  *See* ERISA § 101(a)(1)

-22-

1 (requiring the plan administrator to furnish to each participant covered under the plan and
2 to each beneficiary who is receiving benefits under the plan a summary plan description).
3 These SPDs incorporated by reference Countrywide's SEC filings, thus converting such
4 materials into fiduciary communications.

5       81.   Consequently, in light of the foregoing duties, responsibilities, and actions,
6 the Administrative Committee Defendants were both named fiduciaries of the Plan
7 pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within
8 the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary
9 authority or discretionary control respecting management of the Plan, exercised authority
10 or control respecting management or disposition of the Plan's assets, and/or had
11 discretionary authority or discretionary responsibility in the administration of the Plan.

12 **F.    The Investment Committee Defendants' Fiduciary Status.**

13       82.   The Plan provides that the Investment Committee is a "Named Fiduciary"
14 for purposes of § 402(a) of ERISA. It has been delegated the responsibility of selecting
15 the investments in the Plan and monitoring the performance of the investment funds. *See*
16 Plan Document § 14.01; Plan Amendment Five § 14.01; Plan Amendment Eleven §
17 14.01. Upon information and belief, the Investment Committee discharged this
18 responsibility together with the Plan Administrator pursuant to § 8.02(a) of the Plan.

19       83.   Consequently, in light of the foregoing duties, responsibilities, and actions,
20 the Investment Committee Defendants were both named fiduciaries of the Plan pursuant
21 to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the
22 meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary
23 authority or discretionary control respecting management of the Plan, exercised authority
24 or control respecting management or disposition of the Plan's assets, and/or had
25 discretionary authority or discretionary responsibility in the administration of the Plan.

26
27
28

# VII.  FACTS BEARING ON FIDUCIARY BREACH

**A.    Countrywide Was an Imprudent Investment for the Plan during the Class Period Because of its Serious Mismanagement, Precipitous Decline in the Price of its Stock and Dire Financial Condition.**

## 1.    Summary.

84.    During the Class Period, Countrywide stock became an imprudent investment for participants' retirement savings because of, *inter alia*, the Company's highly risky and inappropriate origination practices and serious financial mismanagement which caused the value of Countrywide stock to be artificially inflated and exposed the Plan to huge losses as a result of such circumstances.

85.    Countrywide's inappropriate origination practices and serious mismanagement pertains to, among other problems, Countrywide's (1) predatory and highly risky lending practices; (2) lack of adequate internal controls over its improper lending practices contributing to high delinquency and foreclosure rates among borrowers; and (3) misleading statements and misrepresentations regarding the Company's financial condition which caused the price of Countrywide stock to be artificially inflated during the Class Period.  In short, during the Class Period, the Company was seriously mismanaged and faced dire financial circumstances as a result of the aforementioned circumstances.  Accordingly, investment in Countrywide stock under these circumstances was imprudent and caused the Plan to suffer enormous losses.

## 2.    The Rise of the Subprime Lending Industry.

86.    Countrywide, like the mortgage industry as a whole, saw rapid growth in its origination of subprime loans in recent years.  Between 2003 and 2005, Countrywide's production of subprime loans doubled, from $19.8 billion to $44.6 billion.  Annual Report (Form 10-K) (Dec. 31, 2006) (hereinafter the "2006 Form 10-K") at 3.

87.    The proliferation of subprime loans has been attributed by many industry experts to a confluence of factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structure and marketing of mortgages, and an abundance of capital

-24-

1  from lenders and mortgage securities investors.  *See* Sandra L. Thompson, Dir., Div. of

2  Supervision and Consumer Prot., *Testimony Before the Committee on Banking, Housing*

3  *and Urban Affairs, U.S. Senate: Federal Deposit Insurance Corporation on Mortgage*

4  *Market Turmoil: Causes and Consequences*, Mar. 22, 2007, *available at*

5  http://www.fdic.gov/news/news/speeches/chairman/ spmar22071.html.

6      88.    Upon information and belief, in 2004, as interest rates began to climb, the

7  pool of potential prime borrowers looking to refinance began to dry up and lenders began

8  extending loans to subprime borrowers with troubled credit histories in an effort to

9  maintain or grow market share in a declining origination environment.

10     89.    In order to take advantage of this new market, lenders began weakening their

11 underwriting standards, including:

12             (a).    reducing the minimum credit score borrowers need to qualify for

13             certain loans;

14             (b).    allowing borrowers to finance a greater percentage of a home's value

15             or to carry a higher debt load;

16             (c).    introducing new products designed to lower borrowers' monthly

17             payments for an initial period; and

18             (d).    allowing borrowers to take out loans with little, if any, documentation

19             of income and assets.

20 *See* Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns,*

21 *Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26,

22 2005, at D1.

23     90.    In addition to lowering underwriting standards, lenders began offering novel

24 loan products to entice borrowers which put them at greater risk of defaulting:

25             (a).    **No-documentation and low-documentation loans:** Known in the

26             industry as "liar loans," the practice of requiring little or no documentation

27             from borrowers constituted as much as 40 percent of subprime mortgages

28             issued in 2006, up from 25 percent in 2001.  *See* Gretchen Morgenson,

-25-

1    *Crisis Looms In Mortgages*, N.Y. Times, Mar. 11, 2007.

2    (b).    **Piggy-back loans:** These combine a mortgage with a home-equity

3    loan or line of credit, allowing borrowers to finance more than 80 percent of

4    the home's value without paying for private mortgage insurance.  As of

5    2006, about half of all subprime loans included "piggyback" loans, and on

6    average all borrowers financed 82 percent of the underlying value of their

7    property, markedly up from 48 percent in 2000. *See Id.*; James R. Hagerty

8    & Ruth Simon, *Home Lenders Pare Risky Loans – More Defaults Prompt*

9    *Cut in 'Piggyback' Mortgages; Housing Market May Suffer*, Wall St. J.,

10   Feb. 14, 2007, at A3.

11   (c).    **Interest-only mortgages:** These allow borrowers to pay interest and

12   no principal in the loan's early years, which keep payments low for a time,

13   but require that the deferred payment of principal be made in the future

14   through increased monthly or balloon payments.

15   (d).    **Option adjustable-mortgages:** The most prevalent of which are

16   hybrid adjustable rate mortgages ("ARMs"), the loans are marketed with

17   promotional or "teaser" rates during the loan's introductory period that later

18   balloon to much higher rates once the introductory period has ended.  ARMs

19   currently account for between one-half and one-third of subprime

20   mortgages. *See* Testimony of Roger T. Cole, Director, Division of Banking

21   Supervision and Regulation, The Federal Reserve Board, *Mortgage Markets*,

22   Before the Committee on Banking, Housing and Urban Affairs, U.S. Senate,

23   Mar. 22, 2007, *available at* http://www.federalreserve.gov/boarddocs/

24   testimony/2007/20070322/default.htm.

25   **3.    The Fall of the Subprime Lending Industry.**

26   91.    As early as 2004, industry watchdogs began expressing growing fears that

27   relaxed lending practices were increasing risks for borrowers and lenders in overheated

28   housing markets. *See* Simon, *Mortgage Lenders, supra*.  As lenders were making it

-26-

1  easier for borrowers to qualify for a loan by such practices as described above, they were

2  also greatly increasing the likelihood that borrowers would be unable to make payments,

3  and that defaults would rise.  Of particular concern was the prevalence of adjustable-rate

4  loans, which in combination with the lowered lending standards, were more likely to

5  result in borrowers' early payment defaults.

6       92.   In May 2005, bank regulators issued their first-ever guideline for credit-risk

7  management for home-equity lending and, in December 2005, new guidelines for

8  mortgage lenders were issued as well.  *Id.*; Testimony of Sandra L. Thompson, *supra*.

9  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a

10  clear message to the marketplace that bank regulators were concerned about the lessened

11  underwriting standards and general lax risk management practices of subprime lenders.

12       93.   As of mid-2005, delinquency rates for subprime loans (60-days or more past

13  due) rose for the first time since 2002.  By the fourth quarter of 2005, delinquencies and

14  foreclosures began to rise even more severely -- as of October 2005 the delinquency rate

15  was twice that recorded on new subprime loans a year earlier.  *See* Simon & Hagerty,

16  *More Borrowers*, *supra*.

17       94.   According to the FDIC, total subprime delinquencies rose from 10.33

18  percent in the fourth quarter of 2004 to 13.33 percent in the fourth quarter of 2006 and

19  foreclosures rose from 1.47 percent to 2.0 percent over the same period.  Testimony of

20  Sandra L. Thompson, *supra*.

21       95.   Subprime loans with ARMs accounted for the largest rise in delinquency

22  rates, an increase from 9.83 percent to 14.44 percent between the fourth quarter of 2004

23  and the fourth quarter of 2006; whereas foreclosures rose from 1.5 percent to 2.7 percent

24  during the same period.  *Id.*

25       96.   In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency,

26  many shortly after origination.  *See* Simon & Hagerty, *More Borrowers*, *supra*.

27

28

97.    In short, the rate of delinquency and foreclosure suggests that lenders underestimated the risk involved and borrowers did not fully understand the full costs of these loans.

**B.    Countrywide Engaged in Risky and Inappropriate Subprime Lending Practices and Serious Mismanagement.**

98.    Despite the many warnings issued by industry analysts and government regulators, as well as other negative indicators, such as rising interest rates and a cooling housing market, for much of the Class Period, Countrywide continued to engage in risky and inappropriate lending practices and to make inaccurate prognostications about its financial future.

**1.    Countrywide's Aggressive Lending Practices.**

99.    In August 2007, *The New York Times* revealed that Countrywide had engaged in predatory lending practices by steering borrowers to risky subprime loans with unfavorable terms in order to generate greater profits for the Company:

> On its way to becoming the nation's largest mortgage lender, the Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied. 'I want to be sure you are getting the best loan possible,' the sales representatives would say.
>
> But providing 'the best loan possible' to customers wasn't always the bank's main goal, say some former employees. Instead, potential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.
> Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom no matter what it costs borrowers, according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided. One document, for instance, shows that until last September the computer system in the company's subprime unit excluded borrowers' cash reserves, which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.

1  Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. Times, Aug. 26,

2  2007.

3      100.   Many of the loans Countrywide forced on uninformed borrowers contained

4  unfavorable terms such as teaser interest rates which were reset to double digits after the

5  teaser period expired, while others carried prohibitive prepayment penalties that made

6  refinancing impossibly expensive. *Id.*

7      101.   Upon information and belief, Countrywide incentivized its brokers to market

8  these unfavorable terms by offering them extra commissions if they did so.  *Id.*  For

9  example, upon information and belief, brokers could earn equal to 1 percent of the loan's

10  value if they added a three-year prepayment penalty to the loan.  *Id.*  In addition, upon

11  information and belief, brokers could earn higher commissions for building higher reset

12  rates into the adjustable rate loans after the teaser period expired. *Id.*

13      102.   Upon information and belief, Countrywide made such loans because the

14  Company's profit margin from the securitization and sale of these loans in the secondary

15  market was greater and thus the company's commission structure rewarded sales

16  representatives for making risky, high-cost loans.

17      103.   However, Countrywide's business model, which prioritizes fees and

18  commissions over financial viability of loans, has resulted in massive delinquencies in its

19  subprime loans and has compromised the financial circumstances of the Company. 20.15

20  percent of subprime loans made by Countrywide were delinquent as of June 30, 2007, up

21  from 14.41 percent in the same period the preceding year.  *Id.*; Countrywide Financial

22  Corp. Quarterly Report (Form 10-Q) (June 30, 2007) at 92. Moreover, almost 10 percent

23  of subprime mortgages were delinquent by 90 days or more compared with the previous

24  year's rate of 5.35 percent.  Morgenson, *Inside the Countrywide Lending Spree, supra.*

25  At the end of 2006, delinquencies for Countrywide's subprime loans had increased to

26  19.03 percent, up 25 percent from the previous year's rate (15.20 percent) and up more

27  than 68 percent from the delinquency rate in 2004 (11.29 percent). 2006 Form 10-K at 9.

28

104.   Countrywide's unscrupulous lending practices are currently the subject of a U.S. Senate panel investigating the current housing and mortgage crisis.  In a recent press conference the panel's chair, Senator Charles Schumer, noted in amazement that 40 percent of subprime loans facing foreclosure could have qualified as prime-rate loans. John Godfrey, *Schumer Tells Countrywide to End Lending Practices*, Wall St. J., Aug. 29, 2007.  Senator Schumer called on Countrywide to end "its bad business practices and reverse some the damage it has already inflicted on our housing market."  *Press Conference with Senator Charles Schumer (D-NY): Countrywide and Subprime Loans*, Fed. News Service, Aug. 29, 2007, *available at* http://text.fednews.com/ transcript.htm?id=20070829t0480&query=schumer&SLID=83ea7d275d2a0272eec4f753 84376875.

2.   **Countrywide Continued to Offer Subprime Loans Despite the High Risk of Default or Foreclosure.**

105.   For much of the Class Period, Countrywide continued to extend subprime loans to borrowers which contained many of the weakened lending terms discussed in Section VII. A.2, *supra*.  Countrywide's aggressive marketing of these loans resulted in massive increases in loan delinquencies and foreclosures and put the financial health of the Company in jeopardy.

106.   As of 2006, Countrywide ranked as one of the largest subprime lender in the country by originating $40.5 billion in subprime mortgage loans.  2006 Form 10-K at 3; *See* Nat'l Mortgage News Online, available at http://data.nationalmortgagenews.com. And again, for the first quarter of 2007, the Company ranked as both the number one subprime originator *and* the number one subprime servicer.  *See* Nat'l Mortgage News Online, *supra*.

107.   In early 2007, the result of Countrywide's aggressive and risky origination practices were revealed when, as discussed at ¶ 103 *supra*, the Company issued its Annual Report, detailing the marked increase in delinquencies and loan foreclosures for the subprime loans the Company was servicing.

108.   Countrywide also reported that foreclosures for subprime loans increased to 3.53 percent, more than doubling the rate of 1.74 percent in 2004.  2006 Form 10-K at 9. Countrywide's loans pending in foreclosure comprised 0.65 percent of its total loans in 2006, up from 0.44 percent in 2005 and 0.42 percent in 2004.  *Id.*

109.   However, it was not until late February 2007 that Countrywide began to tighten up its origination terms.  For instance, the Company continued to originate loans comprising more than 95 percent of a home's appraised value and required no documentation of a borrower's income until February 23, 2007.   *See* Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. Times, Aug. 26, 2007.

110.   And it was not until March 2007, that Countrywide instructed its brokers to stop offering borrowers the option of no-money-down home loans, or "piggyback" loans, which were responsible for a steep rise in delinquencies.  In a Company email Countrywide told its loan originators:  "Please get in any deals over 95 LTV (loan-to-value) today!... Countrywide BC will no longer be offering any 100 LTV products as of Monday, March 12."  *Countrywide Ends No Down-Payment Lending*, Reuters, Mar. 9, 2007.

111.   Moreover, as recently as July 27, 2007, Countrywide's product list showed that it would lend $500,000 to a borrower rated C-, the second riskiest grade.  As long as the loan represented no more than 70 percent of the property's underlying value, the Company would lend to a borrower with a credit score as low as 500.  Morgenson, *Inside the Countrywide Lending Spree, supra.*  In fact, the Company would lend even if the borrower had been 90 days late on a current mortgage payment twice in the last 12 months, if the borrower had filed for personal bankruptcy protection, or if the borrower had faced foreclosure or default notices on his or her property.  *Id.*

112. Finally, in mid-August 2007, after Countrywide's stock had lost approximately 40 percent of its value since the beginning of the Class Period, the Company announced that it would make significant changes to its operations by limiting itself to mortgages which can be bought by government-backed agencies, Freddie Mac

1    and Fannie Mae. Vikas Bajaj, *Big Changes and Big Loan for Lender*, N.Y. Times, Aug.

2    17, 2007. The effort to clean up its act, however, came too late to prevent massive losses

3    to the Plan caused by the investment in Countrywide stock.

3.    **Countrywide Failed to Sufficiently Reserve for Various Liabilities and Obligations Related to Mortgages that it Securitized or Sold.**

113.    Countrywide retains subordinated interests in mortgages that it securitizes and makes representations to buyers about performance and other characteristics of mortgages that it sells. The Company's Annual Report for 2006 reveals that Countrywide underreserved for credit risk arising from its retained subordinated interests and understated liabilities arising from representations it made regarding sold mortgages.

114.    For instance, from 2005 to 2006 the Company increased its recorded reserves and liabilities at a rate much faster than the rate of increase of the related assets or revenue. And from December 31, 2005 to December 31, 2006, the value of Countrywide's subordinated interests increased 16 percent, to $2.0 billion; during the same period, its allowance for credit losses increased more than twice as much, by 36 percent to $269.2 million. 2006 Form 10-K at 46.

115.    Also during the same period, Countrywide's loan sales *decreased* two percent to $403 billion, while its liability for related representations and warranties *increased* by 108 percent to $390.2 million. 2006 Form 10-K at 45, 46.

116.    Similarly, while Countrywide's revenue from gain on sale of loans increased approximately 17 percent during the period to $4.7 billion, its reserves for losses arising from gains on sale increased more than 300 percent, to $290.4 million from $66.5 million. 2006 Form 10-K at F-20-F-21. This increase in 2006 of the accumulation of liabilities or reserves for activities that occurred in past periods caused Countrywide's stock price to be artificially inflated during the Class Period.

-32-

4.    **Countrywide Failed to Provide Complete and Accurate Information to Participants Regarding the Excessive Risks of the Investment.**

117.    During much of the Class Period, Countrywide, and in particular Defendant Mozilo, provided incomplete and inaccurate information regarding the financial circumstances of the Company to Plan participants and the market as a whole.

118.    On January 31, 2006, Countrywide announced results for the quarter and year ended December 31, 2005, touting its impressive growth including quarterly and 2005 net earnings of $639 million and $2.5 billion, respectively, compared to $370 million and $2.2 billion for the comparable periods in 2004. Defendant Mozilo boasted that:

> Importantly, we achieved these results despite an environment that included volatile interest rates; declining production profit margins throughout the industry; and the adverse effects of 2005's hurricanes, primarily Hurricane Katrina. If not for the hurricane charges, the Company would have surpassed its record of $4.18 per diluted share, achieved in the peak refinance boom year of 2003. Countrywide's exceptional performance in the 2005 environment is a reflection of the Company's ability to generate organic market share growth in its Mortgage Banking segment, and of the effective implementation of its strategy to expand its other business segments.'

> ***

> As we look ahead to 2006 and beyond, we expect to see the market transition continue, which should lead to substantial industry consolidation. In the past, Countrywide has benefited from consolidating environments by recruiting talented personnel and fortifying our infrastructure. Just as we have done for nearly four decades, we expect to emerge from challenging times as a stronger Company that is better positioned for the future. We continue to believe the long-term fundamentals of the housing and mortgage finance markets are strong as homeownership remains the foundation of the American dream. Shareholders should take comfort in knowing that Countrywide's workforce of more than 50,000 will continue to work toward making this dream available to all Americans.'

Countrywide Financial Corp., Current Report (Form 8-K) (Jan. 31, 2006).

1      119. On February 9, 2006, Countrywide issued a press release touting its

2   continued growth, including operational results for January 2006 which announced that

3   Countrywide had been named the number one mortgage originator and servicer for 2005

4   by an industry group and had increased its origination share by more than 3 percentage

5   points from 2004 to reach 15.7 percent and widened its lead as the number one originator.

6   Countrywide Financial Corp., Current Report (Form 8-K) (Feb. 9, 2006).

7      120. On March 9, 2006, Countrywide issued a press release touting its positive

8   operational results for February 2006 which reflected "across-the-board growth compared

9   to February 2005." Countrywide Financial Corp., Current Report (Form 8-K) (Mar. 9,

10   2006).

11      121. On April 11, 2006, Countrywide issued a press release touting its positive

12   operational results for March 2006, including a growth in mortgage loan fundings of $40

13   billion, up 10 percent year-over-year and 29 percent over the prior month. Moreover, the

14   Company reported that for the first quarter of 2006, mortgage loan fundings were up 13

15   percent over the first quarter of 2005 and refinance volume remained high, accounting for

16   55 percent of the first quarter's production. Countrywide Financial Corp., Current Report

17   (Form 8-K) (Apr. 11, 2006).

18      122. On April 27, 2006 Countrywide a issued a press release touting its positive

19   earnings for the first quarter, including net quarterly earnings of $684 million and diluted

20   earnings per share were $1.10, as compared to $689 million in net earnings and $1.13 in

21   diluted earnings per share for the first quarter of 2005, and $639 million in net earnings

22   and $1.03 in diluted earnings per share for the fourth quarter of 2005. Defendant Mozilo

23   explained that these results were achieved "[d]espite the challenges created by this

24   environment" and demonstrated the "effectiveness of [Countrywide's] time-tested

25   business model, our focus on mortgage lending and the continued diversification of our

26   earnings base." Countrywide Financial Corp., Current Report (Form 8-K) (Apr. 27,

27   2006). He remarked further that "we remain confident in Countrywide's position within

28   the industry. We will continue to capitalize upon consolidation and other industry

1  dynamics to grow market share, enhance our infrastructure and create greater shareholder

2  value." *Id.*

3      123.  On July 13, 2006, Countrywide issued a press release announcing slowing in

4  the mortgage loan production market as compared to the prior year, but touted its

5  operational results as compared to the industry-wide rate of origination:

> 'Countrywide's mortgage loan production results for the month of
> June and the second quarter of 2006 reflected the year-over-year
> slowdown in activity across the industry,' said Stanford L. Kurland,
> President and Chief Operating Officer. 'While the Company's total
> mortgage loan fundings for the second quarter of 2006 declined by 3
> percent year-over-year, they were up 13 percent from the first quarter
> of 2006, reflecting seasonal improvement. This compared positively
> to the industry, where industry origination volume for the second
> quarter of 2006 was estimated by various industry sources to decline,
> on average, by approximately 13 percent year-over-year. In addition,
> compared to last month, mortgage loan fundings and average daily
> applications increased. The mortgage pipeline also remains strong at
> $65 billion, matching last month and indicative of near-term strength
> in funding volume for Countrywide.'

16  Countrywide Financial Corp., Current Report (Form 8-K) (July 13, 2006).

17      124.  On July 24, 2006, Countrywide issued a press release touting its positive

18  results for the second quarter, including "a 25 percent year-over-year growth in diluted

19  earnings per share for the second quarter despite a 121 basis point rise in the 10-Year

20  U.S. Treasury yield and a 3 percent decline in our total loan funding volume."

21  Countrywide Financial Corp., Current Report (Form 8-K) (July 24, 2006). Defendant

22  Mozilo, explained:

> This demonstrated the power of our business model, as the strategic
> counterbalancing of our Production and Servicing sectors fueled
> positive results in our Mortgage Banking segment.  The ongoing
> growth initiatives in our other businesses are providing significant
> value to the consolidated franchise. Together, these activities help
> position the Company as a strong performer over the long term in a
> wide range of interest rate environments.

28  *Id.*

125.  On August 9, 2006, Countrywide issued a press release announcing a decline in its operational results for July 2006, which stated in part:

- Mortgage loan fundings for the month of July were $36 billion, a decrease of 19 percent from July 2005.  Year-to-date fundings of $256 billion were essentially flat as compared to last year.

- Monthly purchase volume in July was $17 billion as compared to $21 billion for July 2005.  Year-to-date purchase activity of $119 billion was down 3 percent from last year.

- Adjustable-rate loan fundings for the month of July were $17 billion, a decline of 27 percent from July 2005.  Year-to-date adjustable-rate volume was $125 billion, down 10 percent from last year.

- Average daily mortgage loan application activity in July was $2.5 billion, a decrease of 15 percent from last year.  The mortgage loan pipeline was $62 billion at July 31, 2006 as compared to $77 billion at July 31, 2005.

Defendant Kurland, attributed the results in residential mortgage loan production to current market conditions, including the slowed pace of home sales.   Countrywide Financial Corp., Current Report (Form 8-K) (Aug. 9, 2006).

126.  On September 14, 2006, Countrywide again issued a press release announcing a decline in its operational results for the previous month, August 2006, as compared to the prior year.  Defendant Mozilo attributed these results to the "expected industry slowdown."  Countrywide Financial Corp., Current Report (Form 8-K) (Sept. 14, 2006).

127.  On October 24, 2006, Countrywide announced, "In response to changing market conditions, management has initiated an expense and headcount reduction program. By year end, we expect that this program will generate an annualized cost savings run rate of over $500 million." The Company also announced:

We anticipate the fourth quarter of 2006 will be characterized by a continued slowdown in purchase volume beyond typical seasonality. However, should interest rates remain at their current levels or move

1
2
3
4
5

lower, we expect that increased refinance activity will mitigate this decline. We also continue to expect that margins will remain under pressure and that pricing will remain competitive as the mortgage market consolidates. In addition, pay-option loans - which have historically provided higher margins - are declining as a percentage of total production and have experienced margin erosion, and this trend may continue.

6

Countrywide Financial Corp., Current Report (Form 8-K) (Oct. 24, 2006).

7
8

128.   On March 12, 2007, Countrywide issued a press release announcing a further decline in its operational results for February 2007 which stated in part:

9
10
11
12
13
14
15

The nonprime lending industry is currently experiencing significant volatility and instability. . . . As a result, many nonprime competitors have recently exited the market and other lenders have suggested their continued viability is in question. Aggressive industry underwriting guidelines and lower home price appreciation have resulted in increasing delinquencies and defaults. Furthermore, as a result of investor concerns about nonprime loan performance, yield requirements have increased and secondary market liquidity has been reduced. These factors will adversely impact residual valuations and gains on sale of nonprime loans until market conditions improve.'

16
17
18
19
20
21

'In response to market factors, management has implemented changes to our origination policies to mitigate future exposure including further tightening of underwriting guidelines. Nonprime fundings were only 7 percent of total mortgage loan fundings in February and recent nonprime application volumes have declined as a result of our recent policy changes. At December 31, 2006, our nonprime residuals amounted to $402 million, which represents 0.2 percent of the Company's assets.

22
23
24
25
26
27
28

Management views that the long term impact of the current nonprime market dynamics is positive for both the industry and Countrywide. . . . The industry should benefit from more rational underwriting and pricing as excess lending capacity is eliminated. Countrywide is well positioned to take advantage of this market disruption due to its experience, operating controls, strong liquidity profile and relatively low exposure to nonprime. Nonetheless, the Company may experience short term earnings volatility during this transition period.

1  Countrywide Financial Corp., Current Report (Form 8-K) (Mar 12, 2007).

2       129.  On April 26, 2007, Countrywide announced the Company's earnings results

3  for the first quarter.  Defendant Mozilo explained that "[w]hile the Company's core

4  operations delivered what was otherwise a strong quarter, earnings were impacted by

5  charges relating to our subprime activities as well as increases to our loss reserves and

6  related asset valuation adjustments stemming from higher delinquencies and softer

7  housing markets."  Countrywide Financial Corp., Current Report (Form 8-K) (Apr. 26,

8  2007).  In addition, the announcement provided the following outlook for 2007:

> Management believes that considerable risks remain in the mortgage
> marketplace, including but not limited to potential further
> deterioration in the housing market that could impact origination
> volume and future credit costs; potential pending regulatory or
> legislative actions that could impose constraints on our operations;
> and other business risks as outlined in the disclaimer at the end of this
> press release. While the balance of 2007 is expected to be challenging,
> management continues to believe that current market conditions will
> result in opportunities in the form of further industry consolidation.
> Management also believes that the Company is well-positioned to
> capitalize upon these opportunities, which should strengthen
> Countrywide's franchise and result in accelerated future market share
> and earnings growth.

18  *Id.*

19       130.  On June 12, 2007, Countrywide issued a press release touting its positive

20  operational results for May 2007, including "a 17 percent increase in home purchase

21  activity from the prior month."  Countrywide Financial Corp., Current Report (Form 8-K)

22  (June 12, 2007).  President and Chief Operating Officer David Sambol attributed the

23  results to "[Countrywide's] focus on integrating the activities of our Bank and mortgage

24  company, Countrywide Bank funded $19 billion, or 44 percent, of total residential

25  mortgage production during the month of May 2007, its highest monthly amount to date."

26  *Id.*  Moreover, the Company announced that according to *Inside Mortgage Finance*, it

27  had retained its position as the number one mortgage originator in all channels for the

28  first quarter of 2007.  *Id.*

1     131. On July 16, 2007, Countrywide issued a press release announcing

2    operational results for June 2007 which stated in part:

3             'Market conditions became increasingly challenging throughout the

4             second quarter of 2007,' said David Sambol, President and Chief
Operating Officer. 'The housing market continues to soften, and

5             delinquencies and defaults continue to rise. Additionally, interest

6             rates, price competition in the residential lending markets and
secondary market volatility have all increased. However,

7             Countrywide's residential funding volume in June was strong, driven

8             primarily by seasonal purchase activity and higher application
volumes in preceding months.'

9

10   Countrywide Financial Corp., Current Report (Form 8-K) (July 16, 2007).

11     132. Countrywide's announcements were attempts by the Company to hide the

12   truth regarding upcoming impairment charges and drastic need for an infusion of cash.

13   Rather than disclose that Company stock had become an imprudent investment for the

14   Plan, Defendants continued to make optimistic statements about the Company's future

15   and, in particular, continued to make Employer Matching Contributions in Company

16   stock and allow Company stock to remain an investment option in the Plan.

17     **5.    Countrywide's Financial Problems Come to Light.**

18     133. In July 2007, it became abundantly clear that Countrywide had ignored

19   warnings regarding the risks of the subprime lending industry and that this failure was

20   leading to the Company's financial demise.

21     134. On July 24, 2007, Countrywide announced that it had taken impairment

22   charges of $417 million during the second quarter on the Company's investments in

23   credit-sensitive retained interests. The impairment included:

24             $388 million, or approximately $0.40 in earnings per diluted share
based on a normalized tax rate, of impairment on residual securities

25             collateralized by prime home equity loans. The impairment charges on

26             these residuals were attributable to accelerated increases in
delinquency levels and increases in the estimates of future defaults

27             and loss severities on the underlying loans.

28   Countrywide Financial Corp., Current Report (Form 8-K) (July 24, 2007).

1    135.  As a result of these developments, the Company updated its 2007 earnings

2    estimate.  The update cut the earnings estimate to $2.70 a share from $3.30, which was

3    already down from its previous guidance of $3.50 to $4.30 a share.  *Id.*  Upon this news

4    Countrywide's stock price fell $3.56 or 10.4 percent, closing at $30.50 per share, on

5    unprecedented volume of 51.2 million shares, a loss of over $1.87 billion in total market

6    capitalization.

7    136.  On  August  2,  2007,  Countrywide  issued  a  press  release  entitled:

8    "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition." The

9    press release stated in part:

10           'Our mortgage company has significant short-term funding liquidity
11           cushions and is supplemented by the ample liquidity sources of our
             bank. . . . In fact, we have almost $50 billion of highly-reliable short-
12           term funding liquidity available as a cushion today. It is important to
13           note that the Company has experienced no disruption in financing its
             ongoing daily operations, including placement of commercial paper.'
14
15           'Countrywide's financial condition remains strong, as evidenced by
             over $14 billion of net worth, significant excess capital and our strong
16           investment grade credit ratings. . . . Two independent credit rating
             agencies, Moody's Investors Service and Standard & Poor's Rating
17           Service, this week re-affirmed their ratings and stable outlook for
18           Countrywide, its bank and its mortgage company.'

19    *Countrywide Comments on Its Strong Funding Liquidity and Financial Condition,*

20    PR Newswire (Aug. 2, 2007).

21           137.  On August 6, 2007, Countrywide detailed the Company's liquidity sources

22    in an unprecedented disclosure.  Upon release of these disclosures, the price of

23    Countrywide rose 7.0 percent or $1.75, closing at $26.75, on volume of 50.5 million

24    shares. Countrywide Financial Corp., Current Report (Form 8-K) (Aug. 6, 2007).

25           138.  On August 9, 2007, after the close of the markets, Countrywide issued its

26    second quarter results and disclosed the Company's significant financing needs which

27    contradicted its statement one week earlier that the Company's financial situation

28    remained strong and raised questions about the short-term sufficiency and reliability of

1   the reserves presented in its August 6, 2007 Form 8-K.  The Form 10-Q filed August 9,
2   2007 stated in part:

3       Item 1A.     Risk Factors

4       Item 1A of our 2006 Annual Report presents risk factors that may
5       impact the Company's future results. In light of recent developments
        in the mortgage; housing and secondary markets, those risk factors are
6       supplemented by the following risk factor:

7       ***Debt and secondary mortgage market conditions could have a
8       material adverse impact on our earnings and financial condition***

9       We have significant financing needs that we meet through the capital
10      markets, including the debt and secondary mortgage markets. These
        markets are currently experiencing unprecedented disruptions, which
11      could have an adverse impact on the Company's earnings and
12      financial condition, particularly in the short term.

13      Current conditions in the debt markets include reduced liquidity and
14      increased credit risk premiums for certain market participants. These
        conditions, which increase the cost and reduce the availability of debt,
15      may continue or worsen in the future. The Company attempts to
16      mitigate the impact of debt market disruptions by obtaining adequate
        committed and uncommitted facilities from a variety of reliable
17      sources. There can be no assurance however, that the Company will
18      be successful in these efforts, that such facilities will be adequate or
        that the cost of debt will allow us to operate at profitable levels. The
19      Company's cost of debt is also dependent on its maintaining
20      investment-grade credit ratings. Since the Company is highly
        dependent on the availability of credit to finance its operations,
21      disruptions in the debt markets or a reduction in our credit ratings,
22      could have an adverse impact on our earnings and financial condition,
        particularly in the short term.
23
24      The secondary mortgage markets are also currently experiencing
        unprecedented disruptions resulting from reduced investor demand for
25      mortgage loans and mortgage-backed securities and increased investor
        yield-requirements for those loans and securities. These conditions
26      may continue or worsen in the future. In light of current conditions,
27      we expect to retain a larger portion of mortgage loans and mortgage-
        backed securities than we would in other environments. While our
28      capital and liquidity positions are currently strong and we believe we

-41-

1
2
3
4
5

> have sufficient capacity to hold additional mortgage loans and mortgage backed securities until investor demand improves and yield requirements moderate, our capacity to retain mortgage loans and mortgage backed securities is not unlimited. As a result, a prolonged period of secondary market illiquidity may reduce our loan production volumes and could have an adverse impact on our future earnings and financial condition.

6
7

Countrywide Financial Corp. Quarterly Report (Form 10-Q) (Aug. 9, 2007) (emphasis added).

8
9
10
11
12
13
14
15
16

139.    On August 15, 2007, Countrywide shares sank 13 percent, their biggest one-day decline since the 1987 stock market crash, on fears that the largest U.S. mortgage lender could face bankruptcy, spurred by a downgrade of Countrywide stock from a "Buy" recommendation to "Sell" by Merrill Lynch analyst Kenneth Bruce. Bruce stated that "[i]f enough financial pressure is placed on Countrywide or if the market loses confidence in its ability to function properly, then the model can break, leading to an effective insolvency. . . . If liquidations occur in a weak market, then it is possible for Countrywide to go bankrupt.'" Jonathan Stempel, *Countrywide Plunges on Bankruptcy Fear*, Reuters, Aug. 15, 2007.

17
18
19
20
21
22

140.    The following day, August 16, 2007, Countrywide announced that it had drawn down its $11.5 billion credit facility to supplement its funding liquidity position. According to David Sambol, President and Chief Operating Officer:  "Along with reduced liquidity in the secondary market, funding liquidity for the mortgage industry has also become constrained." Countrywide Financial Corp. Current Report (Form 8-K) (Aug. 16, 2007).

23
24
25
26
27

141.    Analysts characterized Countrywide's chosen course as a move made in desperation: "Countrywide said it would tap its $11.5 billion bank line of credit to provide liquidity. And tap is the right word, because usually a bank line like this is your liquidity source of last resort, which you use only when you're tapped out." Randall W. Forsyth, *On Borrowed Time*, Barron's Online, Aug. 20, 2007.

28

142.  Upon news of the downgrade and the announcement that the Company had drawn down its *entire* credit facility, Countrywide shares tumbled and closed at $18.95 per share, a decline of 42 percent from the start of the Class Period.

143.  As of August 17, 2007, Countrywide began laying off employees involved in loan origination – only two weeks after it reported hiring loan officers from rivals forced to close shop.  James R. Hagerty, *Countrywide Begins Staff Layoffs*, Wall St. J., Aug. 20, 2007, at A6.

144.  On August 22, 2007, Countrywide issued a press release in which the Company announced that it had received a much needed infusion of cash in the form of a $2 billion equity investment from Bank of America.  The investment is in the form of a non-voting convertible preferred security yielding 7.25 percent annually.  Under the terms of the agreement, the security can be converted into common stock at $18 per share, with resulting shares subject to restrictions on trading for 18 months after conversion.  Defendant Mozilo, in the Company's press release, stated in part:

> Bank of America's investment in Countrywide represents a vote of confidence and strengthens our balance sheet, enabling us to position Countrywide for future growth and success. This transaction benefits all of Countrywide's constituents, including investors, shareholders, mortgage customers, deposit holders, business partners and employees.

Countrywide Financial Corp. Press Release, *Countrywide Receives $2 Billion Strategic Equity Investment From Bank of America*, attached as Exhibit 99.1 to Countrywide Financial Corp, Current Report (Form 8-K) (Aug. 23, 2007).  However, analysts characterized the agreement as highly *unfavorable* to Countrywide:

> As it turned out, Bank of America's generous gesture was not entirely altruistic.  In return for the $2 billion, it got a preferred that paid 7.25%, a much heftier yield than the 2.5% to 3.5% converts issued by Countrywide a scant three months earlier.  Moreover, the preferred sold to Bank of America is convertible at a surprisingly 205 below then market price of Countrywide common.

Alan Abelson, *Up and Down Wall Street*, Barron's Online, Aug. 27, 2007.

145. The investment by Bank of America was supposed to strengthen Countrywide's financials, but was met with skepticism in the market. "Two billion dollars from Bank of America is not a lot compared to what they may need," said Stuart Plesser, an equity analyst at Standard & Poor's in New York. James R. Hagerty and Karen Richardson, *Why is Countrywide Sliding? It's Unclear, That's the Issue*, Wall St. J., Aug. 29, 2007.

146. On September 7, 2007, Countrywide announced that it would cut up to 12,000 additional jobs, amounting to as much as 20 percent of the Company's workforce. *Countrywide Announces Plan to Address Changing Market Conditions Including Workforce Reductions*, attached as Exhibit 99.1 to Countrywide Financial Corp, Current Report (Form 8-K) (Sept. 7, 2007). Countrywide also announced plans to revise its product offerings to include only high quality prime loans or loans that can be sold in the secondary market. *Id.*

147. On September 11, 2007, it was announced that Countrywide had hired Goldman Sachs Group, Inc. to help it find additional financing for the second time in less than a month. Steve Dickson, *Countrywide Shares Fall on Report Lender Needs Cash*, Bloomberg News, Sept. 11, 2007. As a result of this news, Company stock fell 5 percent to $16.18, its lowest closing price in four years.

148. On September 13, 2007, the Company announced that it had secured an additional $12 billion in secured borrowing through new or existing credit lines. Lingling Wei, *Countrywide Loan Fundings Fall; Lender Lines Up $12 Billion Credit*, Wall St. J., Sept. 13, 2007.

**C.    Defendants Knew or Should Have Known That Countrywide Stock Was an Imprudent Investment.**

149. During the Class Period, as described herein, Defendants knew or, had they properly discharged their fiduciary obligations, would have known that Countrywide stock was imprudent investment alternatives for the Plan due to Countrywide's serious mismanagement and improper business practices, including, among other practices: (a)

-44-

1  marketing and extending subprime mortgage loans, made on a "low documentation"
2  basis, without adequate consideration of the borrower's ability to repay and with
3  unreasonably high risk of borrower default; (b) intentionally marketing subprime loans
4  with high risk of default to borrowers who qualified for prime-rate loans in order to
5  increase Company profits; (c) encouraging brokers to market excessively high-cost loans
6  with greater risk of default to borrowers by offering incentive commissions; (d)
7  representing that Countrywide had strict and selective underwriting and loan origination
8  practices; (e) representing that Countrywide had sufficient reserves set aside to cover the
9  high-risk loans it was selling; (f) operating with inadequate liquidity in relation to the
10  volatility of Countrywide's business lines and assets; and (g) operating without the
11  requisite internal controls to determine appropriate loan loss provisions.

12      150.  As a result, Countrywide's stock price and the price of the Fund were
13  artificially inflated making them an imprudent investment for the Plan.

14      151.  As a result of Defendants' knowledge of the public misconceptions concerning
15  the true financial health of the Company, any generalized warnings of market and
16  diversification risks that Defendants made to the Plan's participants regarding the Plan's
17  investment in Countrywide stock did not effectively inform the Plan's participants of the past,
18  immediate, and future dangers of investing in Company stock.

19      152.  Defendants also failed to take into account the changing risk profile of the
20  Countrywide stock investment as a result of the above circumstances and the Company's
21  deteriorating financial circumstances as demonstrated by objective indicators for
22  evaluating a company's ongoing viability.

23      153.  The Defendants failed to conduct an appropriate investigation into whether
24  Countrywide stock was a prudent investment for the Plan and, in connection therewith, failed
25  to provide the Plan's participants with information regarding Countrywide's tremendous
26  problems so that participants could make informed decisions regarding their investments in
27  Countrywide stock in the Plan.

28

154. An adequate or even cursory investigation by Defendants would have revealed to a reasonable fiduciary that, under these circumstances, investment by the Plan in Countrywide stock was excessively and unduly risky, and, thus, imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

155. Because Defendants knew or should have known that Countrywide was not a prudent investment option for the Plan, they had a fiduciary duty to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Countrywide stock.

156. Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures, as necessary; divesting the Plan of Countrywide stock; discontinuing further contributions to and/or investment in Countrywide stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Countrywide they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Countrywide stock.

157. Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's investment in Countrywide stock. In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as Countrywide's problems came to light.

158. In addition, the Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

159. When it came to their own personal holdings of Countrywide stock, however, the Insider Selling Defendants sold millions of dollars of the stock, effectively cashing in while hanging Plan participants out to dry. Such conduct violated the duties of prudence and loyalty under ERISA.

-46-

**D.    Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Countrywide Stock in the Plan.**

160.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

161.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with participants in the Plan which included statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents, in which Defendants failed to disclose that Company stock was not a prudent retirement investment, and which were incorporated by reference in Plan documents.  The Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company's common stock, which was, far and away, the single largest asset of the Plan.  2006 Form 11-K at 10.

162.    Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

> (a).    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;
>
> (b).    Out of loyalty, employees tend to invest in company stock;
>
> (c).    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;
>
> (d).    Employees tend not to change their investment option allocations in the plan once made;
>
> (e).    No qualified retirement professional would advise rank and file

1    employees to invest more than a modest amount of retirement savings in
2    company stock, and many retirement professionals would advise employees
3    to avoid investment in company stock entirely;

4        (f).    Lower income employees tend to invest more heavily in company
5    stock than more affluent workers, though they are at greater risk; and

6        (g).    Even for risk-tolerant investors, the risks inherent to company stock
7    are not commensurate with it rewards.

8        163.  Even though Defendants knew or should have known these facts, and even
9    though Defendants knew of the high concentration of the Plan's funds in Company stock
10   during the Class Period, Defendants failed to take any meaningful ameliorative action to
11   protect the Plan and its participants from their heavy investment in an imprudent
12   retirement vehicle, Countrywide stock.

13       164.  In addition, Defendants failed to provide participants, and the market as a
14   whole, with complete and accurate information regarding the true financial condition of
15   the Company.  As such, participants in the Plan could not appreciate the true risks
16   presented by investments in Company stock and therefore could not make informed
17   decisions regarding their investments in Company stock in the Plan.

18       165.  Specifically, Defendants failed to provide the Plan's participants with
19   complete and accurate information regarding Countrywide's serious mismanagement and
20   improper business practices, including, among other practices:  (a) marketing and
21   extending subprime mortgage loans, made on a "low documentation" basis, without
22   adequate consideration of the borrower's ability to repay and with unreasonably high risk
23   of borrower default; (b) intentionally marketing subprime loans with high risk of default
24   to borrowers who qualified for prime-rate loans in order to increase Company profits; (c)
25   encouraging brokers to market excessively high-cost loans with greater risk of default to
26   borrowers by offering incentive commissions; (d) representing that Countrywide had
27   strict and selective underwriting and loan origination practices; (e) representing that
28   Countrywide had sufficient reserves set aside to cover the high-risk loans it was selling;

1    (f) operating with inadequate liquidity in relation to the volatility of Countrywide's
2    business lines and assets; and (g) operating without the requisite internal controls to
3    determine appropriate loan loss provisions.

4    166.  As such, the participants were not informed of the true risks of investing
5    their retirement assets in the Plan in Countrywide stock.

6    **E.    Defendants Suffered From Conflicts of Interest.**

7    167.  As ERISA fiduciaries, Defendants are required to manage the Plan's
8    investments, including the investment in Countrywide stock, solely in the interest of the
9    participants and beneficiaries, and for the exclusive purpose of providing benefits to
10   participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid
11   conflicts of interest and to resolve them promptly when they occur.

12   168.  Conflicts of interest abound when a company that invests plan assets in
13   company stock founders.  This is because as the situation deteriorates, plan fiduciaries are
14   torn between their duties as officers and directors for the company on the one hand, and
15   to the plan and plan participants on the other.  As courts have made clear "'[w]hen a
16   fiduciary has dual loyalties, the prudent person standard requires that he make a careful
17   and impartial investigation of all investment decisions.'"  *Martin v. Feilen,* 965 F.2d 660,
18   670 (8th Cir.1992) (citation omitted).  Here, Defendants breached this fundamental
19   fiduciary duty.

20   169.  First, Defendants failed to investigate whether to take appropriate and
21   necessary action to protect the Plan, and instead, chose the interests of the Company over
22   the Plan by continuing to offer Countrywide stock as a Plan investment option, and
23   maintain investment in Countrywide stock in the Plan.

24   170.  Second, certain of the Defendants who knew or should have known of
25   Countrywide's inflated stock price during much of the Class Period, benefited directly
26   from this knowledge or neglect by selling their personal holdings of Countrywide stock
27   for significant gain.  During the Class Period, the Insider Selling Defendants sold
28   approximately 7,804,506 shares of Countrywide stock for proceeds of over $294 million.

-49-

The following is a summary of the insider sales by these Plan fiduciaries since January 2006:

| Name | Sales | Shares Sold | Proceeds of Sales |
|---|---|---|---|
| Mozilo | 116 | 6,451,463 | $242,912,933 |
| Cisneros | 3 | 79,407 | $3,052,506 |
| Cunningham | 12 | 75,000 | $3,004,450 |
| Donato | 2 | 54,142 | $2,142,052 |
| Dougherty | 12 | 227,905 | $9,182,698 |
| Gates | 4 | 75,000 | $2,978,475 |
| Heller | 3 | 106,540 | $4,014,688 |
| Kurland | 34 | 413,049 | $15,211,426 |
| Robertson | 3 | 152,000 | $5,966,400 |
| Snyder | 6 | 170,000 | $6,462,738 |
| TOTALS: | 196 | 7,804,506 | $294,928,366 |

171.   In particular, Defendant Mozilo engaged in significant selling during the Class Period.  Upon review of the Form 4s filed in the last year alone, Defendant Mozilo made a profit of $129 million from the sale of Company stock, approximately one-third of the amount he has reaped over the past 23 years.  Defendant Mozilo continues to hold approximately 500,000 shares in Countrywide stock.  Form 4 (Aug. 13, 2007).

172.   The Insider Selling Defendants breached their fiduciary duties to the Plan and its participants, as, rather than ensure that the Plan discontinued investment in Company stock or informing Plan participants regarding the material negative information concerning the Company's above-outlined problems, they chose to remain quiet and reap the benefit of their insider knowledge by selling their personal holdings of Countrywide for enormous gain.

173.   While the above Defendants protected and enriched themselves, they stood idly by as the Plan lost well over one hundred million dollars because of its investment in Countrywide stock.  This is precisely the type of conflicted and disloyal action that ERISA was intended to prevent.

1

## VIII. THE RELEVANT LAW

2    174. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that

3    a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §

4    1109.

5    175. ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary

6    Duty," provides, in pertinent part, that:

7            any person who is a fiduciary with respect to a plan who breaches any
             of the responsibilities, obligations, or duties imposed upon fiduciaries
8            by this subchapter shall be personally liable to make good to such plan
             any losses to the plan resulting from each such breach, and to restore
9            to such plan any profits of such fiduciary which have been made
             through use of assets of the plan by the fiduciary, and shall be subject
10           to such other equitable or remedial relief as the court may deem
             appropriate, including removal of such fiduciary.
11

12

13   176. ERISA  §  502(a)(3), 29 U.S.C.  §  1132(a)(3),  authorizes  individual

14   participants to seek equitable relief from defendants, including, without limitation,

15   injunctive relief and, as available under applicable law, constructive trust, restitution, and

16   other monetary relief.

17   177. ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B),

18   provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan

19   solely in the interest of the participants and beneficiaries, for the exclusive purpose of

20   providing benefits to participants and their beneficiaries, and with the care, skill,

21   prudence, and diligence under the circumstances then prevailing that a prudent man

22   acting in a like capacity and familiar with such matters would use in the conduct of an

23   enterprise of a like character and with like aims.

24   178. These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to

25   as the duties of loyalty, exclusive purpose and prudence and are the "highest known to

26   the law." *Howard v. Shay,* 100 F.3d 1484, 1489 (9th Cir. 1996). They entail, among

27   other things:

28

and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance Countrywide stock, to ensure that each investment is a suitable option for the plan;

(b).    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c).    The duty to follow the terms of the plan document only "insofar as such documents and instruments are consistent with the provisions of [title I] and title IV" of ERISA. 29 U.S.C. § 1104(a)(1)(D). Therefore, if a plan's terms are inconsistent with ERISA, a prudent fiduciary acting in the best interests of the plan's participants must effectively override the plan's terms. The Department of Labor's regulations interpreting ERISA also demonstrate that the fiduciary's duty of prudence trumps even his obligations to comply with plan terms, including statements of investment policy or plan design; and

(d).    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

179.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

180. Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

181. Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## IX.   ERISA § 404(c) DEFENSE INAPPLICABLE

182. ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over

1   investment decisions.  In order for § 404(c) to apply, participants must in fact exercise
2   "independent control" over investment decisions, and the fiduciaries must otherwise
3   satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29
4   U.S.C. § 1104(c), and the regulations promulgated under it.

5       183.  ERISA § 404(c) does not apply here for, among others, the following three
6   reasons.

7       184.  First, ERISA § 404(c) does not and cannot provide any defense to the
8   fiduciaries' imprudent decision to select and continue offering Countrywide stock as an
9   investment option in the Plan, or to continue matching in Countrywide stock, as these are
10  not decisions that were made or controlled by the participants.  *See* Final Reg. Regarding
11  Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final
12  404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992)
13  (codified at 29 C.F.R. § 2550) (noting that "the act of limiting or designating investment
14  options which are intended to constitute all or part of the investment universe of an
15  ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary
16  designation or express plan language, is not a direct or necessary result of any participant
17  direction of such plan").

18      185.  Second, as to participant directed investment in Countrywide stock, ERISA
19  § 404(c) does not apply because Defendants failed to ensure effective participant control
20  by providing complete and accurate material information to participants regarding
21  Countrywide stock.  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be
22  provided with "sufficient information to make informed decisions").  As a consequence,
23  participants in the Plan did not have informed control over the portion of the Plan's assets
24  that were invested in Countrywide stock as a result of their investment directions, and the
25  Defendants remain entirely responsible for losses that result from such investment.

26      186.  Third, upon information and belief, the Plan participants were not informed
27  that the Plan intended to comply as a § 404(c) plan in the manner required by ERISA and
28  applicable regulations.  Therefore, §404(c) of ERISA does not apply to participants'

1   "investment decisions" regarding Countrywide stock, and Defendants remain liable for
2   losses suffered by participants during the Class Period as a result of such decisions.

3   187.   Because ERISA § 404(c) does not apply here, the Defendants' liability to the
4   Plan, the Plaintiff and the Class (as defined below) for losses caused by the Plan's
5   investment in Countrywide stock is established upon proof that such investments were or
6   became imprudent and resulted in losses in the value of the assets in the Plan during the
7   Class Period.

8   **X.  DEFENDANTS' INVESTMENT IN COUNTRYWIDE STOCK IS NOT
     ENTITLED TO A PRESUMPTION OF PRUDENCE**
9

10  188.   The presumption of prudence that some courts have held applies to the
11  decision to make and maintain investment in company stock in an ESOP does not apply
12  here because the Plan was not, in fact, designed to require the offering of Company stock
13  as a Plan investment option.  Rather, Company stock is a discretionary feature of the
14  Plan.  Accordingly, the Plan lacks the principle feature on which the presumption of
15  prudence is based – namely a need to balance two competing objectives of typical ESOPs
16  – retirement savings on the one hand, and the goal of long term employee ownership on
17  the other.  Here, the Plan's only long-term purpose is retirement savings.

18  189.   To the extent that a presumption of reasonableness applies to the decision to
19  maintain investments in company stock in the purported ESOP portion of the Plan, such
20  presumption is overcome by the facts alleged here, including, among other averments:

21  • A precipitous stock price decline from over $32.49 to $19.81 during the Class
22    Period;

23  • Serious and gross mismanagement evidenced by, among other things:
24    o marketing and extending subprime mortgage loans, made on a "low
25      documentation" basis, without adequate consideration of the borrower's
26      ability to repay and with unreasonably high risk of borrower default;
27    o intentionally marketing subprime loans with high risk of default to
28      borrowers who qualified for prime-rate loans in order to increase

-55-

Company profits;

o encouraging brokers to market excessively high-cost loans with greater risk of default to borrowers by offering incentive commissions;

o representing that Countrywide had strict and selective underwriting and loan origination practices;

o representing that Countrywide had sufficient reserves set aside to cover the high-risk loans it was selling;

o operating with inadequate liquidity in relation to the volatility of Countrywide's business lines and assets; and

o operating without the requisite internal controls to determine appropriate loan loss provisions

o the artificial inflation of Countrywide stock as a result of the above improper business practices.

• Countrywide's deteriorating financial condition calling into question the Company's ongoing viability as a result of the Company's inadequate reserves and risky and inappropriate lending practices; and

• Insider self-dealing by Defendants identified above.

190. The imprudence of continued investment by Defendants in Countrywide stock during the Class Period runs afoul of Department of Labor regulations:

> [B]ecause every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. § 2509.94-1. Defendants had available to them investment alternatives to Countrywide stock that had either a higher rate of return with risk commensurate to Countrywide stock or an expected rate of return commensurate to Countrywide stock but with less risk.

1     191.  Based on these circumstances, and the others alleged herein, it was

2  imprudent and an abuse of discretion for Defendants to continue to make and maintain

3  investment in Countrywide stock, and, effectively, to do nothing at all to protect the Plan

4  from large losses as a result of such investment during the Class Period.

5                           **XI.  CAUSES OF ACTION**

6  **A.    Count I:  Failure to Prudently and Loyally Manage the Plan and Assets of the**
        **Plan.**
7
8     192.  Plaintiff incorporates by this reference the paragraphs above.

9     193.  This Count alleges fiduciary breach against: the Company, the Director

10 Defendants and the Administrative Committee Defendants during such time as each

11 served as the Plan Administrator, respectively, and the Investment Committee

12 Defendants.

13    194.  The Defendants named in this Count were named fiduciaries pursuant to

14 ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of

15 § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of

16 loyalty, exclusive purpose, and prudence.

17    195.  As alleged above, the scope of the fiduciary duties and responsibilities of the

18 Defendants included managing the assets of the Plan for the sole and exclusive benefit of

19 the Plan's participants and beneficiaries, and with the care, skill, diligence, and prudence

20 required by ERISA.  The Defendants were directly responsible for, among other things,

21 selecting prudent investment options, eliminating imprudent options, determining how to

22 invest employer contributions to the Plan and directing the Trustee regarding the same,

23 evaluating the merits of the Plan's investments on an ongoing basis, and taking all

24 necessary steps to ensure that the Plan's assets were invested prudently.

25    196.  Yet, contrary to their duties and obligations under the Plan documents and

26 ERISA, the Defendants failed to loyally and prudently manage the assets of the Plan.

27 Specifically, during the Class Period, these Defendants knew or should have known that

28 Countrywide stock no longer was a suitable and appropriate investment for the Plan, but

1   was, instead, a highly speculative and excessively risky investment in light of the
2   Company's fundamental weaknesses, deteriorating financial circumstances, and
3   challenges to its ongoing viability.   Nonetheless, during the Class Period, these
4   Defendants continued to offer Countrywide stock as an investment option for participant
5   contributions in the Plan, as well as the sole investment receptacle for Employer
6   Matching Contributions in the Plan during the Class Period, even though the Defendants
7   named in this Count had: (1) the discretion to suspend offering Company stock as a Plan
8   investment option; (2) the discretion to suspend making matching contributions and
9   discretionary contributions in Company stock, and instead, invest such amount in cash,
10  and (3) the discretion to adopt rules permitting participants to elect to invest all or a
11  portion of the Company Stock held in their accounts in another Fund. *See* Section V. ,
12  *supra.*

13      197.  Defendants could have and should have taken action to protect Plan
14  participants from unnecessary losses by utilizing their discretion under the Plan
15  Document and ERISA to suspend offering Company stock as a Plan investment option
16  during the Class Period and matching in the stock.  Instead, the Defendants continued to
17  offer Countrywide stock in the Plan despite the fact that they clearly knew or should have
18  known that such investment was unduly risky and imprudent due to the Company's
19  serious mismanagement and improper business practices, described herein.

20      198.  The Defendants were obliged to prudently and loyally manage all of the
21  Plan's assets. However, their duties of prudence and loyalty were especially significant
22  with respect to Company stock because:  (a) company stock is a particularly risky and
23  volatile investment, even in the absence of company misconduct; and (b) participants
24  tend to underestimate the likely risk and overestimate the likely return of investment in
25  company stock.  In view of this, the Defendants were obliged to have in place a regular,
26  systematic procedure for evaluating the prudence of investment in Company stock.

27      199.  The Defendants had no such procedure.  Moreover, they failed to conduct an
28  appropriate investigation of the merits of continued investment in Countrywide stock

1    even in light of the losses, the Company's highly risky and inappropriate practices, and
2    the particular dangers that these practices posed to the Plan. Such an investigation would
3    have revealed to a reasonably prudent fiduciary the imprudence of continuing to make
4    and maintain investment in Countrywide stock under these circumstances.

5        200.   The Defendants' decisions respecting the Plan's investment in Countrywide
6    stock described above, under the circumstances alleged herein, abused their discretion as
7    ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would
8    have made different investment decisions. Specifically, based on the above, a prudent
9    fiduciary could not have reasonably believed that further and continued investment of the
10   Plan's contributions and assets in Countrywide stock was in keeping with the Plan's
11   settlor's expectations of how a prudent fiduciary would operate.

12       201.   The Defendants were obligated to discharge their duties with respect to the
13   Plan with the care, skill, prudence, and diligence under the circumstances then prevailing
14   that a prudent man acting in a like capacity and familiar with such matters would use in
15   the conduct of an enterprise of a like character and with like aims.   ERISA §
16   404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

17       202.   According to DOL regulations and case law interpreting this statutory
18   provision, a fiduciary's investment or investment course of action is prudent if:  (a) he
19   has given appropriate consideration to those facts and circumstances that, given the scope
20   of such fiduciary's investment duties, the fiduciary knows or should know are relevant to
21   the particular investment or investment course of action involved, including the role the
22   investment or investment course of action plays in that portion of the plan's investment
23   portfolio with respect to which the fiduciary has investment duties; and (b) he has acted
24   accordingly.

25       203.   Again, according to DOL regulations, "appropriate consideration" in this
26   context includes, but is not necessarily limited to:

27       •   A determination by the fiduciary that the particular investment or investment
28           course of action is reasonably designed, as part of the portfolio (or, where

-59-

1  applicable, that portion of the plan portfolio with respect to which the fiduciary
2  has investment duties), to further the purposes of the plan, taking into
3  consideration the risk of loss and the opportunity for gain (or other return)
4  associated with the investment or investment course of action; and

5  • Consideration of the following factors as they relate to such portion of the
6  portfolio:

7      o The composition of the portfolio with regard to diversification;
8      o The liquidity and current return of the portfolio relative to the anticipated
9        cash flow requirements of the plan; and
10     o The projected return of the portfolio relative to the funding objectives of
11       the plan.

12  204.  Given the conduct of the Company as described above, the Defendants could
13  not possibly have acted prudently when they continued to invest the Plan's assets in
14  Countrywide stock because, among other reasons:

15  • The Prudence Defendants knew of and/or failed to investigate the failures of
16    the Company, including, but not limited to the following, which made the
17    Company an extremely risky and imprudent investment for the Plan:

18      o marketing and extending subprime mortgage loans, made on a "low
19        documentation" basis, without adequate consideration of the borrower's
20        ability to repay and with unreasonably high risk of borrower default;
21      o intentionally marketing subprime loans with high risk of default to
22        borrowers who qualified for prime-rate loans in order to increase
23        Company profits;
24      o encouraging brokers to market excessively high-cost loans with greater
25        risk of default to borrowers by offering incentive commissions
26      o representing that Countrywide had strict and selective underwriting and
27        loan origination practices;
28      o representing that Countrywide had sufficient reserves set aside to cover

the high-risk loans it was selling;

   o operating with inadequate liquidity in relation to the volatility of Countrywide's business lines and assets; and

   o operating without the requisite internal controls to determine appropriate loan loss provisions; and

   o the artificial inflation of Countrywide stock as a result of the above improper business practices.

- The risk associated with the investment in Countrywide stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plan's participants, and the Prudence Defendants knew that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it;

- Knowing of this extraordinary risk, and knowing the Plan's participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plan or any participant from investing the Plan's assets in Countrywide stock; and

- Further, knowing that the Plan was not a diversified portfolio, but was heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

205.   The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor. On information and belief, the Insider Selling Defendants acted in their own self-interest in benefiting from selling huge amounts of Company stock at fraudulently inflated values. Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is

1 | untainted by the conflict and made in a disinterested fashion, typically by seeking
2 | independent financial and legal advice obtained only on behalf of the plan.

3 |     206. The Insider Selling Defendants breached their duty to avoid conflicts of
4 | interest and to promptly resolve them by, *inter alia*, failing to engage independent
5 | advisors who could make independent judgments concerning the Plan's investment in
6 | Countrywide; failing to notify appropriate federal agencies, including the DOL, of the
7 | facts and circumstances that made Countrywide stock an unsuitable investment for the
8 | Plan; failing to take such other steps as were necessary to ensure that participants'
9 | interests were loyally and prudently served; with respect to each of these above failures,
10 | doing so in order to avoid adversely impacting their own compensation or drawing
11 | attention to Countrywide's inappropriate practices; engaging in insider sales of
12 | Countrywide stock and yet, taking no action to disclose to the Plan's participants the
13 | reason for their sales or to protect the Plan's holdings of Countrywide stock once proper
14 | disclosure was made; and by otherwise placing their own and Countrywide's improper
15 | interests above the interests of the participants with respect to the Plan's investment in
16 | Countrywide stock.

17 |     207. As a consequence of the Defendants' breaches of fiduciary duty alleged in
18 | this Count, the Plan suffered tremendous losses. If the Defendants had discharged their
19 | fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan
20 | would have been minimized or avoided. Therefore, as a direct and proximate result of
21 | the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the
22 | other Class members, lost well over one hundred million dollars of retirement savings.

23 |     208. Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),
24 | 1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the Plan caused by
25 | their breaches of fiduciary duties alleged in this Count and to provide other equitable
26 | relief as appropriate.

27
28

**B.    Count II:  Failure to Monitor Fiduciaries.**

209.   Plaintiff incorporates by this reference the allegations above.

210.   This Count alleges fiduciary breaches against the following Defendants: the Company, Director Defendants and Compensation Committee Defendants, through which the Company and the Board of Directors acted in carrying out their appointment responsibilities (collectively, the "Monitoring Defendants").

211.   As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

212.   As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| Countrywide | Investment Committee<br>Administrative Committee | ¶ 63 |
| Director Defendants | Compensation Committee<br>Investment Committee<br>Administrative Committee | ¶¶ 67-69 |
| Compensation Committee | Investment Committee<br>Administrative Committee | ¶¶ 74-76 |

213.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

214.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic

-63-

1    reports on their work and the plan's performance, and by ensuring that they have a
2    prudent process for obtaining the information and resources they need). In the absence of
3    a sensible process for monitoring their appointees, the appointing fiduciaries would have
4    no basis for prudently concluding that their appointees were faithfully and effectively
5    performing their obligations to plan participants or for deciding whether to retain or
6    remove them.

7        215.  Furthermore, a monitoring fiduciary must provide the monitored fiduciaries
8    with complete and accurate information in their possession that they know or reasonably
9    should know that the monitored fiduciaries must have in order to prudently manage the
10    plan and the plan assets, or that may have an extreme impact on the plan and the
11    fiduciaries' investment decisions regarding the plan.

12        216.  The Monitoring Defendants breached their fiduciary monitoring duties by,
13    among other things: (a) failing, at least with respect to the Plan's investment in Company
14    stock, to monitor their appointees, to evaluate their performance, or to have any system in
15    place for doing so, and standing idly by as the Plan suffered enormous losses as a result
16    of their appointees' imprudent actions and inaction with respect to Company stock; (b)
17    failing to ensure that the monitored fiduciaries appreciated the true extent of
18    Countrywide's highly risky and inappropriate business and accounting practices, and the
19    likely impact of such practices on the value of the Plan's investment in Countrywide
20    stock; (c) to the extent any appointee lacked such information, failing to provide
21    complete and accurate information to all of their appointees such that they could make
22    sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing
23    to remove appointees whose performance was inadequate in that they continued to make
24    and maintain investments in Countrywide stock despite their knowledge of practices that
25    rendered Countrywide stock an imprudent investment during the Class Period for
26    participants' retirement savings in the Plan, and who breached their fiduciary duties
27    under ERISA.

28

217.  As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost well over one hundred million dollars of retirement savings.

218.  Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.    Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plan's Participants and Beneficiaries.**

219.  Plaintiff incorporates by this reference the allegations above.

220.  This Count alleges fiduciary breach against: the Company, the Director Defendants and the Administrative Committee Defendants.

221.  At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

222.  At all relevant times, the scope of the fiduciary responsibility of the Defendants included the communications and material disclosures to the Plan participants and beneficiaries.

223.  The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options such that participants can make informed decisions with regard to the

1   prudence of investing in such options made available under the plan. This duty applies to
2   all of the Plan's investment options, including investment in Countrywide stock.

3       224. Because investments in the Plan were not diversified (*i.e.* the Defendants
4   chose to invest the Plan's assets, and/or allow those assets to be invested so heavily in
5   Countrywide stock), such investment carried with it an inherently high degree of risk.
6   This inherent risk made the Defendants' duty to provide complete and accurate
7   information particularly important with respect to Countrywide stock.

8       225. The Defendants breached their duty to inform participants by failing to
9   provide complete and accurate information regarding Countrywide's serious
10  mismanagement and improper business practices, public misrepresentations and material
11  accounting irregularities, and the consequential artificial inflation of the value of
12  Countrywide stock, and, generally, by conveying incomplete information regarding the
13  soundness of Countrywide stock and the prudence of investing and holding retirement
14  contributions in Countrywide equity. These failures were particularly devastating to the
15  Plan and its participants; a heavy percentage of the Plan's assets were invested in
16  Countrywide stock during the Class Period and, thus, losses in this investment had a
17  significant impact on the value of participants' retirement assets.

18      226. Defendants' omissions clearly were material to participants' ability to
19  exercise informed control over their Plan accounts, as in the absence of the information,
20  participants did not know the true risks presented by the Plan's investment in
21  Countrywide stock.

22      227. Defendants' omissions and incomplete statements alleged herein were Plan-
23  wide and uniform in that the Defendants failed to provide complete and accurate
24  information to any of the Plan's participants.

25      228. Defendants in this Count were unjustly enriched by the fiduciary breaches
26  described in this Count.

27      229. As a direct and proximate result of the breaches of fiduciary duties alleged
28  herein, the Plan, and indirectly Plaintiff and the Plan's other participants and

1    beneficiaries, lost a significant portion of their retirement investment.

2        230.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a),

3    29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan

4    caused by their breaches of fiduciary duties alleged in this Count.

5    **D.    Count IV:  Co-Fiduciary Liability.**

6        231.    Plaintiff incorporates by this reference the allegations above.

7        232.    This Count alleges co-fiduciary liability against the following Defendants:

8    all Defendants (the "Co-Fiduciary Defendants").

9        233.    As alleged above, during the Class Period the Co-Fiduciary Defendants were

10   named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto*

11   fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.

12   Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

13       234.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a

14   fiduciary, in addition to any liability which he may have under any other provision, for a

15   breach of fiduciary responsibility of another fiduciary with respect to the same plan if

16   knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a

17   breach. The Co-Fiduciary Defendants breached all three provisions.

18       235.    **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29

19   U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by

20   another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he

21   makes reasonable efforts under the circumstances to remedy the breach.  Each Defendant

22   knew of the breaches by the other fiduciaries and made no efforts, much less reasonable

23   ones, to remedy those breaches.  In particular, they did not communicate their knowledge

24   of the Company's improper activity to the other fiduciaries.

25       236.    Countrywide, through its officers and employees, engaged in highly risky

26   and inappropriate business practices, withheld material information from the market, and

27   profited from such practices, and, thus, knowledge of such practices is imputed to

28   Countrywide as a matter of law.

237. Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Countrywide's failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

238. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Countrywide knowingly participated in the fiduciary breaches of the Defendants in that it benefited from the sale or contribution of its stock at prices that were disproportionate to the risks for the Plan's participants. Likewise, the Monitoring Defendants knowingly participated in the breaches of the Investment and Administrative Committee Defendants because, as alleged above, they had actual knowledge of the facts that rendered Countrywide stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted the Defendants to breach their duties.

239. **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

240. The Monitoring Defendants' failure to monitor the Defendants, particularly the Investment and Administrative Committee Defendants, enabled that committee to breach their duties.

241. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost well over one hundred million dollars of retirement savings.

1    242.  Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),
2    1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the
3    Plan caused by their breaches of fiduciary duties alleged in this Count and to provide
4    other equitable relief as appropriate.

5    **E.    Count V:  Knowing Participation in a Breach of Fiduciary Duty.**

6    243.  Plaintiff incorporates the allegations contained in the previous paragraphs of
7    this Complaint as if fully set forth herein.

8    244.  To the extent that Countrywide is found not to have been fiduciary or to
9    have acted in a fiduciary capacity with respect to the conduct alleged to have violated
10   ERISA, Countrywide knowingly participated in the breaches of those Defendants who
11   were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief
12   as a result of participating in such breaches.

13   245.  Countrywide benefited from the breaches by discharging its obligations to
14   make contributions to the Plan in amounts specified by the Plan, contributing
15   Countrywide stock to the Plan while the value of the stock was inflated as the result of
16   Countrywide's highly risky and improper business practices, and providing the market
17   with materially misleading statements and omissions.  Accordingly, Countrywide may be
18   required to disgorge this benefit or a constructive trust should be imposed on treasury
19   shares of Countrywide stock which would have been contributed to the Plan, but for
20   Countrywide's participation in the foregoing breaches of fiduciary duty.

21                               **XII.  CAUSATION**

22   246.  The Plan suffered enormous losses because substantial assets of the Plan
23   were imprudently invested or allowed to be invested by Defendants in Countrywide stock
24   during the Class Period, in breach of Defendants' fiduciary duties.

25   247.  Defendants are liable for the Plan's losses in this case because: (a) most of
26   the Plan's investment in Countrywide stock was the result of the Defendants' decisions to
27   invest Employer Matching Contributions in the Plan in Countrywide stock and (b) as to
28   the portion of Plan's assets invested in Countrywide stock as a result of participant

1   contributions, the Defendants are liable for these losses because they failed to take the
2   necessary and required steps to ensure effective and informed independent participant
3   control over the investment decision-making process, as required by ERISA § 404(c), 29
4   U.S.C. § 1104(c), and the regulations promulgated thereunder.

5       248.  The Defendants also are liable for losses that resulted from their decision to
6   invest a majority of the assets of the Plan in Countrywide stock rather than cash or other
7   investment options, and clearly prudent under the circumstances presented here.

8       249.  Had the Defendants properly discharged their fiduciary and co-fiduciary
9   duties, including the monitoring and removal of fiduciaries who failed to satisfy their
10  ERISA-mandated duties of prudence and loyalty, eliminating Countrywide stock as an
11  investment alternative when it became imprudent, and divesting the Plan of Countrywide
12  stock when maintaining such an investment became imprudent, the Plan would have
13  avoided some or all of the losses that it, and indirectly, the participants suffered.

14          **XIII.  REMEDY FOR BREACHES OF FIDUCIARY DUTY**

15      250.  The Defendants breached their fiduciary duties in that they knew or should
16  have known the facts as alleged above, and therefore knew or should have known that the
17  Plan's assets should not have been invested in Countrywide stock during the Class
18  Period.

19      251.  As a consequence of the Defendants' breaches, the Plan suffered significant
20  losses.

21      252.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to
22  bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section
23  409 requires "any person who is a fiduciary. . . who breaches any of the. . . duties
24  imposed upon fiduciaries. . . to make good to such plan any losses to the plan. . . ."
25  Section 409 also authorizes "such other equitable or remedial relief as the court may
26  deem appropriate. . . ."

27      253.  With respect to calculation of the losses to the Plan, breaches of fiduciary
28  duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would

1   not have made or maintained their investments in the challenged investment and, instead,

2   prudent fiduciaries would have invested the Plan's assets in the most profitable

3   alternative investment available to them. Alternatively, losses may be measured not only

4   with reference to the decline in stock price relative to alternative investments, but also by

5   calculating the additional shares of Countrywide stock that the Plan would have acquired

6   had the Plan fiduciaries taken appropriate steps to protect the Plan. The Court should

7   adopt the measure of loss most advantageous to the Plan. In this way, the remedy

8   restores the Plan's lost value and puts the participants in the position they would have

9   been in if the Plan had been properly administered.

10       254.   Plaintiff and the Class are therefore entitled to relief from the Defendants in

11  the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the

12  Plan resulting from the breaches of fiduciary duties alleged above in an amount to be

13  proven at trial based on the principles described above, as provided by ERISA § 409(a),

14  29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the

15  breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§

16  1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant

17  to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-

18  fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by

19  ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable

20  law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such

21  other legal or equitable relief as may be just and proper.

22       255.   Under ERISA, each Defendant is jointly and severally liable for the losses

23  suffered by the Plan in this case.

24              **XIV. CLASS ACTION ALLEGATIONS**

25       256. **Class Definition.** Plaintiff brings this action as a class action pursuant to

26  Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of

27  Plaintiff and the following class of persons similarly situated (the "Class"):

28

-71-

1

2

3

      All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between January 31, 2006 and the present, and whose accounts included investments in Countrywide stock.

4

5

6

7

257. **Class Period.** The fiduciaries of the Plan knew or should have known at least by January 31, 2006 that the Company's material weaknesses were so pervasive that Countrywide stock could no longer be offered as a prudent investment for the retirement Plan.

8

9

10

11

12

13

258. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, based on the Plan's Form 5500 for Plan year 2005, 46,047 active participants in the Plan who participated in, or were beneficiaries of, the Plan during the Class Period.

14

15

16

259. **Commonality.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

17

18

      (a). whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

19

20

21

      (b). whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

22

      (c). whether Defendants violated ERISA; and

23

24

      (d). whether the Plan has suffered losses and, if so, what is the proper measure of damages.

25

26

27

28

260. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because: (1) to the extent Plaintiff seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(2), his claim on behalf of the Plan is not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiff

1   seeks relief under ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief
2   would affect all Class members equally.

3       261.  **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the
4   members of the Class and has retained counsel competent and experienced in class
5   action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in
6   conflict with those of the Class.

7       262.  **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is
8   warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the
9   members of the Class would create a risk of adjudications with respect to individual
10  members of the Class which would, as a practical matter, be dispositive of the interests of
11  the other members not parties to the actions, or substantially impair or impede their
12  ability to protect their interests.

13      263.  **Other Rule 23(b) Requirements.**  Class action status is also warranted
14  under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by
15  the members of the Class would create a risk of establishing incompatible standards of
16  conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally
17  applicable to the Class, thereby making appropriate final injunctive, declaratory, or other
18  appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law
19  or fact common to members of the Class predominate over any questions affecting only
20  individual members and a class action is superior to the other available methods for the
21  fair and efficient adjudication of this controversy.

22  <div align="center">**XV.  PRAYER FOR RELIEF**</div>

23      WHEREFORE, Plaintiff prays for:

24
25  A.    A Declaration that the Defendants, and each of them, have breached their
    ERISA fiduciary duties to the participants;
26
27  B.    A Declaration that the Defendants, and each of them, are not entitled to the
    protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);
28

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Countrywide stock;

F.    Actual damages in the amount of any losses the Plan suffered;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

DATED this 26th day of September, 2007.

BRAUN LAW GROUP, P.C.

Michael D. Braun (167416)
service@braunlawgroup.com
BRAUN LAW GROUP, P.C.
12400 Wilshire Blvd., Suite 920
Los Angeles, CA 90025
Telephone: (310) 442-7755
Facsimile: (310) 442-7756
Local Counsel for Plaintiff

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Derek W. Loeser
dloeser@kellerrohrback.com
Erin M. Riley
eriley@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384
Counsel for Plaintiff